385.    On April 15, 2010, BP issued its 2009 Sustainability Review, which BP made available to the investing public on its official website.  The 2009 Sustainability Review contained a Q&A session with Defendant Hayward in a section entitled "Group Chief Executive's Review." There, Defendant Hayward reemphasized the misrepresentation contained in BP's 2008 Annual Report (which he signed), that eight sites (including the Gulf of Mexico) completed the transition to OMS in 2008:

- Group Chief Executive's Review

*Question:*  What progress has BP made on safety during 2009?

*Answer:* Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS). The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement. I see it as the foundation for a safe, responsible and high-performing BP. ***Having been initially introduced at eight sites in 2008,*** the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. ***This means implementation is 80% complete.***

386.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward, as Chairman of GORC, was ultimately responsible for and charged with oversight and implementation of OMS;

(b)    Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico had not "beg[u]n the process of cutover to OMS" until Fall 2009, and that OMS had not been implemented in the Gulf of Mexico as of April 2010. Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the Gulf of Mexico as of April 2010;

(c)      Hayward made this statement, which reemphasized and confirmed the earlier statement made in the 2008 20-F that eight sites, including the Gulf of Mexico, had completed the transition to OMS despite knowledge that the Gulf of Mexico had not completed the transition to OMS in 2008;

(d)      Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico. Moreover, Hayward was aware or reckless in disregarding, that OMS was never meant to apply, and in fact, never did apply, to contracted third-party rigs, which accounted for the majority of BP's deepwater wells drilled in the Gulf of Mexico during the Relevant Period;

(e)      Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(f)      As members of GORC, Defendants Hayward and Inglis received documents that put them on notice that the Gulf of Mexico had not completed the transition to OMS;

(g)      An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(h)     Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(i)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements;

(j)     According to CW1 there was a company failure to implement an appropriate Operations Management Safety protocol which would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*; and

(k)     Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

387.    Additionally, the 2009 Sustainability Review, published April 15, 2010, which emphasized BP's systematic approach to safe and environmentally responsible operations, stated further, in part:

> BP's operating management system (***OMS) provides a single framework for all BP operations to follow,*** covering all areas from process safety, to personal health, to environmental performance.
>
> Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken. Its principles and processes are designed to simplify the organization, improve productivity, ***enable consistent execution*** and focus BP on performance.

388.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Because the 2009 Sustainability Review was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was required to review the 2009 Sustainability Review and make recommendations to the board concerning its adoption and publication; *see also* 2008 Form 20-F at 69;

(b)    



(d)    Defendants BP and Hayward misled investors by stating that the Gulf of Mexico operations had completed the transition to OMS when, in fact, *inter alia,* Defendant Hayward and other BP personnel testified in MDL 2179 that OMS had not been implemented in the Gulf of Mexico as of April 2010, and BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(e)    Hayward misled investors with regard to BP's OMS program, because BP did not intend for OMS to apply to BP's operations that were not fully-owned by BP, as was the case with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(f)      An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform Companywide process safety procedures; and

(g)      Defendant Hayward further misled investors regarding BP's OMS program given ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ Defendant Hayward knew that Gulf of Mexico joint ventures (such as the Macondo well) were "not in scope" of the BP Safety & Operations audit program.

### The 2009 Sustainability Report

389.    On April 15, 2010, BP issued its 2009 Sustainability Report, which was evaluated and recommended for publication by SEEAC prior to its publication. The Sustainability Report contained misrepresentations related to BP's capability to respond to oil spills:

- **Oil Spills**

BP recognizes the risk posed to the environment from spills and takes a range of measures to prevent any loss of hydrocarbons.

*Our approach*

Our strategy to address spills has three components:

Prevention: we seek to assure the integrity of vessels and pipelines used to transport oil and other hydrocarbons.

***Preparation: we seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and***

*international forums to coordinate contingency planning and emergency response.*

Performance: we record incidents, learn lessons and aim to reduce the number of losses from primary containment.

390.     Moreover, BP's 2009 Sustainability Report stressed BP's capability to operate safely, primarily through its implementation of OMS and commitment to improving process safety:

- **A Systematic Approach**

BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of "no accidents, no harm to people and no damage to the environment."

Our commitment to safe, reliable and responsible operations starts with the group chief executive Tony Hayward and his leadership team: a commitment that filters down through the organization and is regularly communicated to all staff.

Safety performance is a regular focus of the group chief executive's formal communications such as BP's quarterly results and in less formal communications such as his regular townhalls with BP staff. BP's leadership has continued to reinforce the importance of safety when undertaking regular site visits to BP facilities around the world and from all parts of the business.

"I am extremely proud of BP's 2009 safety performance – it reflects a sustained effort across all our operations over many years." – Tony Hayward, Group Chief Executive

*Promoting Safe Operations*

We are carrying forward our efforts on process safety, which is an integral part of our operating management system (OMS) and ingrained within our capability programmes. As participants in a second round of operations leadership sessions at MIT this year, the group chief executive and his executive team were instrumental in establishing the concept of continuous improvement to help drive systematic safety and reliability in our operations. Continuous improvement is a means of empowering our operations managers and supervisors, who are closest to our operational problems, to develop the necessary solutions.

