BP has been particularly vulnerable to criticism because among the large oil companies it is by far the biggest player in deepwater oil exploration. Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with an underwater oil leak at this depth.

Mr. Hayward, speaking to a small group of journalists Wednesday night in Houston, admitted the oil giant had not had the technology available to stop the leak.  He also said in hindsight it was "probably true" that BP should have done more to prepare for such an emergency of this kind.

"It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he said.

456.    On May 14, 2010, due to these revelations, BP's shares dropped $1.23 per ADS to close at $46.87 per share.  BP's ordinary shares suffered a similar decline.  The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically, that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

457.    On May 24, 2010, BP announced that the costs for addressing the Gulf oil spill had more than doubled, from $350 million to $760 million.  Additionally, BP announced that it was recovering less oil than it expected.  Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, the Company's ADSs fell from $43.86 per ADS on Friday, May 21, 2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS; BP's ordinary shares fell from 506.7 pence per share to close at 493 pence per share on May, 24, 2010.

458.    On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy kill mud into the well so that it reduced the pressure and then the flow from the well.

459.    However, on Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed. The failure of

the "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells. The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked investors. As noted by ABC News on Saturday, May 29, 2010: "We begin tonight with **breaking news** from the Gulf. **After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed.... That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf. This is another crushing blow when it comes on what is now day 40 of this crisis."** Similarly, on that same day, the Agence France Presse reported, in part, that: "**The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history. . ."** Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "**slaughtered in London trading on Monday."**

460.    Also on May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig." This article stated, in relevant part:

> Internal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig far earlier than those the company described to Congress last week.

> \*       \*       \*

> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control." And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

461.    On May 30, 2010, Defendant Dudley conducted a series of interviews with U.S. media outlets in which he admitted that BP's original oil flow estimates – which he himself had personally reiterated just *two weeks prior* – were vastly understated. On these disclosures, the Company's ADSs fell from $42.95 per ADS on Friday, May 28, 2010 to close at $36.52 per

ADS on Tuesday, June 1, 2010, a decline of $6.43 per ADS or approximately 15%. BP's ordinary shares suffered a similar decline.

462.    On June 1, 2010 (the first trading day since the failure of the "top kill" effort), United States Attorney General, Eric Holder, reported that the DOJ opened formal criminal and civil probes of BP. News of the Attorney General's action and BP's inability to cap the well with its "top kill" procedure sent its ADSs tumbling nearly 15%, to close on June 1, 2010 at $36.52 per ADS, on heavy trading volume. Likewise, the Company's ordinary shares fell 64.8 pence over the period to close at 430 pence. This closing price on June 1, 2010 represents a cumulative decline in the value of BP's ADSs of nearly $24.00 per ADS since April 20, 2010, or approximately 40%. Moreover, the decline over this period in BP's ordinary shares was more than 225 pence, representing a decline of more than 34% since the closing price on April 20, 2010. These declines are directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

463.    On June 2, 2010, Defendant Hayward admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because *"[w]hat's undoubtedly true is that we did not have the tools you would want in your tool kit"* to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion.

464.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP securities. On this news, the Company's ADSs fell from $34.68 per ADS on June 8, 2010 to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS or almost 16%. BP's ordinary shares suffered a similar decline.

465.    Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010. An Associated Press article published on the afternoon of June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."

466.    On June 14, 2010, BP's Board of Directors officially met to discuss suspending the Company's dividend payments in light of the Company's agreement to set up a $20 billion claim fund for damages caused by the Deepwater Horizon catastrophe.  On that date, *The New York Times* reported, in part, as follows:

> To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually. Senate Democrats are asking BP to set up a $20 billion cleanup fund. BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds. ***But in response to the federal government's requests, BP's board met Monday to consider its options.*** A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called. ***A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.***

According to another news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."  On this news, the Company's ADSs fell from $33.97 per ADS on Friday, June 11, 2010, to close at $30.67 per ADS on Monday, June 14, 2010, a decline of $3.30 per ADS or almost 10%.  BP's ordinary shares suffered a similar decline.

