**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| *In re BP p.l.c. Securities Litigation* | No. 4:10-md-02185 |
| ---------------------------------------------------- | No. 4:12-cv-1836 |
| This document relates to: | No. 4:12-cv-1837 |
| | No. 4:12-cv-1256 (cons.) |
| *State of Oregon* v. *BP p.l.c. et al.* | No. 4:12-cv-1272 |
| *Ohio Public Employees Retirement System et al.* v. *BP p.l.c. et al.* | Honorable Keith P. Ellison |
| *Alameda County Employees' Retirement Association et al.* v. *BP p.l.c. et al.* | JURY TRIAL DEMANDED |
| *Connecticut Retirement Plans & Trust Funds et al.* v. *BP p.l.c. et al.* | **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' COMPLAINTS**

OF COUNSEL:

Daryl A. Libow (pro hac vice)
Amanda F. Davidoff
Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 956-7500
libowd@sullcrom.com
davidoffa@sullcrom.com
rosee@sullcrom.com

Richard C. Pepperman, II (pro hac vice)
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
peppermanr@sullcrom.com
deleeuwm@sullcrom.com
pellerm@sullcrom.com

December 21, 2012

Thomas W. Taylor
Texas State Bar No. 19723875
S.D. Tex. Bar No. 3906
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas  77002
Telephone:  (713) 220-4200
Facsimile:  (713) 220-4285
ttaylor@andrewskurth.com

*Attorney-in-Charge for Defendants*

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ....................................................1

STATEMENT OF THE ISSUES...............................................................................1

SUMMARY OF THE ARGUMENT .........................................................................2

BACKGROUND ......................................................................................................6

ARGUMENT ...........................................................................................................9

I.  ENGLISH LAW GOVERNS PLAINTIFFS' CLAIMS.................................9

    A.  The Law of the Forum With the Most Significant Relationship to Plaintiffs' Claims Applies....................................................................10

    B.  England Has the Most Significant Relationship to the Parties and Transactions ......................................................................................12

        1.  The Majority of the Challenged Statements Were Made in England ........13

        2.  ██████████████████████████████████████ ...................................................14

        3.  Plaintiffs' Purchases of BP Ordinary Shares Occurred in England, Where Those Shares Are Traded .........................................15

        4.  Plaintiffs' Residence in Various States Does Not Support Applying Those States' Laws. ....................................................16

        5.  Policy Considerations Also Favor Application of English Law to Plaintiffs' Ordinary Share Claims.............................................17

II.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER ENGLISH LAW...........................18

    A.  Plaintiffs Do Not Allege Actual Reliance on Any of the Challenged Statements ..........................................................................19

        1.  The Oregon and Ohio Plaintiffs' Conclusory Allegations of Reliance Are Insufficient .............................................20

        2.  The Alameda and Connecticut Plaintiffs' Allegations of Reliance Are Similarly Deficient ...............................................23

            a.  General Allegations of Reliance Coupled With Alleged Transactions in BP Shares Do Not Satisfy Rule 9(b) ...................24

            b.  ██████████████████████████████████ ................................24

            c.  ████████████████████████████████████ ..............26

# TABLE OF CONTENTS
## (Continued)

Page

B.  Plaintiffs Cannot State a Claim Against the Individual Defendants or Assert "Holder" Claims Under the Financial Services and Markets Act 2000 .............................................................................................................. 27

C.  Plaintiffs Fail to State a Claim for Common-Law Fraud or Deceit ...................... 28

    1.  Plaintiffs Fail Adequately to Allege That Any Defendant Intended to Induce Plaintiffs to Purchase BP Shares ................................ 28

        a.  Plaintiffs Do Not Allege That Defendants Intended for Plaintiffs to Rely on the Challenged Statements .......................... 29

        b.  Plaintiffs Fail to Allege the Requisite Intent for Any Particular Defendant ...................................................................... 31

    2.  Certain Statements Challenged in the Complaints Are Non-Actionable Expressions of Opinion, Belief or Intention ........................... 33

        a.  Expressions of Honestly Held Beliefs and Opinions Are Not Actionable .............................................................................. 33

        b.  Expressions of Honestly Held Future Intentions and Expectations Also Are Not Actionable ......................................... 35

    3.    █████████████████████████████ ....................................... 36

D.  Plaintiffs Fail to State a Claim for Negligent Misrepresentation .......................... 40

III.  ALTERNATIVELY, THE COURT SHOULD DISMISS THE ENGLISH-LAW CLAIMS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*. ...................... 43

A.  The Courts of England Provide an Alternative Forum for These Claims .............. 43

B.  The Public and Private Interest Factors Weigh Heavily in Favor of Litigating in England. ...................................................................................... 44

    1.  The Relevant Private Interest Factors Favor Dismissal. ............................ 44

    2.  The Public Interest Factors Point Decisively Towards Dismissal. ............ 46

IV.  THE DORMANT COMMERCE CLAUSE BARS PLAINTIFFS' STATE-LAW CLAIMS BASED ON SECURITIES TRANSACTIONS ON A FOREIGN EXCHANGE ............................................................................................................ 47

A.  Permitting Plaintiffs' State-Law Claims to Proceed Would Directly Interfere With Foreign Commerce ........................................................................ 48

B.  Application of State Law to Foreign Securities Transactions Would Create a Substantial Risk of Conflict with Foreign Governments ........................ 52

C.  Application of State Law to Foreign Securities Transactions Would Undermine the Ability of the Federal Government to Regulate Those Transactions ......................................................................................................... 54

**TABLE OF CONTENTS**
**(Continued)**

**Page**

V.   THE ALAMEDA AND CONNECTICUT PLAINTIFFS' EXCHANGE ACT
     CLAIMS BASED ON CERTAIN STATEMENTS SHOULD BE DISMISSED.............56

     A.   BP's Press Release Dated January 16, 2007 .........................................57

     B.   Malone's House Testimony on May 16, 2007....................................59

     C.   BP's Press Release Dated October 25, 2007 ......................................60

     D.   Rainey's Senate Testimony on November 19, 2009.............................61

     E.   BP's Statements in an Article on May 14, 2010...................................62

     F.   McKay's House Testimony on May 19, 2010 ......................................63

VI.  THE OHIO AND OREGON PLAINTIFFS FAIL TO PLEAD PERSONAL
     JURISDICTION OVER THE DEFENDANTS IN THOSE ACTIONS ..........................64

     A.   The Ohio Plaintiffs Fail to Allege a *Prima Facie* Case of Personal
          Jurisdiction..................................................................................65

          1.   Ohio's Long-Arm Statute Does Not Permit the Exercise of General
               Jurisdiction Over Non-Residents ...............................................65

          2.   The Ohio Plaintiffs Fail to Allege Facts Sufficient to Establish
               Specific Jurisdiction................................................................65

     B.   Oregon Fails to Allege a *Prima Facie* Case of Personal Jurisdiction..................67

          1.   Oregon Fails to Allege Facts Sufficient to Support General
               Jurisdiction.........................................................................68

          2.   Oregon Fails to Allege Facts Sufficient to Support Specific
               Jurisdiction.........................................................................69

CONCLUSION..................................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

## U.S. Cases

*7-Eleven Inc.* v. *Puerto Rico-7 Inc.*,
2008 WL 4951502 (N.D. Tex. Nov. 19, 2008) ................................................................32

*A.S. Goldmen & Co.* v. *New Jersey Bureau of Securities*,
163 F.3d 780 (3d Cir. 1999) ..........................................................................................50

*Abrams* v. *Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) .........................................................................................62

*Aegis Insurance Holding Co., L.P.* v. *Gaiser*,
2007 WL 906328 (Tex. App.—San Antonio Mar. 28, 2007, pet. denied) ....................10

*Ahern* v. *Gaussoin*,
611 F. Supp. 1465 (D. Or. 1985) ...................................................................................11

*America's Favorite Chicken Co.* v. *Cajun Enterprises, Inc.*,
130 F.3d 180 (5th Cir. 1997) .........................................................................................11

*American Interstate Insurance Co.* v. *G & H Service Center, Inc.*,
861 N.E.2d 524 (Ohio 2007) ......................................................................................1, 11

*Amzak Corp.* v. *Reliant Energy, Inc.*,
2004 WL 1882482 (N.D. Ill. Aug. 19, 2004) ................................................................20

*Anderson* v. *Thompson*,
2008 WL 820024 (E.D. Tenn. Mar. 25, 2008) ..............................................................24

*Arizona Corp. Commission* v. *Media Products, Inc.*,
763 P.2d 527 (Ariz. Ct. App. 1988) ..............................................................................50

*Asahi Metal Industries Co.* v. *Superior Court of California*,
480 U.S. 102 (1987) .......................................................................................................66

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) ..................................................................................................29, 68

*Automated Marine Propulsion Systems, Inc.* v. *Aalborg Ciserv International A/S*,
859 F. Supp. 263 (S.D. Tex. 1994) ................................................................................44

*Axial Vector Engine Corp.* v. *Della Penna*,
2009 WL 1270291 (D. Or. May 6, 2009) ......................................................................10

*Baxter* v. *A.R. Baron & Co.*,
1995 WL 600720 (S.D.N.Y. Oct. 12, 1995) ..................................................................24

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007) .......................................................................................................67

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Benchmark Electronics, Inc.* v. *J.M. Huber Corp.*,
343 F.3d 719 (5th Cir. 2003) ...................................................................... passim

*Bixby* v. *KBR, Inc.*,
2011 WL 2971848 (D. Or. June 16, 2011) ............................................................68

*Bradley* v. *Phillips Petroleum Co.*,
527 F. Supp. 2d 661 (S.D. Tex. 2007) .................................................................37

*Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Authority*,
476 U.S. 573 (1986)................................................................................48, 52

*BMW of North America, Inc.* v. *Gore*,
517 U.S. 559 (1996).......................................................................................48

*Carder Buick-Olds Co.* v. *Reynolds & Reynolds, Inc.*,
775 N.E.2d 531 (Ohio Ct. App. 2002).................................................................12

*Carolina Trucks & Equipment, Inc.* v. *Volvo Trucks of North America, Inc.*,
492 F.3d 484 (4th Cir. 2007) .........................................................................51, 52

*Cincinnati* v. *Beretta U.S.A. Corp.*,
768 N.E.2d 1136 (Ohio 2002) ..........................................................................48

*Cipollone* v. *Liggett Group, Inc.*,
505 U.S. 504 (1992)........................................................................................48

*City of Clinton* v. *Pilgrim's Pride Corp.*,
632 F.3d 148 (5th Cir. 2010) ............................................................................29

*Club Escapade 2000, Inc.* v. *Ticketmaster, L.L.C.*,
2011 WL 5976918 (W.D. Tex. Nov. 29, 2011)........................................................21

*Conn* v. *Zakharov*,
667 F.3d 705 (6th Cir. 2012) .........................................................................2, 66

*Crosby* v. *National Foreign Trade Council*,
530 U.S. 363 (2000)....................................................................................47, 56

*Dalton* v. *R & W Marine, Inc.*,
897 F.2d 1359 (5th Cir. 1990) ...........................................................................70

*Dean Foods Co.* v. *Brancel*,
187 F.3d 609 (7th Cir. 1999) .............................................................................52

*DeMelo* v. *Toche Marine, Inc.*,
711 F.2d 1260 (5th Cir. 1983) ...........................................................................65

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Denmark* v. *Tzimas*,
   871 F. Supp. 261 (E.D. La. 1994) ...........................................................47

*Domo* v. *Stouffer*,
   580 N.E.2d 788 (Ohio Ct. App. 1989) ....................................................20

*Dorsey* v. *Portfolio Equities, Inc.*,
   540 F.3d 333 (5th Cir. 2008) ..................................................................38

*Edgar* v. *MITE Corp.*,
   457 U.S. 624 (1982) ....................................................................49, 50, 51

*Eric M. Berman P.C.* v. *City of New York*,
   2012 WL 4514407 (E.D.N.Y. Sept. 29, 2012) .................................49, 52

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
   131 S. Ct. 2179 (2011) ...........................................................................20

*Erie Railroad Co.* v. *Tompkins*,
   304 U.S. 64 (1938) ..................................................................................48

*Evans* v. *Pearson Enterprises*,
   434 F.3d 839 (6th Cir. 2006) ..................................................................21

*Federated Management Co.* v. *Coopers & Lybrand*,
   2004 WL 2008271 (Ohio Ct. App. Sept. 9, 2004) .................................11

*Giner* v. *Estate of Higgins*,
   2012 WL 123973 (W.D. Tex. Jan. 13, 2012) .........................................18

*Global Reinsurance Corp.-U.S. Branch* v. *Equitas Ltd.*,
   969 N.E.2d 187 (N.Y. 2012) ...................................................................56

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown*,
   131 S. Ct. 2846 (2011) ...........................................................................68

*Grant Thornton LLP* v. *Suntrust Bank*,
   133 S.W.3d 342 (Tex. App.—Dallas 2004, pet. denied) ........................12

*Gray* v. *Bayer Corp.*,
   2009 WL 1617930 (D.N.J. June 8, 2009) ...............................................23

*Greenberg Traurig P.C.* v. *Moody*,
   161 S.W.3d 56 (Tex. App.—Houston [14th Dist.] 2004, no pet.)................... passim

*Gulf Oil Corp.* v. *Gilbert*,
   330 U.S. 501 (1947) ...........................................................................2, 44

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Hall* v. *Geiger-Jones Co.*,
   242 U.S. 539 (1916)..............................................................................................51

*Hannan* v. *Maxim Integrated Products*,
   2009 WL 2450349 (D. Or. Aug. 10, 2009)...........................................................69

*Healthcare Capital, LLC* v. *Healthmed, Inc.*,
   213 F. Supp. 2d 850 (S.D. Ohio 2002) ................................................................66

*Healy* v. *Beer Institute*,
   491 U.S. 324 (1989)........................................................................................ passim

*Highland Crusader Offshore Partners, L.P.* v. *Motient Corp.*,
   281 S.W.3d 237 (Tex App.—Dallas 2009, pet. denied)..................................13, 15

*In re Air Cargo Shipping Services Antitrust Litigation*,
   2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) ....................................................54

*In re Air Disaster at Ramstein Air Base, Germany*,
   81 F.3d 570 (5th Cir. 1996) .................................................................................11

*In re Blue Flame Energy Corp.*,
   171 Ohio App. 3d 514 (Ohio App. 10 Dist., 2006) .........................................65, 67

*In re BP p.l.c. Securities Litigation*,
   2012 WL 4739673 (S.D. Tex. Oct. 1, 2012)..........................................................9

*In re BP p.l.c. Securities Litigation*,
   2012 WL 2617244 (S.D. Tex. July 5, 2012)................................................. passim

*In re BP p.l.c. Securities Litigation*,
   852 F. Supp. 2d 767 (S.D. Tex. 2012) ......................................................... passim

*In re BP p.l.c. Securities Litigation*,
   843 F. Supp. 2d 712 (S.D. Tex. 2012) ......................................................... passim

*In re BP Shareholder Derivative Litigation*,
   2011 WL 4345209 (S.D. Tex. Sept. 15, 2011) ............................................ passim

*In re Digi International Inc. Securities Litigation*,
   6 F. Supp. 2d 1089 (D. Minn. 1998).....................................................................21

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
   761 F. Supp. 2d 504 (S.D. Tex. 2011) .................................................................10

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
   490 F. Supp. 2d 784 (S.D. Tex. 2007) ............................................................21, 23

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
    540 F. Supp. 2d 800 (S.D. Tex. 2007) .......................................................18, 22, 31

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
    511 F. Supp. 2d 742 (S.D. Tex. 2005) .......................................................64

*In re Franklin Bank Corp. Securities Litigation*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011) .......................................................39, 58

*In re Geophysical Service, Inc.*,
    590 F. Supp. 1346 (S.D. Tex. 1984) .......................................................18

*In re Intel Corp. Microprocessor Antitrust Litigation*,
    476 F. Supp. 2d 452 (D. Del. 2007) .......................................................56

*In re National Century Financial Enterprises, Inc., Investment Litigation*,
    2012 WL 5334027 (S.D. Ohio Oct. 26, 2012) .......................................................10

*In re National Century Financial Enterprises, Inc., Investment Litigation*,
    755 F. Supp. 2d 857 (S.D. Ohio 2010) ...........................................2, 49, 50, 51

*In re National Century Financial Enterprises, Inc., Investment Litigation*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) .......................................................11

*In re National Century Financial Enterprises, Inc. Investment Litigation*,
    2008 WL 1995216 (S.D. Ohio May 5, 2008) .......................................................13, 15

*In re Pilgrim's Pride Corp. Securities Litigation*,
    2010 WL 3257369 (E.D. Tex. Aug. 17, 2010) .......................................................64

*In re Securities Litigation BMC Software, Inc.*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) .......................................................58, 64

*In re Suprema Specialties, Inc. Securities Litigation*,
    438 F.3d 256 (3d Cir. 2006).......................................................22

*In re Vivendi Universal, S.A. Securities Litigation*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011).......................................................50

*Indiana Electrical Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) .......................................................57, 63

*International Fund Management S.A.* v. *Citigroup Inc.*,
    822 F. Supp. 2d 368 (S.D.N.Y. 2011).......................................................23

*International Transactions, Ltd.* v. *Embotelladora Agral Regiomontana, SA de CV*,
    347 F.3d 589 (5th Cir. 2003) .......................................................54

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Jackson* v. *Tanfoglio Giuseppe, S.R.L.*,
   615 F.3d 579 (5th Cir. 2010) .................................................69

*Japan Line* v. *County of Los Angeles*,
   441 U.S. 434 (1979) ...............................................47, 54

*Johnston* v. *Multidata Systems International Corp.*,
   523 F.3d 602 (5th Cir. 2008) .................................................64

*Karim* v. *Finch Shipping Co.*,
   265 F.3d 258 (5th Cir. 2001) .................................................43

*Koster* v. *(American) Lumbermens Mutual Casualty Co.*,
   330 U.S. 518 (1947) ...............................................43, 44

*Kovacic* v. *Larry Brown Enterprises, L.L.C.*,
   693 F. Supp. 2d 660 (S.D. Tex. 2010) .................................................11

*Lormand* v. *US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .................................................63

*Mathison* v. *Bumbo*,
   2008 WL 8797937 (C.D. Cal. Aug. 18, 2008) .................................................21

*McFadin* v. *Gerber*,
   587 F.3d 753 (5th Cir. 2009) .................................................66

*Midwest Title Loans, Inc.* v. *Mills*,
   593 F.3d 660 (7th Cir. 2010) .................................................52

*Moncrief Oil International Inc.* v. *OAO Gazprom*,
   481 F.3d 309 (5th Cir. 2007) .................................................2

*Morris* v. *LTV Corp.*,
   725 F.2d 1024 (5th Cir. 1984) .................................................18

*Morrison* v. *National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) ................................................. passim

*National Foreign Trade Council* v. *Natsios*,
   181 F.3d 38 (1st Cir. 1999) .................................................47

*New Orleans Steamship Association* v. *Plaquemines Port, Harbor & Terminal District*,
   874 F.2d 1018 (5th Cir. 1989) .................................................48, 54

*New York Times Co.* v. *Sullivan*,
   376 U.S. 254 (1964) .................................................48

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Northrop Grumman Ship Systems, Inc.* v. *Ministry of Defense of Republic of Venezuela*,
  575 F.3d 491 (5th Cir. 2009). ...................................................................................10

*Panda Brandywine Corp.* v. *Potomac Electric Power Co.*,
  253 F.3d 865 (5th Cir. 2001) ..............................................................................64, 67