***

- **Striving for Safe Operations**

*BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at every BP operation*

Taking a systematic approach is integral to improving safety and operating performance in BP operated sites. Our operating management system covers all areas from process safety, to personal health, to environmental performance.

***

*Unifying Way of Operating*

We have successfully introduced OMS at every refinery worldwide in advance of the internal expectations. Hugh Parsons, Vice President with responsibility for management processes in refining states that "the OMS framework has given us a common path, applicable across different sites and assets worldwide. It has provided a unifying way of operating. This is true not only for refining but across the whole of BP, where we have a much clearer definition of what 'good operations' looks and feels like, regardless of the business context."

***

- **Process Safety**

BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this.

Process safety involves applying good design principles, engineering and operating and maintenance practices to manage our operations safely.

*Process Safety Reporting*

To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, such as oil spills, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as inspections and tests of safety-critical equipment.

391.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP to be false at that the time, or were made with reckless disregard for the truth, for the following reasons, among others:

(h)   Because the 2009 Sustainability Report was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was

161

required to review the 2009 Sustainability Report and make recommendations to the board concerning its adoption and publication; *see also* 2008 Form 20-F at 69;

(i)      SEEAC, including Defendant Hayward, specifically discussed and reviewed the content of the "2009 Sustainability Review" and the companion document titled "2009 Sustainability Reporting," which were published simultaneously, before they were released to the public. ████████████████████████████████████████

████████████████████████████   ██████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████

██ ███ ████ ███ ██ ██████ ████ ████ █████ ███ ███
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████

***

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████

(j)      ██████████████████████████████████████████████

████████████████████████████   ██████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

       (k)     Defendants were also aware that BP safety and operations audits consistently uncovered facts that were contrary to public representations of improved process safety and operations. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

       (l)     The 2009 rig audit of the *Deepwater Horizon* confirmed that not all relevant personnel on the rig were knowledgeable about drilling and well operation practices including containing a blowout, and safety goals were not commonly known or properly communicated;

       (m)    The Presidential Commission concluded, "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk factors on the prospects of a successful cement job";

       (n)    According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements;

       (o)    BP's Gulf of Mexico operations had failed to implement BP's OMS in any robust manner and the individuals responsible for its implementation had been terminated or moved outside of Gulf of Mexico operations;

(p)      BP's highest officers had knowledge that its Gulf of Mexico operations had caused oil spills in 2008 and two of its rigs (the *Deepwater Horizon* and the *Atlantis)* had reported operational safety problems, which would have been reported to GORC and, as such, put Defendants on notice of the inadequacy of their safety processes in the Gulf of Mexico;

(q)      BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan, understated its exposure from drilling operations in the Gulf of Mexico, and lacked adequate internal and safety controls; and

(r)      According to BP's own internal reporting, decisions regarding the Macondo well "appear to have been made by the BP Macondo well team in an ad hoc fashion . . . This appears to have been a key causal factor to the blowout."

### *As the Truth Begins to Emerge, BP Continues to Deceive Investors*
### April 20, 2010

392.    On the evening of April 20, 2010, after the markets closed, the Macondo well suffered a significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater Horizon* killing 11 crew members and injuring many others. After attempts to stop the blowout failed, the surviving crew members abandoned ship, as the rig became engulfed in flames. Oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico.

### April 21, 2010

393.    On April 21, 2010, BP issued two press releases about the *Deepwater Horizon* explosion. In the first press release, BP confirmed a statement by Transocean reporting a fire aboard the rig. In the second press release, BP offered its full support to Transocean and said it "stood ready to assist" in responding to the tragedy. However, neither press release acknowledged that oil was currently leaking from the Macondo well into the Gulf of Mexico.

### April 22, 2010

394.    At approximately 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* rig sank, further damaging the riser that had connected the rig to the wellhead on the ocean floor.

**April 24 - 26, 2010**

395.    On Saturday, April 24, 2010, while the unsuccessful attempts to activate the BOP continued, ROVs discovered additional leaks in the broken riser. Although officials had initially estimated that it would take the ROVs 24 to 36 hours to deploy the BOP, by Monday, April 26, 2010, oil continued to spew into the Gulf of Mexico. This news caused BP ADSs to fall $1.97 per ADS, closing at $57.91 per ADS or more than 3% on April 27, 2010.  BP's ordinary shares suffered a similar decline.