467.    The next day, on June 15, 2010, the FRTG released its latest public report, revising its oil flow rate estimates upward again, to between 35,000 barrels per day and 60,000

barrels per day.  On this news, the Company's ordinary shares fell from 355.45 pence per share on June 14, 2010 to close at 342.00 pence per share on June 15, 2010, a decline of 13.45 pence per share or almost 3.8%.  The FRTG maintained this estimate until August 2, 2010, when it issued its final report, estimating the oil flow rate at between 52,700 barrels per day and 62,200 barrels per day during the course of the leak, meaning a total of 4.9 million barrels of oil was spilled overall.

468.   On June 21, 2010, at 2am EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2 billion.  The $2 billion estimate is about $33 million per day, compared with an estimate on June 14 of $1.6 billion or about $30 million per day.  Also, on June 21, BBC interviewed a Deepwater Horizon worker, Tyrone Benton, who claimed to have spotted a leak in safety equipment weeks before the explosion.  Benton claimed the leak in the blowout preventer was not fixed at the time, but instead the faulty device was shut down and a second one used.  Benton said: "We saw a leak on the pod, so by seeing the leak we informed the company men.  They have a control room where they could turn off that pod and turn on the other one, so that they don't have to stop production."   He said to repair the control pod would have meant temporarily stopping drilling work on the rig at a time when it was costing BP $500,000 per day to operate the Deepwater Horizon.

469.   On this news, BP ADS fell $1.43 or 4.5% and BP ordinary shares fell 7.95 pence or 2.2%. on June 21.  On June 22, BP ADS fell an additional 65 cents or 2% and BP ordinary shares fell 15.30 pence or 4%.

470.    On June 25, 2010, at 2am EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2.35 billion.  There was also concern that tropical storm Alex may disrupt the clean-up response.

471.    On these news, BP ADS fell $1.72 or nearly 6% and  BP ordinary shares fell 20.65 pence or 6% on June 25.

472.    Governmental investigations following the oil spill have primarily blamed BP for the initial explosion and the ensuing oil spill.  For example, the Interior Department Report (dated September 14, 2011) states:

> The loss of life at the Macondo site on April 20, 2010, and the subsequent pollution of the Gulf of Mexico through the summer of 2010 were the result of poor risk management, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the Deepwater Horizon.

> BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.

## XI.    NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

473.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

474.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

475.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such

statements because, at the time each statement was made, the speaker knew the statement was false or misleading

## XII.  PLAINTIFFS' RELIANCE IS PRESUMED THROUGH THE FRAUD-ON-THE MARKET DOCTRINE

476.  To the extent available, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)  The omissions and misrepresentations were material;

(c)  The Company's ADSs traded in efficient markets;

(d)  The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

(e)  Plaintiffs Alameda County and State-Boston purchased BP ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

477.  At all relevant times, the markets for BP ADSs and ordinary stock were efficient for the following reasons, among others: (a) BP filed periodic reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.  Plaintiffs relied on the price of BP ADSs and common stock, which reflected all the information in the market, including the misstatements by Defendants.

## XIII. PLAINTIFFS' DIRECT RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

478.

479.

480.

481. 

482. 

483.

484. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

485. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

486. ████████████████████████████████████████████
██████████████   ██████████████████████████████████
████████████████████████████████
              ████████████████████

487. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

488. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████   ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

489.   ██████████████████████████████████

██████████████   ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

490.   ████████  ██  ███████  ████████  ███████  █  ███████  ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

491.   ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

492.   ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

493. 

494.

495.

496.

497.



498.

499.

500.

501.

502.

503.

504.

505.

506. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████

507. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

508. ███████████████████████████████████

███████████████████████████████████████

████████████████████  ████████████████████

███████████████████████████████████████

████████████████████████████  ████████████

███████████████████████████████

509. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████  ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████    ████████████████

██████████████████████████████████████████████████

████████████████████████████

## XIV.   PLAINTIFFS' DIRECT RELIANCE ON THE PRICE INTEGRITY OF BP SECURITIES

510.    BP and the Individual Defendants voluntarily disseminated the information in the false and misleading statements alleged herein to the market.

511.    That information materially inflated the price of BP's securities.

512.    The misrepresentations and omissions alleged herein were material, inflated the price of BP securities, and induced reasonable investors to misjudge the value of BP's securities.

513.    In purchasing BP's securities, Plaintiffs and/or their agents justifiably or reasonably relied on the reasonable assumption that the market price of BP's securities was not affected by material misrepresentations and omissions issued by Defendants, and that the price of BP securities reflected accurate and truthful information issued by Defendants.

514.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████    ████████████████████



516.    Without knowledge of the misrepresented or omitted facts alleged herein, Plaintiffs and/or their agents purchased or otherwise acquired BP securities during the Relevant Period, during which time the price of BP's securities was artificially inflated by Defendants' misrepresentations and omissions.

517.    Defendants intended that the misrepresentations alleged herein be conveyed to Plaintiffs and their agents because those misrepresentations were directed to existing BP shareholders, investors, and the market at large.  Thus, Defendants had every reason to expect that their misrepresentations would materially inflate the price of BP securities, and thereby cause Plaintiffs and/or their agents to purchase BP's securities at artificially inflated prices, in justifiable reliance on the misrepresentations.  Defendants knew that there was an especial likelihood that the misrepresentations would reach Plaintiffs and/or their agents, and would

influence their BP investment decisions.  The Defendants are responsible for Plaintiffs' damages, which resulted from Defendants' misconduct.

518.    Moreover, Defendants filed several Form 20Fs and 6-Ks with the Securities and Exchange Commission, pursuant to the statutory requirements of the Exchange Act, 15 U.S.C. §78a et seq., which mandates periodic filings of disclosure documents and is devised to protect the Plaintiffs as investors.  As alleged herein, those SEC filings contained material misstatements and omissions, made with scienter.  As such, Defendants are presumed to have reason to expect that the false and misleading statements contained therein would reach and influence the Plaintiffs, as they did, as the class of persons that statute is designed to protect.

## XV.    PLAINTIFFS' CLAIMS ARE TIMELY

519.    The claims asserted herein were initially filed within two years after the date that Plaintiffs learned sufficient facts to file them.  Thus, to the extent that such claims are subject to a two-year statute of limitations from the date of discovery, they are timely.

520.    In addition, filing of the initial class action complaint in the first action that would become Case No. 4:10-md-02185 (S.D. Tex.) served to toll the statute of limitations for all individual claims of putative class members, including state law claims.  Until the filing of this instant action, Plaintiffs were absent class members of the putative class at issue in such complaint, and as such, they benefitted from its tolling effect.  Such tolling continued with respect to claims based on BP ordinary shares until February 13, 2012, when the Court dismissed all claims based on purchases of BP ordinary shares abroad.

## XVI.   PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY TRIAL

521.    The federal law causes of action set forth below relate exclusively to Plaintiffs' purchase of BP ADSs and are not brought in the alternative to any other cause of action.

### FIRST CAUSE OF ACTION

### Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

### (Brought by Alameda County and State-Boston with respect to their ADS transactions Against BP, BP America, BP E&P, Howard, Suttles, Inglis, Rainey, McKay, and Dudley)

522.    Plaintiffs Alameda County and State-Boston repeat and reallege each and every allegation contained above as if fully set forth herein.

523.    Defendants Howard, Suttles, Inglis, Rainey, McKay, and Dudley are hereinafter sometimes referred to altogether as the "Individual Fraud Defendants".