*Paull* v. *Capital Resource Management, Inc.*,
  987 S.W.2d 214 (Tex. App.—Austin 1999, pet. denied).........................................10

*Perry* v. *Cohen*,
  285 S.W.3d 137 (Tex. App.—Austin 2009, pet. denied).........................................20

*Piazza's Seafood World, LLC* v. *Odom*,
  448 F.3d 744 (5th Cir. 2006) .....................................................................2, 5, 47, 48

*Piper Aircraft Co.* v. *Reyno*,
  454 U.S. 235 (1981)....................................................................................... passim

*Pt Pukuafu Indah* v. *Securities & Exchange Commission*,
  661 F.3d 914 (6th Cir. 2011) ..................................................................................67

*Quik Payday, Inc.* v. *Stork*,
  549 F.3d 1302 (10th Cir. 2008) ..............................................................................51

*R2 Invs. LDC* v. *Phillips*,
  401 F.3d 638 (5th Cir. 2005) ..........................................................................15, 64

*Revell* v. *Lidov*,
  317 F.3d 467 (5th Cir. 2002) ..................................................................................67

*Robinson* v. *TCI/US West Communications Inc.*,
  117 F.3d 900 (5th Cir. 1997) ..................................................................................43

*Royal Bank of Scotland Group PLC Securities Litigation*,
  765 F. Supp. 2d 327 (S.D.N.Y. 2011).....................................................................50

*San Diego Building Trades Council* v. *Garmon*,
  359 U.S. 236 (1959)................................................................................................48

*Sanchez* v. *Liggett & Myers, Inc.*,
  187 F.3d 486 (5th Cir. 1999) ......................................................................19, 21, 26

*Saqui* v. *Pride Central America, LLC*,
  595 F.3d 206 (5th Cir. 2010) ............................................................................2, 44

*Seiferth* v. *Helicopteros Atuneros, Inc.*,
  472 F.3d 266 (5th Cir. 2006) ..................................................................................68

# TABLE OF AUTHORITIES
## (Continued)

*Shailja Gandhi Revocable Trust* v. *Sitara Capital Management, LLC*,
  2011 WL 814647 (N.D. Ill. Feb. 25, 2011) ...............................................23

*Sinochem International Co.* v. *Malaysia International Shipping Corp.*,
  549 U.S. 422 (2007)..................................................................................44

*Société Nationale Industrielle Aérospatiale* v. *United States District Court for the*
  *Southern District of Iowa*, 482 U.S. 522 (1987) .....................................54

*Southland Securities Corp.* v. *INSpire Insurance Solutions Inc.*,
  365 F.3d 353 (5th Cir. 2004) ...............................................................31, 40

*Spirit Partners, LP* v. *Stoel Rives LLP*,
  157 P.3d 1194 (Or. Ct. App. 2007)................................................. passim

*Stackhouse* v. *Toyota Motor Co.*,
  2010 WL 3377409 (C.D. Cal. July 16, 2010) ..........................................16

*State ex. rel. DeWine* v. *S & R Recycling, Inc.*,
  961 N.E.2d 1153 (Ohio Ct. App. 2011)...................................................65

*Stone ex rel. Stone* v. *Frontier Airlines, Inc.*,
  256 F. Supp. 2d 28 (D. Mass. 2002) ........................................................48

*Sullivan* v. *Leor Energy LLC*,
  2006 WL 2792909 (S.D. Tex. Sept. 27, 2006) ........................................21

*Syndicate 420 at Lloyd's London* v. *Early American Insurance Co.*,
  796 F.2d 821 (5th Cir. 1986) ......................................................43, 44, 45

*Taubenfeld* v. *Hotels.com*,
  385 F. Supp. 2d 587 (N.D. Tex. 2004) ...................................................64

*Tony Gullo Motors I, L.P.* v. *Chapa*,
  212 S.W.3d 299 (Tex. 2006).....................................................................11

*Tuchman* v. *DSC Communications Corp.*,
  14 F.3d 1061 (5th Cir. 1994) ...................................................................29

*Turan* v. *Universal Plan Investment Ltd.*,
  70 F. Supp. 2d 671 (E.D. La. 1999).........................................................44

*United Healthcare Insurance Co.* v. *Davis*,
  602 F.3d 618 (5th Cir. 2010) ...................................................................49

*United States* v. *Bestfoods*,
  524 U.S. 51 (1998)....................................................................................68

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Vargas* v. *Kiewit Louisiana Co.*,
   2012 WL 1029517 (S.D. Tex. Mar. 26, 2012) ........................................................18

*Wenglor Sensors, Ltd.* v. *Baur*,
   847 F. Supp. 2d 1041 (S.D. Ohio 2012) ................................................................65

*Williams* v. *Collins*,
   600 P.2d 1235 (Or. Ct. App. 1979) ........................................................................20

## U.K. CASES

*AB* v. *South West Water Services Ltd.*,
   [1992] 4 All E.R. (Comm) 574 ........................................................................22, 29

*AIC Ltd.* v. *ITS Testing Services*,
   [2007] 1 All E.R. (Comm) 667 ..............................................................................33

*Al-Nakib Investments (Jersey) Ltd.* v. *Longcroft*,
   [1990] 1 W.L.R. 1390 ............................................................................................42

*Bank Leumi Le Israel B.M.* v. *British National Insurance Co.*,
   [1988] 1 Lloyd's Rep. 71 ..................................................................................35, 36

*Barry* v. *Croskey*,
   (1861) 2 J. & H. 1 ..........................................................................................1, 29, 30

*Caparo Industries Plc.* v. *Dickman*,
   [1990] 2 A.C. 605 ............................................................................................40, 42

*Cassa di Risparmio della Repubblica di San Marino SpA* v. *Barclays Bank Ltd.*,
   [2011] EWHC (Comm) 484 ............................................................................34, 35

*Chagos Islanders* v. *Attorney General*,
   [2003] EWHC (QB) 2222 ......................................................................................23

*Dornoch Ltd.* v. *Mauritius Union Assurance Co.*,
   [2005] EWHC (Comm) 1887 ............................................................................1, 19

*Dunbar Bank plc* v. *Nadeem*,
   [1997] All E.R. 253 ................................................................................................38

*Edgington* v. *Fitzmaurice*,
   (1885) 29 Ch.D. 459 ..............................................................................................20

*Galoo Ltd.* v. *Bright Grahame Murray*,
   [1994] 2 B.C.L.C. 492 ............................................................................................42

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Hagen* v. *ICI Chemicals and Polymers Ltd*,
   [2002] I.R.L.R. 31 .................................................................................35, 36

*Hedley Byrne & Co.* v. *Heller & Partners Ltd.*,
   [1964] A.C. 465 ..........................................................................1, 40, 41, 42

*McNaughton Paper Group Ltd.* v. *Hicks Anderson & Co.*,
   [1990] 2 Q.B. 113 ...............................................................................19, 40, 42

*Meridian Global Funds Management Asia Ltd.* v. *Securities Commission*,
   [1995] 2 A.C. 500 ..........................................................................................32

*Possfund Custodian Trustee Ltd.* v. *Diamond*; *Parr* v. *Diamond*,
   [1996] 1 W.L.R. 1351 ....................................................................................30

*Re Augustus Barnett & Son Ltd.*,
   [1986] B.C.L.C. 170 .......................................................................................22

*Reeman* v. *Department of Transport*,
   [1997] P.N.L.R. 618................................................................................1, 41, 42

*Spring* v. *Guardian Assurance Plc.*,
   [1995] 2 A.C. 296 ...........................................................................................40

*Springwell Navigation Corp.* v. *JP Morgan Chase Bank*,
   [2010] EWCA (Civ) 1221................................................................................26

*Way* v. *Hearn*,
   (1862) 13 C.B.N.S. 292 ...................................................................................31

## STATUTES AND OTHER AUTHORITIES

22 Ohio Jur. 3d Courts & Judges § 261 .............................................................65

Brief for United Kingdom as Amicus Curiae Supporting Respondents, *Morrison* v.
   *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) (No. 08-1191), 2010 WL
   723009 (Feb. 25, 2010)...................................................................19, 53, 54

Clerk & Lindsell on Torts (19th ed. 2006) ........................................... passim

Dodd-Frank Wall Street Reform & Consumer Protection Act, 15 U.S.C. § 78aa(b)...................55

Federal Rule of Civil Procedure 8(a)(2) .............................................................67

Federal Rule of Civil Procedure 9(b)...................................................... passim

Federal Rule of Civil Procedure 12(b)(2) .............................................................2

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

Federal Rule of Civil Procedure 44.1 ............................................................10

Financial Services & Markets Act 2000, c. 8 § 90A (Eng.) ................................... passim

John Cartwright, Misrepresentation, Mistake and Non-Disclosure (3d ed. 2012) ............... passim

Katherine Florey, *State Law, U.S. Power, Foreign Disputes: Understanding the Extraterritorial Effects of State Law in the Wake of* Morrison *v.* National Australia Bank, 92 B.U. L. Rev. 535 (2012) ....................................................................53, 55

Oregon Rule of Civil Procedure 4J .................................................................69

Restatement (Second) of Conflict of Laws § 4 ....................................................10

Restatement (Second) of Conflict of Laws § 6 ................................................17, 18

Restatement (Second) of Conflict of Laws § 148 ....................................11, 12, 13, 15

United States Constitution, art. I, § 8, cl. 3. ..................................................47

## NATURE AND STAGE OF THE PROCEEDINGS

Applying *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), this Court held that purchasers of BP p.l.c. ("BP") ordinary shares on the London Stock Exchange ("LSE") cannot state a claim under the Securities Exchange Act of 1934 ("Exchange Act").  Since that decision, more than a dozen BP shareholders—including one of the lead plaintiffs in the class action—filed complaints seeking to end-run *Morrison* by attempting to bring claims under various state laws for alleged losses based on their purchases of BP ordinary shares.  Four of those complaints are the subject of this motion.  In each, plaintiffs purport to assert state common-law and statutory claims for fraud and negligent misrepresentation based on statements identical or similar to those at issue in the consolidated class action asserting federal law claims.

## STATEMENT OF THE ISSUES

1. Does English law apply to common-law and statutory fraud claims, where the majority of the alleged misstatements were made in England, the transactions at issue were purchases of securities in an English company, the claims have no connection with plaintiffs' home states, and the only alleged interaction with defendants occurred in England?  *Greenberg Traurig P.C.* v. *Moody*, 161 S.W.3d 56, 70 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Spirit Partners, LP* v. *Stoel Rives LLP*, 157 P.3d 1194, 1200 (Or. Ct. App. 2007); *Am. Interstate Ins. Co.* v. *G & H Serv. Ctr., Inc.*, 861 N.E.2d 524, 526-27 (Ohio 2007).

2. Should claims for fraud and negligent misrepresentation be dismissed under English law where plaintiffs fail adequately to allege that they actually relied on any of the alleged misstatements in purchasing BP securities and otherwise fail to satisfy the requirements for those claims, including that defendants intended to induce plaintiffs' reliance or the existence of a special relationship imposing a duty of care on any defendant?  Financial Services and Markets Act 2000, c. 8 § 90A (Eng.); *Dornoch Ltd.* v. *Mauritius Union Assurance Co.*, [2005] EWHC (Comm) 1887 at ¶ 106 (Eng.); *Barry* v. *Croskey*, (1861) 2 J. & H. 1 at 23 (Eng.); *Reeman* v. *Dept. of Transport*, [1997] P.N.L.R. 618 at 639-40 (Eng.); *Hedley Byrne & Co.* v. *Heller & Partners Ltd.*, [1964] A.C. 465 at 481-93 (Eng.).

3. Alternatively, should the Court refrain under the doctrine of *forum non conveniens* from exercising jurisdiction over plaintiffs' non-Exchange Act claims because an English court is a more suitable forum for, and has a greater interest in, claims governed by, and involving potentially novel application of, English law and involving securities traded on an English exchange and alleged misrepresentations primarily issued from England, where most of the evidence and witnesses also are located in England?  *Piper Aircraft Co.*

v. *Reyno*, 454 U.S. 235, 251, 258, 260 (1981); *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508 (1947); *Saqui* v. *Pride Cent. Am., LLC*, 595 F.3d 206, 211-14 (5th Cir. 2010).

4.      Alternatively, should plaintiffs' non-Exchange Act claims be dismissed because the dormant Commerce Clause of the U.S. Constitution bars the extraterritorial application of state law to claims based on securities transactions on foreign exchanges, where application of state law would create a substantial risk of conflicts with foreign governments and undermine the ability of the federal government to speak with one voice in regulating commercial affairs with foreign states? *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989); *Piazza's Seafood World, LLC* v. *Odom*, 448 F.3d 744, 749 (5th Cir. 2006); *In re Nat'l Century Fin. Enters., Inc., Invest. Litig.*, 755 F. Supp. 2d 857, 888 (S.D. Ohio 2010).

5.      Should Exchange Act claims based on alleged misstatements (including several not part of the consolidated class-action complaint) be dismissed for failure adequately to plead (i) the falsity of the alleged misstatements, and/or (ii) facts giving rise to a strong inference that any defendant acted with scienter in making the statements? *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 746-50 (S.D. Tex. 2012).

6.      Should the Oregon and Ohio complaints be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) for failure to plead a *prima facie* case of personal jurisdiction over any of the defendants? *Moncrief Oil Int'l, Inc.* v. *OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007); *Conn* v. *Zakharov*, 667 F.3d 705, 718 (6th Cir. 2012).

## SUMMARY OF THE ARGUMENT

The complaints in these actions challenge the same statements, name the same defendants and allege the same facts as the consolidated complaint in the putative class action brought on behalf of purchasers of BP American Depositary Shares ("ADSs").  In the face of this Court's ruling that purchasers of BP ordinary shares on the LSE cannot sue for securities fraud under federal law, plaintiffs seek to circumvent that decision and the Supreme Court's decision in *Morrison* by attempting to recover for such purchases under state law.  These claims, as well as certain non-duplicative Exchange Act claims, should be dismissed in their entirety.

*First*, although asserted under various state laws, plaintiffs' claims are governed by English law pursuant to well-established choice-of-law principles.  England has the most significant relationship to plaintiffs' claims.  BP is an English corporation, and most of the challenged statements were made in England.  With the exception of a few statements made in

2

Texas, none of the alleged misstatements were made in any of the states whose laws plaintiffs seek to apply, and plaintiffs do not allege that any statements were specifically targeted at those states.  Other than being the residence of certain plaintiffs or the forum where these actions were filed, those states have *no* connection to plaintiffs' claims.  ████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Finally, for those claims based on purchases of BP ordinary shares, the transactions occurred in England where those shares are traded.  The Supreme Court's *Morrison* decision underscores why, as a matter of policy, English law should apply to claims premised on such transactions.  *See* Section I.

**Second**, English law recognizes three of plaintiffs' causes of action:  (i) statutory fraud under the Financial Services and Markets Act 2000 ("FSMA"); (ii) common-law fraud; and (iii) negligent misrepresentation.  Unlike federal securities laws, however, all three causes of action require allegations of actual reliance by plaintiffs on the alleged misstatements, and Federal Rule of Civil Procedure 9(b) requires that such allegations be pled with particularity.  The Oregon and Ohio plaintiffs' conclusory allegations of reliance are easily rejected as insufficient███████████████████████████████████████████████████████████ ██████████████████████████████████████████ *See* Section II.A.

Plaintiffs' claims fail under English law for additional reasons.  Their claims based on BP Annual Reports, governed exclusively by FSMA, should be dismissed as to officers and directors and to the extent they are "holder" claims.  *See* Section II.B.  Plaintiffs' common-law fraud claims also are defective because they fail adequately to allege that any of the defendants intended their supposed misstatements to induce plaintiffs to purchase BP shares.  Furthermore, certain of the alleged misstatements are non-actionable expressions of opinion or intention.  *See*

Section II.C.  The Alameda and Connecticut plaintiffs also fail to state a claim for negligent misrepresentation under English law because they do not adequately allege that defendants owed them a duty of care arising out of a special relationship.  As purchasers of BP shares on stock exchanges, plaintiffs are no different from the many thousands of other open-market purchasers of BP stock.  Status as a shareholder, without more, does not create a duty of care under English law.  *See* Section II.D.

**Third**, as an alternative to deciding the English-law claims on the merits, the Court should dismiss them under the doctrine of *forum non conveniens* because an English court is a more appropriate forum for claims governed by English law and brought against an English company based on alleged misstatements that were primarily issued from England.  The evidence and witnesses—████████████████████████████are largely in England.  Plaintiffs' claims also require application of an English statute that has yet to be interpreted by an English court.  Additionally, because these claims relate to plaintiffs' purchases of BP ordinary shares on the LSE, England has the greatest interest in adjudicating this action.  *See* Section III.

**Fourth**, in the alternative, plaintiffs' state-law claims should be dismissed because the dormant Commerce Clause of the U.S. Constitution bars such claims based on purchases of BP ordinary shares on the LSE.  The dormant Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, *whether or not the commerce has effects within the State*."  *Healy*, 491 U.S. at 336 (quotation omitted) (emphasis added).  Application of state laws here to the purchase of BP ordinary shares on the LSE would be wholly extraterritorial and, as such, barred by the Commerce Clause.  *See* Section IV.A.  Even if applying state laws to transactions in London were found to have only "indirect effects" on

foreign commerce, such "indirect effects" violate the dormant Commerce Clause if they "(1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *Piazza's*, 448 F.3d at 750.  Fundamental to the Supreme Court's decision in *Morrison* was the concern, expressed in *amicus* briefs filed by the United Kingdom and other foreign governments, that the application of U.S. law to transactions on foreign exchanges would interfere with the sovereign rights of foreign governments.  That interference would be even greater if the varied and conflicting laws of all 50 states were to apply to transactions on foreign exchanges.  In addition, permitting state laws to govern foreign transactions would undermine Congress's ability to impose a meaningful, uniform limitation on the scope of the Exchange Act and to speak with one voice with respect to international commerce.  *See* Sections IV.B & IV.C.

*Fifth*, the Court should dismiss certain Exchange Act claims asserted by some of the Alameda and Connecticut plaintiffs.  Thirteen of the alleged misstatements at issue relate to BP's operating management system ("OMS").  Those same statements are the subject of a pending motion to dismiss in the consolidated class action (Dkt. No. 357), which defendants adopt and incorporate here.  With respect to six additional alleged misstatements at issue here (some of which the Court dismissed from the two original class-action complaints), the Alameda and Connecticut complaints fail adequately to allege that those statements were (1) materially false or misleading, and/or (2) made with scienter.  *See* Section V.

*Finally*, the Ohio and Oregon complaints should be dismissed for failure to plead a *prima facie* case of personal jurisdiction.  Ohio does not recognize general jurisdiction over non-residents, and none of the defendants in the Ohio action are alleged to be Ohio residents.  Oregon's attempts to plead general jurisdiction by imputing the contacts of BP subsidiaries to BP,

without offering any basis to pierce the corporate veil, are ineffective, and this Court has rejected similar allegations in another action in this MDL.  *In re BP p.l.c. Sec. Litig.*, 2012 WL 2617244, at *7 (S.D. Tex. July 5, 2012).   In addition, neither complaint adequately alleges specific jurisdiction because plaintiffs do not allege that any of defendants' statements or conduct took place in or were directed towards Ohio or Oregon.  *See* Section VI.[1]

## BACKGROUND

Plaintiffs in these four actions are sophisticated institutional investors from nine states that seek to recover losses they allegedly suffered as a result of the decline in price of BP's stock following the April 20, 2010 Deepwater Horizon explosion.  Plaintiffs predicate their claims largely on the same categories of allegedly false or misleading statements at issue in the consolidated class-action litigation asserting federal law claims.  Earlier this year, the Court dismissed all securities fraud claims under the Exchange Act brought on behalf of purchasers of BP ordinary shares.  *BP Sec. Litig.*, 843 F. Supp. 2d at 799.  Plaintiffs here attempt to revive their claims based on their purchases of BP ordinary shares by pleading them as violations of various state laws.  Because plaintiffs borrow liberally from the Second Amended Complaint ("SAC") in the consolidated class action, most of their factual allegations are familiar to this Court.