396.    Beginning on April 26, 2010, Defendant Rainey, who had been assigned to the Unified Command, undertook the task to create a BP flow rate estimate, despite lacking prior experience calculating oil spill flow rates.   Initially consulting the online encyclopedia "Wikipedia," Rainey created or caused to be created several spreadsheets purporting to show a "best guess" of flow rate at 5,000 to 6,000 barrels per day.  Ultimately, Rainey developed his own methodology for estimating flow rates, which did not comport with industry standards, and applied it in a manner rife with mathematical and procedural inaccuracies.   None of the infirmities and inaccuracies in Rainey's work was contemporaneously known by Plaintiffs or investors at large.  Each time, Rainey's "analysis" yielded BP's desired result, which was a "best guess" of flow rate close to 5,000 barrels per day.  Unbeknownst to Plaintiffs and other investors, Rainey's flawed spreadsheets also showed a high flow rate of approximately 14,000 barrels per day.

397.    On April 28, 2010, NOAA's representative on the Unified Command expressed a concern that the flow rate was higher than the 1,000 barrels per day that previously had been

publicly reported by the Unified Command. Upon hearing this concern, a senior member of the Unified Command approached Defendant Suttles and asked for BP's flow rate estimate so that the Unified Command could update the publicly disclosed flow rate number. Suttles responded that BP's internal flow rate was between 1,000 barrels per day and 5,000 barrels per day, with 2,500 barrels per day being the most likely number. No document exists to support this statement by Suttles.

**W.    The April 28 - 29, 2010 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentations #42 and 43)]**

398.    On April 28, 2010, after the markets closed, in reliance upon Suttles' representation, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that NOAA had increased its estimate of the oil flow rate from 1,000 to only 5,000 barrels per day.

399.    During the joint press conference, Defendant Suttles again reiterated that BP's best estimate was that ***1,000 barrels of oil per day were flowing from the Macondo well.*** In addition, Suttles stated, in part, as follows:

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak. This leak is just beyond the top of the blowout preventer in the pipe work called the riser. Given the location, ***we do not believe this changes the amount currently estimated to be released.***

400.    The following day, April 29, 2010, Department of Homeland Security Janet Napolitano announced that "*today I will be designating that this is a spill of national significance.*"

401.    On the same day, April 29, 2010, Defendant Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well. For example:

(a)    During an interview with CBS's "The Early Show," Suttles stated, in part (with emphasis added): "*I think that somewhere* **between one and five thousand barrels a day is probably the best estimate** *we have today."*

(b)    Similarly, during an interview on ABC's "Good Morning America," Suttles, stated, in part (emphasis added): "I think **between one and 5,000 barrels a day is a reasonable estimate**."

(c)    Likewise, on NBC's "Today Show," Suttles stated, in part (emphasis added): "I actually don't think there's a difference between NOAA's view and our view.  I would say **the range is 1,000 to 5,000 barrels a day**."

402.    On the news that spill estimates had increased to 5,000 barrels per day and Secretary Napolitano's designation of the spill as one of "national significance," BP ADSs fell from $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS or more than 8%.  BP's ordinary shares suffered a similar decline.

403.    Although the price of BP securities fell in response to this news, the price of BP's securities were still artificially inflated due to the false and misleading statements made by Defendant Suttles on April 28 and 29, 2010, as well as those made by BP, Suttles, Rainey, McKay, Hayward, and Dudley in the days and weeks ahead (as alleged below).

### X.  BP's False and Misleading Misstatements In SEC Filings Made on April 29 - 30, 2010 and on Its Corporate Website on April 30, 2010

404.    On April 29, 2010, BP filed a Form 6-K with the SEC addressing the Deepwater Horizon explosion and sinking and containing quotes by Defendant Hayward.  In it, BP stated in part (emphasis added): "Efforts continue to stem the flow of oil from the well, **currently estimated at up to 5,000 barrels a day**."

405.    On April 30, 2010, BP filed a Form 6-K with the SEC addressing its response effort, which contained quotes from Defendant Hayward.  In it, BP stated in part (emphasis added): "Efforts to stem the flow of oil from the well, ***currently estimated at up to 5,000 barrels a day***, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the flow out preventer (BOP) on the sea bed."

406.    On April 30, 2010, BP published on its corporate website the same 5,000 barrels per day oil flow estimate as articulated in its Form 6-K filed with the SEC that day.

**Y.    Additional Reasons Why The Statemens On April 28 - 30, 2010 Were False And Misleading And Were Made With Scienter**

407.    Each of the misrepresentations in Sections W. and X. above were materially false or misleading when made, and were known by Defendant Suttles (Section W.) and BP (Section W. and X.) to be false at that time, or were made with reckless disregard for the truth, because they falsely represented that the amount spilling from the Macondo well was between 1,000 and 5,000 barrels of oil per day.  Indeed, as discussed herein, BP agreed on November 15, 2012 to the pay the third-largest penalty in the SEC's history, $525 million, to settle securities fraud charges arising, in part, from the misrepresentations described in Sections W. and X. above.

408.    In contrast to Suttles's and BP's misrepresentations on April 28-30, 2012 (as set forth in Sections W. and X. above) that the oil flow rate was between 1,000 and 5,000 barrels per day, they failed to disclose that the Company's then-existing, internal "best estimate" of the amount of oil flowing from the well, unbeknownst to the investment markets, was in actuality ***many multiples*** greater.