524.    This cause of action is brought against Defendants BP, BP E&P, BP America, and the Individual Fraud Defendants for fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

525.    Defendants BP, BP E&P, BP America, and the Individual Fraud Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S. to carry carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiffs Alameda County and State-Boston, as alleged herein; and (ii) cause Plaintiffs Alameda County and State-Boston to purchase BP ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

526.    Defendants BP, BP E&P, BP America, and the Individual Fraud Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S.: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit

upon the purchasers of the Company's ADSs in an effort to artificially inflate and maintain the market prices for BP ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

527.    As a result of the conduct of Defendants BP, BP E&P, BP America, and the Individual Fraud Defendants , Plaintiffs Alameda County and State-Boston purchased BP ADSs at artificially inflated prices and were damaged thereby when the price of those ADSs declined as alleged herein.

## SECOND CAUSE OF ACTION

### Section 20(a) of the Exchange Act

**(Brought by Alameda County and State-Boston with respect to their ADS Transactions Against BP, BP America, BP E&P, Howard, Suttles, Inglis, Rainey, McKay, and Dudley)**

528.    Plaintiffs Alameda County and State-Boston repeat and reallege each and every allegation contained above as if fully set forth herein.

529.    This cause of action is brought against Defendants BP, BP America, BP E&P, and the Individual Fraud Defendants for control person liability under Section 20(a) of the Exchange Act.

530.    These Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein. Specifically:

(a)    Defendants Hayward and Dudley directly or indirectly controlled Defendant BP as alleged above;

(b)    Defendants Hayward, Dudley, BP, McKay and Rainey directly or indirectly controlled Defendant BP America as alleged above;

(c)    Defendants Hayward, Dudley, BP, Malone, McKay, Rainey, BP America, Suttles,, and Inglis directly or indirectly controlled Defendant BP E&P as alleged above; and/or

(d)      BP, BP America and BP E&P  directly controlled the Individual Defendants who worked for them during the Relevant Period.

531.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of BP's, BP America's and/or BP E&P's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BP, BP America, and BP E&P, including the content and dissemination of the various statements which Plaintiffs Alameda County and State-Boston contend are false and misleading and/or omitted material information. These Defendants were provided with or had unlimited access to copies of the statements alleged by Plaintiffs Alameda County and State-Boston to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

532.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of BP, BP America, and/or BP E&P and, therefore, is presumed to have had the power to control or influence the particular transactions, statements, and omissions giving rise to the securities violations as alleged herein, and to have exercised the same.

533.     As set forth above, BP, BP E&P, BP America, and the Individual Fraud Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Defendants named in this Cause of Action are liable pursuant to Section 20(a) of the Exchange Act.

534.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs Alameda County and State-Boston suffered damages in connection with their purchases of the BP ADSs.

### THIRD CAUSE OF ACTION

### Common Law Fraud, Deceit and Fraudulent Concealment

**(Brought by all Plaintiffs with respect to their Ordinary Share Transactions and by State-Boston with respect to its ADS Transactions Against BP, BP America, BP E&P, and the Individual Fraud Defendants)**

535.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

536.     Defendants BP, BP America, BP E&P, and the Individual Fraud Defendants made the foregoing false and/or misleading statements and/or failed to disclose or concealed information necessary to make such statements not misleading; which were material; with the intent and/or foreseeability that Plaintiffs and investors would rely thereon; and upon which Plaintiffs actually and/or justifiably relied to their detriment.   Plaintiffs and/or their investment advisers acted in justifiable reliance on these Defendants' false and misleading statements, the market price of BP securities and/or the integrity of the market, without knowing the statements were false, when making investment decisions regarding BP securities.  These Defendants' false and misleading statements also induced Plaintiffs and/or their investment advisers to retain Plaintiffs' holdings in BP securities during the Relevant Period.