**Alameda County Employees' Retirement Association,** *et al.*

On November 30, 2012, Alameda County Employees' Retirement Association ("Alameda County"), Employees' Retirement System of the City of Providence ("City of Providence") and State-Boston Retirement System ("State-Boston") (collectively, the "Alameda plaintiffs") filed an amended consolidated complaint (the "Alameda complaint").  This complaint asserts claims against BP, BP America Inc. ("BP America") and BP Exploration & Production

---

[1]    Appendix 1 summarizes the reasons why plaintiffs' claims as to each challenged statement should be dismissed.

Inc. ("BP E&P") (collectively, the "Corporate Defendants") and against Anthony Hayward, Douglas Suttles, Andrew Inglis, Robert Malone, David Rainey, H. Lamar McKay and Robert Dudley based on plaintiffs' alleged purchases of BP ordinary shares and ADSs between November 29, 2006 and June 25, 2010. (Alameda Compl. ¶ 1.) Plaintiffs allege 35 purported misstatements, including all 22 statements at issue in the consolidated class action.[2]

Alameda County and State-Boston allege violations of Sections 10(b) and 20(a) of the Exchange Act based only on their purchases of BP ADSs. The complaint also asserts common-law claims by all three plaintiffs for (i) fraud, deceit, and fraudulent concealment, (ii) aiding and abetting fraud, and (iii) negligent misrepresentation with respect to both ADS and ordinary share transactions. Plaintiffs contend that Texas law applies to these claims or, in the alternative, that the law of each plaintiff's home state (*i.e.*, California, Massachusetts and Rhode Island) should apply. (*Id.* ¶¶ 541, 546, 556.) The complaint further includes claims for statutory fraud under Section 27.01 of the Texas Business and Commerce Code by all plaintiffs, and under the California Corporations Code and the California Civil Code by Alameda County. Finally, State-Boston alleges violations of the Massachusetts Deceptive and Unfair Trade Practices Act.[3]

---

2 Significant portions of the Alameda complaint are nearly identical to the SAC in the class-action litigation. (*Compare* Alameda Compl. ¶¶ 43-201, 223-329 *with* SAC ¶¶ 57-314.)

3 Appendix 2 contains a summary of the claims asserted by each plaintiff in all four complaints.

**Connecticut Retirement Plans and Trust Funds,** *et al*.

On November 30, 2012, Connecticut Retirement Plans and Trust Funds, North Carolina Department of State Treasurer ("North Carolina DST"), Public Employees' Retirement Association of Colorado ("Colorado PERA"), City of Philadelphia Board of Pensions and Retirement ("City of Philadelphia"), Los Angeles County Employees' Retirement Association and San Diego City Employees' Retirement System (collectively, the "Connecticut plaintiffs") filed a third amended complaint (the "Connecticut complaint").  This complaint asserts claims against BP, BP America, BP E&P, Hayward, Suttles, Inglis, Malone, Rainey and McKay based on plaintiffs' alleged purchases of BP ordinary shares and ADSs between January 16, 2007 and May 28, 2010. ███████████████████████████████████████████ ███████████████████████████████████ (Connecticut Compl. ¶¶ 25-30, 335-81.)  The complaint identifies 35 alleged misstatements, including 21 of the 22 statements challenged in the consolidated class action. ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██ ███████████████████████

Plaintiffs allege violations of Sections 10(b) and 20(a) of the Exchange Act based on their purchases of ADSs.  They also assert common-law claims for fraud, aiding and abetting fraud, and negligent misrepresentation based on their ordinary share and ADS transactions.  Plaintiffs contend that Texas law applies to these claims or, in the alternative, that the law of each plaintiff's home state (*i.e.*, California, Colorado, Connecticut, North Carolina and Pennsylvania) should apply.  (*Id.* ¶ 385.)  The complaint further asserts a statutory fraud claim under

Section 27.01 of the Texas Business and Commerce Code and violations of the Colorado Securities Act and the California Civil Code.

**The State of Oregon**

On April 19, 2012, Oregon filed a complaint in Oregon state court on behalf of various state pension funds.  Defendants removed the case, and it was transferred here.  This Court denied plaintiff's remand motion.  *See In re BP p.l.c. Sec. Litig.*, 2012 WL 4739673 (S.D. Tex. Oct. 1, 2012).  The complaint alleges that the Oregon funds purchased BP ordinary shares on the LSE between May 2007 and May 2010.  (Oregon Compl. ¶ 3.)  Oregon asserts claims for fraud under Oregon's securities statute and the common law based on the same 22 statements at issue in the consolidated class action.  (*Id.* ¶¶ 266-331.)

**The Ohio Public Employees Retirement System,** *et al.*

On April 19, 2012, the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, School Employees Retirement System of Ohio and Ohio Police and Fire Pension Fund (collectively, the "Ohio plaintiffs") sued in Ohio state court.  These same plaintiffs are currently among the lead plaintiffs in the consolidated class action.  Defendants removed the case, and it was transferred to this Court, which denied plaintiffs' remand motion. Plaintiffs assert claims under Ohio's securities statute and the common law based on their alleged purchases of BP ordinary shares between May 9, 2007 and May 28, 2010, challenging the same 22 statements at issue in the consolidated class action.  (Ohio Compl. ¶¶ 294-441.)

## ARGUMENT

### I.   ENGLISH LAW GOVERNS PLAINTIFFS' CLAIMS.

In total, plaintiffs purport to bring claims under the laws of nine different states.  Yet the complaints fail to allege facts that support applying this patchwork of state laws to claims arising from purchases of stock of an English company, particularly purchases made on an English stock

exchange, when the vast majority of the allegedly fraudulent conduct occurred in England. Given England's strong ties to the conduct and transactions at issue, plaintiffs' claims should be governed by English law.[4]

### A.    The Law of the Forum With the Most Significant Relationship to Plaintiffs' Claims Applies.

Where a "case is connected with more than one state and the laws of the states in question differ on one or more points in issue," a choice-of-law analysis is necessary.  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 761 F. Supp. 2d 504, 519 (S.D. Tex. 2011). Here, English law conflicts in important respects with the laws of the various states under which plaintiffs have asserted claims.[5]  As Martin Moore QC explains in his accompanying declaration, England has a bifurcated system of statutory and common-law liability for securities fraud based on the source of the alleged misstatement:  statements made in certain published documents (and certain oral statements "made in advance" of their publication) are actionable only under the statute, whereas all other statements are governed by the common law.  (Moore Decl. ¶¶ 19, 25-28.)  In contrast, the Texas, Ohio and Oregon securities statutes do not limit recovery to statements published in particular sources,[6] and those statutes overlap with, rather than preempt,

---

[4]    Defendants hereby provide notice pursuant to Federal Rule of Civil Procedure 44.1 of their intent to rely on foreign law in this action.  *See Northrop Grumman Ship Sys., Inc.* v. *Ministry of Defense of Rep. of Venez.*, 575 F.3d 491, 496-97 (5th Cir. 2009).  Copies of all cited English legal materials are included in the accompanying Declaration of Martin Moore QC, dated December 21, 2012 ("Moore Decl.").

[5]    Courts engage in choice-of-law analyses with respect to both common-law and statutory claims.  *See* Restatement (Second) of Conflict of Laws § 4(1) (local law for purposes of conflicts analysis encompasses all "standards, principles and rules . . . which the courts of that state apply in the decision of controversies brought before them"); *Greenberg Traurig*, 161 S.W.3d at 76-77 (applying conflicts principles to both statutory and common-law claims).

[6]    *See, e.g., Aegis Ins. Holding Co., L.P.* v. *Gaiser*, 2007 WL 906328, at *5 (Tex. App.—San Antonio Mar. 28, 2007, pet. denied); *Paull* v. *Capital Resource Mgmt., Inc.*, 987 S.W.2d 214, 218 (Tex. App.—Austin 1999, pet. denied); *In re Nat'l Century Fin. Enters., Inc., Invest. Litig.*, 2012 WL 5334027, at *16 (S.D. Ohio Oct. 26, 2012); *Axial Vector Engine Corp.* v. *Della Penna*, 2009 WL 1270291, at *4 (D. Or. May 6, 2009).

available common-law remedies.[7]  These fundamental differences give rise to a conflict that affects all of plaintiffs' state-law claims and requires a choice-of-law analysis.[8]

With respect to the Alameda and Connecticut complaints, regardless of whether the Court's jurisdiction over the state-law claims is based on diversity or supplemental jurisdiction, the Court should "appl[y] the choice of law rules of the forum." *Benchmark Elecs., Inc.* v. *J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003) (diversity jurisdiction); *see Kovacic* v. *Larry Brown Enters., L.L.C.*, 693 F. Supp. 2d 660, 662 (S.D. Tex. 2010) (supplemental jurisdiction). For the Ohio and Oregon complaints, which were removed to federal court and then transferred to this Court, "the choice of law rules of each jurisdiction in which the transferred actions were originally filed must be applied." *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 576 (5th Cir. 1996).  Accordingly, this Court should examine the choice-of-law principles of Texas, Ohio and Oregon.

Each of these three states has adopted some version of the "most significant relationship" test of the Restatement (Second) of Conflict of Laws for determining the law that applies to tort claims.[9]  "In evaluating the applicable Restatement provisions, courts typically start with the most particularized section—here, § 148 on fraud and misrepresentation—and then turn to the more general guidance" in the Restatement.  *In re Nat'l Century Fin. Enters., Inc., Invest. Litig.*,

---

[7]  *See Tony Gullo Motors I, L.P.* v. *Chapa*, 212 S.W.3d 299, 303 (Tex. 2006); *Federated Mgmt. Co.* v. *Coopers & Lybrand*, 2004 WL 2008271, at *5 (Ohio Ct. App. 2004); *Ahern* v. *Gaussoin*, 611 F. Supp. 1465, 1491, 1494 (D. Or. 1985).

[8]  As Martin Moore explains (*see* Moore Decl. ¶¶ 36-38, 109), a conflict also exists because English law does not recognize a private cause of action for several of plaintiffs' claims.  *See America's Favorite Chicken Co.* v. *Cajun Enters., Inc.*, 130 F.3d 180, 183 (5th Cir. 1997) ("true conflict" of laws exists where "Louisiana would not recognize a cause of action" but California would).

[9]  In Texas, "courts focus their examination on which state has the most meaningful connections with and interests in the parties and the transactions."  *Greenberg Traurig*, 161 S.W.3d at 70.  Similarly, Oregon courts "apply the 'most significant relationship' approach . . . to tort claims," which requires courts "to consider 'which state has the most significant relationship to the parties and the transaction.'"  *Spirit Partners*, 157 P.3d at 1200 (citation omitted).  And Ohio courts likewise use the "'significant relationship' test to determine which state's law applies to a tort action in a choice-of-law situation."  *Am. Interstate*, 861 N.E.2d at 526-27.

846 F. Supp. 2d 828, 851 (S.D. Ohio 2012); *accord Grant Thornton LLP* v. *Suntrust Bank*, 133 S.W.3d 342, 358-361 (Tex. App.—Dallas 2004, pet. denied).  Under Section 148, "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than where the false representations were made," courts should consider the following contacts in determining which state has the most significant relationship to the parties and transactions:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations, and
> (d) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 148(2); *see Greenberg Traurig*, 161 S.W.3d at 71; *Spirit Partners*, 157 P.3d at 1200; *Carder Buick-Olds Co.* v. *Reynolds & Reynolds, Inc.*, 775 N.E.2d 531, 543-44 (Ohio Ct. App. 2002).

"The various contacts are to be evaluated . . . with respect to the particular issue at hand," and claims of a similar nature can be grouped into categories and analyzed together.  *Greenberg Traurig*, 161 S.W.3d at 70-71 (grouping "fraud-based claims" together).  Here, all of the claims are fraud-based and involve nearly the same alleged misrepresentations and underlying facts.  Thus, for all of these claims, under any of the three states' choice-of-law rules, the most significant relationship test yields the same result.

## B.     England Has the Most Significant Relationship to the Parties and Transactions.

As to the four relevant factors, because the underlying ordinary share purchases occurred on the London Stock Exchange and the claims relate to statements by an English company, three of them—the place where the defendants made the statements, the place where plaintiffs received statements directed specifically at them, and the place where plaintiffs acted in reliance on the challenged statements—point to England as having the most significant relationship to

this litigation.  Restatement (Second) of Conflict of Laws § 148(2)(a)-(c).  The fourth factor—the

place where the parties reside—points to multiple jurisdictions and therefore is neutral.  *Id.*

§ 148(2)(d).

### 1.    The Majority of the Challenged Statements Were Made in England.

"[W]hen evaluating fraud-based claims . . . the principal focus is where the conduct

occurred."  *Greenberg Traurig*, 161 S.W.3d at 72.  "[B]ecause determining the place of loss in

fraud and misrepresentation cases can be difficult, the place of loss is less important in such

cases.  The place where the false representation is made, on the other hand, is an important

contact."  *Spirit Partners*, 157 P.3d at 1200; *accord In re Nat'l Century Fin. Enters., Inc. Invest.*

*Litig.*, 2008 WL 1995216, at *4 (S.D. Ohio May 5, 2008) (applying law of Ohio, where letter

containing alleged misrepresentation was drafted, rather than state where plaintiff received the

representation); Restatement (Second) of Conflict of Laws § 148 cmt. c ("The place where the

defendant made his false representations . . . is as important a contact in the selection of the

law . . . as is the place of the defendant's conduct in the case of injuries to persons or to tangible

things.").  Where "the representations alleged to have been made by the [defendant] were not

directed to [plaintiff's home state]," defendant's location in making the statements is entitled to

significant weight.  *Highland Crusader Offshore Partners, L.P.* v. *Motient Corp.*, 281 S.W.3d

237, 252 (Tex. App.—Dallas 2009, pet. denied) (quotation omitted).

Here, the majority of the alleged misrepresentations were made in England.  Although the

complaints generally do not allege the location of the challenged statements, it is apparent from

the documents in which many of the statements appear that they were made or issued by an

English company in England.  Of the 22 statements challenged in all four complaints, 14 were

made in England, whereas, at most, four were made in Texas, three in Louisiana, and one in

Washington, DC.  (*See* Appendix 3.)  Of the additional 12 statements challenged in both the

Alameda and Connecticut complaints, three were made in England, four were made in Louisiana, two were made in Texas and three in Washington, DC; one additional statement challenged in the Connecticut complaint was made in England, and the location of one additional statement challenged in the Alameda complaint is unknown. (*See id.*) ████████████████████

████████████████████████████████████████

████████████████████████████████████████

███

None of the plaintiffs assert that any alleged misstatements were made from their home states. Although plaintiffs allege that BP posted certain documents containing purported misstatements on its corporate website, these statements were issued from BP's headquarters in London and were not specifically directed at Texas, Ohio, Oregon or any other state. (*See, e.g.,* Alameda Compl. ¶¶ 333, 345, 354, 357, 370, 377, 385, 387, 389-90.)

███  ████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



Plaintiffs do not allege, other than in conclusory terms (*see* Ohio Compl. ¶¶ 21-22), that defendants specifically directed any of the challenged statements to them or their home states. *Cf. Benchmark*, 343 F.3d at 728 ("The alleged injury occurred to Benchmark in Texas, and it arose from misrepresentations made in or directed to this state."). Indeed, the Alameda plaintiffs contend that the alleged misstatements "were directed to existing BP shareholders, investors, and the market at large" (Alameda Compl. ¶ 517), which undermines the notion that defendants directed their statements to any particular plaintiff or state. *Compare Greenberg Traurig*, 161 S.W.3d at 72-73 ("representations were not directed to Texas") *with Highland Crusader*, 281 S.W.3d at 252 ("communications were directed to [plaintiff] in Texas"); *see also Nat'l Century*, 2008 WL 1995216, at *4.

### 3. Plaintiffs' Purchases of BP Ordinary Shares Occurred in England, Where Those Shares Are Traded.

Plaintiffs allege that they purchased their BP ordinary shares on the LSE. (*See* Alameda Compl. ¶ 1; Connecticut Compl. ¶ 31; Oregon Compl. ¶ 3; Ohio Compl. ¶ 6.) The bright-line rule announced by the Supreme Court in *Morrison* makes clear that those purchases therefore occurred in England. *See BP Sec. Litig.*, 843 F. Supp. 2d at 794. Consequently, any alleged

---

10



reliance by plaintiffs on the alleged misrepresentations necessarily took place in England as well. The Ohio and Oregon plaintiffs do not even attempt to allege that their purchases of BP ordinary shares occurred in their home states.  (Ohio Compl. ¶¶ 476, 480; Oregon Compl. ¶¶ 359, 362.) Although the Alameda and Connecticut plaintiffs allege in conclusory terms that they "act[ed] in and from their respective home states, by and through their investment advisers" (Alameda Compl. ¶ 478; Connecticut Compl. ¶ 335), that allegation is directly contradicted by their admission that they purchased BP ordinary shares in England on the LSE.  As one court reasoned, "because the actual transaction takes place on the foreign exchange, the purchaser or seller has figuratively traveled to that foreign exchange—presumably via a foreign broker—to complete the transaction."  *Stackhouse* v. *Toyota Motor Co.*, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010).  Thus, plaintiffs' purchases of their ordinary shares in supposed reliance on defendants' statements also occurred in England, which is another factor that points to England as having the most significant relationship to the present claims.

### 4. Plaintiffs' Residence in Various States Does Not Support Applying Those States' Laws.

None of the plaintiffs allege a meaningful connection between their home states—Rhode Island, California, Massachusetts, Connecticut, North Carolina, Colorado, Pennsylvania, Ohio and Oregon—and the conduct at issue.  (*See* Alameda Compl. ¶¶ 22-24; Connecticut Compl. ¶¶ 25-30; Ohio Compl. ¶¶ 24-27; Oregon Compl. ¶¶ 37-40.)  Plaintiffs' residence in those states creates no such connection.  *Greenberg Traurig*, 161 S.W.3d at 74 ("Although the investors are Texans, there is little other connection with Texas.").  Nor does the Ohio plaintiffs' conclusory assertion that the challenged statements "were made for the purpose of facilitating the sale and transfer of BP's ordinary shares in Ohio, including sales to Plaintiffs."  (Ohio Compl. ¶ 499.)

███████████████████████████████████████████████████████

████████████████████████████████ [11] That a shareholder "had no contact and no direct dealings" with the defendants "greatly impacts the conflict-of-laws analysis" and renders the shareholder's location relatively insignificant. *Greenberg Traurig*, 161 S.W.3d at 72; *accord Spirit Partners*, 157 P.3d at 1201.

Because the claims have no connection with plaintiffs' home states other than plaintiffs' residence there, and several of the defendants reside in England, the fourth factor—the place where the parties reside—is at most neutral with respect to which law should apply.