409.    When the statements set forth in Sections W. and X., which caused BP common stock and ADSs to trade at artificially high prices, were made, BP and Suttles knew them to be false or were severely reckless in not knowing them to be false.  BP admitted in its November

15, 2012 Consent with the SEC that by April 28, 2010, BP had possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 barrels per day.  They were:

(a)     By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates ***between 64,000 barrels per day and 146,000 barrels per day***.

(b)     On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of 100,000 barrels per day.

(c)     By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 barrels per day.

(d)     On April 27, 2010, a BP engineer estimated the oil flow rate to be approximately 5,000 to 22,000 barrels per day on the basis of temperature readings along the riser pipe, among other factors.

(e)     By April 28, 2010, Defendant Rainey's own spreadsheets showed a flow rate ranging up to over 14,000 barrels per day.

410.     In addition, by April 28, 2010, BP had learned that there was oil leaking also from the "kink," the place where the riser pipe had bent before it came to rest on the ocean floor.  This fact represented a totally separate leak point, the flow from which would necessarily add to the total being calculated and reported.

411.     Given that BP possessed data, estimates, and calculations significantly higher than 5,000 barrels per day, for BP and Suttles to publicly disclose that the flow rate had been estimated by BP as ranging "up to 5,000" barrels per day was knowingly and materially false and

misleading.   Moreover, failing to disclose even the existence of data, estimates, and calculations showing a higher flow rate also constituted a material omission of information regarding the oil flow rate.

412.    Further, Rainey's deposition testimony in MDL 2179 indicated that one internal estimate of the amount of oil flowing from the well was as high as 92,000 barrels per day. These figures were provided to BP's senior management in two internal BP documents dated April 26, 2010 and April 27, 2010 – i.e., **before** Suttles made his public misrepresentations. In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles's misrepresentations and stated, in part, as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. *Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.*
>
> ***
>
> BP has also turned over another document dated April 26 [2010] which includes a 5,000 barrel per day figure as well. *So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels* that were spilling into the Gulf every day.

**May 3, 2010**

413.    On May 3, 2010, after initially blaming Transocean and others for the Macondo well blowout and spill, BP admitted that it was fully responsible for the disaster in the Gulf of Mexico. More specifically, Defendant Hayward told NPR's Steve Inskeep that: "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . . We will absolutely be paying for the cleanup operation. There is no doubt about that. It's our responsibility – we accept it fully." On this news, the Company's ADSs fell from $52.15 per ADS on Friday, April 30,

2010 to close at $50.19 per ADS on Monday, May 3, 2010, a decline of $1.96 per ADS or almost 4%. BP's ordinary shares suffered a similar decline.

### Z. BP's False and Misleading Statements in Its SEC Filing on May 4, 2010

414. On May 4, 2010, BP filed a Form 6-K with the SEC, which contained quotes from Defendant Hayward and in which BP stated in part (emphasis added): "[C]urrent estimates by the U.S. National Oceanic and Atmospheric Administration (NOAA) suggest *some 5,000 barrels (210,000 U.S. gallons) of oil per day* are escaping from the well."

415. The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by BP to be false at that time, or was made with reckless disregard for the truth. BP omitted from this Form 6-K the material fact that, by that date, its own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX.Y. and IX.G.G. herein. For the same reasons, BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico. Likewise, for the same reasons, it was misleading to use NOAA's 5,000 barrels per day as the "best estimate" as the basis of any public disclosure when BP itself had its own, higher range of flow rate estimates.

### AA. The May 5, 2010 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #45)]

416. On May 5, 2010, Defendant Hayward conducted an interview with journalists from the Houston Chronicle, at BP's offices in Houston. In reference to the oil flow rate at the Macondo well, Hayward stated, "*A guesstimate is a guesstimate. And the guesstimate remains 5,000 barrels a day.*"

417.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth. Hayward omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX.Y. and IX.G.G. herein.   For the same reasons, Hayward also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.

**BB.    Defendant McKay's May 10, 2010 False and Misleading Statements to Congress**

418.    On May 10, 2010, Defendant McKay appeared before the Committee On Transportation And Infrastructure and said the following in response to a question about whether "5,000 barrels per day [was] the most accurate" figure for the amount of oil leaking into the Gulf:

> [McKay] **That is our best estimate**.  Obviously, it's continually being looked at.  As you may know, we've gotten this riser insertion tube to work, and we're getting increased volumes at the surface where we can actually measure.  And then, I believe there is a new small task force that has been put together under direction of Unified Command to get all the experts together in a room and try to understand, with the latest available data, is there a more accurate estimate?  But we do recognize there is a range of uncertainty around the current estimate.

The following exchange ensued later during this same hearing:

> [Rep. LAURA A. RICHARDSON]: . . . Why is there a disagreement between the total amount of oil that is leaking?  BP has said 5,000, other reports are saying otherwise. Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?

Mr. McKay.  I think there are a range of estimates and it is impossible to measure.  That is the reality.  What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface.  And those two added together is the estimated volume.  It has been clear from day one there is a large uncertainty range around that.