537.     Defendants BP, BP America, BP E&P, and the Individual Fraud Defendants had a duty to disclose the truth because where a person or entity voluntarily discloses information, it must disclose the whole truth; when a person or entity makes a representation and new information makes that earlier misrepresentation misleading or untrue, it must disclose the whole truth and correct its prior misrepresentation; and when a person or entity makes a partial

disclosure and conveys a false impression, it must disclose the whole truth.  These Defendants voluntarily disclosed information concerning BP that, when viewed in the best light imaginable, disclosed only partial, deceptive information and half-truths (and in a more realistic light, was utterly false).  Accordingly, these Defendants had a duty to tell the whole truth.

538.    Defendants BP, BP America, BP E&P, and the Individual Fraud Defendants knew or, but for their egregious recklessness would have known, that their misstatements and omissions were false and/or misleading at the time they were made.

539.    Plaintiffs would not have acquired their BP securities had they known the truth about the matters alleged herein, at least not at the prices that they paid, which were inflated by these Defendants' misconduct.

540.    As a result of these Defendants' false and misleading statements and omissions, Plaintiffs suffered substantial damages, the amount of which will be proved at trial.

541.    The misrepresentations and omissions, as set forth herein, constitute fraud, deceit, fraudulent misrepresentation and/or fraudulent concealment under Texas, California, Massachusetts, and Rhode Island common law.  Plaintiffs submit that Texas law applies to Plaintiffs' claims.   If the Court finds that Texas law does not apply to Plaintiffs' claims, Plaintiffs submit that California law applies to Alameda County's claims, Massachusetts law applies to State-Boston's claims, and Rhode Island law applies to The City of Providence's claims.

## FOURTH CAUSE OF ACTION

### Common Law Aiding and Abetting Fraud

**(Brought by All Plaintiffs with respect to their Ordinary Share Transactions
and by State-Boston with respect to its ADS Transactions
Against BP, BP America, BP E&P, and the Individual Fraud Defendants)**

542.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

543.    Defendants BP, BP America, BP E&P and the Individual Fraud Defendants knowingly provided one another with substantial assistance in perpetrating the fraud.  They provided one another with misinformation, conspired with one another, and/or substantially assisted one another in the perpetration of the fraud alleged herein, forgoing the opportunities each of them had to prevent the issuance of the false and misleading misstatements and omissions alleged herein and thereby failing to prevent their issuance.

544.    To the extent necessary for these claims, these Defendants owed fiduciary duties of candor and care to BP investors.  They knew about the materially misleading challenged statements.  Therefore, they knew of the fraud perpetrated by BP.

545.    As a direct and natural result of the fraud alleged herein, and the knowing and active participation by the Defendants named in this Cause of Action, Plaintiffs suffered substantial damages in connection with their purchases of BP securities, the amount of which will be proved at trial.

546.    The aiding and abetting claims are brought under Texas, California, Massachusetts, and Rhode Island common law.  Plaintiffs submit that Texas law applies to Plaintiffs' claims.   If the Court finds that Texas law does not apply to Plaintiffs' claims, Plaintiffs submit that California law applies to Alameda County's claims, Massachusetts law applies to State-Boston's claims, and Rhode Island law applies to The City of Providence's claims.

**FIFTH CAUSE OF ACTION**

218

**Common Law Negligent Misrepresentation**

**(Brought by all Plaintiffs with respect to their Ordinary Shares Transactions
and by State-Boston with respect to its ADS Transactions
Against All Defendants)**

547.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except all allegations speaking only to any Defendants' subjective state of mind.

548.    To the extent necessary for this claim, Defendants owed duties of candor to Plaintiffs and investors in the Company.  Defendants expected, or it was reasonably foreseeable to them, that BP investors would rely on Defendants' statements in determining whether to buy shares in the Company.

549.    Defendants supplied false and materially misleading statements and omissions in the course of their business for the guidance of Plaintiffs to purchase BP securities.