### 5. Policy Considerations Also Favor Application of English Law to Plaintiffs' Ordinary Share Claims.

The general choice-of-law principles set forth in Section 6 of the Restatement support application of English law to plaintiffs' ordinary share claims. Restatement (Second) of Conflict of Laws § 6(2). As the Supreme Court recognized in *Morrison* in declining to apply U.S. securities laws extraterritorially, "[l]ike the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction," 130 S. Ct. at 2885, and the U.S. should respect those sovereign prerogatives. The Supreme Court also credited the *amicus* briefs filed by three foreign governments arguing that a clear test governing extraterritorial application of the Exchange Act was necessary to avoid undesirable U.S. interference in the domestic markets of foreign countries. *Id.* at 2886. These considerations, which are no less valid in determining whether various state laws should apply extraterritorially to foreign securities transactions, implicate the following Section 6 factors:

---

[11] ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

(i) England's interest in having its own law applied to transactions on its markets; (ii) the basic policies underlying the field of securities law; (iii) certainty, predictability and uniformity of result; and (iv) ease in determination and application of the governing law.   Restatement (Second) of Conflict of Laws § 6(2)(a), (c), (e)-(g); *see also Greenberg Traurig*, 161 S.W.3d at 73 ("[T]he state where the act or omission occurs has a real interest in applying its law in order to implement the state's regulatory policy as reflected in that law.").

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER ENGLISH LAW.

English law recognizes three causes of action that correspond to plaintiffs' state-law claims:  (i) statutory securities fraud under FSMA; (ii) common-law fraud; and (iii) common-law negligent misstatement.[12]  (Moore Decl. ¶ 13.)  Rule 9(b) requires plaintiffs alleging fraud "at a minimum" to allege "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark*, 343 F.3d at 724 (quotation omitted).[13]  "Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out."  *Id.* (quotation omitted).  Rule 9(b) also applies to negligent misrepresentation claims if, as here, they "are based on the same set of alleged facts" as a fraud claim.  *Id.* at 723; *see In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F.

---

[12]    The remainder of plaintiffs' causes of action—aiding and abetting common-law fraud, statutory fraud or statutory deceit, and statutory unfair and deceptive trade practices—are not recognized under English law.  (Moore Decl. ¶¶ 36-38, 109.)  Accordingly, those claims should be dismissed.  *See Vargas* v. *Kiewit La. Co.*, 2012 WL 1029517, at *6-*7 (S.D. Tex. Mar. 26, 2012) (dismissing claims unavailable under applicable state law); *Greenberg Traurig*, 161 S.W.3d at 76 (dismissing two claims brought under Texas law because, "with the application of New York law, the Investors cannot maintain a claim for statutory fraud," and likewise, "the Investors cannot maintain a private statutory claim for securities fraud under New York law").

[13]    It is well settled that a court must "apply federal procedural law in cases involving foreign substantive law." *Giner* v. *Estate of Higgins*, 2012 WL 123973, at *5 (W.D. Tex. Jan. 13, 2012); *see Morris* v. *LTV Corp.*, 725 F.2d 1024, 1026-27 (5th Cir. 1984) ("Texas conflict-of-laws rules require application of foreign law if such law is characterized as substantive," but a federal court "will follow its own rules of procedure") (quotation omitted); *In re Geophysical Serv., Inc.*, 590 F. Supp. 1346, 1355 (S.D. Tex. 1984) ("forum will apply the foreign substantive law, but will follow its own rules of procedure") (quotation omitted).

Supp. 2d 800, 827 (S.D. Tex. 2007) (where plaintiffs "incorporated, indiscriminately, all their allegations of fraud into the claims" of negligent misrepresentation, Rule 9(b) applies).

### A.      Plaintiffs Do Not Allege Actual Reliance on Any of the Challenged Statements.

To state a claim under Section 90A of FSMA or English common law, plaintiffs must allege actual, individual reliance on each of the challenged statements.  (Moore Decl. ¶¶ 34-35, 70-72, 79 & n.14.)[14]  Plaintiffs cannot plead reliance by invoking the fraud-on-the-market presumption.  (*Id.* ¶¶ 35, 70-72, 79 ("[A]s a matter of US law, there is in certain circumstances a presumption of reliance, based on the 'fraud on the market' doctrine.  English law does not recognise such a doctrine at least for the purposes of founding a private law cause of action" under Section 90A or at common law.)   *See also* Brief for United Kingdom as Amicus Curiae Supporting Respondents, *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) (No. 08-1191), 2010 WL 723009, at *17-*18.

Because actual (as opposed to constructive) reliance is an essential element of a fraud claim under English law, Rule 9(b)'s heightened pleading standard applies.  *See Sanchez* v. *Liggett & Myers, Inc.*, 187 F.3d 486, 491 (5th Cir. 1999) (affirming dismissal of Texas common-law fraud claim under Rule 9(b) for failure to plead reliance with sufficient particularity). Plaintiffs thus must advance "particularized allegation[s]" that each of them actually relied on each of the alleged misstatements in purchasing BP shares.[15]  *Id.*  "The traditional way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged

---

[14]    *See McNaughton Paper Group Ltd.* v. *Hicks Anderson & Co.*, [1991] 2 Q.B. 113 at 126-27 (Eng.) ("[i]t is also necessary to consider whether [plaintiff] did in fact rely on the statement" for negligent misstatement claim); *Dornoch*, [2005] EWHC (Comm) 1887 at ¶ 106 (one of "the most significant elements of the torts of deceit or fraudulent misstatement [is] . . . the actual reliance by that person on the untrue statement to his loss").

[15]    Notably, several plaintiffs—City of Providence, Colorado PERA, City of Philadelphia, LACERA, SDCERS, and Ohio Police and Fire Pension Fund—do not allege that they purchased BP shares after April 20, 2010, and therefore they are unable to claim that they relied on any of the post-spill statements for their purchases. (Alameda Compl. ¶ 486; Connecticut Compl. ¶¶ 354, 361, 368, 375; Ohio Compl., Ex. D.)

in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation."  *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2181 (2011); *accord Edgington* v. *Fitzmaurice*, (1885) 29 Ch.D. 459 at 483 (Eng.) (representation must have been "actively present" in claimant's mind when he decided to enter into contract).  Because Plaintiffs do not allege "a nexus between any particular alleged misrepresentation and a specific act of reliance," they fail to plead an essential element of each of their claims under English law. *Amzak Corp.* v. *Reliant Energy, Inc.*, 2004 WL 1882482, at *6 (N.D. Ill. Aug. 19, 2004); *accord* (Moore Decl. ¶¶ 70-72 (English law requires a showing of reliance "on an individual basis" and "[i]f [the plaintiff] would have done the same thing even in the absence of [the misrepresentation], he will fail [for lack of reliance]") (quotation omitted).)[16]

### 1. The Oregon and Ohio Plaintiffs' Conclusory Allegations of Reliance Are Insufficient.

The Ohio and Oregon complaints contain only conclusory allegations of reliance that fall far short of pleading with particularity that each plaintiff actually relied on defendants' specific statements in making specific purchases of BP ordinary shares.  The Ohio plaintiffs assert that they "relied upon the material misstatements discussed herein in purchasing and retaining their BP ordinary shares" (Ohio Compl. ¶ 476), but they allege no facts to support this contention. Oregon similarly alleges that it "relied on BP's fraud, material misrepresentations and omissions, and deceptive business practices through its individual reliance."  (Oregon Compl. ¶ 366.)  In

---

[16]      Although English law governs plaintiffs' claims, their failure adequately to allege actual reliance would require dismissal of their common-law claims under Texas, Ohio, and Oregon law as well.  *See Perry* v. *Cohen*, 285 S.W. 3d 137, 145–48 (Tex. App.—Austin 2009, pet. denied) (requiring actual reliance for common-law fraud and negligent misrepresentation); *Domo* v. *Stouffer*, 580 N.E.2d 788, 793 (Ohio Ct. App. 1989) (requiring actual reliance for common-law fraud); *Williams* v. *Collins*, 600 P.2d 1235, 1239 (Or. Ct. App. 1979) (same).  If the Court were to determine that the various state laws and not English law apply to plaintiffs' claims and if the Court were to not dismiss the claims on the basis that application of the state laws to these wholly foreign transactions is constitutionally precluded by the dormant Commerce Clause, defendants request the opportunity to submit a brief on the deficiencies of plaintiffs' claims under the various state laws.

support, Oregon adds only that its "money managers regularly reviewed BP's annual reports and other SEC filings, read analyst reports regarding BP, and otherwise conducted research on the Company in order to determine whether investment by Oregon was appropriate," and that "if the true facts had been known to Plaintiff, Plaintiff would not have acted as it did in holding and purchasing BP ordinary shares."   (*Id.* ¶¶ 362, 376.)   Oregon does not identify a specific document, let alone a particular alleged misstatement, on which it or its money managers actually relied in purchasing BP ordinary shares.

"Conclusory statements of reliance are not sufficient to explain with particularity how [plaintiffs] detrimentally relied on the alleged fraud . . . ."  *Evans* v. *Pearson Enters.*, 434 F.3d 839, 852-53 (6th Cir. 2006); *see also Club Escapade 2000, Inc.* v. *Ticketmaster, L.L.C.*, 2011 WL 5976918, at *4 (W.D. Tex. Nov. 29, 2011); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 813 (S.D. Tex. 2007).  A plaintiff who "does not describe . . . the circumstances of his reliance" fails to satisfy the particularity requirements of Rule 9(b). *Sullivan* v. *Leor Energy LLC*, 2006 WL 2792909, at *7 (S.D. Tex. Sept. 27, 2006).  Accordingly, the conclusory assertions that Oregon "would not have acted as they did if they had known" the true facts and that the Ohio plaintiffs relied on the alleged misstatements without "stat[ing] facts showing that they were aware of the[] [statements], and that they relied on them in purchasing" BP shares are "insufficient to sustain the element of reliance."  *Mathison* v. *Bumbo*, 2008 WL 8797937, at *7 (C.D. Cal. Aug. 18, 2008).  Likewise, Oregon's general allegation that its money managers regularly review BP's SEC filings and analyst reports fails either to identify specific alleged misstatements or to explain how they supposedly were tied to plaintiffs' purchases, and thus does not provide "particularized allegation[s] that a *certain misrepresentation* was relied upon by [plaintiffs]."  *Sanchez*, 187 F.3d at 491 (emphasis added); *see also In re Digi Int'l, Inc.*

*Sec. Litig.*, 6 F. Supp. 2d 1089, 1103-04 (D. Minn. 1998) ("allegation is insufficient under Rule 9(b) because [plaintiff] has failed to allege that it actually read and relied on any specific misrepresentation in purchasing [defendant's] shares"); *accord AB* v. *S.W. Water Servs. Ltd.*, [1992] 4 All E.R. (Comm) 574 at 587 (Eng.) (adequately pleading fraud "requires clear and specific allegations of the precise nature and extent of the alleged false representations . . . and the extent to which any individual plaintiff became (a) aware of and (b) relied upon such representations."). (*See* Moore Decl. ¶ 17 & n.1 ("courts often emphasise that fraud has to be pleaded clearly and with particularity") (citing *Re Augustus Barnett & Son Ltd.*, [1986] B.C.L.C. 170 at 174-76 (Eng.).)

In *Enron*, for example, plaintiffs attempted to plead reliance based on allegations that they "read and relied upon each of the Forms 10-K . . . and Forms 8-K issued by Enron, between 1997 and November 2001, not knowing that they were false and misleading." 540 F. Supp. 2d at 830 (quotation omitted). In dismissing claims under Section 18 of the Exchange Act, which, like the English law claims asserted here, also requires actual reliance, the court held that "[s]uch conclusory, general statements are not sufficient to satisfy Rule 9(b)'s particularity requirement" and that plaintiffs were required "to make specific factual allegations describing each [of their] reliance on the statements in the[] documents and allege a causal connection between the statements and that [p]laintiff's purchase" of the relevant security. *Id.* Similarly, *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 284 (3d Cir. 2006), the Third Circuit rejected "cursor[y]" reliance allegations that plaintiffs "received, reviewed, actually read, and relied upon" various SEC filings, concluding that those allegations failed "to plead facts probative of [plaintiffs'] actual reliance on any specific false statements contained in those filings" and thus lacked "the requisite causal nexus between [plaintiffs'] purchase of securities

and specific statements contained in the SEC filings." *See also Int'l Fund Mgmt. S.A.* v. *Citigroup Inc.*, 822 F. Supp. 2d 368, 386-87 (S.D.N.Y. 2011) (allegations that plaintiffs "read and relied" on two SEC filings "lack supporting factual matter indicating how plaintiffs relied on the alleged misrepresentations" and thus are "too conclusory to state a claim").

### 2. The Alameda and Connecticut Plaintiffs' Allegations of Reliance Are Similarly Deficient.

The Alameda and Connecticut plaintiffs similarly allege in conclusory fashion that they "directly, justifiably, and reasonably relied, to their detriment, on the alleged false and misleading statements and omissions . . . by, among other things[,] reading the statements made by defendants in BP's various public filings; [and] reviewing analyst reports and news articles about BP that quoted, summarized or otherwise incorporated such statements." (Alameda Compl. ¶ 478; *see also* Connecticut Compl. ¶ 335.)  These conclusory reliance allegations fail to identify a single challenged statement that plaintiffs actually read, much less relied upon, and thus do not satisfy Rule 9(b).[17]  *See Enron*, 490 F. Supp. 2d at 813, 825; *Gray* v. *Bayer Corp.*, 2009 WL 1617930, at *3 (D.N.J. June 8, 2009) ("Alleging generally that [defendant] made misrepresentations, some of which were relied upon by Plaintiff" will not "survive the heightened scrutiny" of Rule 9(b)); *Chagos Islanders* v. *Attorney General*, [2003] EWHC (QB) 2222 at ¶ 364 (Eng.) (parties cannot sue in deceit "in respect of representations . . . in reliance upon which they did not act, being unaware of them").  The Alameda and Connecticut complaints' other allegations of reliance, discussed below, also come up short.

---

[17]     Both the Alameda and Connecticut plaintiffs make several references to "public statements to the press by BP of the estimated spillage into the Gulf of Mexico after the Deepwater Horizon well explosion." (Connecticut Compl. ¶ 344; Alameda Compl. ¶ 483, 490, 499, 500, 505.)  Yet nowhere in either complaint do those plaintiffs "indicate which specific representations individual plaintiffs relied on" or explain how they were influenced to act thereby.  *Shailja Gandhi Revocable Trust* v. *Sitara Capital Mgmt., LLC*, 2011 WL 814647, at *3 (N.D. Ill. Feb. 25, 2011).

a.    **General Allegations of Reliance Coupled With Alleged Transactions in BP Shares Do Not Satisfy Rule 9(b).**

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████   This type of conclusory pleading does not satisfy Rule 9(b) because plaintiffs "have not . . . clearly alleged" which of their transactions were made "in reliance on" which specific statements and the Court "cannot simply infer reliance." *Anderson* v. *Thompson*, 2008 WL 820024, at *6 (E.D. Tenn. Mar. 25, 2008) (finding reliance allegations "inadequate to survive dismissal" where complaint "represent[s] some Plaintiffs have held, bought, or sold [defendant's] stock during the time period involved, but fail[s] to ever relate that to any of the alleged instances of fraud"); *see also Baxter* v. *A.R. Baron & Co.*, 1995 WL 600720, at *4 & n.5, *5 (S.D.N.Y. Oct. 12, 1995) (dismissing fraud claims because, despite plaintiff's inclusion of "a register of transactions including the dates and amounts of the trades, there is no way to link the indicated trades with the allegations of misrepresentations and omissions in the Complaint").

b.    ████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████





### B.   Plaintiffs Cannot State a Claim Against the Individual Defendants or Assert "Holder" Claims Under the Financial Services and Markets Act 2000.

Section 90A of FSMA provides the exclusive remedy for purchasers of securities on a regulated market (such as the LSE) based on false or misleading statements in yearly and half-yearly financial reports and other interim management statements.  (Moore Decl. ¶¶ 18-19, 25-31.)  An issuer may be liable for such statements only if (i) a shareholder bought and sold shares and suffered a loss as a result of the statements, (ii) the shareholder reasonably relied on the statements in purchasing the shares, and (iii) a person with managerial responsibility for the publication knew the statement was false (or was reckless as to its truth) or knew an omission to be a dishonest concealment of material fact.  (Id. ¶¶ 19-20, 29-35.)  FSMA does not create a cause of action for shareholders that purportedly held their shares—so-called "holder" claims—in reliance on the statements.  (Id. ¶ 31.)  Under FSMA, officers and directors are personally liable only to the issuer; they are not liable to shareholders.  (Id. ¶ 26.)

As shown in Appendix 3, two of the statements challenged by the Ohio, Oregon and Alameda plaintiffs, and three of the statements challenged by the Connecticut plaintiffs, are portions of BP Annual Reports for 2007, 2008 and 2009 (filed with the SEC on Form 20-F) that fall within the ambit of Section 90A of FSMA.  No other statements at issue in these actions are subject to FSMA.  (Id. ¶ 29.)  In addition to their failure to plead actual reliance, which is fatal to all of plaintiffs' claims under FSMA (id. ¶¶ 34-35), plaintiffs cannot state a claim under FSMA (i) against the individual defendants, and (ii) based on BP shares that they held during the relevant time period.  (Id. ¶¶ 26, 31.)[20]

---

[20]   The Connecticut plaintiffs also fail to state a claim with respect to the statement in BP's 2007 Annual Report because they do not allege that a person discharging managerial responsibility knew the statement was false or was reckless as to its truth.  (See Connecticut Compl. ¶¶ 171-72.)  Although plaintiffs allege that this document "was signed by Hayward" (id. ¶ 171), they do not allege that Hayward or any other individual with "managerial responsibilities . . . in relation to the publication" had the requisite state of mind.  (Moore Decl. ¶¶ 19, 32 (quoting

*(footnote continued)*

**C.      Plaintiffs Fail to State a Claim for Common-Law Fraud or Deceit.**

For the statements not governed exclusively by FSMA, plaintiffs fail to state a claim for common-law fraud (or deceit in English parlance).  To state such a claim (*see* Moore Decl. ¶ 40), plaintiffs must allege that (i) the speaker made a false statement of fact or failed to disclose a material fact, (ii) the speaker knew the statement was false or was reckless as to its truth, (iii) the speaker made the statement with the intent that plaintiff act upon it, and (iv) plaintiff acted in reliance on the statement and suffered loss as a result.  *See also* Clerk & Lindsell on Torts, 18-01 (19th ed. 2006) (hereinafter "Clerk & Lindsell") (English tort of deceit). In addition to their failure to plead reliance, plaintiffs do not allege that any defendant made a statement with the required intent to induce plaintiffs to purchase BP shares.  Moreover, several of the alleged misstatements challenged here but not in the federal law class-action complaint are not statements of fact but statements of opinion or intent that are not actionable under English law.

**1.      Plaintiffs Fail Adequately to Allege That Any Defendant
            Intended to Induce Plaintiffs to Purchase BP Shares.**

To plead the requisite intent to induce reliance under English law, plaintiffs must allege that "there was an actual intention to deceive the claimant in question . . . it will not be enough merely to show that the misstatement is reasonably calculated to deceive him."  Clerk & Lindsell, 18-30.  Plaintiffs cannot plead that defendants intended to induce their reliance simply by arguing that it was foreseeable that plaintiffs might rely on the statements.  (*See id*.)  Likewise, allegations that defendants understood that members of the general investing public would read

---

*(footnoted continued)*
FSMA Section 90A(4)).)  Rather, they merely cross-reference another paragraph of their complaint that identifies supposed reasons why "BP" and "Defendants" purportedly knew an unattributed corporate statement in a BP press release dated January 16, 2007 was false or were reckless as to its truth.  (Connecticut Compl. ¶ 154.)  But nowhere in this cross-referenced paragraph do plaintiffs even mention Hayward, let alone allege that he knew the challenged statement in the 2007 Annual Report was false or was reckless as to its truth.

or hear the challenged statements do not suffice under English law.  *See Barry*, (1861) 2 J. & H. at 24-29 (Eng.) (sellers of shares that spread false rumors to boost share price not liable in deceit to third persons that bought shares based on rumor).  "[I]t must have been the representor's intention that this statement would cause an act of reliance of the kind which the representee has established."  John Cartwright, *Misrepresentation, Mistake and Non-Disclosure*, 5-19 (3d ed. 2012) (hereinafter "Cartwright").