Mr. Richardson.  Is it possible it could possibly be the larger number that has been reported?

**Mr. McKay**.  It is theoretically possible.  **I don't think anyone believes it is quite that high that has been working on this.  I believe the uncertainty range is around that 5,000 number, and it could be higher.  But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.**

419.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the truth.  McCay omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX.Y. and IX.G.G. herein.  For the same reasons, McCay also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.  In reality, BP's own internal estimates were significantly closer to the 70,000 barrels per day McKay dismissed as someone working on the spill response would not believe.

### CC.    The May 14, 2010 False and Misleading Statements

420.    On May 14, 2010, Defendant Suttles appeared on ABC's "Good Morning America," during which interview he stated in part (emphasis added):   "[O]urselves and the

people from NOAA and others believe that *something around 5,000, that's actually barrels a day, is the best estimate*."

421.   Also on May 14, 2010, Defendant Suttles appeared on NBC's "Today Show," where he was asked whether BP had "underplayed" the size of the leak and "[I]s it possible that you are actually leaking more than 5,000 barrels a day?  Yes or no."  In response, Suttles replied in part:  "I don't think it is wildly different than that number...it could be a bit above or below."

422.   Additionally on May 14, 2010, on CNN.com, BP publicly reasserted the 5,000 barrels per day number and directly rejected a Purdue University professor's estimate that the flow rate was up to 70,000 barrels per day.  Specifically, Defendant Dudley, who at the time was BP's Managing Director and one of its top officials coordinating the Company's oil spill response, called the 70,000 barrel-per-day figure "not accurate at all" and said it "isn't anywhere I think within the realm of possibility."  As discussed below, Dudley essentially disavowed this statement altogether as having been false just two weeks later, on May 30, 2010.  On or about July 27, 2010, BP announced that Dudley would become BP's new CEO, succeeding Hayward, which he did on October 1, 2010.

423.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by BP and Suttles to be false at that time, or were made with reckless disregard for the truth.  Suttles omitted his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX.Y. and IX.G.G. herein.  For the same reasons, BP and Suttles also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000

174

barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico. Likewise, for the same reasons, it was misleading to use NOAA's 5,000 barrels per day as the "best estimate" as the basis of any public disclosure when BP itself had its own, higher range of flow rate estimates.

424.    Indeed, as BP admitted in its November 15, 2012 Consent with the SEC, a BP senior engineer performed work that resulted in an estimated range of flow rates between 14,000 and 96,000 barrels per day, which he shared internally with BP executives during the second week of May 2010.  That same engineer read on CNN.com that BP had publicly reasserted the 5,000 barrels per day flow rate while refuting the Purdue University professor's figure of 70,000 barrels per day, and after doing so, wrote an email to a senior executive within BP's Exploration and Production business segment and a junior executive tasked to support him, stating:

> I just read an article on CNN (May 14, 2010 1:00 pm) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd figure.  With the data and knowledge we currently have available we cannot definitively state the oil rate from this well.  ***We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd*** depending on a number of unknown variables…   We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information.

This email failed to spur any discussion within BP as to whether it should update or correct its prior disclosures about the 5,000 barrels per day figure.

**DD.    The May 17, 2010 False and Misleading Statements**

425.    On May 17, 2010, at a Unified Command press briefing, Defendant Suttles was asked if BP was "certain how much is actually leaking and that it is about that 5,000 barrel figure we used to hear before?"  In response, he stated in part (emphasis added): "***[T]hat's our best estimate today***.  Clearly people are constantly asking that question."

426.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Suttles to be false at that time, or was made with reckless disregard for the truth. Suttles omitted his statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX.Y. and IX.G.G. herein.  For the same reasons, Suttles also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.

### EE.    The May 21, 2010 False and Misleading Statements

427.    On May 21, 2010, Defendant Suttles appeared once again on ABC's "Good Morning America," where he was asked point-blank as to whether he and BP were being truthful in their oil flow estimates.  Specifically, this exchange occurred:

Q:  People have really had enough of this.  You know, initially, you were saying 5,000 barrels were leaking.  Now we can see for ourselves that it's far more than that.   Could be – approaching 100,000.   Did you deliberately underestimate the size of the spill and mislead the public?

Suttles:  Robin, you know, from the beginning, we've, we, we've worked with the government on this estimate.  In fact, I should actually point out that the 5,000 barrels a day… That was not just BP's estimate.  That was the estimate of the Unified Command, including NOAA and the Coast Guard. ***And that's the best estimate we have.***  We can't put a meter on this thing.  We can see what you can see.  We can see what's on the surface. …

428.    Also on May 21, 2010, Suttles appeared at a Unified Command press briefing, where in response to a question he stated in part (emphasis added):

[W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times.  And we've said since quite early on

in this that ***our best estimate was around 5,000 barrels a day***…   So ***at the moment, that's our best estimate***.