550.    When Defendants made the materially misleading misstatements and omissions alleged herein, they had no reasonable ground for believing them to be true.  Defendants failed to exercise reasonable care or competence in communicating the information.

551.    Defendants made untrue statements of material fact or failed to disclose material facts which rendered their affirmative statements materially misleading.

552.    Plaintiffs and/or their investment advisers acted in justifiable reliance on the Defendants' false and misleading statements, the market price of BP securities and/or the integrity of the market, without knowing the statements were false or misleading, when making investment decisions regarding BP securities.  The Defendants' false and misleading statements and omissions also induced Plaintiffs and/or their investment advisers to retain Plaintiffs' holdings in BP securities during the Relevant Period.

553.    Had Defendants not made the false and misleading misrepresentations and omissions alleged herein, Plaintiffs would not have purchased BP securities, at least not at the artificially inflated prices that they paid.

554.    When Plaintiffs purchased BP securities, they did not know about the untrue and misleading nature of the statements and omissions alleged herein.

555.    As a direct and proximate result of the negligent misrepresentations made by Defendants, Plaintiffs incurred damages, the amount of which will be proved at trial.

556.    The negligent misrepresentation claims are brought under Texas, California, Massachusetts, and Rhode Island common law.  Plaintiffs submit that Texas law applies to Plaintiffs' claims.   If the Court finds that Texas law does not apply to Plaintiffs' claims, Plaintiffs submit that California law applies to Alameda County's claims, Massachusetts law applies to State-Boston's claims, and Rhode Island law applies to The City of Providence's claims.

### SIXTH CAUSE OF ACTION

### Texas Business and Commerce Code §27.01

**(Brought by All Plaintiffs with respect to their Ordinary Shares Transactions and by State-Boston with respect to its ADS Transactions
Against All Defendants)**

557.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

558.    Defendants made false representations of material facts to Plaintiffs and investors. Such statements were made for the purpose of inducing Plaintiffs to invest in BP shares.

559.    To the extent necessary for proof of this claim, Defendants had a duty to disclose the truth because where a person or entity voluntarily discloses information, it must disclose the

whole truth; when a person or entity makes a representation and new information makes that earlier misrepresentation misleading or untrue, it must disclose the whole truth and correct the prior misrepresentation; and when a person or entity makes a partial disclosure and conveys a false impression, it must disclose the whole truth.  Defendants voluntarily disclosed information concerning BP that, when viewed in the best light imaginable, disclosed only partial, deceptive information and half-truths (and in a more realistic light was simply false).  Accordingly, Defendants had a duty to tell the whole truth.

560.    Plaintiffs and/or their investment advisers acted in justifiable reliance on the Defendants' false and misleading statements and omissions, the market price of BP securities and/or the integrity of the market, without knowing the statements were false, when making investment decisions regarding BP securities.  The Defendants' false and misleading statements and omissions also induced Plaintiffs and/or their investment advisers to retain Plaintiffs' holdings in BP securities during the Relevant Period.

561.    As a direct and proximate result of the misrepresentations made by Defendants, Plaintiffs incurred economic damages are entitled to and punitive damages, the amount of which will be proved at trial.

### SEVENTH CAUSE OF ACTION

### Violations of Cal. Corp. Code §§ 25400, 25403, and 2550

### (Brought by Alameda County relating to its Ordinary Share Transactions Against Defendants BP, BP America, BP E&P and the Individual Fraud Defendants)

562.    Plaintiff Alameda County repeats and realleges each and every allegation above as if fully set forth herein.

563.    This cause of action is brought against all Defendants for fraud under California Corporations Code Sections 25400, 25403 and 25500.

564.     Defendants BP, BP America, BP E&P and the Individual Fraud Defendants are liable under Section 25400 and 25500 because they sold and offered to sell BP shares and, with a specific intent to artificially inflate prices of BP shares, willfully induced Plaintiff Alameda County to purchase BP shares by making untrue statements of material fact and/or by omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

565.     Plaintiff Alameda County and/or its investment advisers would not have acquired BP shares had they known the truth about the matters alleged herein, at least not at the prices that they paid, which were inflated by Defendants' misconduct.