<div align="center">

a.      **Plaintiffs Do Not Allege That Defendants Intended for Plaintiffs to Rely on the Challenged Statements**.

</div>

Plaintiffs assert that defendants made the challenged statements "with the intent that they be acted upon by others, including investors and prospective investors in BP securities, such as Plaintiffs ███████████████████████"  (Connecticut Compl. ¶¶ 403, 419, 427, 445; *see also* Ohio Compl. ¶ 488; Oregon Compl. ¶ 374; Alameda Compl. ¶ 536.)  Such a conclusory assertion is not sufficient to plead that defendants acted with the requisite intent.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  "While Rule 9(b) provides that intent and knowledge 'may be alleged generally,' this is not license to base claims of fraud upon conclusory allegations."  *City of Clinton* v. *Pilgrim's Pride Corp.*, 632 F.3d 148, 154 (5th Cir. 2010); *see Tuchman* v. *DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) ("more than a simple allegation that a defendant had fraudulent intent" is required); *accord S.W. Water Servs.*, [1992] 4 All E.R. at 587 (requiring "clear and specific allegations of . . . the intent upon the part of the defendants or any individual employee").

In addition, many of the statements challenged in the complaints were not addressed to the investing public, let alone to plaintiffs in particular.  Under English law, plaintiffs must allege that it was each speaker's "intention that [his] statement would cause an act of reliance of the

kind" that resulted in plaintiffs' losses.  Cartwright, 5-19; *see Barry*, (1861) 2 J. & H. at 23 ("false representation was made with the direct intent that it should be acted upon by [another] in the manner that occasions the injury or loss").[21]  Whereas statements in prospectuses may reflect such an intention, *see*, *e.g.*, *Possfund Custodian Trustee Ltd.* v. *Diamond*; *Parr* v. *Diamond*, [1996] 1 W.L.R. 1351 at 1365 (Eng.), many of the statements at issue here derive from sources addressed to audiences other than investors and do not invite the purchase of shares.

For example, plaintiffs challenge statements from BP's Initial Exploration Plan ("EP") and Oil Spill Response Plan ("OSRP") filed with a government agency.  (*See*, *e.g.*, Alameda Compl. ¶¶ 360-61, 372.)  Plaintiffs recognize that "before BP could begin operations at the Macondo well, federal regulations required BP to submit its EP."  (*See id.* ¶ 364.)  They do not allege that BP filed the EP or OSRP with the Mineral Management Services with an intent that shareholders rely on it, or even for that matter that they were aware of the EP or OSRP prior to this litigation.  Plaintiffs also challenge statements from BP's 2006 and 2009 Sustainability Reports (*see*, *e.g.*, Alameda Compl. ¶¶ 333, 389-90) and BP's 2008 and 2009 Sustainability Reviews (*see*, *e.g.*, *id.* ¶¶ 370, 385, 387).  These documents are "aimed at all readers with an interest in BP's social, environmental and safety performance."  (Ex. E at 35 (BP Sustainability Review 2009).)  Two of the documents expressly state that "[n]o part . . . constitutes, or shall be taken to constitute, an invitation or inducement to invest in BP p.l.c. or any other entity and must not be relied upon in any way in connection with any investment decisions."  (Ex. E at i (BP Sustainability Review 2009); Ex. F at 1 (BP Sustainability Report 2009).)  Plaintiffs similarly challenge congressional testimony by Malone, Rainey and McKay (*see*, *e.g.*, Alameda Compl. ¶¶ 335, 374, 418) without alleging that this testimony was intended to induce plaintiffs to

---

[21]  Allegations that defendants intended their statements to inflate artificially the price of BP shares are insufficient to satisfy the intent to induce reliance element of common-law deceit.  (*See* Moore Decl. ¶ 62(a).)

purchase  BP  shares  ███████████████████████████████████████████

███████████████████████

Given  the  variety  of  settings  in  which  the  challenged  statements  arose,  plaintiffs'
conclusory  assertion  that  defendants  made  these  statements  "with  the  intent  that  they  be  acted
upon  by  .  .  .  investors  and  prospective  investors"  is  insufficient.   Because  plaintiffs  do  not—and
cannot—allege  that  defendants  made  the  supposed  misstatements  "with  a  view  to  [their]
transaction[s],"  *Way*  v.  *Hearn*,  (1862)  13  C.B.N.S.  292  at  305  (U.K.),  plaintiffs  fail  to  plead
intent  to  induce  reliance  under  English  law.

### b.   Plaintiffs Fail to Allege the Requisite Intent for Any Particular Defendant.

Plaintiffs  fail  to  allege  with  sufficient  particularity  that  any  individual  speaker  intended  to
induce  plaintiffs'  reliance,  referring  instead  to  "defendants"  collectively.   (*See* Alameda Compl.
¶¶ 517, 536; Connecticut Compl. ¶¶ 402, 403, 418, 419, 426, 427, 435, 436; Ohio Compl. ¶ 488;
Oregon Compl. ¶ 374.)   The  "general  common  law  rule  [is]  that  where,  as  in  fraud,  an  essentially
subjective  state  of  mind  is  an  element  of  a  cause  of  action  .  .  .  the  required  state  of  mind  must
actually  exist  in  the  individual  making  (or  being  a  cause  of  the  making  of)  the  misrepresentation."
*Southland Sec. Corp.* v. *INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).   Plaintiffs
fail  to  allege  that  any  "individual  corporate  official"  who  made  a  purported  misstatement  acted
with  intent  to  induce  reliance,  and  such  intent  "may  not  simply  be  imputed"  to  a  particular
defendant  based  on  allegations  about  defendants  as  a  group.   *Id.*   Plaintiffs'  generalized
allegations  about  defendants'  collective  intent  are  insufficient  to  plead  that  any  individual
defendant  acted  with  the  requisite  intent  to  induce  reliance.   *See Enron*, 540 F. Supp. 2d at 832-
33 ("conclusory"  allegations  "relat[ing]  to  all  the  defendants"  insufficient  to  plead  required
individual  state  of  mind).

As for statements attributed to BP, a corporation can be held to have a particular state of mind only if the responsible individual possessed that mental state.  As Moore explains, "where representations are alleged to be have been made, or states of mind held 'by' a company, it is necessary to specify which individual(s) are said to have acted on behalf of the company and to consider whether their actions and/or state of mind can be attributed to the company."  (Moore Decl. ¶ 17 & n.3 (citing *Meridian Global Funds Mgmt. Asia Ltd.* v. *Securities Comm'n*, [1995] 2 A.C. 500 at 506-07 (Eng.) ("[A] reference to a company 'as such' might suggest that there is something out there called the company of which one can meaningfully say that it can or cannot do something. . . . To say that a company cannot do something means only that there is no one whose doing of that act would, under the applicable rules of attribution, count as an act of the company.").)   Although Rule 9(b)'s particularity requirement is "relaxed" with regard to allegations of "conditions of the mind," plaintiffs still must "point[] out circumstances or facts that reasonably indicate intent" on the part of the person who "ma[de] or issue[d] the statement." *7-Eleven Inc.* v. *Puerto Rico-7 Inc.*, 2008 WL 4951502, at *2 (N.D. Tex. Nov. 19, 2008).  The complaints fail to do so here.[22]

---

[22]    Intent to induce reliance is an element of common-law fraud in addition to the separate element of knowledge or recklessness of falsity.  (Moore Decl. ¶¶ 40, 56-58.)  Thus, the Court's determination that the class action plaintiffs have sufficiently alleged scienter under the Exchange Act for certain defendants does not mean that similar allegations satisfy the intent-to-induce-reliance requirement of common-law deceit.  *See* Clerk & Lindsell, 18-01.  Moreover, as to statements attributed to Malone, McKay, Rainey and Dudley, plaintiffs' allegations are insufficient to plead knowledge of falsity or recklessness.  For several of these statements, the Connecticut plaintiffs merely allege that they were made negligently, which is facially insufficient to plead knowledge or recklessness.  (*See* Connecticut Compl. ¶¶ 158, 164, 195; *see also id*. ¶ 227.)  Further, as noted above, under English law, the requisite mental state must exist in the individual making or causing the statement and cannot be inferred based on allegations about collective or corporate knowledge.  (Moore Decl. ¶ 17 & n.3.)  As a result, plaintiffs' allegations about "defendants" or "BP" fail to allege knowledge or recklessness on the part of any individual speaker.  (*E.g.*, Alameda Compl. ¶ 336; Connecticut Compl. ¶ 158.)  Likewise, for unattributed corporate statements, because plaintiffs fail to allege the requisite mental state for an individual, they cannot impute knowledge or recklessness to the corporation.  (*E.g.*, Alameda Compl. ¶¶ 332, 407; Connecticut Compl. ¶¶ 154, 221; *see*  Moore Decl. ¶ 17 ("it is necessary to specify which individual(s) are said to have acted on behalf of the company and to consider whether their actions and/or state of mind can be attributed to the company").)

32

## 2. Certain Statements Challenged in the Complaints Are Non-Actionable Expressions of Opinion, Belief or Intention.

The Alameda and Connecticut complaints challenge five statements (three of which were dismissed by this Court in deciding defendants' first motions to dismiss in the class action) that are not actionable in fraud or deceit because they are expressions of opinion, belief or intention, not representations of fact.[23]

### a. Expressions of Honestly Held Beliefs and Opinions Are Not Actionable.

A statement of opinion is generally not actionable as fraud or deceit because it is not "a representation of the objective state of affairs being discussed." (Moore Decl. ¶ 47.) "A mere statement that one thinks a given state of affairs exists is not a statement that it does in fact exist: it follows that it cannot engender liability in deceit on that basis [if the opinion is honestly held]." Clerk & Lindsell, 18-11; *see also AIC Ltd.* v. *ITS Testing Servs.*, [2007] 1 All E.R. (Comm) 667 at 726 (Eng.) ("It is also standard law that to found an action in deceit the representation relied on must be one of fact.  A statement of opinion will not suffice unless the deceit is in the fact that the opinion was not, or not honestly, held or in some further implicit dishonest misrepresentation of fact to be derived from the statement of opinion.").

---

[23]     In addition, plaintiffs' failure adequately to allege under the Exchange Act that statements were false or misleading or made with scienter also supports dismissal of plaintiffs' claims for deceit under English law, and vice versa.  *Compare BP Sec. Litig.*, 843 F. Supp. 2d at 746, 748 ("To state a private claim under section 10(b), a plaintiff must allege . . . a material misrepresentation or omission by the defendant" and "scienter," which is defined as "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it" (quotation omitted)), *with* Moore Decl. ¶¶ 40, 43-44, 50-52 (to state a claim for English tort of deceit, plaintiff must allege, *inter alia*, that the speaker made a false statement of fact or omitted a material fact "knowing it [was] untrue, or being reckless as to whether it [was] true").  In particular, thirteen of the statements challenged in these actions are already subject to defendants' pending motion to dismiss Exchange Act claims in the consolidated class action, and plaintiffs' common-law claims based on those statements should be dismissed for the same reasons.

Both Malone's statements during a May 16, 2007 congressional hearing and McKay's statements during his congressional testimony on May 19, 2010,[24] do not constitute actionable representations of fact:

> Today I want to assure you that we get it.  We have learned the lessons of the past.  BP America is committed to safety . . . .  (Alameda Compl. ¶ 335 (testimony of Malone).)

> That is our best estimate . . . . But we do recognize there is a range of uncertainty around the current estimate.  I think there are a range of estimates and it is impossible to measure . . . . It has been clear from day one there is a large uncertainty range around that.  It is theoretically possible.  I don't think anyone believes it is quite that high that has been working on this.  I believe the uncertainty range is around that 5,000 number, and it could be higher.  But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.  (Alameda Compl. ¶ 418; Connecticut Compl. ¶ 226 (testimony of McKay).)

The first statement by Malone asserts a subjective belief—"we get it," "we have learned"—that BP has learned from past safety incidents.  The second statement by McKay— with qualifications such as "I think," "I believe" and "I don't know"—"would indicate to a reasonable person that the putative representor was not assuming a responsibility for the accuracy or completeness of the statement or was saying that no reliance can be placed upon it." *Cassa di Risparmio della Repubblica di San Marino SpA* v. *Barclays Bank Ltd.*, [2011] EWHC (Comm) 484 at ¶ 222 (Eng.).  (*See* Moore ¶ 48 ("the whole context must be considered since taken in the round it may be clear that the particular representor was not making an assertion of accuracy").)  Indeed, McKay qualified his statement with words such as "estimate," "range of uncertainty" and "theoretically possible."  McKay's statement thus does not "have the character of a statement upon which the representee was intended, and entitled, to rely."  *Cassa di*

---

[24]     Plaintiffs mistakenly allege that this testimony occurred on May 10, 2010.  (Alameda Compl. ¶ 418; Connecticut Compl. ¶ 226.)

*Risparmio*, [2011] EWHC (Comm) 484 at ¶ 222.  Significantly, plaintiffs fail adequately to allege that these statements of beliefs and opinions were not honestly held by the speakers, Malone and McKay.  (*See*, *e.g.*, Alameda Compl. ¶ 332; Connecticut Compl. ¶ 154.)  As noted, plaintiffs' allegations about these individuals' mental state are either wholly conclusory or impermissibly premised on purported collective or corporate knowledge.  *See supra* Section II.C.1.b; *supra* n.22.

### b.   Expressions of Honestly Held Future Intentions and Expectations Also Are Not Actionable.

Similarly, "[a] representation as to the future will not as such found liability in deceit. Nor will a broken promise, as such."  Clerk & Lindsell, 18-09.  (*See* Moore ¶ 47.)  "A statement as to a future state of affairs can in itself be neither true nor false at the time it is made, since the future cannot be foretold."  *Bank Leumi Le Israel B.M.* v. *British Nat'l Ins. Co.*, [1988] 1 Lloyd's Rep. 71 at 75 (Eng.).  Although a statement of present intention can be actionable as deceit if that intention was not genuinely held at the time, *id.*, "[t]he difficulty facing many, if not most, claimants, is that their real complaint is that the intention was not carried out.  But absent some contractual undertaking to do so, there never was a representation that it would be."  *Hagen* v. *ICI Chems. and Polymers Ltd*, [2002] I.R.L.R. 31 at ¶ 131 (Eng.).

The following statements are expressions of future intention, not representations of present fact and, as such, are not actionable as deceit:

> BP has already taken a number of actions which align with the recommendations of the BP US Refineries Independent Safety Review Panel and *will, after a more thorough review, develop plans* for additional action at its U.S. refineries and for applying lessons learned elsewhere.  (Alameda Compl. ¶ 331 (emphasis added); Connecticut Compl. ¶ 153 (emphasis added).)

> *[W]e will continue to invest in research and technology* to drive us to *our ultimate goal* of zero discharge . . . . I would like to return to the Gulf of Mexico . . . . There are many challenges to overcome to bring Tiber to production, but they are exciting challenges and *we look forward* to addressing them. As we do so, *we*

*will* be ever mindful and respectful of the communities and the environments in which we operate.  (Alameda Compl. ¶ 374 (emphasis added).)

BP America is *in the midst* of a comprehensive *effort to improve* its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities.  (*Id.* ¶ 341 (emphasis added).)

The first two statements are representations about what the speaker *will* do in the future and "can in [themselves] be neither true nor false at the time [they were] made, since the future cannot be foretold."  *Bank Leumi*, [1988] 1 Lloyd's Rep. at 75.  The third statement refers to an "effort to improve" BP's safety culture and risk management programs, and thus expresses an intent to achieve future results.  The focus of each of these statements is not on present facts or the present state of affairs, but rather on the speaker's future intention.  "[T]hat the intention was [allegedly] not carried out," *Hagen*, [2002] I.R.L.R. 31 at ¶ 131, is insufficient to plead deceit because "the mere fact that the intention which was represented to exist was not eventually carried into effect is little or no evidence of the original non-existence of the intention."  Clerk & Lindsell, 18-10.  Plaintiffs also do not adequately allege that these expressions of future intention were not genuinely held at the time the statements were made.





Such allegations do not satisfy Rule 9(b), which "requires the who, what, when, where, and how to be laid out." *Benchmark*, 343 F.3d at 724 (quotation omitted).



Plaintiffs do not allege that these factual statements were untrue.  *See In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 801 (S.D. Tex. 2012) ("Because Plaintiffs fail to identify any facts calling into question the specific statement they challenge, Plaintiffs have failed to plead with particularity the falsity.").  Having failed to "explain why the statements were fraudulent," plaintiffs cannot state a claim based on these allegations.  *Dorsey* v. *Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008); *accord Dunbar Bank plc* v. *Nadeem*, [1997] All E.R. 253 at 268 (Eng.) (finding an allegation of fraud insufficient because "it [did] not allege that any express false statement was made").







### D.    Plaintiffs Fail to State a Claim for Negligent Misrepresentation.

In addition to their failure to plead actual reliance, the Alameda and Connecticut plaintiffs do not state a claim for negligent misrepresentation because they fail to allege that any defendant owed them a duty of care arising from a special relationship.  To state a claim for negligent misrepresentation (negligent misstatement under English law (*see* Moore Decl. ¶ 77)), plaintiffs must allege that (i) defendants owed them a duty of care based on a special relationship,[28] (ii) defendants breached that duty, and (iii) the breach caused plaintiffs' loss through their reliance on the misstatement.  (Moore Decl. ¶¶ 78-81 (citing *Hedley Byrne*, [1964] A.C. at 483).)  Moreover, "a director or employee acting in that role does not bear personal

[27]    The Alameda plaintiffs assert, in conclusory fashion, that non-defendants Grote and MacLeod were "fully informed surrogates of Hayward and Lord Browne."  (Alameda Compl. ¶ 440.)  Not only do plaintiffs fail to allege any facts to substantiate this assertion, but a mental state "may not simply be imputed . . . on general principles of agency."  *Southland Sec. Corp.*, 365 F.3d at 366.

[28]    A special relationship exists only if "there is such proximity between the maker and the subject of the misstatement as will impose a duty of care on the former for the protection of the latter."  *Spring* v. *Guardian Assurance Plc.*, [1995] 2 A.C. 296 at 325 (Eng.).  (*See* Moore Decl. ¶¶ 86-87 (citing *Caparo Indus. Plc.* v. *Dickman*, [1990] 2 A.C. 605 at 632-33 (Eng.)).)  To make this determination, courts consider factors including (i) the purpose for which the statement was made or communicated, (ii) the relationship between the adviser, the advisee and any relevant third party, and (iii) the size of any class to which the advisee belongs.  *McNaughton*, [1991] 2 Q.B. at 125-26.

liability.  Such statements are made on behalf of the corporation."  (Moore Decl. ¶ 101-02 (citing *Williams* v. *Natural Life Health Foods Ltd.*, [1998] 2 All E.R. 577 at 582-86).)[29]

Plaintiffs do not allege any pre-existing relationship—let alone a "special" relationship—between them and any of the defendants resulting from a "direct and specific" assumption of responsibility that would give rise to a duty of care.  (Moore Decl. ¶¶ 80-82 (citing *Hedley Byrne*, [1964] A.C. at 483).)  For such a duty to exist, the statement must be (i) "plaintiff-specific: that is, it must be given to the actual plaintiff or to a member of a group, identifiable at the time the statement is made, to which the actual plaintiff belongs," (ii) "purpose-specific: the statement must be made for the very purpose for which the actual plaintiff has used it," and (iii) "transaction-specific: the statement must be made with reference to the very transaction into which the plaintiff has entered in reliance on it."  (Moore Decl. ¶ 89 (quoting *Reeman*, [1997] P.N.L.R. at 639-40).)  Plaintiffs' allegation that their reliance on the statements was foreseeable is insufficient because "[i]t is clear that the imposition of a duty depends on the defendant knowing as opposed to merely foreseeing, that specific interests of the claimant are at issue." Clerk & Lindsell, 8-95.  (*See* Moore Decl. ¶ 85.)