429.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by Suttles to be false at that time, or were made with reckless disregard for the truth.   Suttles omitted from his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX.Y. and IX.G.G. herein.   For the same reasons, Suttles also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico. Likewise, for the same reasons, it was utterly misleading to use NOAA's 5,000 barrels per day as the "best estimate" as the basis of any public disclosure, or to reference the Unified Command, NOAA, and the Coast Guard as evidence of the validity of such a statement, when BP itself had its own, higher range of flow rate estimates.

**FF.    The May 22, 2010 False and Misleading Statements**

430.    On May 22, 2010, Defendant Suttles was interviewed on NPR's "Weekend Edition."  During the course of the interview, Suttles made repeated misrepresentations about the oil flow rate from the Macondo well, including among others:

> Q:  And how much oil is billowing into the Gulf right now?
>
> Suttles:   Well, Scott, I precisely don't know.   We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others.   We can monitor what comes out of that pipe, but that's visual.   It's very difficult to measure that.   There's no meter.   But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at the difference.   ***And***

*those are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do…*

Q:    Now…there's independent scientists who've made their own estrimates at NPR's request, and they've come up with a substantially higher figure than 5,000.  They say as much as 70,000 barrels a day.

Suttles:  *I've heard those [70,000 barrels a day] estimates and seen them and I don't believe it's possible that it's anywhere near that number*… since I can't meter it, I can't actually say it couldn't be.  But *all of our techniques say that that's highly unlikely.*  And I think some of the reasons these estimates may not be able to accurately calculate is there's a large volume of gas coming out of the end of that pipe with the oil.  And in addition to that, we, particularly over the last few days, when we've had good weather, we've actually seen the size of the spill and the amount of the oil on the surface go down.  *So those are the things that lead me to belive that those estimates are way too high*.

Q:  What I'm trying to understand is if, and I will split the difference, but let's say that it's 30,000 barrels a day that are spillin – if you try to top kill…do you risk using a technique that could make the spill even worse?

Suttles:  No, I don't believe that's the case, Scott, and *we don't think the rate's anywhere near that high*.

431.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by Suttles to be false at that time, or were made with reckless disregard for the truth.   Suttles omitted from his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX.Y. and IX.G.G. herein.  For the same reasons, Suttles also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.  Likewise, for the same reasons, it was misleading to reference NOAA and the Coast Guard's role in estimating the oil flow rate as evidence of the validity of Suttles's statements reaffirming the

5,000 barrels per day figure and refuting the 30,000 and 70,000 barrels per day figures, when BP itself had its own, higher range of flow rate estimates.

### GG.   Additional Reasons Why The Statements During April 30 – May 22, 2010 Were False And Misleading And Were Made With Scienter

432.   Each of the misrepresentations in Sections IX.W., IX.X., IX.Z.-F.F. above were materially false or misleading when made, and were known by the speaking Defendant(s) and those Defendant(s) to whom each such statement was attributable to be false at that time, or were made with reckless disregard for the truth, because they falsely represented that the amount spilling from the Macondo well was approximately 5,000 barrels of oil per day and/or rejected the idea that the flow rate could be higher.  Indeed, as discussed herein, BP agreed on November 15, 2012 to the pay the third-largest penalty in the SEC's history, $525 million, to settle securities fraud charges arising, in part, from the misrepresentations described in Sections IX.W., IX.X., IX.Z.-F.F. above.

433.   In contrast to the misrepresentations in Sections IX.W., IX.X., IX.Z.-F.F. above, Defendants failed to disclose that the Company's then-existing, internal "best estimate" of the amount of oil flowing from the well, unbeknownst to the investment markets, was in actuality *many multiples* greater.  When the statements set forth in Sections IX.W., IX.X., IX.Z.-F.F., which caused BP common stock and ADSs to trade at artificially high prices, were made, the speaking Defendant(s) and those Defendant(s) to whom each such statement was attributable knew them to be false or were severely reckless in not knowing them to be false.  In addition to the *five* pieces of data, estimates, or calculations that BP possessed by April 28, 2010 showing flow rates significantly higher than 5,000 barrels per day (as discussed in paragraphs IX.Y. above), BP admitted in its November 15, 2012 Consent with the SEC that between April 30, 2010 and May 24, 2010, BP generated or was aware of *eleven* additional pieces of data,

179

estimates, and calculations - - of which Suttles received at least six, Rainey received at least four, and Hayward knew of all eleven - - showing a range of flow rates **significantly higher than 5,000 barrels per day**.  They were:

(a)     On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates **from 5,000 barrels per day to 40,000 barrels per day**.

(b)     In early May 2010, a video analysis by a BP engineer resulted in an estimate of **20,000 barrels per day**, attributable to just the riser pipe.

(c)     On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates **from 37,000 to 87,000 barrels per day**.

(d)     On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be "ruled out" that the flow rate was "in the order of **40,000 bopd**."