566.     The Individual Fraud Defendants are also liable under Section 25403(a) because they were the principal executives of and, thus, controlled BP, BP America, and BP E&P during the Relevant Period and knew or recklessly disregarded that the Defendants engaged in the misconduct described above and controlled and induced the Defendants to engage in such misconduct.  In addition:

(a)     BP is liable under Section 25403(a) because, as the parent entity of BP America and BP E&P and through its ownership of them, BP controlled BP America and BP E&P during the Relevant Period, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading and/or omitted material information.

(b)     BP America is liable under Section 25403(a) because, as the parent entity of BP E&P and through its ownership of BP E&P, BP America controlled BP E&P during the Relevant Period, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading and/or omitted material information.

567.     As a direct and proximate result of the wrongful conduct of Defendants BP, BP America, BP E&P and the Individual Fraud Defendants, Plaintiff Alameda County incurred significant damages, the amount of which will be proved at trial.

## EIGHTH CAUSE OF ACTION
### Violations of Cal. Civ. Code §1709

**(Brought by Alameda County relating to its Ordinary Share Transactions Against BP, BP America, BP E&P, and the Individual Fraud Defendants)**

568.     Plaintiff Alameda County repeats and realleges each and every allegation above as if fully set forth herein, except all allegations about intentional or reckless misconduct.

569.     During the Relevant Period, Defendants BP, BP America, BP E&P and the Individual Fraud Defendants, individually and in concert with others, participated in the fraudulent scheme set forth therein and made, or caused BP, BP America, and BP E&P to make, statements which, at the time and in light of the circumstances they were made, were materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiff Alameda County and the investing public.

570.     Defendants BP, BP America, BP E&P and the Individual Fraud Defendants had a duty to disclose the truth because where a person or entity voluntarily discloses information, it must disclose the whole truth; when a person or entity makes a representation and new information makes that earlier misrepresentation misleading or untrue, it must disclose the whole truth and correct their prior misrepresentations; and when a person or entity makes a partial disclosure and conveys a false impression, it must disclose the whole truth.  These Defendants voluntarily disclosed information concerning BP that, when viewed in the best light imaginable, disclosed only partial, deceptive information and half-truths (and when viewed realistically was completely false).  Accordingly, these Defendants had a duty to tell the whole truth.

571. When making the false and misleading representations, Defendants BP, BP America, BP E&P and the Individual Fraud Defendants knew they were false or made them with reckless disregard for their truth.

572. Plaintiff Alameda County and/or its investment advisers acted in justifiable reliance on these Defendants' false and misleading statements and omissions, the market price of BP securities and/or the integrity of the market, without knowing the statements were false, when making investment decisions regarding BP securities. These Defendants' false and misleading statements and omissions also induced Plaintiff Alameda County and/or its investment advisers to retain Plaintiffs' holdings in BP securities during the Relevant Period.

573. Plaintiff Alameda County would not have acquired BP securities had it known the truth about the matters alleged herein, at least not at the prices that it paid, which were inflated by Defendants' misconduct.

574. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Alameda County incurred significant damages, the amount of which will be proved at trial.

### NINTH CAUSE OF ACTION

### Deceptive and Unfair Trade Practices in Violation of Massachusetts Law

### (Brought by State-Boston Regarding Its ADS and Its Ordinary Share Transactions Against All Defendants)

575. Plaintiff State-Boston repeats and realleges each and every allegation above as if fully set forth herein.

576. This claim is brought pursuant to Massachusetts General Laws chapter 93A, §§2 and 11.

577.    At all times relevant hereto, Plaintiff State-Boston was a "person" within the meaning of M.G.L. c. 93A §§1(a) and 11, which "engage[d] in the conduct of any trade or commerce" within the meaning of M.G.L. c. 93A §§1(b) and 11.

578.    At all times relevant hereto, Defendants were engaged in "trade or commerce" within the meaning of M.G.L. c. 93A §§1(b) and 11.

579.    Defendants made numerous misstatements and omissions, as alleged herein, which constituted "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of M.G.L. c. 93A §§2(a) and 11.

580.    Plaintiff State-Boston's losses, as alleged herein, constitute a "loss of money or property, real or personal, as a result of the use or employment" by Defendants of "an unfair or deceptive act or practice declared unlawful by [c. 93A] section two or by any rule or regulation issued under paragraph (c) of section two," including without limitation the Massachusetts Attorney General's regulations set forth in MASS. REGS CODE tit. 940 §3.16.

581.    Defendants' unfair or deceptive acts or practices, as alleged herein, were communicated to Plaintiff State-Boston and its agents by, among other methods, print and broadcast news media based, operating and/or sold in the Commonwealth of Massachusetts.

582.    Plaintiff State-Boston and its agents received and acted upon Defendants' unfair or deceptive acts or practices, as alleged herein, in the Commonwealth of Massachusetts.

583.    Plaintiff State-Boston's losses as a result Defendants' unfair or deceptive acts or practices, as alleged herein, occurred in the Commonwealth of Massachusetts.

584.    Defendants' unfair or deceptive acts or practices, as alleged herein, therefore occurred primarily and substantially within the Commonwealth of Massachusetts.

585.    Defendants' unfair or deceptive acts or practices, as alleged herein, were willful and/or knowing violations of M.G.L. c. 93A §2 and invaded the right of Plaintiff State-Boston to be free from deceptive and unfair business practices.

586.    As a direct and proximate result of Defendants' violations of M.G.L. c. 93A, as described herein, Plaintiff State-Boston is entitled to a judgment awarding triple the amount of its actual damages as defined in M.G.L. c. 93A §11, its reasonable attorneys' fees and costs, and such other equitable relief as the Court deems just and proper.

PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment in their favor and pray for relief as follows:

A.    An award in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained by Plaintiffs as a result of Defendants' wrongdoing, in an amount to be proved at trial;

B.    A judgment finding that Defendants' violations of M.G.L. c. 93A §§2 and 11 were willful or knowing and an award in favor of Plaintiff State-Boston against all Defendants, jointly and severally, trebling, pursuant to M.G.L. c. 93A §11, the amount of Plaintiff's actual damages as a result of Defendants' wrongdoing as proved at trial;

C.    An award in favor of Plaintiffs against all Defendants, jointly and severally, for all punitive damages Plaintiffs are entitled to as a result of Defendants' wrongdoing, in an amount to be proved at trial;

D.    An award in favor of Plaintiffs of the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees, if applicable, together with pre- and post-judgment interest; and

E.    An award in favor of Plaintiffs of any other relief as this Court deems just,

equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated November 30, 2012

Respectfully submitted,

**ABRAMAN, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND**

By: _____/s/ Sammy Ford IV_____
        Sammy Ford IV
Federal Bar Number 950682
Texas Bar Number: 24061331
800 Commerce Street
Houston, Texas 77002
Telephone: (713) 222-7211
Facsimile: (713) 225-0827

**POMERANTZ GROSSMAN HUFFORD
 DAHLSTROM & GROSS LLP**

/s/       Marc Gross
Marc I. Gross
Jeremy A. Lieberman
Jason S. Cowart
Matthew L. Tuccillo
Emma Gilmore
Jessica N. Dell
600 Third Avenue, 20th Floor
New York, NY  10016
Telephone:  (212) 661-1100
Facsimile: (212) 661-8665


**POMERANTZ GROSSMAN HUFFORD
 DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184

***Attorneys for Plaintiffs***

228