████████████████████████████████████

████████████████████████████████████

plaintiffs do not allege that any of the challenged statements were directed specifically to them. If plaintiffs' allegations that they were members of an indeterminate class of shareholders or potential shareholders of BP were sufficient to plead a "special relationship" (Moore Decl. ¶ 80), there would be virtually "no limit to the persons to whom the speaker . . . could be liable."

---

[29]   Such liability is "rarely" found and cannot exist unless an individual "conveyed to the plaintiffs that [he] was willing to assume personal responsibility to them" (Moore Decl. ¶¶ 103-04), yet plaintiffs make no such allegations.

*Hedley Byrne*, [1964] A.C. at 534; *see McNaughton*, [1991] 2 Q.B. at 126; Clerk & Lindsell, 8-98 ("[T]he larger the class of persons the more difficult it may be to infer that a duty of care was owed to the individuals within it.").  (*See* Moore Decl. ¶¶ 81, 86.)  "[W]here a statement is put into more or less general circulation and may foreseeably be relied on by [anyone] for any one of a variety of different purposes which the maker of the statement has no specific reason to anticipate," the maker of the statement is not "under a duty . . . to all and sundry for any purpose for which they may choose to rely on it."  *Caparo*, [1990] 2 A.C. at 621.

Plaintiffs also fail to allege that the statements were "made for the very purpose for which the actual plaintiff has used [them]" or "made with reference to the very transaction into which the plaintiff has entered in reliance on [them]."  (Moore Decl. ¶ 89 (quoting *Reeman*, [1997] P.N.L.R. at 639-40).)  Courts will not "attribute an assumption of responsibility unless the maker of the statement ought in all the circumstances, both in preparing himself for what he said and in saying it, to have directed his mind . . . to some *particular and specific purpose* for which he was aware that his advice or information would be relied on."  *Caparo*, [1990] 2 A.C. at 624 (quotation omitted) (emphasis added).[30]  Plaintiffs fail to plead that any defendant, in making the challenged statements, "directed his mind" to and "was aware that his advice or information would be relied on" for the "particular and specific purpose" of inducing plaintiffs to purchase BP stock.  *See supra* Section II.C.1.a.

---

[30]      *See Al-Nakib Inv. (Jersey) Ltd.* v. *Longcroft*, [1990] 1 W.L.R. 1390 at 1396-1400 (Eng.) (directors owed no duty of care to shareholder-claimants who received prospectus for purpose of subscribing to share issue but instead relied on prospectus to buy shares in open market); *Galoo Ltd.* v. *Bright Grahame Murray*, [1994] 2 B.C.L.C. 492 at 513-16 (where accountants made statements to be relied on for initial share purchase, they were not liable for losses connected with subsequent additional share purchases and loans because accountants were not alleged to have known that their work would be relied on for such transactions); Clerk & Lindsell, 8-92 ("in *Caparo* . . . the purpose of an audit report was restricted to enabling shareholders to exercise their proprietary interests in the management of the company and did not extend to enabling shareholders or anyone else to make informed investment decisions").

### III.     ALTERNATIVELY, THE COURT SHOULD DISMISS THE ENGLISH-LAW CLAIMS UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.

Under the *forum non conveniens* doctrine, a court has discretion to decline to exercise jurisdiction over a suit if the convenience of the parties and the court and the interests of justice favor adjudication of the case in another forum.  *See Koster* v. *(Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527-28 (1947); *Karim* v. *Finch Shipping Co.*, 265 F.3d 258, 268 (5th Cir. 2001); *In re BP S'holder Deriv. Litig.,* 2011 WL 4345209, at *2 (S.D. Tex. Sept. 15, 2011).  A court deciding whether to dismiss a case on *forum non conveniens* grounds first considers whether an alternative forum exists and then weighs the relevant public and private interest factors, giving appropriate deference to the plaintiff's choice of forum.  *See Syndicate 420 at Lloyd's London* v. *Early Am. Ins. Co.*, 796 F.2d 821, 828 (5th Cir. 1986); *In re BP S'holder Deriv. Litig.,* 2011 WL 4345209, at *2-*3.

### A.     The Courts of England Provide an Alternative Forum for These Claims.

This Court and others have routinely found that English courts are a suitable alternative forum in granting *forum non conveniens* dismissals.   *See*, *e.g.*, *Robinson* v. *TCI/US West Commc'ns Inc.*, 117 F.3d 900, 908 (5th Cir. 1997); *Syndicate 420*, 796 F.2d at 828-30; *In re BP S'holder Deriv. Litig.,* 2011 WL 4345209, at *2.  English courts are an undeniably available and particularly appropriate forum for the present cases because plaintiffs' claims are governed by English statutory and common law and defendants are amenable to process in England.  *See Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 255 n.22 (1981); *Karim*, 265 F.3d at 268.  (Moore Decl. ¶ 13.)

**B.      The Public and Private Interest Factors Weigh Heavily in Favor of Litigating in England.**

The next step "is to proceed to a balancing of the public and private interest factors." *Syndicate 420*, 796 F.2d at 828.  Although deference is owed to plaintiffs' choice of forum,[31] "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice."  *Koster*, 330 U.S. at 527.  *Forum non conveniens* dismissal may be particularly appropriate where the "gravamen of [plaintiff's] complaint" presents "an issue best left for determination by [foreign] courts."  *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 435-36 (involving misrepresentations by foreign company made in a foreign country); *see In re BP S'holder Deriv. Litig.*, 2011 WL 4345209, at *3.  If they are not dismissed outright, plaintiffs' claims under English law, based on allegedly fraudulent conduct that occurred primarily in England and on purchases of securities in an English company on the LSE, should proceed in an English court.

**1.      The Relevant Private Interest Factors Favor Dismissal.**

All of the relevant private interest factors—the relative ease of access to sources of proof, the availability of compulsory process for unwilling witnesses, and the cost of attendance at trial of willing witnesses—support litigating these actions in England.  *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508 (1947); *see Saqui* v. *Pride Cent. Am., LLC*, 595 F.3d 206, 213 (5th Cir. 2010); *In re BP S'holder Deriv. Litig.*, 2011 WL 4345209, at *10.

---

[31]      As explained above, plaintiffs' claims have little connection with the forums in which they sued.  *See supra* Section I.B.  None of the Alameda and Connecticut plaintiffs are Texas residents (Alameda Compl. ¶¶ 22-24; Connecticut Compl. ¶¶ 25-30), and thus their choice to bring suit in the Southern District of Texas deserves less deference.  *See Piper Aircraft*, 454 U.S. at 255-56; *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *In re BP S'holder Deriv. Litig.*, 2011 WL 4345209, at *4.  Although the Ohio plaintiffs and Oregon reside in the state in which they initiated suit, their claims have no other connection to these jurisdictions.  *See Turan* v. *Universal Plan Inv. Ltd.*, 70 F. Supp. 2d 671, 677 (E.D. La. 1999) (plaintiffs' choice of their home state as forum outweighed where more convenient foreign forum was "focal point" of litigation); *Automated Marine Propulsion Sys., Inc.* v. *Aalborg Ciserv Int'l A/S*, 859 F. Supp. 263, 267-69 (S.D. Tex. 1994) (Texas resident's choice of Texas forum outweighed by private interest factors where Texas had little connection to case).

First, the relative ease of access to sources of proof favors England as the most convenient forum.  If plaintiffs' claims are not dismissed at the pleading stage, discovery will not focus on the oil spill in the Gulf of Mexico but on the facts and circumstances surrounding the issuance of the challenged statements—the majority of which originated in ███████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████ Thus, the ease of access to all of the relevant corporate documents strongly suggests that an English court is the more convenient forum.  *See*, *e.g.*, *Piper Aircraft*, 454 U.S. at 258 (affirming dismissal of action where "[a] large proportion of the relevant evidence is located in Great Britain"); *Syndicate 420*, 796 F.2d at 831; *In re BP S'holder Deriv. Litig.*, 2011 WL 4345209, at *10 ("Notwithstanding electronic discovery and other advancements that have eased the burden of defending this suit in the United States, the private interest factors still favor England as a more convenient forum.").

Likewise, the availability of compulsory process for attendance of unwilling witnesses and the cost of attendance for willing witnesses demonstrate that Texas, Oregon, and Ohio are far more inconvenient forums than England.  *See*, *e.g.*, *Syndicate 420*, 796 F.2d at 831 ("Most of th[e] witnesses are British, many may prove unwilling to  travel . . . to testify, and an American federal court is without power to compel them to do so.  In any event, the cost of obtaining the attendance of even those witnesses who are willing to come . . . to offer their evidence would certainly be considerable, and could prove to be prohibitive.").  Again, the most significant witnesses will be the BP officers to whom the alleged misstatements are attributed.  None of the individual defendants is alleged to reside in Ohio or Oregon, and only one is alleged to be "based in" Texas.  (Alameda Compl. ¶ 34; *see id*. ¶¶ 29-35; Connecticut Compl. ¶¶ 35-40; Ohio Compl. ¶¶ 33-35.)  It would be less costly for those individuals if the cases were tried in England.  The

Alameda and Ohio complaints also identify Lord Browne and Sir William Castell, both English citizens, as "non-parties."  (Alameda Compl. ¶¶ 38-39; Ohio Compl. ¶¶ 37, 39.)  District courts in the U.S. may be unable to compel those witnesses' attendance at trial.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

### 2.     The Public Interest Factors Point Decisively Towards Dismissal.

The relevant public interest factors—"the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action" and "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law"—strongly favor adjudication in England.  *See In re BP S'holder Deriv. Litig.,* 2011 WL 4345209, at *10, *15 ("It is the public interest factors . . . that most strongly favor England as the appropriate forum . . . [and] persuade the Court that this action should be dismissed.").

As the Supreme Court has stated, "the need to apply foreign law point[s] towards dismissal."  *Piper Aircraft*, 454 U.S. at 260.  This is especially true where, as here, the case may involve the application of novel issues of foreign law.  (*See* Moore Decl. ¶¶ 24, 41, 55, 60.)  Because there are no reported cases applying Section 90A of FSMA (*id.* ¶ 24), this Court would not have the benefit of English precedent in interpreting that provision.  An English court should be given the opportunity to analyze that statute in the first instance.  *See Piper Aircraft*, 454 U.S. at 251 ("The doctrine of *forum non conveniens* . . . is designed in part to help courts avoid conducting complex exercises in comparative law . . . ."); *In re BP S'holder Deriv. Litig.,* 2011 WL 4345209, at *14 (where this Court "would enjoy little guidance from the English courts, as

few relevant legal issues have been addressed . . . public interest factors weigh heavily in favor of England as the more convenient forum"); *Denmark* v. *Tzimas*, 871 F. Supp. 261, 271 (E.D. La. 1994) ("Although this Court is capable of applying English law, the courts of England are certainly better suited for such a task.").

## IV.   THE DORMANT COMMERCE CLAUSE BARS PLAINTIFFS' STATE-LAW CLAIMS BASED ON SECURITIES TRANSACTIONS ON A FOREIGN EXCHANGE.

In the alternative, plaintiffs' claims under the laws of various states should be dismissed because they are barred by the Commerce Clause of the U.S. Constitution.  That clause provides that "Congress shall have the Power . . . [t]o regulate commerce with foreign nations, and among the several states."  U.S. Const., art. I, § 8, cl. 3.  "Although the Commerce Clause speaks only of Congress's power, it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce."  *Piazza's*, 448 F.3d at 749.

The dormant Commerce Clause "applies both to the Foreign Commerce Clause ('Commerce with foreign Nations')" and "to the Interstate Commerce Clause ('Commerce . . . among the several states')."  *Id*.  Because the scope of Congress's power to regulate foreign commerce is greater than its power to regulate interstate commerce, "the limit on the power of the states in that area, is greater."  *Id*.  "The Supreme Court has repeatedly suggested that state regulations that touch on foreign commerce receive a greater degree of scrutiny than do regulations that affect only domestic commerce."  *Nat'l Foreign Trade Council* v. *Natsios*, 181 F.3d 38, 66 (1st Cir. 1999), *aff'd on other grounds sub nom. Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *accord Japan Line* v. *County of L.A.*, 441 U.S. 434, 446 (1979)

("more extensive constitutional inquiry is required" where state action implicates foreign commerce); *Piazza's*, 448 F.3d at 749 (citing decisions).[32]

The dormant Commerce Clause bars plaintiffs' state-law claims for two reasons.  First, state action that "directly regulates" foreign commerce is *per se* invalid.  *See Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986).  Second, even when state action has only "indirect effects" on foreign commerce, it is invalid if it "(1) create[s] a substantial risk of conflicts with foreign governments; or (2) undermine[s] the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states."  *Piazza's*, 448 F.3d at 750 (quoting *New Orleans S.S. Ass'n* v. *Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1022 (5th Cir. 1989)).[33]

### A.  Permitting Plaintiffs' State-Law Claims to Proceed Would Directly Interfere With Foreign Commerce.

Purely extraterritorial application of state laws to foreign commerce is unconstitutional *per se*—that is, without regard to whether it discriminates against out-of-state commerce and without regard to the possible benefits of the application to the state.  The Supreme Court has held that "'the Commerce Clause . . . precludes the application of a state statute to commerce that

---

[32]    Although dormant Commerce Clause challenges are generally brought against the application of state statutes or regulations, the doctrine is equally applicable to common-law claims.  *See, e.g.*, *Stone ex rel. Estate of Stone* v. *Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 45-47 (D. Mass. 2002); *Cincinnati* v. *Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1150 (Ohio 2002).  In *BMW of North America, Inc.* v. *Gore*, 517 U.S. 559, 572 n.17 (1996), the Supreme Court stated that "State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute."  *See also N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 265 (1964) ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised."); *San Diego Building Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief.").  *Cf. Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("At least since *Erie R. Co.* v. *Tompkins*, 304 U.S. 64 (1938), we have recognized the phrase 'state law' to include common law as well as statutes and regulations.").

[33]    In the context of *interstate* commerce, courts are directed to apply a balancing test that examines "the nature of the local interest and whether alternative means could achieve that interest with less impact on interstate commerce."  *Piazza's*, 448 F.3d at 750 (quotation omitted).  In the context of *foreign* commerce, however, the Fifth Circuit has made clear that state action is invalid if it violates either of the two conditions set forth in *Piazza's*; there are no countervailing considerations for the court to balance.  *Id.*

takes place wholly outside of the State's borders, *whether or not the commerce has effects within the State*.'" *Healy*, 491 U.S. at 336 (quoting *Edgar* v. *MITE Corp.*, 457 U.S. 624, 642-643 (1982)) (emphasis added).  This is because a "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id.*  Thus, "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.*

Courts examine "where the transaction being regulated was consummated to determine whether the application of a law impermissibly regulates extraterritorial commerce." *Eric M. Berman P.C.* v. *City of N.Y.*, 2012 WL 4514407, at *22 (E.D.N.Y. Sept. 29, 2012).  Federal law defines the relevant transaction for dormant Commerce Clause purposes. *Nat'l Century*, 755 F. Supp. 2d at 886 (analysis of location of securities transactions "is controlled by federal Commerce Clause and extraterritoriality jurisprudence"); *see United Healthcare Ins. Co.* v. *Davis*, 602 F.3d 618, 626 n.5 (5th Cir. 2010) (state cannot "use a purported 'definition' to impose de facto regulation that would violate the dormant Commerce Clause").

Here, plaintiffs' state statutory and common-law claims are predicated on purchases of securities.  As a result, the relevant focus for dormant Commerce Clause purposes is the location of the securities transactions, *i.e.*, in the United Kingdom on the LSE for plaintiffs' purchases of BP ordinary shares. *See Nat'l Century*, 755 F. Supp. 2d at 882.  Although *Morrison* addressed claims under Section 10(b) of the Exchange Act, the Supreme Court's reasoning makes clear that the location of transactions in publicly traded securities is the exchange on which the shares are traded. *See* 130 S. Ct. at 2886.  "Though the Supreme Court in *Morrison* did not explicitly define the phrase 'domestic transactions,' there can be little doubt that the phrase was intended to

be a reference to the location *of the transaction*, not to the location of the purchaser . . . ."  *In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 532 (S.D.N.Y. 2011) (emphasis in original). As this Court recognized, "[p]ost *Morrison*, the only relevant inquiry is where the transaction occurred, i.e., whether it was a 'domestic transaction.'"  *BP Sec. Litig.*, 843 F. Supp. at 796.  This inquiry "does not leave open any . . . back doors, loopholes or wiggle room to accommodate the distinctions Plaintiffs [may] urge."  *Id*.  Consideration of factors other than the location of the transaction "is exactly the type of analysis that *Morrison* seeks to prevent."  *Royal Bank of Scot. Grp. PLC Sec. Litig.*, 765 F. Supp. 2d 327, 337 (S.D.N.Y. 2011).

In *National Century*, the court held that the application of anti-fraud provisions of the Ohio Securities Act to transactions that occurred outside of Ohio—even if the fraud was centered in Ohio—would violate the dormant Commerce Clause.  755 F. Supp. 2d 877, 888 (S.D. Ohio 2010).  "[G]uided by" the "transactional test" of *Morrison*, the court held that "the 'commerce' or 'conduct' reached by the Ohio Securities Act," which "focuses on the 'purchase' and 'sale' of a security . . . is the securities transaction and not the fraud."  *Id*. at 882-84.  The court thus concluded that applying Ohio's securities fraud statute to these transactions would violate the extraterritoriality principle of the dormant Commerce Clause.  *Id*. at 888.[34]

As the *National Century* court explained, focusing on the securities transactions themselves is consistent with "the historical rationale for the constitutionality" of those laws. 755 F. Supp. 2d at 879.  In *Edgar*, the Supreme Court noted that the justification "for upholding

---

[34]      Even prior to *Morrison*, dormant Commerce Clause decisions analyzed state securities laws by reference to the location of the targeted transaction.  In *Arizona Corp. Commission* v. *Media Products, Inc.*, 763 P.2d 527, 531-33 (Ariz. Ct. App. 1988), the court held that the dormant Commerce Clause barred application of an Arizona registration requirement, where a Delaware corporation located in Arizona sold its securities exclusively to out-of-state purchasers.  The court focused on the purchasers' out-of-state locations in concluding that the requirement, as applied, impermissibly burdened interstate commerce.  *Id*. at 533.  Similarly, in *A.S. Goldmen & Co.* v. *New Jersey Bureau of Securities*, 163 F.3d 780, 786 (3d Cir. 1999), the dormant Commerce Clause inquiry turned on "the territorial basis" of the securities sale at issue.

blue-sky laws was that they only regulated transactions occurring within the regulating States," and that "'[s]uch regulations affect interstate commerce in [securities] only incidentally.'"  457 U.S. at 641 (quoting *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539, 557-58 (1916)); *see also Healy*, 491 U.S. at 333 n.9 (*Edgar* "significantly illuminates the contours of the constitutional prohibition on extraterritorial legislation").