(e)     On or about May 10 and May 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates **from 14,000 bopd to 96,000 bopd**.  This senior engineer shared his work internally with senior BP executives during the second week of May 2010.  As described above, on May 15, 2010, he expressed concerns in an email to a senior and a junior executive in BP's Exploration and Production business regarding the Company's public statements reaffirming the 5,000 barrels per day figure and refuting a professor's calculated estimate of 70,000 barrels per day.  In the email, this engineer stated that the flow rate could be anything up to 100,000 barrels per day.

(f)     From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 barrels per day.  The critique identified what the BP engineer stated were potential errors made by that professor that,

when corrected for, yielded a revised estimate of 15,000 barrels per day, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made.

(g)     On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer yielded a flow rate calculation of 86,600 barrels per day, based on the then-estimated pressure.

(h)     From May 19 to May 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool ("RITT") showed average collection rates of approximately 5,000 barrels per day for a 12-hour period, capturing only a portion of the oil leaking from the riser, therefore indicating that the total amount of oil leaking was in excess of 5,000 barrels per day.

(i)     On May 22, 2010, an external surface expression analysis showed a range of estimated flow rate from 6,154 to 11,609 barrels per day.

(j)     On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 barrels per day.

(k)     On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour perio from midnight to midnight, despite the fact that it was not  collecting all of the oil flowing out from the well, therefore indicating again that the total amount of oil leaking was in excess of 5,000 barrels per day.

434.    On May 27, 2010 the Flow Rate Technical Group ("FRTG"), a group of scientists and engineers from federal agencies and universities charged with creating an estimate of the oil

flow rate from the Macondo well, issued its first public report and statement, setting forth a flow rate estimate range of 11,000 barrels per day to 25,000 barrels per day.

435.    The same day, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

> *I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest.* I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming. So my attitude is *we have to verify whatever it is they say about the damage*.

> This is an area, by the way, where I do think our efforts fell short. And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front. But I do believe that *when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day,* that was based on satellite imagery and satellite data that would give a rough calculation. *At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like.*

436.    It is not surprising that BP, Suttles, and Rainey continuously misrepresented the known amounts of oil that were being released from the well. As noted in a *Rolling Stone* article dated June 8, 2010 (emphasis added): "***For BP, the motive [to downplay the amount of oil seeping into the Gulf] is financial****. Under the Clean Water Act, the company could owe fines of as much as $4,300 for every barrel [of oil] spilled, in addition to royalties for the oil it is squandering."*

437.    Additionally, information regarding the oil flow rate was material to BP's investors, because the amount of oil spilled would inform any consideration of the costs of offshore and onshore oil spill response, claims for natural resource damage under the Oil Pollution Act of 1990 [33 U.S.C. §2701 *et seq.*], penalties for strict liability under the Clean Water Act [33 U.S.C. §1251 *et seq.*], as well as other potential liabilities arising from claims, lawsuits, and enforcement actions related to the explosion and sinking of the Deepwater Horizon rig and the resultant oil spill.

**HH.** ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████

438. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

439. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

(a) ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(b)

███████████████████████████████████████████████████

████████████████████████

(c)  ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

(d)  ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████   ███████████

██████████  ████████████████████████████████████████



440.

441.

## X.    DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSSES

442.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  Throughout the Relevant Period, the market prices of BP securities (including those purchased by Plaintiffs) were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  For example, prior to the *Deepwater Horizon* incident, securities analysts touted BP's renewed dedication to safety and BP's operations in the Gulf of Mexico as one of the main focuses for BP's future results:

> A February 28, 2008 analyst report from JP Morgan stated that "Safety and operations: although BP has already made significant progress in this area through the implementation of the Baker panel recommendation and their 'sixpoint plan,' safety and operations remain one of BP's main priorities."

> An October 9, 2009 analyst report from Bank of America stated that "[w]e believe that the focus of results will center around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . .

> A February 1, 2010 analyst report from Dolmen Stockbrokers stated "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

> A March 3, 2010 analyst report from Bank of America stated that "the development of recent deepwater discoveries in the GoM (eg, Tiber field) along with further growth from TNKBP is [sic] set to be the key drivers."

> A March 3, 2010 analyst report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

> A March 12, 2010 analyst report from Bank of America stated that "whilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM—particularly in the Lower Tertiary area—is second to none and are clearly taking a positive view here."

443.    When the truth became known, the prices of BP securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Plaintiffs.

444.    The relevant truth about BP's operations slowly emerged following the April 20, 2010 explosion on the *Deepwater Horizon* and BP's failed efforts to control the resulting oil spill.  Immediately prior to the explosion, BP's ADS traded at approximately $60.48 per ADS, and its ordinary shares traded at 655.4 pence per share on the LSE.  Following the explosion, BP ADS and ordinary shares began a nearly continuous decline as the artificial inflation created by the Defendants' misrepresentations and material omissions dissipated from the price of the securities.