Plaintiffs' transactions in BP ordinary shares—the proper focus of the dormant Commerce Clause inquiry—occurred in England on the LSE.  (*See* Alameda Compl. ¶ 1; Connecticut Compl. ¶ 31; Oregon Compl. ¶ 3; Ohio Compl. ¶ 6.)  Those transactions are thus wholly extraterritorial from the states whose laws Plaintiffs seek to assert, and applying those laws here would violate the dormant Commerce Clause.  *See*, *e.g.*, *Healy*, 491 U.S. at 336; *Nat'l Century*, 755 F. Supp. 2d at 888 (where securities sales "occurred wholly outside of Ohio" "applying [the Ohio Securities Act] . . . would violate the extraterritoriality principle of the Commerce Clause").

Plaintiffs' *residency* in particular states does not avoid the Commerce Clause bar because the relevant *transactions* occurred wholly outside those states.  *See Quik Payday, Inc.* v. *Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008) (to avoid violating dormant Commerce Clause, payday loan regulation interpreted to apply only to loans made to "Kansas consumers while they are in Kansas," not to Kansas residents who acquired loans outside state); *Carolina Trucks & Equip., Inc.* v. *Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007) ("Once a South Carolinian travels to Georgia, he is no longer a 'consumer in the State,'" and thus not subject to the South Carolina regulation at issue).  "Quite simply, if the transaction is consummated out of state, a state may not regulate it without violating the dormant Commerce Clause . . . regardless

of whether some other aspect of the commercial activity occurs within the state."  *Berman*, 2012 WL 4514407, at *22.

Nor can plaintiffs save their state-law claims by contending that their injury occurred in their home state or that defendants' allegedly false statements were disseminated into or relied upon in various states.  (*See*, *e.g.*, Alameda Compl. ¶¶ 517-18; Connecticut Compl. ¶ 388; Ohio Compl. ¶¶ 21-22.)  "The fact that a particular transaction may affect or impact a state does not license that state to regulate commerce which occurs outside its jurisdiction."  *Dean Foods Co.* v. *Brancel*, 187 F.3d 609, 619-20 (7th Cir. 1999); *see also Midwest Title Loans, Inc.* v. *Mills*, 593 F.3d 660, 669 (7th Cir. 2010).  Simply stated, "a plaintiff cannot seek to apply one state's statute to transactions in another state through an expansive definition of the site of the regulated conduct."  *Carolina Trucks*, 492 F.3d at 491.[35]  "The Supreme Court . . . has indicated that the rule against extraterritorial application of state law is not a technicality to be so readily evaded."  *Id.*; *see*, *e.g.*, *Healy*, 491 U.S. at 335-40 (invalidating price affirmation statute); *Brown-Forman*, 476 U.S. at 583 (same).

### B.   Application of State Law to Foreign Securities Transactions Would Create a Substantial Risk of Conflict with Foreign Governments.

In *Morrison*, the Supreme Court "reject[ed] the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad" in part because of "[t]he

---

[35]   In *Carolina Trucks*, the court rejected the argument that because a truck manufacturer advertised in South Carolina, "any 'sales' to South Carolina residents should be presumed to have occurred in part within the state" even if the sale transaction occurred at a dealership in another state.  492 F.3d at 490-91.  The court reasoned that "plaintiff's creative definition of the location of a sale" would subject companies that advertise nationally to claims by "all fifty states . . . that the manufacturer made 'sales' within their borders" and would run afoul of the Supreme Court's jurisprudence "deem[ing] extraterritorial statutes that seize upon a company's in-state commercial activities, such as . . . mailings and phone book advertising . . . to regulate the companies' out-of-state conduct."  *Id.* at 491; *see also Mills*, 593 F.3d at 669 ("Our conclusion is not altered by the fact that Midwest advertises in Indiana.").

probability of incompatibility with the applicable laws of other countries."  130 S. Ct. at 2885.[36]

The Court recognized that:

> Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. . . . [T]he regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters.

*Id*.  The Court noted that three foreign governments—including the United Kingdom—and eight national and foreign organizations filed *amicus* briefs "complain[ing] of the interference with foreign securities regulation that application of § 10(b) abroad would produce, and urg[ing] the adoption of a clear test that will avoid that consequence."  *Id*. at 2886.

The United Kingdom in particular argued that "[a]pplication of U.S. securities laws brings with it the full force of the U.S. legal system and real conflicts with other legal systems." 2010 WL 723009, at *16.  Its brief explains that there are "highly significant consequences of the extraterritorial application of U.S. securities laws, especially of the Rule 10b-5 private right of action," because "the panoply of procedural rules and remedies that accompany litigation in federal courts under U.S. securities laws creates a very different environment for the commencement, prosecution and settlement of lawsuits than exists in other jurisdictions."  *Id*. at *15-*16.  This risk of interference with other legal systems—expressly recognized by the Court in *Morrison*—is even greater if claims are permitted under the laws of all 50 states.[37]

---

[36]       That *Morrison* concerned the interpretation of a federal statute is irrelevant to whether plaintiffs' state-law claims would interfere with foreign commerce.   "When state law applies to conduct abroad, it is no less an application of U.S. law than when federal law is applied, and similar concerns about subjecting foreign actors to U.S. liability standards and damages should apply."   Katherine Florey, *State Law, U.S. Power, Foreign Disputes: Understanding the Extraterritorial Effects of State Law in the Wake of* Morrison *v*. National Australia Bank, 92 B.U. L. Rev. 535, 571 (2012).

[37]       The United Kingdom also noted that "[t]he regulation of securities markets involves exactly the kind of 'policy judgments' where sovereignty should be respected" and that "U.S. judicial interference in those decisions

*(footnote continued)*

### C.     Application of State Law to Foreign Securities Transactions Would Undermine the Ability of the Federal Government to Regulate Those Transactions.

"Foreign commerce is pre-eminently a matter of national concern," and therefore, it is important for the federal government to speak with a single, unified voice. *Japan Line*, 441 U.S. at 448.  The Fifth Circuit thus has held that "state and local policies affecting foreign commerce are invalid if they . . . undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states."  *Plaquemines Port*, 874 F.2d at 1022 (quoting *Japan Line*, 441 U.S. at 446).

*Morrison*'s promulgation of a transactional test was intended to clarify the extraterritorial reach of U.S. securities laws by setting forth an objective, bright-line rule for application of the Exchange Act.  *Morrison* overruled the "proliferation of vaguely related variations on the 'conduct' and 'effects' tests" that had been employed by various courts, noting that "th[e] tests were not easy to administer" and had been criticized as "unpredictable and inconsistent."  130 S. Ct. at 2879-80.  The Court's transactional test also responded to the foreign *amici* who "urge[d] the adoption of a clear test" that would avoid interference with foreign securities regulation.  *Id.* at 2886.

Thus, under *Morrison*, a clear test—understandable by investors, issuers and foreign regulators—now governs whether federal securities laws apply to a given transaction in an action

---

*(footnoted continued)*

risks damaging the mutual respect that comity is meant to protect and could be perceived as an attempt to impose American economic, social and judicial values."  2010 WL 723009 at *22-*23.  "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."  *Société Nationale Industrielle Aérospatiale* v. *U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987); *see also Int'l Transactions, Ltd.* v. *Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 593 (5th Cir. 2003).  Principles of comity further underscore why application of state law to plaintiffs' claims here would risk conflict with the United Kingdom's sovereign interests.  *Cf. In re Air Cargo Shipping Servs. Antitrust Litig.*, 2008 WL 5958061, at *31-*33 (E.D.N.Y. Sept. 26, 2008) (declining to adjudicate claim that would "undermine" another country's "stated" and "sovereign interest").

brought by a private investor.[38]  As this Court recognized, "[p]ost *Morrison*, the only relevant inquiry is where the transaction occurred, *i.e.*, whether it was a 'domestic transaction.'"  *BP Sec. Litig.*, 843 F. Supp. 2d at 796.  *Morrison*'s clear transactional test would be thwarted if private parties could apply the varying, and sometimes conflicting, laws of 50 states to transactions on foreign exchanges.  The concern recognized by the Supreme Court that the United States become the "Shangri-La" for "those allegedly cheated in foreign securities markets" is no less a concern because plaintiffs are pursuing state law instead of federal claims.  *Morrison*, 130 S. Ct at 2886.  As one commentator notes, "[i]f foreign conduct is increasingly subject to the differing regulatory demands of the fifty states, results are unlikely to be predictable, conflict with the laws of foreign jurisdictions is likely to increase rather than decrease, and foreign investors need only adjust their compass slightly to find a new Shangri-La."  Florey, 92 B.U. L. Rev. at 568.  It is precisely this type of disunity and confusion that the dormant Commerce Clause prohibits.  *See Healy*, 491 U.S. at 336 (extraterritorial state law is evaluated "not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.").

For this reason, courts do not apply state antitrust laws to foreign conduct that is beyond the scope of the federal antitrust laws.  As one court recently stated:

> [I]t is not necessary to know precisely the extent of the [New York] Act's extraterritorial reach to understand that it cannot reach foreign conduct deliberately placed by Congress beyond the Sherman Act's jurisdiction.  The federal limitation upon the reach of the Sherman Act, predicated upon and an expression of the essentially federal power to regulate foreign commerce, would

---

[38]    Congress subsequently amended the securities laws, including the Exchange Act, to provide that *Morrison* does not apply to actions brought by the Securities and Exchange Commission and Department of Justice.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 929P, § 27(b), 124 Stat. 1376, 1862 (2010).

be undone if states remained free to authorize 'little Sherman Act' claims that went beyond it.

*Global Reins. Corp.-U.S. Branch* v. *Equitas Ltd.*, 969 N.E.2d 187, 195 (N.Y. 2012). Other courts have reached the same result. *See*, *e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, 476 F. Supp. 2d 452, 457-58 (D. Del. 2007) (because Congress promulgated specific test governing extraterritorial application of federal antitrust laws, its intent "would be subverted if state antitrust laws were interpreted to reach conduct which the federal law could not").[39]

## V.  THE ALAMEDA AND CONNECTICUT PLAINTIFFS' EXCHANGE ACT CLAIMS BASED ON CERTAIN STATEMENTS SHOULD BE DISMISSED.

The Alameda and Connecticut plaintiffs (excluding City of Providence and Colorado) also allege violations of Sections 10(b) and 20(a) of the Exchange Act based on their alleged purchases of BP ADSs. Plaintiffs predicate those claims in part on the same 22 statements at issue in the putative class action pending before the Court. *See supra* at 6-8. Defendants incorporate by reference their arguments in support of dismissal of 13 of these duplicative statements that relate to BP's OMS. *See supra* at 5.[40]

---

[39]  In addition to violating the dormant Commerce Clause, applying state law to foreign securities transactions also would violate the Supremacy Clause. Although the Exchange Act was not intended to displace state securities statutes, and therefore those laws are not generally preempted, the Supremacy Clause nevertheless preempts state law where "under the circumstances of [a] particular case, [the challenged state action] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373. It would frustrate *Morrison*'s purposes if each state was permitted *ad hoc* to reach beyond the boundaries it established to regulate foreign transactions.

[40]  For example, two of these statements (the only alleged misstatements attributed to Inglis) represent that BP's Operating Management System ("OMS") will apply to "all aspects of operations throughout BP" (Alameda Compl. ¶ 339; Connecticut Compl. ¶ 161) and "provides a single, consistent framework for our operations" (Alameda Compl. ¶ 381; Connecticut Compl. ¶ 201). These statements were dismissed from the New York and Ohio and Ludlow complaints either for failure adequately to allege falsity, *BP Sec. Litig.*, 843 F. Supp. 2d at 768-72 (New York and Ohio), or scienter, *BP Sec. Litig.*, 852 F. Supp. 2d at 817 (Ludlow); *see also BP Sec. Litig.*, 843 F. Supp. 2d at 781, 782 & n.35. And as set forth in BP's motion to dismiss these and similar statements from the consolidated class-action complaint, these statements are entirely consistent with the description of OMS and its implementation that plaintiffs themselves allege was provided to Inglis and other defendants, and plaintiffs here still fail to allege any facts that give rise to a cogent and compelling inference of scienter. (Brief for Defendants (Dkt. 357) at 10, 23-24, 35-37.)

The Alameda plaintiffs also assert Exchange Act claims based on statements not included in the amended class-action complaint that are attributed to Malone, Rainey, McKay and Dudley.[41]   The Court previously dismissed some of these statements (and others not alleged here) from the putative class action because plaintiffs failed adequately to allege scienter for these individuals.  *BP Sec. Litig.*, 843 F. Supp. 2d at 781 (Rainey); *id*. at 785 (Malone); *id*. at 786 (Dudley); *id*. at 778 (McKay); *BP Sec. Litig.*, 852 F. Supp. 2d at 815 (McKay).  The Court should do so again here.  In addition, the Court should dismiss the Alameda and Connecticut plaintiffs' Section 10(b) claims based on several new statements not previously included in the class-action complaints.[42]

### A.      BP's Press Release Dated January 16, 2007

BP's January 16, 2007 press release stated:

> BP **already has taken** a number of actions which align with the recommendations of the BP US Refineries Independent Safety Review Panel and will, after a more thorough review, develop plans for additional action at its U.S. refineries and for applying lessons learned elsewhere.

(Alameda Compl. ¶ 331; *see also* Connecticut Compl. ¶ 153.)  Plaintiffs assert that this statement was false and misleading because BP was expanding its deep-water drilling operations without

---

[41]      The Connecticut plaintiffs assert Section 10(b) claims against BP, BP E&P, Hayward, Suttles and Inglis only and contend that these defendants "are liable for the materially false and misleading statements attributed to them." (Connecticut Compl. ¶ 391; *see id.* ¶ 388.)  The Connecticut plaintiffs do not predicate any Exchange Act claims on statements attributed to individuals other than Hayward, Suttles or Inglis or assert Exchange Act claims against other individuals.  In any event, with respect to statements attributed to other individuals, *see infra* Section V.B-D, F, the Connecticut plaintiffs allege that those statements were made negligently rather than intentionally or recklessly, *see supra* n.22, which is inadequate to state a claim for liability under the Exchange Act. *See Ind. Elec. Workers' Pension Trust Fund IBEW* v. *Shaw Grp., Inc.,* 537 F.3d 527, 533 (5th Cir. 2008).

[42]      "To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *BP Sec. Litig.*, 843 F. Supp. 2d at 746.  Plaintiffs must plead with particularity "'the reason or reasons why the statement is misleading'" and "'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'"  *Id.* (quoting 15 U.S.C. § 78u-4(b)(1), (2)).)

implementing adequate safety procedures despite knowing the risks associated with such drilling. (Alameda Compl. ¶ 332; *see also* Connecticut Compl. ¶ 154.)

As an initial matter, plaintiffs fail to plead adequately the falsity of the challenged statement, which concerns BP's refineries, not deep-water drilling.  The press release addresses BP's "continuing effort to improve its safety culture and to strengthen and standardize process safety management *at BP's five U.S. refineries*" and makes repeated references to BP's refining activities.  (Ex. G (January 16, 2007 Press Release).)  Plaintiffs' allegations concerning BP's mitigation of risks in its deep-water drilling operations are unrelated to BP's plans to implement safety recommendations at its U.S. refineries.  In addition, the reference to "applying lessons learned elsewhere" is a generalized positive statement that is too vague to be material.  *See Franklin Bank*, 782 F. Supp. 2d at 381; *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001) ("Vague, loose optimistic allegations that amount to little more than corporate cheerleading" are immaterial).

Nor have Plaintiffs adequately alleged scienter with respect to this statement.  Plaintiffs attribute the statement to "BP," not to any individual.  (Alameda Compl. ¶ 331; Connecticut Compl. ¶ 153.)  The only way plaintiffs can plead scienter for an unattributed corporate statement is by pleading errors "so egregious as to rise to the level of extraordinary and dramatic falsity."  *BP Sec. Litig.*, 843 F. Supp. 2d at 791.  The generalized statement in BP's press release about its future plans for its U.S. refineries does not come close to satisfying that exacting standard.[43]

---

[43]     This forward-looking statement also falls within the PSLRA's safe harbor because it is a "statement of the plans and objectives of management for future operations" and was accompanied by meaningful cautionary language.  *See BP Sec. Litig.*, 852 F. Supp. 2d at 799.  The challenged language includes the words "*will*, after a more thorough review, *develop plans*," and thus is phrased in a way that emphasizes the forward-looking nature of this statement.  (Alameda Compl. ¶ 331 (emphasis added); Connecticut Compl. ¶ 153 (emphasis added); *see also* Ex. G (BP "will implement the recommendations made by an independent safety review panel" and will "becom[e] an

*(footnote continued)*

### B.      Malone's House Testimony on May 16, 2007

In testimony before the U.S. House of Representatives Committee on Energy and Commerce on May 16, 2007, Malone stated:

> **Today I want to assure you that we get it.**  We have learned the lessons of the past.
>
> **BP America is committed to safety,** and the expectation of our management is that **budget guidelines should never result in a compromise in safety performance.** That is and has long been our philosophy . . . .
>
> I continue to meet with employees to reinforce my expectations of them: **that they must ensure that our operations are safe,** that they understand that they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.
>
> BP does not tolerate retaliation against workers who raise safety concerns.

(Alameda Compl. ¶ 335.)  The Alameda plaintiffs contend that these statements were false and misleading, and made with scienter, because Malone "portrayed BP's operations as safe" and "misrepresented BP's risk profile" while failing to disclose "multiple safety failures and near-failures" that BP had experienced in its deep-water operations.  (*Id*. ¶ 336(a)-(b).)  Plaintiffs also allege that Malone learned of retaliation by BP in 2008, after this statement was made.  (*Id*. ¶ 197.)[44]

These same allegations were the basis for an Exchange Act claim in a New York and Ohio class-action complaint.  (Ex. H ¶¶ 269-70 (New York & Ohio Complaint).)  The Court dismissed that claim because (i) with respect to the first paragraph of Malone's statement, "generalized statements about BP's 'commitment to safety,'" are "not actionable," *BP Sec. Litig.*,

---

*(footnoted continued)*

industry leader in process safety management").)  The statement also is accompanied by meaningful cautionary language.  (*See* Ex. G ("making dramatic change in large companies is difficult in short time frames and . . . the ultimate effectiveness of the actions taken or planned by BP could only be determined over time").)

[44]      It is unclear whether the Alameda plaintiffs assert that this statement provides a basis for an Exchange Act claim because they do not assert such a claim against Malone.

843 F. Supp. 2d at 757 & n.11; (ii) with respect to the second paragraph, "[s]imply citing prior examples of safety failures does not render false or misleading generalized statements about BP's risk profile or the riskiness of its operations," *id.* at 762 & n.13; and (iii) with respect to the statement about retaliation, plaintiffs failed to allege scienter because "Malone is not alleged to have received information from the Ombudsman contradicting his representation until 2008" and "knowledge Malone allegedly gained in 2008 cannot support Plaintiffs' allegation of scienter as to his 2007 statement," *id.* at 766 & n.20, 785.  These conclusions also apply here.

### C.    BP's Press Release Dated October 25, 2007

BP's October 25, 2007 Press Release stated:

> In the months and years since these violations occurred, **we have made real progress in the areas of process safety performance and risk management.**

(Alameda Compl. ¶ 341.)  Plaintiffs argue that this statement, which they attribute to Malone, was false and misleading because BP was expanding its deep-water drilling operations without implementing adequate safety procedures and because the statement misrepresented BP's risk profile by failing to disclose prior safety incidents.  (Alameda Compl. ¶ 342(a)-(b).)

Again, the Court found identical allegations (Ex. H ¶¶ 273-74 (New York & Ohio Complaint)) inadequate to state an Exchange Act claim in the New York and Ohio complaint. Malone's statement was not adequately alleged to be false or misleading because it was "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision."  *BP Sec. Litig.*, 843 F. Supp. 2d at 757 (quotation omitted).  In addition, the Court found that the New York and Ohio plaintiffs failed to plead facts that raise a strong inference of scienter for Malone because they did not "demonstrate that Malone was aware of any of BP's failures to implement adequate

safety protocols in the Gulf." *Id*. at 785.  The same is true for the Alameda plaintiffs' complaint.[45]

### D.     Rainey's Senate Testimony on November 19, 2009

In written statements submitted to the Senate Committee on Energy and Natural Resources on November 19, 2009, Rainey stated:

> While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies.  **All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents.**

(Alameda Compl. ¶ 375.)  This alleged misstatement, too, was part of the New York and Ohio complaint.[46]

The Court previously concluded that the New York and Ohio complaint "pleads no facts to support Rainey's knowledge" of the alleged falsity of his statement, instead relying on his corporate position and information allegedly known to "BP." *BP Sec. Litig.*, 843 F. Supp. 2d at 781.[47]  The same defect exists in the Alameda complaint.  (*See* Alameda Compl. ¶ 376).  The Alameda complaint also references Rainey's deposition testimony in MDL 2179 on the topic of post-spill flow rate estimates (Alameda Compl. ¶¶ 33, 36, 412), but that testimony is unrelated to Rainey's statement.

---

[45]     The Alameda plaintiffs also challenge an unattributed statement in this press release regarding BP's efforts to "improve its safety culture and to . . . standardize safety and risk management programs."  (Alameda Compl. ¶ 342(c).)  This Court also held that this statement is not actionable.  *See BP Sec. Litig.*, 843 F. Supp. 2d at 768 & n.22.

[46]     The Alameda plaintiffs allege that other portions of Rainey's testimony were false because Rainey misrepresented BP's commitment to the environment and reducing environmental impacts.  (Alameda Compl. ¶ 376.)  This Court already held that these same vague statements about the effects of deep-water drilling in the Gulf of Mexico on the environment were "not specific enough to perpetrate a fraud on the market."  843 F. Supp. 2d at 774.

[47]     Similar allegations based on the same alleged misstatement appear in the class-action complaint previously filed by the Ludlow plaintiffs.  (Ex. I ¶¶ 370-71 (Ludlow Complaint).)  Those allegations, too, were dismissed for failure adequately to plead scienter.  *BP Sec. Litig.*, 852 F. Supp. 2d at 819.

### E.     BP's Statements in an Article on May 14, 2010

According to the Alameda plaintiffs, in a May 14, 2010 article on CNN.com, BP "reasserted the 5,000 barrels per day estimate" of the flow rate, and Dudley commented on "a Purdue University professor's estimate that the flow rate was up to 70,000 barrels per day," stating:  "[That's] not accurate at all" and "isn't anywhere I think within the realm of possibility." (Alameda Compl. ¶ 422.)  The Alameda plaintiffs allege that "BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure," and that  therefore "it was misleading" to use that estimate "when BP itself had its own, higher range of flow rate estimates." (*Id*. ¶ 423.)

The Alameda complaint fails to allege any facts giving rise to a strong inference that Dudley acted with scienter.   Instead, it rests on conclusory allegations that Dudley "understated . . . the oil flow rate, in the face of known facts to the contrary, including internal data, estimates, and calculations."  (*Id*. ¶ 206; *see id*. ¶ 212.)  To plead a strong inference of scienter, allegations "about the existence of confidential corporate reports that reveal information contrary to reported accounts . . . must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients."  *Abrams* v. *Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).  Notwithstanding their access to voluminous documents produced in MDL 2179, plaintiffs do not identify a single contrary report that Dudley actually received prior to making the challenged statement.   Because the Alameda plaintiffs are unable to connect Dudley to any of the conflicting estimates or calculations, their allegations fail to create a cogent and compelling inference of scienter.   Nor does plaintiffs' allegation that Dudley "disavowed" the 5,000 barrel-per-day estimate in a series of interviews several weeks later (Alameda Compl. ¶¶ 422, 461) successfully plead scienter.   Alleging "that the fact that something turned out badly

must mean defendant knew earlier that it would turn out badly" does not suffice.  *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (quotation omitted).[48]

### F.    McKay's House Testimony on May 19, 2010

In testimony before the U.S. House of Representatives Committee on Transportation and Infrastructure on May 19, 2010, McKay stated:

> **That is our best estimate**.  Obviously, it's continually being looked at . . . . I believe there is a new small task force that has been put together under direction of Unified command to get all the experts together in a room and try to understand, with the latest available data, is there a more accurate estimate?  But we do recognize there is a range of uncertainty around the current estimate.

> I think there are a range of estimates and it is impossible to measure. . . . It has been clear from day one there is a large uncertainty range around that.

> It is theoretically possible.  **I don't think anyone believes it is quite that high that has been working on this.  I believe the uncertainty range is around that 5,000 number, and it could be higher.  But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people who are working with it believe that that is a possibility.**

(Alameda Compl. ¶ 418.)   The Alameda plaintiffs allege that these statements were false and misleading because "BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure."  (Alameda Compl. ¶ 419.)

To begin with, McKay's statements did not communicate an actionable representation of fact.  Rather, the statements contained cautionary language, such as "I believe," "range of uncertainty" and "I don't know," that signal the inherent uncertainty of the information he was communicating.  Such statements are not actionable under the "bespeaks caution" doctrine, which "protects optimistic projections accompanied by cautionary language."  *BMC Software*,

---

[48]    Because the court "looks to the state of mind of the individual corporate official" alleged to have made a statement in determining corporate scienter, failure to allege Dudley's scienter also renders the scienter allegations for BP insufficient.  *Shaw Grp.*, 537 F.3d at 533.

183 F. Supp. 2d at 895; *see also Taubenfeld* v. *Hotels.com*, 385 F. Supp. 2d 587, 592 (N.D. Tex. 2004) (vague statements "not phrased in terms of guarantees" are not actionable "because reasonable investors will not rely on them").

Plaintiffs also fail adequately to plead that McKay acted with scienter when he made the statements.  They do not allege that McKay received any of the "data, estimates, and calculations" that supposedly contained conflicting flow rate estimates, and instead merely assert that those sources were "undisputedly known to BP and at least one (and likely all) of the Individual Defendants."  (Alameda Compl. ¶ 212.)  This conclusory allegation is insufficient to link McKay to the internal estimates that supposedly contradicted his statement and thus fails to plead his knowledge of those estimates.  *See In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 WL 3257369, at *8 (E.D. Tex. Aug. 17, 2010) (scienter not pled by alleging "Officer Defendants as a group were aware of the adverse market conditions" without specific allegations "to demonstrate this knowledge is attributed to" individual defendant).  Unable to allege specific facts about McKay's knowledge, plaintiffs rely on allegations about his corporate position.  (*See* Alameda Compl. ¶ 34.)  But the Fifth Circuit has rejected attempts to ascribe knowledge "based solely on the positions of the defendants."  *R2 Invs. LDC*, 401 F.3d at 646.

## VI.   THE OHIO AND OREGON PLAINTIFFS FAIL TO PLEAD PERSONAL JURISDICTION OVER THE DEFENDANTS IN THOSE ACTIONS.

Plaintiffs bear the burden of pleading a *prima facie* case of personal jurisdiction.  *See Johnston* v. *Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  "[T]he prima-facie-case requirement does not require the court to credit conclusory allegations, even if uncontroverted."  *Panda Brandywine Corp.* v. *Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).  In MDL proceedings, this Court "ha[s] the same in personam jurisdiction as the transferor . . . federal court, and no more."  *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 511

64

F. Supp. 2d 742, 789 (S.D. Tex. 2005).  As a result, this Court may exercise personal jurisdiction over defendants if (i) the relevant long-arm statutes confer personal jurisdiction and (ii) the exercise of jurisdiction is consistent with due process.  *See BP Sec. Litig.*, 2012 WL 2617244, at *5.[49]

> A.   **The Ohio Plaintiffs Fail to Allege a *Prima Facie* Case of Personal Jurisdiction.**

> > 1.   **Ohio's Long-Arm Statute Does Not Permit the Exercise of General Jurisdiction Over Non-Residents.**

"Ohio law does not appear to recognize general jurisdiction over non-resident defendants." *Conn* v. *Zakharov*, 667 F.3d 705, 717 (6th Cir. 2012); *see also Wenglor Sensors, Ltd.* v. *Baur*, 847 F. Supp. 2d 1041, 1044 (S.D. Ohio 2012) ("Ohio does not recognize general jurisdiction over non-residents."); 22 Ohio Jur. 3d Courts and Judges § 261 ("[B]ecause the Ohio long-arm statute does not extend personal jurisdiction to limits of federal due process, there can be no exercise of general personal jurisdiction over nonresident defendants.").  None of the defendants in the Ohio action are alleged to be residents of Ohio.  (*See* Ohio Compl. ¶¶ 28-30, 33-35.)  As a result, the Ohio complaint does not allege general jurisdiction over any of those defendants.

> > 2.   **The Ohio Plaintiffs Fail to Allege Facts Sufficient to Establish Specific Jurisdiction.**

The Ohio plaintiffs allege that defendants "conducted extensive business in Ohio and disseminated false and misleading statements into Ohio."  (Ohio Compl. ¶ 22.)  As an initial matter, the Ohio complaint fails to allege *any* business conducted by Hayward, Suttles and Inglis in Ohio, let alone that they engage in regular business in the state.[50]  (*See id.* ¶¶ 33-35.)  Likewise,

---

[49]    Although federal jurisdiction over the Ohio and Oregon actions is predicated on OCSLA, that statute does not provide for service of process, and therefore personal jurisdiction is evaluated under the applicable state long-arm statutes.  *See DeMelo* v. *Toche Marine, Inc.*, 711 F.2d 1260, 1266 (5th Cir. 1983).

[50]    Nor can a corporation's contacts be attributed to any of the individual defendants for purposes of personal jurisdiction. *See State ex. rel. DeWine* v. *S & R Recycling, Inc.*, 961 N.E.2d 1153, 1158-60 (Ohio Ct. App. 2011) (finding no personal jurisidiction over individual officers with no Ohio contacts, notwithstanding jurisidiction over

*(footnote continued)*

there are no allegations that BP E&P conducted any business in Ohio.  (*Id.* ¶ 30.)  More generally, the Ohio plaintiffs fail to allege any actions purposely directed toward Ohio or that their claims arise from such actions.

In evaluating whether the exercise of specific jurisdiction comports with due process, courts consider "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable."  *McFadin* v. *Gerber*, 587 F.3d 753, 759 (5th Cir. 2009).  "The 'substantial connection,' between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*."  *Asahi Metal Indus. Co.* v. *Superior Court of Cal.*, 480 U.S. 102, 112 (1987).  "[A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State."  *Id.*

Despite plaintiffs' assertion that BP allegedly disseminated false or misleading statements "into Ohio" or "to investors in Ohio" (Ohio Compl. ¶¶ 22, 11, 28), they do not allege that any of defendants' statements—none of which are alleged to have been made in Ohio—were specifically directed toward Ohio.  Plaintiffs' allegation that BP's "public filings with the [SEC]" were "disseminated to investors in Ohio" (Ohio Compl. ¶¶ 11, 28) also is insufficient because SEC disclosures prepared and filed outside Ohio are not purposefully directed toward the state.

---

*(footnoted continued)*

corporation); *see also In re Blue Flame Energy Corp.*, 871 N.E.2d 1227, 1241 (Ohio Ct. App. 2006) ("Jurisdiction over individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation.").

*See Healthcare Capital, LLC* v. *Healthmed, Inc.*, 213 F. Supp. 2d 850, 861 (S.D. Ohio 2002) (SEC disclosures were not communications purposefully directed to Ohio).  Similarly, plaintiffs fail to allege that other statements made to the general public—whether on BP's website or otherwise—were specifically directed to Ohio or its residents.  Rule 8(a)(2) "requires more than labels and conclusions."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).

In *Revell* v. *Lidov*, the Fifth Circuit held that a public communication "presumably directed at the entire world" was not "directed specifically at" the forum state.  317 F.3d 467, 475 (5th Cir. 2002).  "The defendant must be chargeable with knowledge of the forum at which his conduct is directed in order to reasonably anticipate being haled into court in that forum."  *Id.* As one court concluded:

> If we were to accept . . . that advertising a security through a website constitutes a 'sale' in Ohio, then the Division would have jurisdiction over every issuer who maintains a promotional website, regardless of whether the issuer actually sells or intends to sell securities in Ohio.  Personal jurisdiction exists only in forums in which a party has purposeful, deliberate contact, not random contact occasioned by the wide accessibility of the internet.

*In re Blue Flame Energy Corp.*, 871 N.E.2d at 1238.[51]

## B. Oregon Fails to Allege a *Prima Facie* Case of Personal Jurisdiction.

Because Oregon's long-arm statute confers jurisdiction to the extent permitted by due process, the Due Process Clause defines the scope of personal jurisdiction in Oregon.  *See BP Sec. Litig.*, 2012 WL 2617244, at *5.

---

[51]     In addition, "the fact that . . . sale[s] of stock to the general public may have included sales to individuals within [Ohio] does not support specific . . . jurisdiction."  *Pt Pukuafu Indah* v. *SEC*, 661 F.3d 914, 923 (6th Cir. 2011).  As the Fifth Circuit has held, "the plaintiff's residence in the forum, and suffering of harm there, will not alone support jurisdiction."  *Revell*, 317 F.3d at 473.  Were that not the case, "a nonresident defendant would be subject to jurisdiction in [a state] for an intentional tort simply because the plaintiff's complaint alleged injury in [that state] to [state] residents regardless of the defendant's contacts."  *Panda Brandywine*, 253 F.3d at 870.

1.    **Oregon Fails to Allege Facts Sufficient to Support General Jurisdiction.**

"For general jurisdiction to exist over a nonresident defendant . . . the defendant must engage in continuous and systematic general business contacts . . . that approximate physical presence in the forum state." *Bixby* v. *KBR, Inc.*, 2011 WL 2971848, at *5 (D. Or. June 16, 2011) (quotation omitted). "This standard is intended to be an exacting one . . . ." *BP Sec. Litig.*, 2012 WL 2617244, at *3. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home," such as its "domicile, place of incorporation, and principal place of business." *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 131 S. Ct. 2846, 2853-54 (2011). Oregon is not such a place for BP, BP America or BP E&P.

Although Oregon asserts that "BP conducts and maintains substantial operations in Oregon," the complaint acknowledges that "BP operates entirely through its subsidiaries and affiliates" in Oregon. (Oregon Compl. ¶ 41.) Oregon cannot allege general jurisdiction over BP based on allegations regarding BP's subsidiaries. The Supreme Court has emphasized that "a corporation and its stockholders are generally to be treated as separate entities" and that "the exercise of the control which stock ownership gives to the stockholders" is not a basis for disregarding corporate separateness. *United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998) (quotation omitted). Instead, "[e]ach defendant's contacts with the forum State must be assessed individually." *Seiferth* v. *Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006) (quotation omitted).

Oregon asserts that "BP America is . . . BP's designated agent in the United States" (Oregon Compl. ¶ 42), but alleges no facts to support that conclusion. Such a "naked assertion[] devoid of further factual enhancement" is insufficient to plead an agency relationship. *Iqbal*, 556

U.S. at 678 (quotation omitted).  Dismissing another complaint in this MDL, this Court noted

that "Plaintiff cites an SEC filing in which BP named BP America its 'agent.'"  *BP Sec. Litig.*,

2012 WL 2617244, at *12.  "Such a nominal agency relationship," however, "is insufficient to

demonstrate the element of control required under the agency test."  *Id*.  Oregon's allegations

here are even more sparse than those rejected in *BP Securities Litigation*, 2012 WL 2617244, at

*5-*13.  In any event, the Fifth Circuit requires an alter-ego relationship, which Oregon does not

allege here, to impute one corporation's jurisdictional contacts to another.  *See Jackson* v.

*Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010) ("[A] court which has jurisdiction

over a corporation has jurisdiction over its alter egos." (quotation omitted)).[52]

Oregon's jurisdictional allegations as to BP America and BP E&P are also defective.

Oregon alleges only that BP America was registered to do business in Oregon.  (Oregon Compl.

¶ 42.)  This Court has held, however, that "[m]ere registration in the state is not evidence that BP

America conducts Oregon operations."  *BP Sec. Litig.*, 2012 WL 2617244, at *10.  Oregon

alleges nothing about BP E&P's activities in Oregon.

### 2. Oregon Fails to Allege Facts Sufficient to Support Specific Jurisdiction.

Oregon alleges specific jurisdiction pursuant to Oregon Rule of Civil Procedure 4J,

which provides for long-arm jurisdiction over defendants alleged to have violated the Oregon

Securities Law.  But "[e]ven if [Oregon] had adequately pled a claim under Oregon's Securities

Law," it also must "demonstrate[] that the exercise of jurisdiction comports with principles of

due process."  *Hannan* v. *Maxim Integrated Prods.*, 2009 WL 2450349, at *5 (D. Or. Aug. 10,

---

[52]      Plaintiff alleges that "[a]ll of BP's operations in the United States, including Oregon, are conducted by and
through BP America and BP America's subsidiaries."  (Oregon Compl. ¶ 42.)  This conclusory allegation comes
nowhere close to alleging that BP "so dominates" either BP America or BP E&P such "that they do not in reality
constitute separate and distinct corporate entities," as required to impute their contacts to BP for jurisdictional
purposes.  *Dalton* v. *R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990).

2009), *rev'd on other grounds*, 394 F. App'x 434 (9th Cir. 2010).  Because Oregon fails to allege that any defendants specifically directed any supposedly false or misleading statements to Oregon, it has not established that the exercise of personal jurisdiction here is consistent with due process.  *See id.* at *5 (allegations that defendants "made misrepresentations to the SEC" and "prepared and certified false statements filed with the SEC" did not "form a reasonable basis for [defendants] to expect to defend a case in Oregon" because "Plaintiff failed to allege that any of these actions occurred in Oregon or were aimed at Oregon").

## CONCLUSION

For the foregoing reasons, all claims asserted in the Alameda, Connecticut, Oregon and Ohio complaints—other than the Exchange Act claims based on the same statements this Court already has determined are actionable—should be dismissed with prejudice.

Dated: December 21, 2012

OF COUNSEL:                                    Respectfully submitted,

Daryl A. Libow (pro hac vice)                 */s/ Thomas W. Taylor*
Amanda F. Davidoff                            Thomas W. Taylor
Elizabeth A. Rose                             Texas State Bar No. 19723875
SULLIVAN & CROMWELL LLP                       S.D. Tex. Bar No. 3906
1701 Pennsylvania Avenue, N.W.                ANDREWS KURTH LLP
Washington, D.C.  20006                       600 Travis, Suite 4200
Telephone: (202) 956-7500                     Houston, Texas  77002
libowd@sullcrom.com                           Telephone:  (713) 220-4200
davidoffa@sullcrom.com                        Facsimile:   (713) 220-4285
rosee@sullcrom.com                            ttaylor@andrewskurth.com

Richard C. Pepperman, II (pro hac vice)       *Attorney-in-Charge for Defendants*
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
peppermanr@sullcrom.com
deleeuwm@sullcrom.com
pellerm@sullcrom.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Motion has been

served by electronic CM/ECF filing, on this 21st day of December, 2012.

*/s/ Thomas W. Taylor*
Thomas W. Taylor