445.    Specifically, on April 26, 2010, government officials announced that attempts to stop the spill had failed and that oil was flowing into the Gulf of Mexico.  This news caused the price of BP securities to plummet.  Specifically, BP's ADSs declined $1.97 per ADS, from $59.88 per ADS on Friday, April 23, 2010 to close at $57.91 per ADS on Monday, April 26, 2010, while BP's ordinary shares fell from 639.7 pence per share on the LSE on April 23, 2010, to close at 626.8 pence per share on April 26, 2010, a decline of 12.9 pence per share.  The declines are directly related to the market absorbing information revealing risks BP concealed throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

446.    After the market closed on April 28, 2010, NOAA held a press conference during which it increased its estimate of the amount of oil spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day – five-times greater than that previously estimated by BP.  On April 29, 2010, Homeland Security Secretary Janet Napolitano declared the spill a crisis of "national significance."  This news caused the price of BP securities to fall again.  Specifically, BP ADSs fell from a closing price of $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on

April 29, 2010, a decline of $4.78 per ADS or more than 8%, while BP ordinary shares fell from 625.0 pence per share on the LSE on April 28, 2010, to 584.2 pence per share on April 29, 2010, a decline of 40.8 pence per share.  The declines are directly related to the market absorbing information revealing risks BP concealed throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a legitimate spill response plan, that the Company's statements about reforming BP's safety profile were false, and about the amount of oil believed to be spilling into the Gulf on a daily basis.

447.    On April 30, 2010, when it was reported that the oil slick caused by the disaster reached Louisiana's coastline, BP ADSs closed at $52.15 per ADS, a decline of over $8.00 per ADS since April 20, 2010.  BP's ordinary shares had declined nearly 80 pence per share over the period.  The declines are directly related to the market absorbing information revealing risks BP concealed throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

448.    In the days and weeks that followed, additional news and information emerged on a seemingly continuous basis further revealing BP's wanton disregard for conducting its operations in a safe manner and the lack of any legitimate spill response plan by BP.  These revelations caused BP's ADSs and ordinary shares to plummet further.

449.    On May 3, 2010, BP claimed responsibility for the cleanup efforts related to the spill, and Defendant Hayward stated: "This is not our accident, but it's our responsibility."  The Company's ADS fell from $52.15 to $50.19, a decline of 3.8%.  The Company's ordinary shares were not traded on the LSE on May 3rd, due to a holiday, but closed at 575.5 pence per share on April 30, 2010, and opened at 546 pence per share on May 4, 2010, representing a decline of

5.1%.   The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

450.   On May 6, 2010, BP commenced its attempt to contain the spill with a large dome-like structure, to be placed over the Macondo well.  On May 8, 2010, BP disclosed that the containment dome efforts had failed.  At this time, tar had begun to wash up on the Alabama coast.  On May 10, 2010, BP released a statement updating the public on the Gulf of Mexico oil spill response and revealed that oil spill costs to date had reached $350 million.  In reaction to this news, BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on Monday, May 10, 2010, a decline of $0.31 per ADS; BP's ordinary shares fell from 553.9 pence per share to 549.2 pence per share over the same period.  The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

451.   On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress Gulf Well Failed Tests Before Blast."  The article stated, in relevant part:

> A Gulf of Mexico oil well failed a pressure test hours before a drilling rig exploded last month, an executive for well owner BP Plc told the U.S. House Energy Committee that's investigating the incident.
>
> Such pressure tests are aimed at ensuring the integrity of cement poured into the well to keep out natural gas, said Committee Chairman Henry Waxman, a California Democrat, citing a report to the panel from James Dupree, BP senior vice president for the Gulf. The tests before the April 20 blast showed "discrepancies" in pressure levels, Waxman said.

*             *             *

"BP, one of the largest oil companies, assured Congress and the public that it could operate safely in deep water and that a major oil spill was next to impossible," Waxman said. "We now know those assurances were wrong."

\*       \*       \*

'Serious Questions'

"BP promised to make safety its number one priority," Stupak said. "This hearing will raise serious questions about whether BP and its partners fulfilled this commitment. The safety of its entire operations rested on the performance of a leaking and apparently defective blowout preventer."

452.    These revelations caused BP ADSs to close at $48.50 per share on May 12, 2010, a decline of $0.24 per ADS from the previous day's closing price and approximately $11.98 per ADS since April 20, 2010.  Similarly, BP's ordinary shares in London closed at 541.6 pence per share that day—down 3.9 pence from the previous day and 113.8 pence per share (-17.4%) in comparison to April 20, 2010.

453.    On May 13, 2010, the *Wall Street Journal* published an article entitled, "Red Flags Were Ignored Aboard Doomed Rig."  This article stated, in relevant part:

Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed Deepwater Horizon rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal*.

454.    On May 13, 2010, as a result of these continuing revelations about BP's operations, BP ADSs closed at $48.10 per ADS, $0.40 per share below the previous day's closing price.  BP's ordinary shares increased on this date, but in an amount that was restrained by this disclosure. This decline is directly related to the market learning of BP's process safety deficiencies.

455.    On May 14, 2010, the *Wall Street Journal* published an article entitled "BP Wasn't Prepared for Leak, CEO Says."  This article stated, in relevant part: