# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| *In re BP p.l.c. Securities Litigation* | No. 4:10-md-02185 |
| ----------------------------------------------------- | No. 4:12-cv-1837 |
| This document relates to: | No. 4:12-cv-1256 (cons.) |
| *Ohio Public Employees Retirement System et al.* v. *BP p.l.c. et al.* | No. 4:12-cv-1272 |
| *Alameda County Employees' Retirement Association et al.* v. *BP p.l.c. et al.* | Honorable Keith P. Ellison |
| *Connecticut Retirement Plans & Trust Funds et al.* v. *BP p.l.c. et al.* | JURY TRIAL DEMANDED |
| | **ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' COMPLAINTS

OF COUNSEL:

Daryl A. Libow (pro hac vice)
Amanda F. Davidoff
Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 956-7500
libowd@sullcrom.com
davidoffa@sullcrom.com
rosee@sullcrom.com

Richard C. Pepperman, II (pro hac vice)
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
peppermanr@sullcrom.com
deleeuwm@sullcrom.com
pellerm@sullcrom.com

April 1, 2013

Thomas W. Taylor
Texas State Bar No. 19723875
S.D. Tex. Bar No. 3906
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
ttaylor@andrewskurth.com

*Attorney-in-Charge for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ....................................................................................................................4

I. ENGLISH LAW GOVERNS PLAINTIFFS' CLAIMS .....................................................4

    A. A Choice-of-Law Analysis Is Necessary ...............................................................4

        1. English Law Conflicts With Texas and Ohio Laws....................................... 4

        2. A Traditional Choice-of-Law Analysis Applies to Plaintiffs' Statutory Claims.......................................................................... 5

        3. There Is No Basis for Judicial Estoppel on the Choice-of-Law Question in the Ohio Action............................................. 7

        4. The Choice-of-Law Question Is Ripe for Determination ........................... 8

    B. Section 148 of the Restatement Requires Application of English Law.................10

        1. There Is No Presumption in Favor of the Place of Injury for Fraud and Misrepresentation Claims ...................................................... 10

        2. England Has the Most Significant Relationship to the Claims................. 11

            a. No Statements Were Made in Ohio, and Far More Were Made in England Than Texas ....................................................... 11

            ■ ████████████████████████████████

               ████████████████████████████████████

            c. Plaintiffs Concede That They Acted in Reliance in England, Where BP's Ordinary Shares Are Traded .................... 14

            d. The Parties' Residences in Various States Do Not Favor Any Particular State................................................ 16

            e. The General Principles Outlined in Section 6 of the Restatement Favor Application of English Law .......................... 16

II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER ENGLISH LAW ...........................17

    A. ████████████████████████████████████ ████████████████████████.......................................................18

1. ██████████████████████████████████
   ████████████████████..................................................... 18

2. Plaintiffs Fail to Allege That the Speakers
   Knew Their Statements Were False...................................... 20

3. ███████████████████████
   ███████████████████..................................... 22

█ ███████████████████████████
   █████████████████████████████████████████████

B. Plaintiffs Fail to State a Claim for Any Alleged Misstatements Made to the
   Public at Large ..........................................................................23

   1. Plaintiffs Fail to Plead Actual Reliance ................................... 23

   2. Plaintiffs Fail to Allege That Any Defendant Acted
      With an Intent to Induce Reliance ............................................ 25

III. ALTERNATIVELY, THE COURT SHOULD DISMISS PLAINTIFFS'
   ENGLISH-LAW CLAIMS UNDER THE *FORUM NON CONVENIENS*
   DOCTRINE ......................................................................................27

   A. The Court Has Discretion to Dismiss Plaintiffs' English-Law Claims ................27

   B. Plaintiffs' English-Law Claims Should Be Heard in an English Forum ..............28

      1. English Courts Provide an Adequate Alternative Forum ......................... 29

      2. Plaintiffs' English-Law Claims Involve Distinct Issues and Are at
         a Different Procedural Stage Than the Putative Class Action ................. 29

      3. Plaintiffs' Exchange Act Claims Are the
         Source of Duplication and Inefficiency .................................... 31

IV. THE DORMANT COMMERCE CLAUSE BARS APPLYING
   OHIO AND TEXAS LAW TO PLAINTIFFS' TRANSACTIONS
   ON A FOREIGN EXCHANGE.............................................................31

   A. Plaintiffs Seek to Apply State Law to Wholly Foreign Transactions ..................32

   B. Applying Ohio or Texas Law to Plaintiffs' Ordinary Share Claims
      Would Interfere With Foreign Commerce ........................................35

V.      THE ALAMEDA AND CONNECTICUT PLAINTIFFS FAIL TO STATE
        AN EXCHANGE ACT CLAIM FOR CERTAIN STATEMENTS ..................................37

VI.     THE OHIO PLAINTIFFS FAIL TO PLEAD PERSONAL JURISDICTION .................40

        A.      Plaintiffs Do Not Plead General Jurisdiction Over Any Defendant .....................40

                1.      Ohio Does Not Recognize General Jurisdiction Over
                        Non-Residents ............................................................................................ 40

                2.      The Ohio Plaintiffs Do Not Allege a Basis for General Jurisdiction
                        Over BP p.l.c. or BP America in Any Event ........................................... 41

        B.      Plaintiffs' "Effects" Theory of Specific Jurisdiction Is
                Contrary to Due Process ........................................................................................43

CONCLUSION ......................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.S. Goldmen & Co.* v. *New Jersey Bureau of Securities*,
163 F.3d 780 (3d Cir. 1999)................................................................6

*Akerblom* v. *Ezra Holdings Ltd.*,
2012 WL 464917 (S.D. Tex. Feb. 13, 2012) .............................17, 29

*American Dredging Co.* v. *Miller*,
510 U.S. 443 (1994).....................................................................27

*American Interstate Insurance Co.* v. *G & H Service Center, Inc.*,
861 N.E.2d 524 (Ohio 2007)..........................................................11

*American Pipe & Construction Co.* v. *Utah*,
414 U.S. 538 (1974).....................................................................31

*Anwar* v. *Fairfield Greenwich Ltd.*,
2013 WL 662972 (S.D.N.Y. Feb. 25, 2013)....................................36

*Barclays Bank PLC* v. *Franchise Tax Board of California*,
512 U.S. 298 (1994).....................................................................36

*Baron* v. *Strassner*,
7 F. Supp. 2d 871 (S.D. Tex. 1998)................................................15

*Basis Yield Alpha Fund* v. *Goldman Sachs Group, Inc.*,
2012 WL 5187653 (N.Y. Sup. Ct. Oct. 18, 2012) ...........................15

*Baumgart* v. *Fairchild Aircraft Corp.*,
981 F.2d 824 (5th Cir. 1993) ........................................................27

*Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*,
486 U.S. 888 (1988).....................................................................42

*Berry* v. *Indianapolis Life Insurance Co.*,
608 F. Supp. 2d 785 (N.D. Tex. 2009) ............................................8

*Black* v. *Toys R US-Delaware, Inc.*,
2010 WL 4702344 (S.D. Tex. Nov. 10, 2010) ..................................5

*BMW of North America, Inc.* v. *Gore*,
517 U.S. 559 (1996)......................................................................32

*Bryant* v. *Wyeth*,
879 F. Supp. 2d 1214 (W.D. Wash. 2012)........................................13

*Buzzard* v. *Roadrunner Trucking, Inc.*,
966 F.2d 777 (3d Cir. 1992) ................................................................ 32

*Cadle Co.* v. *Schlichtmann*,
123 F. App'x 675 (6th Cir. 2005) ........................................................ 43

*Camden County Board of Chosen Freeholders* v. *Beretta U.S.A. Corp.*,
123 F. Supp. 2d 245 (D.N.J. 2000) ..................................................... 32

*Celanese Corp.* v. *Coastal Waters Authority*,
475 F. Supp. 2d 623 (S.D. Tex. 2007) ................................................. 24

*Chen* v. *Cayman Arts, Inc.*,
2011 WL 1085646 (S.D. Fla. Mar. 21, 2011) ...................................... 17

*Chrysler Capital Corp.* v. *Century Power Corp.*,
800 F. Supp. 1189 (S.D.N.Y. 1992) ............................................... 32, 33

*Cipollone* v. *Liggett Group, Inc.*,
505 U.S. 504 (1992) ............................................................................ 32

*Circle Group Holdings, Inc.* v. *Akhamzadeh*,
2006 WL 2548164 (N.D. Ill. Sept. 1, 2006) .......................................... 6

*Citizens Insurance Co. of America* v. *Daccach*,
217 S.W.3d 430 (Tex. 2007) ............................................................. 5, 7

*City of Boston* v. *Smith & Wesson Corp.*,
2000 WL 1473568 (Mass. Super. Ct. July 13, 2000) .......................... 32

*Colantonio* v. *Hilton International Co.*,
2004 WL 1810291 (E.D. Pa. Aug. 13, 2004) ...................................... 28

*Commonwealth* v. *TAP Pharmaceutical Products, Inc.*,
36 A.3d 1197 (Pa. Commw. Ct. 2011) ................................................ 32

*Conn* v. *Zakharov*,
667 F.3d 705 (6th Cir. 2012) .............................................................. 40

*Contractor's Source Inc.* v. *Hanes Cos., Inc.*,
2009 WL 6443116 (S.D. Tex. Dec. 29, 2009) ...................................... 5

*Corrigan* v. *USX Corp.*,
2005 WL 2621981 (N.D. Ohio Oct. 14, 2005) .................................... 42

*Crowley* v. *Cybersource Corp.*,
166 F. Supp. 2d 1263 (N.D. Cal. 2001) .............................................. 32

*Cryofab Inc.* v. *Precision Medical, Inc.*,
2008 WL 2705007 (D.N.J. July 8, 2008).................................................................10

*Dallman Acquisition, LLC* v. *Dallman*,
2011 WL 798093 (S.D. Ohio Mar. 1, 2011).......................................................10, 11

*Detrick* v. *84 Lumber Co.*,
2007 WL 1467070 (N.D. Ohio May 10, 2007)......................................................9

*Dingle* v. *Halliburton Co.*,
2006 WL 2729286 (S.D. Tex. Sept. 26, 2006) ...................................................41

*Dorsey* v. *Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ..............................................................................20

*Fielding* v. *Hubert Burda Media, Inc.*,
415 F.3d 419 (5th Cir. 2005) ..............................................................................42

*FRC International, Inc.* v. *Taifun Feuerloschgeratebau und Vertriebs GmbH*,
2002 WL 31086104 (N.D. Ohio Sept. 4, 2002)....................................................44

*French* v. *Essentially Yours Industries, Inc.*,
2008 WL 2788511 (W.D. Mich. July 16, 2008) ...................................................6

*Girgis* v. *Countrywide Home Loans, Inc.*,
733 F. Supp. 2d 835 (N.D. Ohio 2010)...............................................................9

*Global Healing Center, LP* v. *Powell*,
2012 WL 1709144 (S.D. Tex. May 15, 2012) .....................................................17

*Global Reinsurance Corp.-U.S. Branch* v. *Equitas Ltd.*,
969 N.E.2d 187 (N.Y. 2012)...............................................................................37

*Goldstein* v. *Christiansen*,
638 N.E.2d 541 (Ohio 1994)...............................................................................40

*Grant Thornton LLP* v. *Suntrust Bank*,
133 S.W.3d 342 (Tex. App.—Dallas 2004, pet. denied) .................................12, 15

*Greenberg Traurig of New York P.C.* v. *Moody*,
161 S.W.3d 56 (Tex. App. —Houston [14th Dist.] 2004, no pet.)..............6, 11, 12

*Hall* v. *Geiger-Jones Co.*,
242 U.S. 539 (1917)............................................................................................35

*Harvest Credit Management VII, L.L.C.* v. *Harris*,
2012 WL 112583 (Ohio Ct. App. Jan. 12, 2012)................................................42

*Healy* v. *Beer Institute*,
491 U.S. 324 (1989)...........................................................................................31

*Highland Crusader Offshore Partners, L.P.*. v. *Motient Corp.*,
281 S.W.3d 237 (Tex. App. —Dallas 2009, pet. denied) ......................................15

*IMO Industries, Inc.* v. *Kiekert AG*,
155 F.3d 254 (3d Cir. 1998)...............................................................................44

*'In' Porters, S.A.* v. *Hanes Printables, Inc.*,
663 F. Supp. 494 (M.D.N.C. 1987) ....................................................................37

*In re Building Materials Corp. of America Asphalt Roofing Shingle Products Liability Litigation*, 2013 WL 169289 (D.S.C. Jan. 16, 2013)...........................................8, 9

*In re BP p.l.c. Securities Litigation*,
2012 WL 2617244 (S.D. Tex. July 5, 2012).................................................41, 42

*In re BP p.l.c. Securities Litigation*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) .............................................19, 21, 22, 38

*In re Countrywide Financial Corp.Mortgage-Backed Securities Litigation*,
860 F. Supp. 2d 1062 (C.D. Cal. 2012) .........................................................12, 14

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
761 F. Supp. 2d 504 (S.D. Tex 2011) ...................................................................6

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
2010 WL 9077875 (S.D. Tex. Jan. 19, 2010)..............................................24, 25

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
540 F. Supp. 2d 800 (S.D. Tex. 2007) ................................................................24

*In re Initial Public Offering Securities Litigation*,
358 F. Supp. 2d 189 (S.D.N.Y. 2004).................................................................12

*In re Marsh & McLennan Cos., Inc. Securities Litigation*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)................................................................24

*In re National Century Financial Enterprises, Inc., Investment Litigation*,
755 F. Supp. 2d 857 (S.D. Ohio 2010) ......................................................... passim

*In re National Century Financial Enterprises, Inc., Investment Litigation*,
2008 WL 1995216 (S.D. Ohio May 5, 2008) ......................................................11

*In re National Century Financial Enterprises, Inc., Investment Litigation*,
2006 WL 469468 (S.D. Ohio Feb. 27, 2006).......................................................10

*In re Oparaji*,
698 F.3d 231 (5th Cir. 2012) ..............................................................................8

*In re Rospatch Securities Litigation*,
1992 WL 226912 (W.D. Mich. July 8, 1992) ......................................................6

*In re Smart Technologies, Inc. Shareholder Litigation*,
2013 WL 139559 (S.D.N.Y. Jan. 11, 2013) .......................................................33

*In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*,
2010 WL 2545415 (W.D. Wash. June 21, 2010)................................................25

*Iragorri* v. *United Technologies Corp.*,
274 F.3d 65 (2d Cir. 2001)................................................................................27

*Japan Line, Ltd.* v. *County of Los Angeles*,
441 U.S. 434 (1979)...........................................................................................37

*Johnson* v. *Church of the Open Door*,
902 N.E.2d 1002 (Ohio Ct. App. 2008)..............................................................7

*Johnston* v. *Multidata System International Corp.*,
523 F.3d 602 (5th Cir. 2008) ............................................................................42

*Kauffman Racing Equipment, L.L.C.* v. *Roberts*,
930 N.E.2d 784 (Ohio 2010)..................................................................40, 43, 44

*Keeton* v. *Hustler Magazine, Inc.*,
465 U.S. 770 (1984)...........................................................................................44

*Lewis* v. *Horace Mann Insurance Co.*,
410 F. Supp. 2d 640 (N.D. Ohio 2005)..............................................................11

*Lintz* v. *Carey Manor Ltd.*,
613 F. Supp. 543 (W.D. Va. 1985) ...................................................................6, 7

*Lynch* v. *Hilton Worldwide, Inc.*,
2011 WL 5240730 (D.N.J. Oct. 31, 2011)..........................................................28

*Lyon* v. *Caterpillar, Inc.*,
194 F.R.D. 206 (E.D. Pa. 2000)..........................................................................14

*McInnis* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
706 F. Supp. 1355 (M.D. Tenn. 1989).............................................................6, 7

*McNulty* v. *J.H. Miles & Co., Inc.*,
2012 WL 6652824 (D.N.J. Dec. 19, 2012)..........................................................28

*Merlino* v. *Harrah's Entertainment, Inc.*,
  2006 WL 401847 (E.D. Pa. Feb. 17, 2006) ............................................................42

*Mid-America Gutters* v. *Thompson Creek Window Co.*,
  2012 WL 3224148 (S.D. Ohio Aug. 6, 2012) ..........................................................40

*Montich* v. *Miele USA, Inc.*,
  849 F. Supp. 2d 439 (D.N.J. 2012) ..........................................................................9

*Morgan* v. *Biro Manufacturing Co.*,
  474 N.E.2d 286 (Ohio 1984) ............................................................................10, 11

*Morrison* v. *National Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010) ................................................................................... passim

*New York Times Co.* v. *Sullivan*,
  376 U.S. 254 (1964) ................................................................................................32

*Nicula* v. *Nicula*,
  2009 WL 1244170 (Ohio Ct. App. May 7, 2009) ....................................................11

*North Cypress Medical Center Operating Co.* v. *CIGNA Healthcare*,
  2011 WL 5325785 (S.D. Tex. Nov. 3, 2011) ..........................................................41

*Ohio Police & Fire Pension Fund* v. *Standard & Poor's Financial Services, LLC*,
  813 F. Supp. 2d 871 (S.D. Ohio 2011) .....................................................................7

*Organ* v. *Byron*,
  435 F. Supp. 2d 388 (D. Del. 2006) ..........................................................................6

*Pasquantino* v. *United States*,
  544 U.S. 349 (2005) ................................................................................................33

*Peterson* v. *Daka International, Inc.*,
  61 F. Supp. 2d 634 (E.D. Mich. 1999) ....................................................................15

*Piazza's Seafood World, LLC* v. *Odom*,
  448 F.3d 744 (5th Cir. 2006) ........................................................................31, 32, 35

*Pike* v. *Bruce Church, Inc.*,
  397 U.S. 137 (1970) ................................................................................................33

*Piper Aircraft Co.* v. *Reyno*,
  454 U.S. 235 (1981) ................................................................................................27

*Pittock* v. *Otis Elevator Co.*,
  8 F.3d 325 (6th Cir. 1993) ......................................................................................42

*Prospect High Income Fund* v. *Grant Thornton, LLP*,
    203 S.W.3d 602 (Tex. App. —Dallas 2006).......................................................23

*Puronics, Inc.* v. *Clean Resources, Inc.*,
    2013 WL 149882 (N.D. Ohio Jan. 14, 2013)...........................................40

*Rahr* v. *Grant Thornton LLP*,
    142 F. Supp. 2d 793 (N.D. Tex. 2000) ...............................................31

*Revell* v. *Lidov*,
    317 F.3d 467 (5th Cir. 2002) ...............................................................43

*Roy* v. *JPMorgan Chase Bank, N.A.*,
    2013 WL 164147 (S.D. Tex. Jan. 15, 2013).........................................20

*San Diego Building Trades Council* v. *Garmon*,
    359 U.S. 236 (1959).............................................................................32

*Scottish Air International, Inc.* v. *British Caledonian Group, PLC*,
    81 F.3d 1224 (2d Cir. 1996).................................................................29

*Simmons* v. *Peavy-Welsh Lumber Co.*,
    113 F.2d 812 (5th Cir. 1940) ...............................................................41

*Simms Investment Co* v. *E.F. Hutton & Co. Inc.*,
    699 F. Supp. 543 (M.D.N.C. 1988) ........................................................6

*Sky Technology Partners, LLC* v. *Midwest Research Institute*,
    125 F. Supp. 2d 286 (S.D. Ohio 2000) ...............................................15

*Societe Nationale Industrielle Aerospatiale* v. *U.S. District Court*
    *for the Southern District of Iowa*, 482 U.S. 522 (1987) ........................7

*Southmark Corp.* v. *Life Investors Inc.*,
    851 F.2d 763 (5th Cir. 1988) ...............................................................43

*Spirit Partners, LP* v. *Stoel Rives LLP*,
    157 P.3d 1194 (Or. Ct. App. 2007).......................................................11

*Stackhouse* v. *Toyota Motor Co.*,
    2010 WL 3377409 (C.D. Cal. July 16, 2010).........................................7

*Timberlake* v. *Synthes Spine Co., L.P.*
    2009 WL 926990 (S.D. Tex. Mar. 31, 2009).......................................24

*U.S. Sprint Communications Co. Limited Partnership* v. *Mr. K's Foods, Inc.*,
    624 N.E.2d 1048 (Ohio 1994)..............................................................41

*Viking Global Equities, LP* v. *Porsche Automobil Holding SE*,
101 A.D.3d 640 (N.Y. App. Div. 2012) ..........................................................30, 31

*Wagner* v. *Circle W. Mastiffs*,
2010 WL 1009904 (S.D. Ohio Mar. 12, 2010)..........................................................9

*Washkoviak* v. *Sallie Mae*,
900 A.2d 168 (D.C. 2006) ..........................................................10

*Zenith Radio Corp.* v. *Matsushita Electric Industrial Co. Ltd.*,
494 F. Supp. 1161 (E.D. Pa. 1980) ..........................................................36

## STATUTES & OTHER AUTHORITIES

Outer Continental Shelf Lands Act, 43 U.S.C. § 1333 ..........................................................8

Outer Continental Shelf Lands Act, 43 U.S.C. § 1349 ..........................................................8

Federal Rule of Civil Procedure 9 ..........................................................24, 25

Federal Rule of Civil Procedure 12 ..........................................................17

Federal Rule of Civil Procedure 23 ..........................................................31

Ohio Revised Code § 1707.44 ..........................................................33

Texas Business and Commerce Code § 27.01 ..........................................................33

Financial Services & Markets Act 2000, c. 8 (Eng.) ..........................................................16

Brief for United Kingdom as Amicus Curiae Supporting Respondents, *Morrison* v.
*National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) (No. 08-1191), 2010 WL
723009 (Feb. 25, 2010) ..........................................................36

Restatement (Second) of Conflict of Laws § 3 ..........................................................12

Restatement (Second) of Conflict of Laws § 6 ..........................................................16, 17

Restatement (Second) of Conflict of Laws § 148 .......................................................... passim

Louis Loss, *The Conflict of Laws and the Blue Sky Laws,*
71 Harv. L. Rev. 209 (1957) ..........................................................5

## PRELIMINARY STATEMENT

Plaintiffs seek to use different state laws as a vehicle to assert securities fraud claims based on their purchases on the London Stock Exchange ("LSE") of stock of an English corporation headquartered in England on the basis of alleged misstatements mostly made in England. Those claims should be dismissed on multiple, independent grounds.

*First*, plaintiffs' vain attempts to portray their state-law claims as "local" fraud claims involving only local conduct and localized injury—although they cannot agree on which locality—are belied by the complaints' own allegations and only highlight why English law should apply. Seeking to avoid the obvious ties to England, different sets of plaintiffs seek to apply different interpretations of the Restatement (Second) of Conflict of Laws leading to different views of which state's law should apply. The Ohio plaintiffs urge application of Ohio law solely because of their residence there; the Alameda and Connecticut plaintiffs, by contrast, urge application of Texas law, even though none of them resides there, because Texas is purportedly the locus of the alleged fraud and home to certain of the defendants. Both theories are wrong; England clearly has the most significant relationship to these claims and its law should apply. It is undisputed that (i) none of the alleged misrepresentations were made in Ohio and many more were made in England than Texas (rather than the entire United States, on which the Alameda and Connecticut plaintiffs improperly focus), (ii) the allegedly false statements were no more "disseminated" to plaintiffs in Ohio or Texas than anywhere else in the world and the only alleged misstatements directed to plaintiffs ███████████████████████ ██████████████████████ and (iii) the ordinary share transactions underlying plaintiffs' claims—and thus their reliance on the alleged misstatements—occurred in England.

*Second*, the Alameda and Connecticut plaintiffs' allegations—the Ohio plaintiffs do not address this issue—do not state a claim under English law. Although they try to manufacture

actionable misstatements ██████████████████████████████████████, plaintiffs do not explain why the statements ███████████████████████████ were false, let alone made with knowledge of their falsity, or how, in any event, plaintiffs relied on those statements. And the Alameda and Connecticut plaintiffs' opposition ("Alameda Opposition") makes plain that they seek to rely on a dressed-up "fraud-on-the-market" theory of reliance that is indisputably unavailable under English law.

**Third**, if the Court does not dismiss plaintiffs' non-Exchange Act claims for failure to state a claim under English law, those claims should be dismissed under the *forum non conveniens* doctrine. An English forum is more appropriate for claims governed by English law and relating to securities purchased on the LSE that are based primarily on alleged misstatements by an English company originating from London.

**Fourth**, application of Ohio or Texas law to plaintiffs' ordinary share claims would violate the dormant Commerce Clause of the U.S. Constitution. Plaintiffs' primary response is a straw-man argument based on defendants' citation to *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). Defendants do not argue that *Morrison* concluded anything about the application of state laws to securities transactions executed on foreign exchanges. Rather, defendants rely on well-settled Constitutional limits to applying state law to international commerce, informed by the principles discussed in *Morrison*. Because no part of the securities transactions underlying plaintiffs' ordinary share claims occurred in either Ohio or Texas, application of either state's laws would be wholly extraterritorial and run afoul of the dormant Commerce Clause. Application of state law to securities transactions on the LSE also would interfere with foreign commerce and undermine the federal government's ability to speak with one voice about regulation of foreign securities transactions. Although plaintiffs suggest that this

application of the dormant Commerce Clause is unprecedented, a federal district court in Ohio recently rejected securities fraud claims based on the Ohio Securities Act, the same statute on which the Ohio plaintiffs attempt to rely, based on the dormant Commerce Clause. *See In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 755 F. Supp. 2d 857, 888 (S.D. Ohio 2010).

*Fifth*, to the extent that the Alameda and Connecticut plaintiffs challenge statements not still at issue in the consolidated class action, their Exchange Act claims fail because the statements are not actionable and plaintiffs fail adequately to plead scienter. Indeed, this Court dismissed identically pled claims relating to some of these same statements in the class action.

*Finally*, the Ohio plaintiffs fail adequately to plead personal jurisdiction over any of the defendants. Ohio does not recognize general jurisdiction over non-residents, and in any event, the Ohio plaintiffs' allegations are insufficient to establish general jurisdiction over either BP p.l.c. or BP America, the only two defendants supposedly subject to that jurisdiction. The Ohio plaintiffs' specific jurisdiction theory—that generalized public statements may give rise to jurisdiction in Ohio if any injury results there, even if Ohio is not the focal point of the harm and the defendant did not specifically target Ohio or its residents—violates due process and has been rejected by the Fifth Circuit and other courts of appeal.[1]

---

[1] The Ohio plaintiffs challenge the same 22 statements that were at issue in the putative class action. (*See* Defs.' Opening Br. at 9.) The Alameda and Connecticut plaintiffs challenge those same 22 statements (with one exception) and 13 others, as well as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See id*. at 7-8.) As the Alameda and Connecticut plaintiffs acknowledge (Alameda Opp'n at 8 n.1), this Court's decision on the motion to dismiss the Second Amended Complaint in the class action forecloses any claims based on the July 24, 2007 statement by Anthony Hayward and the September 25, 2007 statement by Andrew Inglis. The same is true with respect to the Ohio plaintiffs' claims. Additionally, because the Court found that plaintiffs in the class action failed adequately to plead scienter for a March 22, 2010 statement by Inglis—and plaintiffs here rely on the same allegations to plead Inglis's scienter and knowledge—only the Alameda and Connecticut plaintiffs' negligent misstatement claim survived the Court's decision. Under English law, however, "a director or employee acting in that role does not bear personal liability" for negligent misstatements. (*See* Defs.' Opening Br. at 40-41.) Inglis thus should be dismissed from these actions, as he was from the putative class action.

**ARGUMENT**

## I.   ENGLISH LAW GOVERNS PLAINTIFFS' CLAIMS.

These two sets of plaintiffs urge this Court to apply two different states' laws to their nearly identical claims. Such inconsistent positions are likely to proliferate as the Court progresses through the similar cases now part of this MDL filed by 55 additional plaintiffs located in various jurisdictions, including many in England and other countries. Under a proper choice-of-law analysis, English law should govern all of these cases.

### A.   A Choice-of-Law Analysis Is Necessary.

Plaintiffs urge the Court to forego or delay a choice-of-law analysis, resulting in defendants being subject to an ever-increasing number of claims without knowing which of dozens of possible laws might apply. There is no basis for such an illogical approach.

#### 1.   English Law Conflicts With Texas and Ohio Laws.

Plaintiffs do not dispute that English law conflicts with Texas and Ohio laws. (*See* Ohio Opp'n at 7-8; Alameda Opp'n at 11-12 & n.3.) Indeed, the Alameda and Connecticut plaintiffs identify multiple conflicts between the laws of England and Texas, including with respect to their common-law claims. (Alameda Opp'n at 11-12 & n.3.) Although they attempt to downplay those conflicts by arguing that "the elements of the common law torts for fraud and negligent misrepresentation are substantially similar under Texas and English law" (*id*. at 10), they cannot avoid the clear conflict that results from the FSMA's statutory exclusion for statements published in certain documents. (*See* Defs.' Opening Br. at 10; Moore Decl. ¶¶ 25-28; Declaration of Martin Moore, executed March 28, 2013 ("Moore Reply Decl.") ¶ 37.) "Given the clear conflict between the two states' laws regarding several critical issues in this

case, the Court must determine which law should govern." *Black* v. *Toys R US-Delaware, Inc.*, 2010 WL 4702344, at *7 (S.D. Tex. Nov. 10, 2010).[2]

### 2. A Traditional Choice-of-Law Analysis Applies to Plaintiffs' Statutory Claims.

The Ohio plaintiffs (but not the Alameda and Connecticut plaintiffs) argue that their statutory claims present an exception to the general rule that where the laws of two states conflict, a court must determine the applicable law. Instead, they argue that multiple laws may apply to the same conduct even if the laws conflict. (Ohio Opp'n at 23-26.) This is wrong.

For purposes of a choice-of-law analysis, there is no reason to treat claims asserting violations of the antifraud provisions of one or more state securities laws differently than other statutory or common-law fraud claims. Although a failure to comply with the *registration requirements* of a state blue sky statute "does not present a classic conflict of laws problem" because a dealer "may be subject to the registration requirements of each state in which an offer or sale is made," the same rationale does not apply to "violations of other securities laws, such as those based on misrepresentation." *Citizens Ins. Co.* v. *Daccach*, 217 S.W.3d 430, 441 (Tex. 2007). This approach is consistent with the views of the author of the Uniform Securities Act, who noted that "the problem of choice of law with respect to the antifraud aspects of the blue sky laws need not be labored, because presumably the conflict-of-laws rules are not too different there from the rules for common-law deceit or rescission." Louis Loss, *The Conflict of Laws and the Blue Sky Laws*," 71 Harv. L. Rev. 209, 209 (1957).

---

[2] Even if there were some doubt about the existence of a conflict (there is not), this Court has stated that courts can "move directly to the choice of law analysis for the sake of efficiency." *Contractor's Source Inc.* v. *Hanes Cos., Inc.*, 2009 WL 6443116, at *2 n.4 (S.D. Tex. Dec. 29, 2009). This is particularly so here because many other cases are pending before this Court in which the same choice-of-law issue will arise.

Accordingly, courts, including those in this district, have employed a conventional choice-of-law analysis to determine which state's blue sky antifraud provisions apply. *See, e.g.*, *In re Enron Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 521 (S.D. Tex 2011) (using Texas choice-of-law rules in holding that plaintiffs' blue sky securities fraud claim should be decided under New York law); *Greenberg Traurig P.C.* v. *Moody*, 161 S.W.3d 56, 70 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (same).[3] The Court should do the same here.

Although some courts have stated that "the securities laws of two or more states may be applicable to a single transaction without presenting a conflicts of law question," *Simms Inv. Co.* v. *E.F. Hutton & Co.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988), the rationale of those decisions, which are not binding on this Court, is inapplicable here. That line of inapposite cases originated from a single decision, *Lintz* v. *Carey Manor Ltd.*, 613 F. Supp. 543 (W.D. Va. 1985), in which the court reasoned that simultaneous application of multiple blue sky laws does not raise a conflicts issue because blue sky laws are a regulatory scheme developed by each state to "govern the actions of those operating within the borders of the state." *Id.* at 551. Similarly, the Third Circuit upheld application of New Jersey's blue sky law to a contract between a New York buyer and New Jersey seller to "allow[] the [N.J. state agency] to regulate its 'half' of the transaction— the offer that occurs entirely within the state of New Jersey." *A.S. Goldmen & Co.* v. *N.J.*

---

[3]  *See, e.g.*, *In re Rospatch Sec. Litig.*, 1992 WL 226912, at *15 (W.D. Mich. July 8, 1992) (finding "issue is best resolved through a traditional conflicts analysis" because it is "impractical, confusing and unfair to apply more than one state statutory law to a claim"); *McInnis* v. *Merrill Lynch, Pierce, Fenner & Smith*, 706 F. Supp. 1355, 1358 (M.D. Tenn. 1989) (applying "rule concerning choice-of-law in tort actions" to fraud claim asserted under Florida's blue sky statute); *see also French* v. *Essentially Yours Indus.*, 2008 WL 2788511, at *7 (W.D. Mich. July 16, 2008) (finding that "Blue Sky claims . . . raise choice of law issues," although in this case "there is no actual conflict necessitating a choice of laws analysis"); *Circle Grp. Holdings, Inc.* v. *Akhamzadeh*, 2006 WL 2548164, at *10 (N.D. Ill. Sept. 1, 2006) (applying Illinois' choice-of-law rules to plaintiffs' California Blue Sky claim and holding that because defendant "has not identified any conflict between Illinois' Blue Sky . . . statute[] and th[at] of California, Illinois law governs this case"); *Organ* v. *Byron*, 435 F. Supp. 2d 388, 391 (D. Del. 2006) (rejecting plaintiffs' argument that "general choice of law principles do not apply to the broad coverage of the blue sky laws" and holding that Delaware choice-of-law provision in agreement precluded seller from making claim based on Illinois blue sky statute).

*Bureau of Sec.*, 163 F.3d 780, 787 (3d Cir. 1999) (cited in Ohio Opp'n at 25-26). The court observed that "[a] contract between Goldmen in New Jersey and a buyer in New York does not occur 'wholly outside' New Jersey, just as it does not occur 'wholly outside' New York." *Id*.

By contrast, plaintiffs' ordinary share transactions took place entirely in England (*see* Defs.' Opening Br. at 51-52), and thus Ohio has no portion of the transaction to regulate. Foregoing a choice-of-law analysis is particularly inappropriate under these circumstances because the interests of a foreign sovereign, not merely those of other states, are implicated. *See Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987) (recognizing need for "spirit of cooperation" in "approach[ing] the resolution of cases touching the laws and interests of other sovereign states").[4]

### 3. There Is No Basis for Judicial Estoppel on the Choice-of-Law Question in the Ohio Action.

The Ohio plaintiffs assert that "Defendants should be estopped from arguing now that anything other than Ohio substantive law governs" their claims because of a statement made by defendants' counsel during oral argument on the Ohio plaintiffs' remand motion. (Ohio Opp'n at 12.) Contrary to the Ohio plaintiffs' contention, defendants are not "assert[ing] a legal

---

[4] Although plaintiffs argue that they can invoke the Ohio Securities Act because their residence creates a territorial nexus with Ohio (Ohio Opp'n at 25-26), under *Lintz*, a "nexus to the transaction" is a condition precedent to dispensing with a traditional conflict-of-laws analysis. 613 F. Supp. at 551. Plaintiffs' residence in Ohio is neither necessary nor sufficient to establish a transactional nexus. *See, e.g., McInnis*, 706 F. Supp. at 1363 ("Residency alone is not dispositive of the issue at bar"); *Citizens*, 217 S.W.3d at 445 (drafters of Uniform Act rejected citizenship or residence in particular state as basis for application of Uniform Act to particular transactions). Rather, as *Morrison* makes clear, for exchange-traded securities, the transaction occurs where the exchange is located. 130 S. Ct. at 2886; *see also Stackhouse* v. *Toyota Motor Co.*, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010) ("because the actual transaction takes place on the foreign exchange, the purchaser or seller has figuratively traveled to that foreign exchange—presumably through a foreign broker—to complete the transaction"). Plaintiffs acknowledge that they purchased BP ordinary shares on the LSE (Ohio Compl. ¶ 6); therefore, regardless of where plaintiffs ▬▬▬▬▬▬ were located, those transactions occurred in London. Because the Ohio plaintiffs engaged in exchange-traded securities transactions in an impersonal market as opposed to dealing directly with the defendant in off-exchange transactions, the cases they cite are inapposite to show a transactional nexus. *See Ohio Police & Fire Pension Fund* v. *Standard & Poor's Fin. Servs. LLC*, 813 F. Supp. 2d 871, 877 (S.D. Ohio 2011) (over-the-counter purchase of mortgage backed securities); *Johnson* v. *Church of the Open Door*, 902 N.E.2d 1002, 1004-06 (Ohio Ct. App. 2008) (over-the-counter purchase of interest in fraudulent investment scheme).

position that is plainly inconsistent" with a prior position in this litigation. *In re Oparaji*, 698 F.3d 231, 235 (5th Cir. 2012). The previous remand motion involved the question of whether subject-matter jurisdiction exists under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b). In that context, the Court asked whether OCSLA's jurisdictional grant, Section 1349(b), and its choice-of-law provision, Section 1333, are coextensive. Defendants responded that Section 1349(b)'s jurisdictional grant is significantly broader than Section 1333's choice-of-law provision, which defendants noted is inapplicable to plaintiffs' substantive state-law claims. Accordingly, defendants' statement that "Your Honor would be applying . . . Ohio law" expressed defendants' view that OCSLA's choice-of-law provision did not govern plaintiffs' claims, but rather that the Court would need to apply Ohio's choice-of-law rules. Defendants were not taking a position as to which substantive law would ultimately govern plaintiffs' claims under those rules. Judicial estoppel thus does not apply.

### 4. The Choice-of-Law Question Is Ripe for Determination.

The Ohio plaintiffs argue that the Court "need not make a conclusive choice of law determination at this stage of the litigation." (Ohio Opp'n at 9.) This position, not shared by the Alameda and Connecticut plaintiffs (*see* Alameda Opp'n at 11-12), is incorrect on the law and would result in needless delay and inefficiency.

"[T]he choice of law issue is normally a threshold inquiry that must be made before the Court can adequately address the sufficiency of the pleadings." *Berry* v. *Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 800 n.16 (N.D. Tex. 2009) (quotation omitted). Thus, "court[s] may appropriately undertake a choice of law analysis at the motion to dismiss stage where the factual record is sufficiently developed to facilitate the resolution of the issue." *In re Bldg. Materials Corp. of Am. Asphalt Roofing Shingle Prods. Liab. Litig.*, 2013 WL 169289, at *2 (D.S.C. Jan.

16, 2013).[5] The voluminous complaints here "provide[] the relevant factual information for the court's evaluation of the relevant [choice-of-law] factors." *Id*.

Although the Ohio plaintiffs contend that there is an "incomplete factual record" (Ohio Opp'n at 11), the three subjects they identify for "explor[ation] in discovery"—defendants' (i) knowledge of each statement's dissemination into Ohio, (ii) intention that Ohio investors rely on the statements by purchasing BP ordinary shares, and (iii) contacts with Ohio investors regarding the statements (*id*.)—have little or no bearing on the choice-of-law analysis. Defendants' knowledge and intention in making the statements are not relevant to where the statements were made, where they were received, and where they were acted upon. *See infra* Section I.B. Similarly, plaintiffs' suggestion that they need discovery regarding defendants' contacts, if any, with Ohio investors does not cure their failure to allege any contact between defendants and themselves, the proper focus of the choice-of-law inquiry. *See infra* Section I.B. The Ohio plaintiffs also assert that "circumstances surrounding each of the Ohio Plaintiffs' purchases of BP ordinary shares is a matter to be investigated through discovery" (Ohio Opp'n at 19), but to the extent those circumstances are relevant, the information is within plaintiffs' control (*id*. at 3 n.3). In short, the Ohio plaintiffs' "position that the Court cannot engage in a choice-of-law analysis is belied by [their] inability to indicate what other facts are necessary to decide this issue." *Montich* v. *Miele USA, Inc.*, 849 F. Supp. 2d 439, 445 (D.N.J. 2012).

The real choice-of-law dispute between the parties is how the relevant facts should be weighed, which can be resolved at the motion to dismiss stage. There is no reason to delay this

---

[5] *Accord, e.g., Wagner* v. *Circle W. Mastiffs*, 2010 WL 1009904, at *3-4 (S.D. Ohio Mar. 12, 2010); *Detrick* v. *84 Lumber Co.*, 2007 WL 1467070, at *1 (N.D. Ohio May 10, 2007); *Girgis* v. *Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 851 (N.D. Ohio 2010).

inquiry, particularly given its importance to the numerous other cases now part of this MDL that were filed by other individual purchasers of BP ordinary shares.[6]

### B. Section 148 of the Restatement Requires Application of English Law.

Plaintiffs do not dispute that both Texas and Ohio look to Section 148 of the Restatement (Second) of Conflict of Laws to determine the law applicable to claims of fraud and misrepresentation. (*See* Alameda Opp'n at 12-13 & n.4; Ohio Opp'n at 13.) The relevant factors under Section 148 favor application of English law. In arguing otherwise, plaintiffs incorrectly seek to insert a presumption in favor of the place of injury into Section 148 and, failing that, to recast the nature of their claims.

### 1. There Is No Presumption in Favor of the Place of Injury for Fraud and Misrepresentation Claims.

The Ohio plaintiffs argue that "under Ohio choice of law principles, the law of the state where the injury occurred presumptively controls." (Ohio Opp'n at 12 (quotation omitted).) The case plaintiffs cite, however—*Morgan* v. *Biro Mfg. Co.*, 474 N.E.2d 286, 289 & n.4 (Ohio 1984)—invokes such a presumption only for *personal injury claims* pursuant to Section 146 of the Restatement. *See Dallman Acquisition, LLC* v. *Dallman*, 2011 WL 798093, at *3 (S.D. Ohio Mar. 1, 2011) ("The *Morgan* court addressed a choice of law issue in the context of a personal injury claim" and "examined § 146 of the Restatement, which specifically addresses personal injury actions"). As a federal court in Ohio explained, because "[c]laims of fraud and

---

[6] In *In re National Century Financial Enterprises*, the court delayed making a choice of law because it found that "the facts need[ed] further development" and, with regard to the key substantive issues, there was "no argument that Ohio law varies from the law of other states in any way pertinent to the matters at hand." 2006 WL 469468, at *7-8. In contrast, the Ohio plaintiffs cannot point to any relevant facts in need of further development, and they acknowledge the existence of pertinent differences between the law of England and Ohio. The remaining cases cited by the Ohio plaintiffs actually support defendants' position that choice of law is ripe for determination. For example, in *Cryofab Inc.* v. *Precision Medical, Inc.*, the court was unable to make a choice-of-law determination because the defendant "failed to furnish the Court with a copy" of the contractual-choice-of-law provision fundamental to the dispute. 2008 WL 2705007, at *3 (D.N.J. July 8, 2008). And in *Washkoviak* v. *Sallie Mae*, the court did in fact make a choice-of-law determination, stating "we must make our choice of law determination in the context of a 12(b)(6) motion." 900 A.2d 168, 182 (D.C. 2006).

misrepresentation . . . are not governed by § 146 . . . but rather by § 148," reliance on the *Morgan* presumption for those claims is "misplaced." *Dallman*, 2011 WL 798093, at *3; *see also Am. Interstate Ins. Co.* v. *G & H Serv. Ctr., Inc.*, 861 N.E.2d 524, 527 (Ohio 2007) (presumption did not apply when tort action was governed by provision other than Section 146).[7]

The comments to Section 148 recognize that if the alleged "loss is pecuniary in its nature, the place of loss is far more difficult to locate than when the damage consists of physical injury to persons or tangible things." Restatement (Second) of Conflict of Laws § 148 cmt. c. Section 148 thus identifies other factors to be considered in identifying the state with "the most significant relationship" to the claims. *See Dallman*, 2011 WL 798093, at *3-4.

### 2. England Has the Most Significant Relationship to the Claims.

Applying Section 148, the Alameda and Connecticut plaintiffs assert that Texas has the most significant relationship to the parties and transactions, whereas the Ohio plaintiffs assert that Ohio has the most significant relationship. Both are wrong. England has the strongest ties to the alleged misstatements by an English company and to securities transactions on the LSE.

### a. No Statements Were Made in Ohio, and Far More Were Made in England Than Texas.

"[W]hen evaluating fraud-based claims . . . the principal focus is where the conduct occurred." *Greenberg Traurig*, 161 S.W.3d at 72. Thus, "[t]he place where the false representation is made . . . is an important contact." *Spirit Partners, LP* v. *Stoel Rives LLP*, 157 P.3d 1194, 1200 (Or. Ct. App. 2007); *accord In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,

---

[7] In *Nicula* v. *Nicula*, an unpublished opinion cited by the Ohio plaintiffs, the court cited *Morgan* and applied Ohio law because "the fraud took place in Ohio and all the parties to the litigation live in Ohio." 2009 WL 1244170, at *6 (Ohio Ct. App. May 7, 2009). That decision does not cite and is inapplicable to Section 148. *See Dallman*, 2011 WL 798093, at *3. Similarly, the court in *Lewis* v. *Horace Mann Insurance Co*. considered the fact that plaintiff was "injured in Ohio" only in the context of determining which law applied to general negligence and negligence per se claims. 410 F. Supp. 2d 640, 654-55 (N.D. Ohio 2005). When making a separate choice-of-law determination for plaintiff's negligent misrepresentation and fraud claims, the court instead looked to the Section 148 factors and did not consider the place of injury. *Id.* at 655-56.

2008 WL 1995216, at *4 (S.D. Ohio May 5, 2008); *see also* Restatement (Second) of Conflict of Laws § 148 cmt. c ("The place where the defendant made his false representations . . . is as important a contact in the selection of the law . . . as is the place of the defendant's conduct in the case of injuries to persons or to tangible things.").  The Ohio plaintiffs concede that none of the challenged statements "originated in Ohio," but they argue that "this factor is of relatively little weight" because the statements were "disseminated widely."  (Ohio Opp'n at 20.)[8]  In contrast, the Alameda and Connecticut plaintiffs acknowledge the importance of this factor, but contend that the majority of the statements "were made in the U.S."  (Alameda Opp'n at 12-13.)

The Alameda and Connecticut plaintiffs cannot support application of Texas law based on their assertion that "30 [of 49 challenged statements] were made in the U.S., including Texas."  (Alameda Opp'n at 14.)[9]  The purpose of Section 148 (and the issue here) is to determine the particular *state* (or foreign jurisdiction) that has the most significant relationship with the parties and transactions.  Counting the number of statements made in the "U.S.," as opposed to Texas, thus has no bearing on that determination.  *See* Restatement (Second) of Conflict of Laws § 3 & cmt. a ("'state' denotes a territorial unit with a distinct general body of law," and "each State of the United States is a state under the definition").[10]

---

[8]  The lone case the Ohio plaintiffs cite provides no support for its conclusion.  *See In re Countrywide Fin. Corp.*, *Mortgage-Backed Sec. Litig.*, 860 F. Supp. 2d 1062, 1074 (C.D. Cal. 2012).  "[W]hen evaluating fraud-based claims to determine governing law, the principal focus is where the conduct [*i.e.*, the statements] occurred"—especially when plaintiffs and defendants "had no contact and no direct dealings."  *Greenberg Traurig*, 161 S.W.3d at 72.

[9]  In their Appendix A, the Alameda and Connecticut plaintiffs inflate their number of U.S. statements by improperly counting identical statements repeated or republished by the same speaker on the same day.  *See In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 198-201 (S.D.N.Y. 2004) (treating "identical language" in a registration statement and a separate prospectus, dated a day later, as a single set of alleged misstatements).

[10]  The Alameda and Connecticut plaintiffs' argument that statements in BP's Forms 20-F and Forms 6-K were "made" in Washington, D.C. is baseless.  Plaintiffs provide no support for the notion that statements in documents filed with the SEC were made in Washington, D.C. (*see* Alameda Opp'n at 9), a proposition that would make District of Columbia law potentially applicable to any number of claims directed at companies that have no connection to that jurisdiction.  Rather, in determining where a statement was made—that is, where it "originated"—courts consider where it was prepared or issued.  *See, e.g.*, *Grant Thornton LLP* v. *Suntrust Bank*, 133 S.W.3d 342,
(*footnote continued*)

Because all agree that many more alleged misstatements were made in England than in Texas (Alameda Opp'n, App. A (five in Texas; 19 in U.K.)), and none were made in Ohio (Ohio Opp'n at 20), this important factor strongly favors application of English law.[11]

████  ████████████████████████████████████
████████████████████████████████████████████

The location where plaintiffs allegedly received the challenged statements also does not support application of Ohio or Texas law, but rather points to England, if anywhere. (*See* Defs.' Opening Br. at 14-15.) The Alameda and Connecticut plaintiffs attempt to downplay ████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████

The Alameda and Connecticut plaintiffs assert that "most of the misrepresentations were 'received' in the U.S." (as opposed to in Texas). (Alameda Opp'n at 16.) But the location where a plaintiff receives such public statements disseminated to a global audience, as opposed to bilateral communications directed specifically at them, is entirely "fortuitous." *See Bryant* v. *Wyeth*, 879 F. Supp. 2d 1214, 1222 (W.D. Wash. 2012) (because nationwide marketing practices were indiscriminate, "the place of injury is therefore fortuitous"). Because plaintiffs challenge

---

(*footnote continued*)
348 & n.1, 358-59 (Tex. App.—Dallas 2004, pet. denied) (representations in registration statement filed with SEC "were made from Texas").

[11] The Alameda and Connecticut plaintiffs argue that the challenged statements "concerned BP's U.S. operations, including in particular, the deepwater drilling operations of BP's Houston-based subsidiaries in the Gulf of Mexico," and that therefore "the policy underlying Section 148(e) . . . weighs heavily in favor of applying Texas law." (Alameda Opp'n at 15-16.) Section 148(2)(e) refers to "the place where a tangible thing which is *the subject of the transaction between the parties* was situated at the time" (emphasis added). The ordinary share transactions at issue here occurred on the LSE. *See Morrison*, 130 S. Ct. at 2886. Thus, this factor, if relevant at all, points to England as having the most significant relationship to the subject transactions.

████  ████████████████████████████████████████████  ████████
████████████████████████████  ████  ██████████  ████████████████
██████████████████████████████████  ████████

public statements made to the market as a whole, their alleged "receipt" of those statements in

their home states is an incidental contact that does not establish a strong tie with those states.[13]

### c. Plaintiffs Concede That They Acted in Reliance in England, Where BP's Ordinary Shares Are Traded.

Plaintiffs do not point to any allegation that they "acted in reliance" in Ohio or Texas.

*See* Restatement (Second) of Conflict of Laws § 148(2)(a). Instead, the Ohio plaintiffs argue

that because they reside in Ohio, they necessarily must have received and relied on statements by

defendants in making their "investment decisions" there ███████████████████████████

████████████████.[14] (Ohio Opp'n at 17, 19.) Similarly, the Alameda and Connecticut

plaintiffs argue that although their "purchases of BP common stock were effectuated in England

. . . their reliance on Defendants' misrepresentations and omissions███████████████████

██████████████████ occurred primarily in the U.S." (Alameda Opp'n at 17.) This

is wrong.

"[T]aking plaintiff's argument to its logical extreme, 'reliance' would occur in whatever

state plaintiff happened to be in at the time he formed the subjective intent to act upon the

---

[13] While purporting to show the importance of the place where the statements were received, the Ohio plaintiffs cite discussions in two cases of the place of reliance, a separate Section 148 factor. (*See* Ohio Opp'n at 16-17 (citing *In re Countrywide*, 860 F. Supp. 2d at 1074; *Lyon* v. *Caterpillar, Inc.*, 194 F.R.D. 206, 214-15 (E.D. Pa. 2000)).) These cases are inapposite because the plaintiffs' purchases—and therefore their reliance—occurred in the same place where they received the statements. *In re Countrywide*, 860 F. Supp. 2d 1066, 1074 (plaintiffs' "action in reliance" took place in Florida, where most of them resided and purchased certificates directly from defendants); *Lyon*, 194 F.R.D. at 214-15 ("plaintiffs may have received these representations in any state in which they purchased their boats containing engines made by defendant"). Here, by contrast, regardless of where plaintiffs received the public statements, any reliance upon them in purchasing ordinary shares occurred in England on the LSE. *See infra* Section I.B.2.c. This distinction is critical because the place where the plaintiff received the representations "is not so important a contact as is the place where the plaintiff acted in reliance on the defendant's representations." Restatement (Second) of Conflict of Laws § 148 cmt. g.

[14] The Ohio plaintiffs' complaint does not include any allegations about investment managers. (*See* Ohio Compl. ¶ 489.) In their opposition, however, they assert that all four of the Ohio Funds purportedly delegated all or part of their "investment decision[s]" and "authority to invest" to "outside investment managers" not alleged to be located in Ohio. (Ohio Opp'n at 3 n.3.) Thus, even accepting the Ohio plaintiffs' incorrect assertion that the location of investment decisions is akin to the location of actual reliance (*id*. at 17-19), they tacitly admit that these investment decisions were made outside of Ohio by their investment managers. The Ohio plaintiffs' argument that principles of agency somehow transplant the location of those decisions back to Ohio is unsupported, as the cases they cite merely stand for the notion that a principal may sue for misrepresentations relied on by his agent. (*Id*. at 3 n.3.)

alleged misrepresentations." *Peterson* v. *Daka Int'l, Inc.*, 61 F. Supp. 2d 634, 638 n.4 (E.D. Mich. 1999). Instead, wherever plaintiff "may (or may not) have formed the subjective intent to rely upon [defendants'] statements," the relevant location for choice-of-law purposes is where plaintiff "manifested his reliance" by *taking action*. *Id*. A federal court in Ohio thus held that a plaintiff "acted in reliance upon defendants' alleged fraudulent statements" where it "design[ed], develop[ed] and [did] programming work related to the" subject of the alleged fraud. *Sky Tech. Partners, LLC* v. *Midwest Research Inst.*, 125 F. Supp. 2d 286, 297 (S.D. Ohio 2000). Here, wherever plaintiffs ███████████████ "formed the subjective intent" to purchase BP ordinary shares, they allegedly "acted in reliance" in England when they purchased their shares on the LSE.[15] Accordingly, this factor points strongly to application of English law.[16]

---

[15] The Alameda and Connecticut plaintiffs argue that "*Morrison* did not define where a plaintiff relies on a misrepresentation." (Alameda Opp'n at 17.) Although *Morrison* did not address this narrow question, the decision teaches that the ordinary share transactions took place in England where the LSE is located. *See* 130 S. Ct. at 2886. Because plaintiffs claim to have relied on the challenged statements in purchasing BP stock on the LSE (*see* Ohio Compl. ¶ 6; Alameda Compl. ¶ 1; Connecticut Compl. ¶ 31), this act of reliance occurred in England. The Ohio plaintiffs attempt to diminish the significance of the location of their securities transactions by quoting an unreported New York state court decision involving non-exchange traded synthetic securities for the proposition that "the fact that the underlying transactions are not considered domestic securities transactions for the purposes of federal securities laws . . . has no bearing on the viability of [Plaintiff]'s state law claims." (Ohio Opp'n at 19 quoting *Basis Yield Alpha Fund* v. *Goldman Sachs Grp., Inc.*, 2012 WL 5187653, at *5 (N.Y. Sup. Ct. Oct. 18, 2012).) The quoted language is taken from the court's discussion of whether New York is an appropriate forum to hear plaintiff's claims and in no way undercuts the significance of the place where the transactions occurred for purposes of determining the applicable law. The court in *Basis Yield Alpha Fund* did not conduct a choice-of-law analysis because "the parties d[id] not dispute that there is no conflict between the applicable English and New York laws of fraud." 2012 WL 5187653, at *6.

[16] The cases cited by the Alameda and Connecticut plaintiffs (Alameda Opp'n at 17-18) do not suggest otherwise. *Baron* v. *Strassner*, 7 F. Supp. 2d 871, 875-76 (S.D. Tex. 1998), does not involve a choice-of-law determination, and the other two cases only serve to highlight that the Alameda and Connecticut plaintiffs' own allegations are devoid of meaningful ties to Texas. In *Grant Thornton*, the defendant "performed the audit in Texas of a Texas corporation that made the alleged misrepresentations and omissions from Texas." 133 S.W.3d at 359. And in *Highland Crusader Offshore Partners, L.P.* v. *Motient Corp.*, the alleged misstatements were prepared in Texas and the majority of plaintiffs were Texas corporations with their principal places of business in Texas who received the representations in Texas and acted in reliance in Texas. 281 S.W.3d 237, 250-52 (Tex. App.—Dallas 2009, pet. denied).

### d. The Parties' Residences in Various States Do Not Favor Any Particular State.

The Ohio plaintiffs acknowledge that "BP plc is a UK corporation with its principal offices in London, England," but nonetheless contend that their own residence weighs heavily in favor of applying Ohio law. (Ohio Opp'n at 14-15.) The Alameda and Connecticut plaintiffs take a different tack, asserting that the residence of two corporate defendants and several individual defendants supports application of Texas law. (Alameda Opp'n at 14-15.) As these conflicting arguments demonstrate, the parties' varied residences in a number of different jurisdictions do not establish which state has the most significant relationship to the claims.

### e. The General Principles Outlined in Section 6 of the Restatement Favor Application of English Law.

The general choice-of-law principles set forth in Section 6 of the Restatement favor application of English law to the foreign securities transactions at issue. (*See* Defs.' Opening Br. at 17-18.) The Alameda and Connecticut plaintiffs argue that "Texas provides more robust protection for victims of securities-related fraud than does England," which "leads to the inexorable conclusion that Texas law should be applied." (Alameda Opp'n at 11.) Although the "relevant policies of the forum" is one consideration, *see* Restatement (Second) of Conflict of Laws § 6(2)(b), this factor does not lead "inexorably" to the conclusion that Texas law should apply. Under Section 6, the "relevant policies of other interested states," the "basic policies underlying the particular field of law," and "the needs of the interstate and international systems" are all relevant. *Id.* § 6(2)(a), (c), (e). In addition to considering any interest Texas may have in applying its laws to protect non-Texas investors such as the Alameda and Connecticut plaintiffs that engaged in foreign securities transactions on the LSE, this Court also should consider England's clearly expressed policy interest in the "regulation of [its] financial services and markets." Financial Services & Markets Act 2000, c. 8 (Eng.). Applying English law helps to

"further harmonious relations between states and to facilitate commercial intercourse between them," Restatement (Second) of Conflict of Laws § 6 cmt. d, by respecting the prerogative of foreign sovereigns to regulate "their domestic securities exchanges and securities transactions" without U.S. interference. *Morrison*, 130 S. Ct. at 2885-86.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER ENGLISH LAW.

The Ohio plaintiffs do not argue that their allegations state a claim under English law, instead requesting leave to amend their complaint if the Court determines that English law applies to their claims. (*See* Ohio Opp'n at 26-27 n.9.)[17] For their part, the Alameda and Connecticut plaintiffs attempt to salvage their claims by combining allegations ███████████ ████████████████████████████████████████████ with allegations about public statements by different speakers, at different time periods, conveying different information. This attempt does not cure plaintiffs' failure to state a claim under Section 90A of the FSMA or for fraud or negligent misrepresentation under English law. (*See* Defs.' Opening Br. at 27 (Section 90A); *id*. at 28 (deceit); *id*. at 40 (negligent misstatement).)[18]

---

[17]  Leave to amend should be denied because amendment would be futile; for the reasons set forth in defendants' opening brief and herein, the Ohio plaintiffs cannot cure their failure to allege claims under English law.

[18]  In the event that Ohio, Texas or another state's law applies, it would be well within the Court's discretion to grant defendants leave to submit supplemental briefing on the deficiencies of plaintiffs' claims under that law. Contrary to plaintiffs' assertion (Ohio Opp'n at 7 n.4; Alameda Opp'n at 10 n.2, 16 n.8), Rule 12(g) is inapplicable here. First, defendants did not "omit" this defense, but rather expressly stated that plaintiffs' inadequate pleading "would require dismissal of their common-law claims under Texas, Ohio, and Oregon law" but did not brief those issues in the interest of efficiency. (Defs.' Opening Br. at 20 n.16.) Second, defendants are not attempting to make "two separate motions to dismiss." *See Chen* v. *Cayman Arts, Inc.*, 2011 WL 1085646, at *1 (S.D. Fla. Mar. 21, 2011). Rather, defendants request the opportunity, should the need arise, to submit a supplemental brief—a request this Court has ample discretion to allow. *See, e.g., Akerblom* v. *Ezra Holdings Ltd.*, 2012 WL 464917, at *2 (S.D. Tex. Feb. 13, 2012). In any event, as this Court has previously found, considering successive motions to dismiss can further "the spirit of Rule 12" by allowing for the "swift resolution" of a defense of failure to state a claim. *Global Healing Ctr., LP* v. *Powell*, 2012 WL 1709144, at *4 (S.D. Tex. May 15, 2012).

**A.** ██████████████████████████████████████████
█████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████ ████████████████ ████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████ ■  In any

event, those allegations do not state a claim for deceit or negligent misrepresentation. The

Alameda and Connecticut plaintiffs still fail to identify any alleged statement by defendants ████

████████████ that was false, much less made with knowledge of such falsity,[20] or to plead

that they relied on any of those purported statements. (*See* Defs.' Opening Br. at 23-26, 36-40.)

**1.** ████████████████████████████████████
████████████████████████████████████.

Plaintiffs assert that defendants misled ███████ "by making the same type of

misstatements that the Court has already determined to be actionable." (Alameda Opp'n at 25.)

This is incorrect. To the extent these alleged statements resemble any this Court previously

considered, they are similar to those this Court found were too vague to be actionable. (*See*

Defs.' Opening Br. at 38-39.) █████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████ (Alameda Opp'n at 26) are the same type of "generalized

statement about BP's 'commitment to safety,' [and] prioritization of 'process safety

performance'" that this Court has already concluded are "simply too illusory" to be actionable.



─────────────────────
[20] For these same reasons, the Alameda and Connecticut plaintiffs fail to state claim for a violation of Section 10(b)
of the Exchange Act ████████████████████████████

*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 757 (S.D. Tex. 2012).[21]  Contrary to plaintiffs'

suggestion (Alameda Opp'n at 28-29), these generalized, positive statements do not resemble the

seven statements that this Court sustained "involving [BP's] progress in process safety as

measured against the Baker Report recommendations."  *BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at

759.  According to the Court, the truth or falsity of those seven statements could be "measured

against the metrics set forth in the Baker Report's recommendations."  *Id.* at 757.  Plaintiffs

identify no "metrics" to measure BP's "focus" or whether safety was "taking priority."

(Alameda Opp'n at 26.)

      The remainder of the alleged misstatements contain factual information that plaintiffs fail

to allege was false.  (*See* Defs.' Opening Br. at 37-38.)  ███████████████████

████████████████████████████████████████████████████████

███████████████████████"[22]  (Alameda Opp'n at 26-27 (citing Alameda Compl.

¶ 439(a)).)  ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████s.[23]  Without

an allegation that these statements were false, plaintiffs' claims for fraud and negligent



---

[21]  The same is true for statements about ███████████████████ (Alameda Compl. ¶ 439(b);
Connecticut Compl. ¶ 240), ██████████████████████ (Alameda Compl. ¶ 439(c); Connecticut
Compl. ¶ 241), ███████████████ (Alameda Compl. ¶ 439(d); Connecticut Compl. ¶ 242), ███
████████████ (Alameda Compl. ¶ 439(e)-(f); Connecticut Compl. ¶¶ 243-44,
246), and ████████████████ (Alameda Compl. ¶ 439(g); Connecticut Compl. ¶¶ 245-46).

[22]  The Alameda plaintiffs also assert that BP stated that ████████████████████████
█████████████ (Alameda Opp'n at 26), but the relevant allegation reads ███████████████
███████████████ (Alameda Compl. ¶ 439(a).)  Only the ███████████████ portion of this allegation
is attributed as a direct quote, and, for reasons already explained, this type of statement is not actionable.

[23]  Plaintiffs allege a panoply of statements about ████████████████████████████
██████████ (Alameda Compl. ¶ 439(b); Connecticut Compl. ¶ 240), ████████████████████
████████████ (Alameda Compl. ¶ 439(c);
Connecticut Compl. ¶ 241), and "██████████████████████
(Alameda Compl. ¶ 439(d); Connecticut Compl. ¶ 242), yet they fail to allege why any of these disparate
statements—none of which are challenged in the putative class action—are false.

misrepresentation fail. *See Dorsey* v. *Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (requiring plaintiffs to "explain why the statements were fraudulent" (quotation omitted)); *Roy* v. *JPMorgan Chase Bank N.A.*, 2013 WL 164147, at *2 (S.D. Tex. Jan. 15, 2013) (same).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ But these supposed details do not address why Defendants' responses were purportedly false.

Plaintiffs argue that "Defendants were under a duty to disclose . . . facts so as to not render their affirmative representations misleading." (Alameda Opp'n at 30.) Plaintiffs' apparent theory of liability is that if anyone at BP made any statement related to safety—whether a vague, generalized statement about ████████████████████ or a specific statement about ████████████████████—he or she was required to disclose BP's progress with respect to the Baker Panel recommendations, BP's precise deepwater oil spill response capability, and the status and scope of BP's OMS. There is no basis for this theory in the Court's prior decisions.

### 2. Plaintiffs Fail to Allege That the Speakers Knew Their Statements Were False.

The Alameda and Connecticut plaintiffs also fail to allege that any of the statements████ ██████████████████ were made with knowledge of falsity. Plaintiffs attribute two of the statements to Fergus MacLeod and Lord John Browne, but they fail to allege that either knew that his alleged statement was false. (*See* Alameda Compl. ¶¶ 439(b), (c); Connecticut Compl. ¶¶ 240, 241.) The remaining statements were allegedly made by "BP."[24] Plaintiffs argue that

---

[24] Plaintiffs argue that they have identified certain people who █████████████████ (Alameda Opp'n at 27-28), but they attribute all but two statements to "BP."

████████████████████████████████████████████

████████████████████████████████████████ (Alameda Opp'n at 31.) But "corporate scienter" is not recognized under English law. (*See* Moore Decl. ¶ 17 & n.3.) Even if it were, plaintiffs do not come close to satisfying the "egregious falsity" standard for corporate scienter applied by this Court to unattributed corporate statements. *See BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 791.

Plaintiffs also argue that this Court's previous holding "that the Class Plaintiffs sufficiently alleged that Defendants Hayward, Suttles, BP plc, BP America, and BP Exploration made false and misleading statements with scienter" establishes that the alleged statements to ████ were made with knowledge of their falsity. (Alameda Opp'n at 30.) Allegations about the state of mind of different individuals when making different statements at different times cannot establish universal scienter. As this Court explained, "[c]ourt[s] must consider whether Plaintiffs have satisfied the heightened pleading requirements for proving scienter for *each* allegedly fraudulent misrepresentation as to *each* Individual Defendant." *BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 777 (emphasis added).



(Alameda Compl. ¶ 439(b).) This Court has never considered whether any plaintiff has adequately alleged

Hayward's scienter for such statements.  Nor do this Court's prior rulings that the class-action complaint adequately pled BP's corporate scienter for "glaring and egregious" statements about oil spill preparedness, *BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 789-90, translate into corporate scienter for other statements about wholly different topics.

**3.** ██████████████████████.



The complaints do not identify any instance when ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Instead, plaintiffs argue that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Alameda Opp'n at 40.)  That vague chronology, without more, is insufficient to plead reliance.  The complaints do not identify specific share purchases ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ nor which (if any) of these purchases were made in reliance on a statement ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Plaintiffs do not allege that the analysis includes any specific statement, let alone one made by a defendant ▮▮▮▮▮▮▮▮.[25]

---

[25] Plaintiffs try to piggyback on the putative class action by arguing that this Court's scienter rulings "support[] the conclusion that Defendants' intent to induce reliance has been pled." (Alameda Opp'n at 31 n.17.)  But "[i]ntent to induce reliance is an element of common-law fraud in addition to the separate element of knowledge or recklessness of falsity." (Defs.' Opening Br. at 32 n.22  (citing Moore Decl. ¶¶ 40, 56-58).)  Elsewhere, plaintiffs argue that Hayward and Dudley ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This argument is baseless; the complaints do not allege that Hayward and Dudley said anything at the one meeting they supposedly attended.  (*See* Alameda Compl. ¶ 439(b); Connecticut Compl.  ¶ 240.)

■ ███████████████████████████████████
████████████████████████████.

Plaintiffs also fail to allege a special relationship with defendants that would support a claim for negligent misstatement. (Defs.' Opening Br. at 40-42.) ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████ The standard for imposing a duty of care on one person for the protection of another is a high one (*id*. ¶¶ 86-87), and plaintiffs have not alleged that ████████████████████ expressed a "willing[ness] to assume personal responsibility to them." (*Id*. ¶¶ 103-04.)

### B. Plaintiffs Fail to State a Claim for Any Alleged Misstatements Made to the Public at Large.

#### 1. Plaintiffs Fail to Plead Actual Reliance.

Despite challenging 33 allegedly public statements made over a span of more than three years, the Alameda and Connecticut plaintiffs are unable to identify any particular statement on which they supposedly relied. They instead argue that as "predominantly pre-existing shareholders . . . ███████████████████████████████████████

███████████████████████████████████████[26]

(Alameda Opp'n at 38-39.) This is incorrect. Plaintiffs must plead that they actually relied on

---

[26] Plaintiffs' repeated assertion that they were "pre-existing shareholders" (Alameda Opp'n at 38-39) does not strengthen their reliance allegations. In *Prospect High Income Fund* v. *Grant Thornton, LLP*, the court found that the fact that "appellants already owned Epic bonds" was significant only for determining whether "appellants qualif[ied] as members of the limited class of persons entitled to sue a professional for negligent misrepresentation"—not whether plaintiffs had adequately alleged actual reliance. 203 S.W.3d 602, 615-16 (Tex. App.—Dallas 2006), *rev'd in part*, 314 S.W.3d 913, 921 (Tex. 2010).

each of the challenged statements—that each of the alleged statements was "actively present" in plaintiffs' minds when they entered into the relevant transactions. (*See* Defs.' Opening Br. at 19-20 & n.16; Moore Decl. ¶¶ 34-35, 70-72, 79; Moore Reply Decl. ¶¶ 29-36.) They do not do so.

The Alameda and Connecticut plaintiffs accuse defendants of "overstat[ing]" their burden for pleading actual reliance under Rule 9(b) (Alameda Opp'n at 37), but their argument is based largely on language from cases addressing justifiable reliance, which is not at issue here. (*Id.* at 38 (citing *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2010 WL 9077875 at *20 (S.D. Tex. Jan. 19, 2010); *Celanese Corp.* v. *Coastal Water Auth.*, 475 F. Supp. 2d 623, 638 (S.D. Tex. 2007)).)[27] Plaintiffs also assert that reliance allegations are inherently conclusory because "one either relies on a particular statement or one does not" (*id.* (quotation omitted)), while ignoring that they fail to allege reliance on any particular statement. Additionally, plaintiffs cite *Enron* as a "more relevant authorit[y]." (*Id.* at 40 n.24.)[28] But *Enron* illustrates why plaintiffs' reliance allegations here are deficient. In *Enron*, the complaint "allege[d] how the misrepresentations affected investors' evaluation of Enron" and also included a chart "identif[ying] which purchase(s) was made by a particular Plaintiff, what was purchased, the name of the analyst who made the purchase, the date of the purchase, what financial information each analyst relied upon,

---

[27] Plaintiffs' contention that two cases cited in defendants' brief are inapplicable because they address claims under Section 18 of the Exchange Act (Alameda Opp'n at 40 n.24) is incorrect. A Section 18 claim, like a common-law fraud claim, requires actual reliance, and courts in the Fifth Circuit apply the same pleading standard—particularity under Rule 9(b)—to both claims. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 816, 832 (S.D. Tex. 2007) (requiring plaintiff to plead actual reliance with particularity under Rule 9(b) for Section 18 and common-law claims); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006) ("As discussed in the context of Plaintiffs' Section 18 claims . . . the Complaint fails to adequately allege actual reliance . . . . Accordingly, Plaintiffs' common law fraud claims are dismissed [as well].").

[28] Plaintiffs also cite *Timberlake* v. *Synthes Spine Co.*, but the court's discussion of plaintiffs' reliance allegations in that case was dicta "[b]ecause Plaintiffs fail[ed] to describe with specificity when and where Defendants allegedly made each representation." 2009 WL 926990, at *6 (S.D. Tex. Mar. 31, 2009). Furthermore, *Timberlake* is factually distinguishable because it involved plaintiffs' lone decision to "implant[] the artificial intervertebral disc" manufactured by defendants; thus, it was clear that plaintiffs were allegedly influenced by the statements in taking a specifically identified action. *Id.* at *1. In contrast, plaintiffs here allege that they made an unspecified number of purchases of BP shares at various times without attempting to connect any of those purchases to plaintiffs' supposed reliance on any of the alleged misstatements.

-24-

and which section of the financials was the source of that information." 2010 WL 9077875 at

*32 & n.58. This crucial information is missing from the Alameda and Connecticut complaints,

which instead merely assert that plaintiffs "reviewed and relied upon informational sources that

included, summarized, and/or otherwise incorporated some or all of the misstatements and

omissions at issue." (*E.g.*, Alameda Compl. ¶ 489; Connecticut Compl. ¶ 335.) Because

"Plaintiffs must do more than simply pronounce that they read the [documents containing the

alleged misstatements] and relied on them," such "thin allegation[s] do[] not satisfy the

particularity standard of Rule 9(b)." *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,

2010 WL 2545415, at *5 (W.D. Wash. June 21, 2010).

Finally, the Alameda and Connecticut plaintiffs assert that an "inference of reliance" can

be drawn from allegations that they "assumed that the market price for BP's securities was not

affected by material misrepresentations and omissions." (Alameda Opp'n at 40.) This is not an

allegation of actual reliance, as required to state a claim under the FSMA or English common

law. (*See* Defs.' Opening Br. at 19-20 & n.16.) Rather, these are fraud-on-the-market

allegations that even plaintiffs concede are insufficient to plead actual reliance under English

law. (*See* Lowe Decl. ¶ 89; Moore Decl. ¶¶ 34-35, 71; Moore Reply Decl. ¶ 36.)

### 2. Plaintiffs Fail to Allege That Any Defendant Acted With an Intent to Induce Reliance.

The Alameda and Connecticut plaintiffs argue that "the nature" of the alleged

misstatements contained in "SEC filings, Annual meeting remarks, and remarks made during

teleconferences with investors and analysts" "indicates that these statements were intended to

induce Plaintiffs' reliance" (Alameda Opp'n at 33), that the Sustainability Reports and Reviews

were "specifically directed" and "directly aimed" at shareholders (*id.* at 33-34), and that "[t]here

is a strong, common-sense inference" that the challenged post-spill statements containing flow-

rate estimates "were made with the express intent to induce shareholders" to purchase BP shares (*id.* at 35).[29] These arguments boil down to the assertion that because the alleged misstatements appeared in documents available to the public at large, including shareholders, plaintiffs have adequately alleged that defendants intended to induce plaintiffs' reliance.

Contrary to plaintiffs' suggestion, English law does not apply a presumption of intent to induce reliance simply because information is available to investors. (*See* Moore Reply Decl. ¶ 24 ("simply because a representation may be received (indirectly or even directly) by a whole class of people" does not create inference "that it is intended to be acted upon by them").) Rather, the speaker must have intended that the statement reach a particular person or group of persons *and* be acted upon for a particular purpose.[30] (*See* Defs.' Opening Br. at 29-31; Moore Reply Decl. ¶¶ 21-25.) With respect to statements made to the public at large, English courts "have been restrictive in terms of imposing liability and have tended to be very wary of transposing general statements into specific transactions." (Moore Decl. ¶ 69.) The examples offered by plaintiffs' expert where liability attaches based on a public statement—a newspaper advertisement and a bill of lading, whose sole purpose is to be "passed on to other people and

---

[29] None of plaintiffs' arguments addresses the challenged statements contained in Robert Malone's House testimony, David Rainey's Senate testimony, or any of the five pre-spill speeches delivered by Anthony Hayward or Andrew Inglis at industry conferences or public forums. Plaintiffs thus concede that they fail to allege an intent to induce reliance with respect to those statements. (Alameda Compl. ¶¶ 335, 339, 343, 352, 374-75, 381, 383; Connecticut Compl. ¶¶ 157, 161, 165, 175, 194, 201, 203.) With respect to the statements contained in the IEP and OSRP, plaintiffs argue that defendants had an "especial reason" to expect that plaintiffs would rely on these "statutorily mandated submissions." (Alameda Opp'n at 34 n.19.) But the fact that the IEP and OSRP were prepared for and filed with a government agency to satisfy a regulatory requirement underscores that they were not intended to induce plaintiffs to purchase BP shares. (*See* Moore Decl. ¶ 63 ("statement[s] which have a particular legal or other purpose simply are not to be taken as intended to influence dealings in shares").)

[30] The cases cited in the Lowe Declaration involving statements in prospectuses are inapposite. Prospectuses are unambiguously designed to induce investors to purchase the stock of an issuing company in a share offering, a specific transaction that the issuer contemplates and initiates. (Moore Reply Decl. ¶ 21; Lowe Decl. ¶ 8 n.1 ("a prospectus is an invitation to the public to subscribe for shares").) Unlike prospectuses, the annual shareholder meetings, corporate documents and teleconferences at issue here did not serve the sole purpose of promoting BP's shares for purchase, and certainly were not directed at specific share offerings or transactions. (Moore Decl. ¶¶ 65-66.)

relied upon" by prospective purchasers in exactly the type of transaction contemplated by the author—prove this point. (Lowe Decl. ¶ 75.) Unlike such public statements, the corporate reports and press conferences at issue here served many purposes unrelated to inducing purchases of BP stock. (Moore Reply Decl. ¶¶ 21-22; *see* Moore Decl. ¶¶ 61-66.)[31]

## III. ALTERNATIVELY, THE COURT SHOULD DISMISS PLAINTIFFS' ENGLISH-LAW CLAIMS UNDER THE *FORUM NON CONVENIENS* DOCTRINE.

*Forum non conveniens* is a valuable doctrine due largely to its flexibility and the trial court's broad discretion. *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 249-50, 257 (1981). Yet plaintiffs seek to eliminate that flexibility and discretion.[32] (*See* Defs.' Opening Br. at 43-47.)

### A. The Court Has Discretion to Dismiss Plaintiffs' English-Law Claims.

It is generally true that a plaintiff's choice of forum in its home jurisdiction is entitled to higher deference, but "this deference is not dispositive and . . . may be overcome." *Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001). *Forum non conveniens* dismissal instead "is committed to the sound discretion of the trial court," *Am. Dredging Co.* v. *Miller*, 510 U.S. 443, 455 (1994) (quotation omitted), and may be particularly appropriate where "the operative

---

[31] Having failed to plead facts regarding each speaker's intent with respect to each statement, plaintiffs default to arguing that BP's criminal plea and SEC settlement support a finding of intent. (Alameda Opp'n at 31-32 n.17.) This is wrong. The criminal plea did not involve securities fraud and related to statements not at issue in these actions, and the SEC settlement involved no admissions at all, much less of intent. And neither agreement was assented to by any of the individual defendants. ███████████████████████

███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

████████████████████████ Under English law, plaintiffs must allege more than "mere foreseeability (or even actual foresight)" to plead intent to induce reliance. (*See* Moore Reply Decl. ¶ 25.) Plaintiffs' conclusory argument also fails to support a claim for negligent misstatement, which requires allegations of a "direct and specific" assumption of responsibility by the defendant to the plaintiff before a "special relationship" that would give rise to a duty of care will be said to exist. (*See* Defs.' Opening Br. at 41.)

[32] The Alameda and Connecticut plaintiffs incorrectly argue that the removal and transfer of various actions estop defendants from moving for dismissal on *forum non conveniens* grounds. (Alameda Opp'n at 23.) The Fifth Circuit has squarely rejected this very argument. *Baumgart* v. *Fairchild Aircraft Corp.*, 981 F.2d 824, 835 (5th Cir. 1993). As the *Baumgart* court noted, the Supreme Court has upheld a *forum non conveniens* dismissal of an action that defendants removed and transferred to another federal forum. *Piper Aircraft*, 454 U.S. at 240-41.

facts giving rise to the complaint occurred outside of the chosen forum." *Lynch* v. *Hilton Worldwide, Inc.*, 2011 WL 5240730, at *3 (D.N.J. Oct. 31, 2011) (quotation omitted). In those circumstances, "courts reduce the deference owed to a plaintiff's choice of forum," even if the forum is home to the plaintiff. *Id.*

The Ohio plaintiffs incorrectly attempt to limit the Court's discretion by asserting that their choice of their home forum should be disturbed only if they were "motivated by an effort to render the litigation vexatious for the defendants." (Ohio Opp'n at 28-29.) Because the Ohio plaintiffs' claims have no connection to Ohio other than that they reside there, their choice of forum "does not coincide with the district wherein the heart of this dispute occurred." *McNulty* v. *J.H. Miles & Co., Inc.*, 2012 WL 6652824, at *5 (D.N.J. Dec. 19, 2012). As a result, the deference owed to the Ohio plaintiffs' forum choice is "diminished," *Colantonio* v. *Hilton Int'l Co.*, 2004 WL 1810291, at *5 (E.D. Pa. August 13, 2004), and this Court has the discretion to dismiss these actions in favor of a more appropriate forum. The exercise of that discretion is particularly appropriate here given that dozens of additional plaintiffs from around the world (including England) have filed similar claims in this Court against some or all defendants. (Defs.' Opening Br. at 44 & n.31).[33]

**B.** **Plaintiffs' English-Law Claims Should Be Heard in an English Forum.**

Plaintiffs' non-Exchange Act claims are governed by English law, relate to purchases of BP ordinary shares on the LSE, and are primarily based on alleged misstatements by an English company and its officers or other representatives originating from London. The relevant public

---

[33] Since filing their opening brief, defendants have become aware that a Dutch foundation has been established for "[i]nstitutional investors who purchased BP common stock . . . on any European or other non-U.S. exchange . . . includ[ing] U.S. investors who purchased BP common stock outside the U.S. stock exchanges." (Ex. A at 3 (Foundation Website).) That foundation is now soliciting investors for the purposes of suing BP in cases around the world. (*Id.*) This effort only reinforces the public interest in having all claims based on purchases on the LSE proceed in England. *See Morrison*, 130 S. Ct. at 2886.

and private interest factors thus weigh in favor of an English forum. (*See* Defs.' Opening Br. at 44-47.) As this Court has noted, "[i]n an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere." *Akerblom* v. *Ezra Holdings Ltd.*, 2012 WL 464917, at *4 (S.D. Tex. Feb. 13, 2012) (quotation and citation omitted).

### 1.      English Courts Provide an Adequate Alternative Forum.

Plaintiffs do not dispute that English courts offer an adequate alternative forum to adjudicate English-law claims. Rather, the Alameda and Connecticut plaintiffs argue that English courts are not available to hear their "entire case," which also includes Exchange Act claims. (Alameda Opp'n at 19.) But defendants have asked this Court to dismiss only plaintiffs' English-law claims on *forum non conveniens* grounds. "Depending upon the facts of the particular case, a district court may dismiss part of a lawsuit [under *forum non conveniens*] while deciding the merits of other issues." *Scottish Air Int'l, Inc.* v. *British Caledonian Grp., PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996). In *Scottish Air*, the court rejected the argument that severing related claims would necessarily be inconvenient and inefficient, reasoning that such a rule "would reduce the flexibility of the doctrine and would allow litigants to . . . join[] claims that lack merit." *Id*. at 1235.

### 2.      Plaintiffs' English-Law Claims Involve Distinct Issues and Are at a Different Procedural Stage Than the Putative Class Action.

Plaintiffs argue that discovery in their actions should be coordinated with discovery in the federal putative class action and MDL 2179 in New Orleans. According to plaintiffs, the need for such coordination weighs against dismissing their English-law claims. (Ohio Opp'n at 31-33;

Alameda Opp'n at 20-22 & n.11.)  The obvious value of coordinated discovery is not reason alone to litigate plaintiffs' English-law claims in this Court.

As an initial matter, the class action has progressed further than these actions, which have not yet survived a challenge to their pleadings.  The class action also will involve procedures and discovery related to class certification that these individual actions will not.

More fundamentally, discovery in these actions can be coordinated with discovery in related cases pending in the U.S. even if this Court does not retain jurisdiction over plaintiffs' English-law claims.  As plaintiffs acknowledge, they have been given access to and the ability to participate in discovery from the MDL 2179 litigation.  (Ohio Opp'n at 32; Alameda Opp'n at 21.)  And defendants have agreed to grant individual plaintiffs access to ongoing discovery in the class action pending in this Court.  Plaintiffs' access to this discovery will continue regardless of where their English-law claims are litigated.  The question here is whether dispositive motions and trial should be held in the jurisdiction whose law governs the claims.

Finally, the Alameda and Connecticut plaintiffs focus extensively on ███████████ ███████████  ███████████  (*E.g.*, Alameda Opp'n at 25-31.)  Plaintiffs cannot feature those allegations in attempting to establish the merits of their claims under English law, but then downplay their significance for purposes of the *forum non conveniens* analysis.  Plaintiffs' London-centric allegations underscore the lack of connection between plaintiffs' English-law claims and Texas, and they weigh in favor of an English forum where the parties will have easy access to sources of proof unique to plaintiffs' claims.  *See Viking Global Equities, LP* v. *Porsche Automobil Holding SE*, 101 A.D.3d 640 (N.Y. App. Div. 2012).[34]

---

[34] In *Viking Global*, the court granted *forum non conveniens* dismissal where U.S. plaintiffs asserted state-law fraud and misrepresentation claims against a foreign issuer arising out of transactions on a foreign exchange.  101 A.D.3d at 641.  Although plaintiffs had "alleged connections between the action and the forum" based on representations

(*footnote continued*)

### 3. Plaintiffs' Exchange Act Claims Are the Source of Duplication and Inefficiency.

The Alameda and Connecticut plaintiffs argue that severing their English-law claims from their Exchange Act claims would be wasteful and inefficient. (Alameda Opp'n at 18-20.) But plaintiffs are to blame for any duplication: their federal claims are entirely duplicative of claims already asserted on their behalf as purchasers of BP ADSs in the pending class action. Such duplicative claims, brought individually by putative class members before class certification is decided, undermine the judicial efficiency rationale underlying Rule 23. *See Am. Pipe & Constr. Co.* v. *Utah*, 414 U.S. 538, 553-54 (1974); *Rahr* v. *Grant Thornton LLP*, 142 F. Supp. 2d 793, 800 (N.D. Tex. 2000).

## IV. THE DORMANT COMMERCE CLAUSE BARS APPLYING OHIO AND TEXAS LAW TO PLAINTIFFS' TRANSACTIONS ON A FOREIGN EXCHANGE.

Plaintiffs accuse defendants of being Commerce Clause "radical[s]" and "revolutiona[ries]" who seek an "unprecedented" extension of that provision. (Ohio Opp'n at 38; Alameda Opp'n at 45, 50.) To the contrary, defendants ask this Court to apply settled jurisprudence:

- The dormant Commerce Clause (i) "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," *Healy* v. *Beer Institute*, 491 U.S. 324, 336 (1989) (quotation omitted), and (ii) prohibits the application of state law where it would (a) interfere with foreign commerce, or (b) undermine the federal government's ability to speak with one voice, *see Piazza's Seafood World, LLC* v. *Odom*, 448 F.3d 744, 750 (5th Cir. 2006).

- In *Morrison*, the Supreme Court made clear that (i) the focus of securities fraud claims is regulation of the securities transaction itself, rather than other aspects of the alleged misconduct, 130 S. Ct. at 2884, and (ii) permitting private actions under the remedial, anti-fraud provisions of the federal securities laws arising from foreign transactions would "interfere[] with foreign securities regulation," *id.* at 2886.

---

(*footnote continued*)
received by "plaintiffs in [their home forum] but generally disseminated to parties elsewhere," the court dismissed in favor of the foreign forum. *Id.*

- Plaintiffs' purchases of BP ordinary shares were made on the LSE in England. None of these purchases are alleged to have resulted from any offer made by defendants (or anyone else) in Texas or Ohio. Thus, no aspect of the securities transactions at issue here occurred in Texas or Ohio. *See Nat'l Century*, 755 F. Supp. 2d at 884 ("Even in securities transactions having points of contact with more than one state, the contacts that matter are the offer, sale, and purchase.").

Under well-settled principles, the dormant Commerce Clause thus bars the application of either Ohio or Texas law to plaintiffs' ordinary share purchases on the LSE for two reasons: (i) as in *National Century*, 755 F. Supp. 2d at 888, plaintiffs' claims seek to apply state law extraterritorially to foreign transactions, and (ii) applying state law to those foreign transactions would run afoul of interference-with-foreign-commerce test set forth in *Piazza's*, 448 F.3d at 750.[35]

### A. Plaintiffs Seek to Apply State Law to Wholly Foreign Transactions.

Relying on *Chrysler Capital Corp.* v. *Century Power Corp.*, 800 F. Supp. 1189, 1195 (S.D.N.Y. 1992), plaintiffs assert that remedial, antifraud actions, by their very nature, cannot burden commerce. (Alameda Opp'n at 47-48; Ohio Opp'n at 37.) As the *National Century* court

---

[35] Plaintiffs are wrong that their common-law claims escape scrutiny under the dormant Commerce Clause. The Supreme Court's decisions in *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254 (1964), *San Diego Building Trades Council* v. *Garmon*, 359 U.S. 236 (1959), *Cipollone* v. *Liggett Group, Inc.*, 505 U.S. 504 (1992), and *BMW of North America, Inc.* v. *Gore*, 517 U.S. 559 (1996), establish that the form in which state power is exercised is irrelevant to constitutional analysis. "State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute." *BMW*, 517 U.S. at 572 n.17. Because "common-law damages actions . . . are premised on the existence of a legal duty," "it is difficult to say that such actions do not impose 'requirements or prohibitions,'" *Cipollone*, 505 U.S. at 522, that are at the core of what the dormant Commerce Clause prohibits. Although *City of Boston* v. *Smith & Wesson Corp.*, 2000 WL 1473568, at *12 (Mass. Super. Ct. July 13, 2000) (Alameda Opp'n at 49), observed that "[t]he standard for analysis under the Commerce Clause has its *focus* on positive law-statutes or regulations," it acknowledged "that Commerce Clause principles apply in some civil suits." And the remainder of plaintiffs' authorities provide no analysis of this issue. *Buzzard* v. *Roadrunner Trucking, Inc.*, 966 F.2d 777, 784 n.9 (3d Cir. 1992)—a pre-*BMW* decision—noted only that "[t]hough there are numerous cases holding state legislative action invalid under the dormant commerce clause, we have found none invalidating liability founded on principles of state common law." *Camden County Board of Chosen Freeholders* v. *Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 254 (D.N.J. 2000), and *Crowley* v. *Cybersource Corp.*, 166 F. Supp. 2d 1263, 1272 (N.D. Cal. 2001) (Alameda Opp'n at 48), both rely on *Buzzard*. Similarly, *Commonwealth* v. *TAP Pharmaceutical Products, Inc.*, 36 A.3d 1197, 1234 (Pa. Comm. Ct. 2011), commented that "[t]he dormant Commerce Clause implicitly identifies the limits of states in impacting interstate commerce," without explaining why those limits would not be violated through common-law liability. *See Garmon*, 359 U.S. at 247 ("[State] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.").

explained, however, *Chrysler* "did not address the extraterritoriality principle, but limited its analysis to the . . . balancing test" set forth in *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970). 755 F. Supp. 2d at 881. Plaintiffs' claims here are not subject to *Pike* balancing; they are subject to the extraterritoriality principle and *Piazza*'s foreign commerce test.[36] Even if *Pike* were relevant, *Chrysler*'s conclusion that "remedial statutes" cannot "burden" commerce, 800 F. Supp. at 1195, is contrary to *Morrison*, which made clear that liability for foreign transactions under an anti-fraud provision (Section 10(b)) would "interfere[] with foreign securities regulation." 130 S. Ct. at 2886.

Plaintiffs next argue that *Morrison*'s holding that the geographic locus of securities fraud claims is the location of the securities transaction applies only to Section 10(b) claims. (Alameda Opp'n at 52-53; Ohio Opp'n at 36.) Defendants do not suggest that the Court's holding in *Morrison* went beyond Section 10(b), but rather that the Court's reasoning applies with equal force to state-law fraud claims. All of plaintiffs' claims involve alleged misstatements in connection with the purchase or sale of a security, and thus are analogous to claims under Section 10(b). *See In re Smart Tech., Inc. S'holder Litig.*, 2013 WL 139559, at *5 (S.D.N.Y. Jan. 11, 2013) (applying *Morrison* to claims requiring acquisition or purchase of securities).[37] Quoting *Morrison*'s discussion of *Pasquantino* v. *United States*, 544 U.S. 349

---

[36] The Alameda Opposition (but not the Ohio Opposition) argues that "[t]he Fifth Circuit has not adopted a *per se* extraterritorial prohibition." (Alameda Opp'n at 51 n.14.) But, as the Alameda and Connecticut plaintiffs acknowledge, the extraterritoriality rule "has its origins in a handful of Supreme Court decisions from the 1980s" (*id.* at 50), and thus there is no need for the appeals court to have "adopted" the approach.

[37] The Alameda and Connecticut plaintiffs assert a statutory claim under Texas Business and Commerce Code Section 27.01, which is entitled "Fraud in Real Estate and Stock Transactions" and prohibits "[f]raud in a transaction involving . . . stock in a corporation." Because Section 27.01 applies only to fraud coinciding with a securities transaction, it is "legally equivalent to section 10(b)'s 'purchase or sale of any security' requirement." *Smart Tech.*, 2013 WL 139559, at *5. The Ohio plaintiffs similarly allege violations of Ohio Revised Code Section 1707.44(J), which prohibits making materially false statements "as to alleged facts affecting the value of securities," and they seek rescission under Section 1707.43(A), which requires a "sale or contract for sale." These requirements are legally indistinguishable from those of Section 10(b). *See Smart Tech.*, 2013 WL 139559, at *5.

(2005), plaintiffs assert that "*Morrison* made clear that a simple fraud (without the requirement that it be in connection with a purchase or sale in a particular place) has no territorial restriction." (Alameda Opp'n at 53.) As *Morrison* explained, however, *Pasquantino* addressed the federal wire fraud statute, which "'prohibits any scheme or artifice to defraud,' . . . without any requirement that it be 'in connection with' any particular transaction or event." *Morrison*, 130 S. Ct. at 2887. Here, by contrast, plaintiffs' claims are not directed broadly to an alleged fraudulent scheme in the United States, but rather depend on plaintiffs' purchase of BP ordinary shares on the LSE.

The Alameda and Connecticut plaintiffs incorrectly assert that "no court has ever dismissed" a state fraud claim on the basis of the dormant Commerce Clause. (Alameda Opp'n at 46.) In fact, the court in *National Century* recently struck a claim under the same Ohio statute that the Ohio plaintiffs seek to assert here on that very basis. *See Nat'l Century*, 755 F. Supp. 2d at 888. The Ohio plaintiffs attempt to distinguish *National Century* on the ground that the transactions at issue there were purportedly more remote from Ohio than the transactions at issue here. This is incorrect. *National Century* addressed out-of-state securities sales of an *Ohio* issuer to plaintiffs (one of which was an *Ohio* resident) by an out-of-state defendant that allegedly assisted the issuer's fraud in *Ohio*. 755 F. Supp. 2d at 861-62. If anything, the connections to Ohio in *National Century* were greater than the connections to Ohio (residence of the Ohio plaintiffs) or Texas (location of a small number of the allegedly false statements) here. Moreover, as in *National Century*, the relevant conduct for the dormant Commerce Clause—the securities transactions themselves—occurred entirely outside of the states whose laws plaintiffs seek to apply. *Id.* at 888.

The Ohio plaintiffs argue that defendants misinterpret prior dormant Commerce Clause jurisprudence to focus on the location of the targeted securities transaction. (Ohio Opp'n at 39-40.) But they ignore that state blue sky laws were originally upheld as constitutional under the dormant Commerce Clause *because they regulated only in-state transactions*. *See*, *e.g.*, *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539, 557 (1916) ("The provisions of the law . . . apply to dispositions of securities *within* the state."); *Nat'l Century*, 755 F. Supp. 2d at 879 (explaining history). These decisions explain that dormant Commerce Clause analysis of state securities laws for nearly a century has employed a transactional test.[38] Under that test, because the securities transactions at issue here occurred on the LSE—not in either Ohio or Texas—application of Texas or Ohio law would be extraterritorial and thus unconstitutional.[39]

**B.     Applying Ohio or Texas Law to Plaintiffs' Ordinary Share Claims Would Interfere With Foreign Commerce.**

The Ohio plaintiffs argue that defendants have not demonstrated that applying state law here would interfere with foreign commerce because the United Kingdom's *amicus* brief in *Morrison* was limited to that case. (Ohio Opp'n at 42.)[40] But they do not explain why the United Kingdom would take a contrary position on the claims here, which also seek to regulate

---

[38] Indeed, the Ohio plaintiffs' own descriptions of dormant Commerce Clause decisions demonstrate their focus on the location of the targeted securities transaction rather than any other conduct. (*See* Ohio Opp'n at 37, 40.)

[39] In an unsuccessful effort to domesticate their claims, plaintiffs posit various alleged contacts with Ohio and Texas. The Ohio plaintiffs point to their residency in, and defendants' alleged dissemination of false statements "into," that state. (Ohio Opp'n at 39.) But because the dormant Commerce Clause focuses on the location of the transaction at issue, *Nat'l Century*, 755 F. Supp. 2d at 884, plaintiffs' residence is irrelevant. The Ohio plaintiffs' statement that defendants "disseminated" statements "into Ohio" (Ohio Opp'n at 39) is both misleading—defendants are not alleged to have made any alleged misstatements *in* Ohio—and irrelevant—it is undisputed that no portion of the relevant securities transactions occurred in Ohio. Similarly, the Alameda and Connecticut plaintiffs cite Texas's alleged "legitimate interest" in this action. (Alameda Opp'n at 49.) But they do not allege that any portion of their securities transactions occurred in Texas.

[40] The Alameda and Connecticut plaintiffs assert that "the Fifth Circuit employs a two-tiered approach" to "determine whether a statute violates the dormant Commerce Clause" and accuse defendants of failing to "acknowledge—much less address"—the "two-tier analysis." (Alameda Opp'n at 46-47.) When foreign, rather than domestic, commerce is at issue, however, this two-tiered test is inapplicable, and the Fifth Circuit instead applies the disjunctive test set forth in *Piazza*'s, 448 F.3d at 750.

transactions on an English exchange. Indeed, at least one court has credited a foreign government's brief in *Morrison* as evidence of that nation's more general position, *see Anwar* v. *Fairfield Greenwich Ltd.*, 2013 WL 662972, at *10 (S.D.N.Y. Feb. 25, 2013) (citing France's *Morrison* brief regarding enforcement of U.S. class-action judgment). That the United Kingdom's position in *Morrison* was not limited to that case is confirmed by a February 2011 SEC comment letter submitted by the United Kingdom urging that the transactional test promulgated by *Morrison* be retained because revival of a private right of action for foreign securities transactions "has the potential to conflict with the interests of the United Kingdom and other jurisdictions." (Ex. B at 1 (SEC Comment Letter).) These comity concerns apply equally to claims under state law because "issues with respect to the extraterritorial application of American economic regulation are the same regardless of the particular statute being applied." *Zenith Radio Corp.* v. *Matsushita Elec. Indus. Co.*, 494 F. Supp. 1161, 1178 (E.D. Pa. 1980).[41]

Plaintiffs ignore that "[i]n the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." *Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311 (1994) (quotation and citation omitted). The Ohio plaintiffs assert that because state securities laws may "coexist[]" with the federal securities laws, they can reach conduct that is beyond the scope of federal law. (Ohio Opp'n at 42.) It is

---

[41] The Alameda and Connecticut plaintiffs point to the United Kingdom's recognition in its *Morrison* brief about the continued availability of state-law fraud actions. (Alameda Opp'n at 54.) But plaintiffs read that discussion, which addressed whether restricting the extraterritorial application of the Exchange Act would permit the United States "to become a base for foreign frauds," out of context. Brief for United Kingdom as Amicus Curiae Supporting Respondents, *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) (No. 08-1191), 2010 WL 723009, at *37-38 (Feb. 25, 2010). The United Kingdom noted that state law permits fraud actions and that "the alleged conduct by [National Australia Bank's] *U.S. subsidiary* [that was alleged to have manipulated its financial models] . . . may be actionable as common law fraud, even if it is not securities fraud." *Id.* (emphasis added). The United Kingdom did not approve any of the state-law claims against *National Australia Bank*, let alone any action under state law based upon purchases of its securities on a non-U.S. exchange. The Ohio plaintiffs' *seriatim* citation to Justice Breyer's concurring opinion in *Morrison* (Ohio Opp'n at 18, 23, 36, 41) is similarly off-point, as that opinion observes only that "state law or other federal fraud statutes . . . may apply to the fraudulent activity alleged here to have occurred in the United States" (*i.e.*, the actions of the U.S. subsidiary), and says nothing about claims arising from the purchase of securities overseas. 130 S. Ct. at 2888.

illogical, however, for a state's power over foreign securities transactions to exceed that of the federal government. *See*, *e.g.*, '*In' Porters, S.A.* v. *Hanes Printables, Inc.*, 663 F. Supp. 494, 502 n.8 (M.D.N.C. 1987) (noting the anomaly that would be created if state antitrust statute "were construed to have a greater extraterritorial reach than the Sherman Act"). Plaintiffs also fail to explain how state law could apply to foreign securities transactions without undermining the federal policy unequivocally expressed in *Morrison* that application of U.S. law to transactions in England would interfere with the authority of foreign governments. And plaintiffs offer no response to *Global Reinsurance Corp.-U.S. Branch* v. *Equitas Ltd.*, 969 N.E.2d 187, 195 (N.Y. 2012), which made clear in the analogous antitrust context that the "federal power to regulate foreign commerce" would be "undone" if state law reached "foreign conduct deliberately placed" beyond the reach of federal law. If federal law is inapplicable to foreign transactions because of concerns about foreign interference, it is difficult to see how permitting over 50 different state regimes to apply to those transactions would either avoid that interference or be consistent with federal policy.[42]

## V. THE ALAMEDA AND CONNECTICUT PLAINTIFFS FAIL TO STATE AN EXCHANGE ACT CLAIM FOR CERTAIN STATEMENTS.

The Alameda and Connecticut plaintiffs assert claims under the Exchange Act based on certain statements not at issue in the class action. Those claims fail as a matter of law. (*See* Defs.' Opening Br. at 57 & n.41.) Indeed, this Court already has dismissed identically pled claims in the related class action.

*BP's Press Release Dated January 16, 2007.* The unattributed statement in BP's press release about actions BP "already has taken" and about plans it "will, after a more thorough

---

[42] *See Japan Line, Ltd.* v. *Cnty. of L.A.*, 441 U.S. 434, 450-51 (1979) ("If other States followed the taxing State's example, various instrumentalities of commerce could be subjected to varying degrees of multiple taxation, a result that would plainly prevent this Nation from 'speaking with one voice' in regulating foreign commerce.").

review, develop" is not actionable because it applies only to BP's U.S. refineries—a topic not at issue in these actions. (*See* Defs.' Opening Br. at 57-58.) Plaintiffs cite the Court's discussion of different statements made months or years later, without acknowledging that those statements were not limited to U.S. refineries. (Alameda Opp'n at 42 & n.26.)

Plaintiffs also fail to plead facts necessary to satisfy the egregious falsity standard for corporate scienter. (Defs.' Opening Br. at 58.) Plaintiffs' conclusory assertion to the contrary (Alameda Opp'n at 42) is no substitute for well-pled allegations of fact.

***Malone's House Testimony on May 16, 2007.*** Plaintiffs concede that the first two paragraphs of Malone's statement, expressing that "we get it" and "BP America is committed to safety," are not actionable. (Alameda Opp'n at 42.) As to the third and fourth paragraphs, which state that Malone "continue[s] to meet with employees to reinforce . . . that they must ensure that our operations are safe" and that "BP does not tolerate retaliation against workers who raise safety concerns," the Court dismissed all claims against Malone in the class action based on those same statements for failure adequately to allege scienter. (Defs.' Opening Br. at 60.) Plaintiffs offer no response. (Alameda Opp'n at 42-43.)

***BP's Press Release Dated October 25, 2007.*** This Court also already has dismissed for failure to plead scienter claims based on Malone's statement that BP had "made real progress in the areas of process safety performance and risk management" since the Texas City refinery explosion. *BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 785. Plaintiffs fail to address this ruling, which requires dismissal of claims based on the same statement in this press release.[43]

---

[43] Although plaintiffs state that they "are not pursuing claims based on portions of the press release that the Court already dismissed for failure to plead falsity" (Alameda Opp'n at 43), they included in their complaint (Alameda Compl. ¶¶ 341-42), the exact same unattributed statement about BP America's "comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs" that the Court already held was not actionable on falsity grounds. *BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 759, 762 & n.13.

***Rainey's Senate Testimony on November 19, 2009.***  Plaintiffs concede that the portions of Rainey's testimony concerning BP's commitment to the environment and reducing environmental impacts are not actionable.  (Alameda Opp'n at 43.)  They also concede that the Court already has rejected the same scienter allegations with respect to Rainey's statement about BP's contingency planning.  (*Id*. at 43 n.28.)  Plaintiffs nevertheless argue that they have pled scienter based on an indictment of Rainey related to different statements to Congress concerning the rate of oil flow after the Deepwater Horizon explosion.  (*Id*.)  This indictment, however, says nothing about Rainey's state of mind with respect to statements made six months earlier on an entirely different topic.

***Dudley's Statement on May 14, 2010 and McKay's House Testimony on May 19, 2010.***  Plaintiffs' allegations concerning the statements of Dudley and McKay responding to estimates that the flow rate could be 70,000 barrels per day fail adequately to plead scienter.[44]  Plaintiffs do not dispute that they fail to allege that either Dudley or McKay received any contradictory information before making the statements.  (*Id*. at 43-44.)  Instead, they argue that BP's criminal plea and SEC settlement support a scienter finding because they concerned "Defendants' public reiteration of the 5,000 barrels per day figure."  (*Id*.)  This is incorrect:  the plea is based on letters dated May 24 and June 25 that were not prepared by either Dudley or McKay.  The SEC settlement likewise made no mention of Dudley or McKay, and thus creates no inference that either acted with scienter.[45]

---

[44] Plaintiffs claim that McKay's statements are "clearly actionable," citing non-controlling Texas authority for the proposition that statements of opinion may form the basis of liability in limited circumstances.  (Alameda Opp'n at 44 & n.29.)  This contention does not respond to defendants' actual argument—that McKay's statements are not actionable because they contain explicit cautionary language signaling the inherent uncertainty of the information he was conveying.  (Defs.' Opening Br. at 63-64.)

[45] Plaintiffs' failure to plead scienter as to individual corporate officers also renders their related scienter allegations for BP insufficient.  (Defs.' Opening Br. at 63 n.48.)

## VI. THE OHIO PLAINTIFFS FAIL TO PLEAD PERSONAL JURISDICTION.

### A. Plaintiffs Do Not Plead General Jurisdiction Over Any Defendant.

The Ohio plaintiffs concede through their silence that general jurisdiction in Ohio is lacking over BP Exploration & Production and the individual defendants. They argue, however, that BP p.l.c. and BP America, neither of which is alleged to be an Ohio resident, are subject to general jurisdiction in Ohio. (Ohio Opp'n at 46-47.) They are not.

#### 1. Ohio Does Not Recognize General Jurisdiction Over Non-Residents.

Although federal courts previously disagreed on the issue, the Sixth Circuit last year held that "it is clear that under Ohio law, a court may exercise personal jurisdiction over a non-resident defendant only if specific jurisdiction can be found under one of the enumerated bases in Ohio's long-arm statute." *Conn* v. *Zakharov*, 667 F.3d 705, 718 (6th Cir. 2012).[46] As the court explained, the Ohio Supreme Court's decisions in *Goldstein* v. *Christiansen*, 638 N.E.2d 541, 543-45 & n.1 (Ohio 1994), and *Kauffman Racing Equip., L.L.C.* v. *Roberts*, 930 N.E.2d 784, 790 (Ohio 2010), compel the conclusion "that jurisdiction over non-resident defendants must be found in Ohio's long-arm statute and that the long-arm statute *does not* extend to the limits of Due Process." 667 F.3d at 717 (emphasis in original). Subsequent decisions have recognized that *Conn* resolved this issue.[47]

In response, plaintiffs point to *Kauffman*'s discussion of general jurisdiction. (Ohio Opp'n at 46.) But *Kauffman* mentioned general jurisdiction, which was not even alleged in that action, only in passing in considering whether due process permitted the exercise of jurisdiction after determining that Ohio's long-arm statute was satisfied. 930 N.E.2d at 787, 792; *see also*,

---

[46] Plaintiffs attempt to undercut *Conn* by arguing that it "nonetheless" applied "a general jurisdiction analysis." (Ohio Opp'n at 47.) But the court applied that analysis as an alternative basis for dismissal. *Conn*, 667 F.3d at 718.

[47] *See, e.g.*, *Puronics, Inc.* v. *Clean Res., Inc.*, 2013 WL 149882, at *4 n.3 (N.D. Ohio Jan. 14, 2013); *Mid-Am. Gutters* v. *Thompson Creek Window Co.*, 2012 WL 3224148, at *2 (S.D. Ohio Aug. 6, 2012).

*e.g.*, *U.S. Sprint Commc'ns Co.* v. *Mr. K's Foods, Inc.*, 624 N.E.2d 1048, 1053 (Ohio 1994) (applying due process analysis for additional claims once long-arm statute satisfied).

### 2. The Ohio Plaintiffs Do Not Allege a Basis for General Jurisdiction Over BP p.l.c. or BP America in Any Event.

Even if it were available, the Ohio plaintiffs' allegations do not suffice to establish general jurisdiction over BP p.l.c. or BP America. Plaintiffs identify a number of purported "contacts" that "BP plc has with Ohio." (Ohio Opp'n at 45.) But nearly all of those contacts are of BP p.l.c. subsidiaries and affiliates, not of BP p.l.c. itself, and the remainder, such as filing documents with the SEC, do not constitute doing business in Ohio. As this Court has recognized, "BP [p.l.c.] has no contacts of its own with the United States beyond listing its stock on the NYSE." *BP p.l.c. Sec. Litig.*, 2012 WL 2617244, at *6 (S.D. Tex. July 5, 2012).

In fact, plaintiffs fail even to allege that BP p.l.c. is licensed to do business in Ohio, despite admitting that "[o]nly by having registered for [a] license is [a company] permitted to transact business in Ohio." (Ohio Opp'n at 49.) They nonetheless argue that BP p.l.c. regularly engages in business in Ohio. (*Id.* at 45.) On a motion to dismiss, this Court need not "accept . . . unwarranted deductions," *N. Cypress Med. Ctr. Operating Co.* v. *CIGNA Healthcare*, 2011 WL 5325785, at *3 (S.D. Tex. Nov. 3, 2011), or "draw inferences . . . that contradict . . . matters of which judicial notice may be taken," *Dingle* v. *Halliburton Co.*, 2006 WL 2729286, at *1 (S.D. Tex. Sept. 26, 2006) (quotation omitted). Here, documents subject to judicial notice demonstrate that plaintiffs' allegations about BP p.l.c.'s purported activities in Ohio are erroneous.[48]

---

[48] *BP-Husky Refinery*. Plaintiffs assert that BP p.l.c. "own[s] a 50% interest in an oil refinery located in Oregon, Ohio." (Ohio Opp'n at 45.) As the March 27, 2012 press release quoted in the complaint (Ex. C at 1(Press Release)) makes clear, however, that refinery is owned not by BP p.l.c., but by a joint venture between BP and Husky. *Cf. Simmons* v. *Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control."). General

(*footnote continued*)

Plaintiffs argue that BP America is subject to general jurisdiction in Ohio because it (i) is registered to do business and (ii) has, in the past, filed lawsuits in the state.  (Ohio Opp'n at 48-49.)[49]  As this Court has already held, "BP America's registration in [a] state is not evidence of the 'systematic and continuous contacts' with the state . . . required for the minimum contacts analysis."  *BP Sec. Litig.*, 2012 WL 2617244, at *8; *see also*, *e.g.*, *Fielding* v. *Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005) ("The registration of an agent for receipt of process does not establish general jurisdiction . . . ."); *Pittock* v. *Otis Elevator Co.*, 8 F.3d 325, 329 (6th Cir. 1993) (same).[50]

---

(*footnote continued*)

jurisdiction over BP p.l.c. cannot be predicated on its alleged ownership interest in BP-Husky Refining LLC.  *See*, *e.g.*, *Corrigan* v. *USX Corp.*, 2005 WL 2621981, at *11 (N.D. Ohio Oct. 14, 2005) (allegation of 50/50 joint venture in Ohio insufficient to support general jurisdiction).

*Trumbull County Leasing.*  Plaintiffs allege that BP p.l.c. "leas[ed] over 84,000 acres of property for oil/gas production in Trumbull County, Ohio."  (Ohio Opp'n at 45.)  Trumbull County land records establish, however, that no deeds have been recorded to BP p.l.c. since March 27, 2012, the date of the press release upon which the complaint relies.  (Ex. D (Deed Search).)  Over 4,000 deeds have been recorded to BP America Production Co. in that time period.  (*Id.*)  Similarly, the only BP entity that appears in the Ohio Division of Natural Resource's Oil & Gas Well Database list of active well owners is BP America Production Co., not BP p.l.c.  (Ex. E at 3 (Well Database Search).)

*BP-Branded Gas Stations and Marketing.*  The March 27, 2012 press release on which plaintiffs rely (Ohio Compl. ¶ 28) states that BP markets fuels in Ohio "through *independently-owned marketers* under the BP brand."  (Ex. C at 1 (Press Release) (emphasis added).)

[49]  Plaintiffs' reliance on decade-old actions brought by BP America is insufficient to plead general jurisdiction.  Merely bringing an action in a state is insufficient to trigger general jurisdiction or constitute transacting business in a state.  *See*, *e.g.*, *Harvest Credit Mgmt. VII, L.L.C.* v. *Harris*, 2012 WL 112583, at *2 (Ohio Ct. App. Jan. 12, 2012); *Merlino* v. *Harrah's Entm't, Inc.*, 2006 WL 401847, at *3 (E.D. Pa. Feb. 17, 2006) ("Filing even nineteen lawsuits, without more, cannot constitute continuous and systematic activity so as to establish general jurisdiction.").  In any event, lawsuits from ten years ago are simply too dated to be considered.  *See Johnston* v. *Multidata Sys. Int'l Corp.*, 523 F.3d 602, 610 (5th Cir. 2008) ("General jurisdiction can be assessed by evaluating contacts of the defendant with the forum *over a reasonable number of years*, up to the date the suit was filed.") (emphasis added) (quotation omitted).

[50]  Plaintiffs cite *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U.S. 888, 889 (1988), for the proposition that appointment of an agent for service of process is equivalent to consent to general jurisdiction.  (Ohio Opp'n at 49.)  This is incorrect.  The "mere designation of an agent in compliance with the service-of-process statute does not automatically eliminate the requirement of minimum contacts to establish personal jurisdiction."  *Pittock*, 8 F.3d at 329.

### B.     Plaintiffs' "Effects" Theory of Specific Jurisdiction Is Contrary to Due Process.

To satisfy due process, a defendant must have purposefully availed itself of the privilege of conducting activities within Ohio, such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. *Kauffman*, 940 N.E.2d at 792. Plaintiffs argue that because defendants' alleged misrepresentations reached Ohio residents, those statements were somehow "specifically directed to Ohio" and that due process therefore is satisfied. (Ohio Opp'n at 51.) That is wrong. Even if all inferences are drawn in plaintiffs' favor, there is not a single allegation in the complaint that comes close to alleging that "Defendants . . . intentionally sen[t] . . . misrepresentations into Ohio with the intent to mislead investors within [Ohio]." (*Id*. at 51.)

Plaintiffs' argument also is contrary to settled law. *See Revell* v. *Lidov*, 317 F.3d 467, 475 (5th Cir. 2002) (public communication "presumably directed at the entire world" was not "directed specifically at" forum state); *Cadle Co.* v. *Schlichtmann*, 123 F. App'x 675, 679 (6th Cir. 2005) ("The law does not require that people avoid using the internet altogether in order to avoid availing themselves of the laws of every state."). Indeed, the Fifth Circuit has made clear that a plaintiff cannot establish that a defendant purposefully availed itself of the privilege of conducting activities in the forum state based on allegations of an "effect" in that state without allegations, absent here, that the defendant "expressly aimed its allegedly tortious activities at" the state and knew "that the brunt of the injury [would] be felt by a particular resident in the forum." *Southmark Corp.* v. *Life Investors Inc.*, 851 F.2d 763, 772 (5th Cir. 1988); *accord Cadle*, 123 F. App'x at 680 (jurisdiction lacking where allegedly defamatory website "was not

directed toward Ohio in its content or in its target audience"); *IMO Indus., Inc.* v. *Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998).[51]

## CONCLUSION

For the foregoing reasons and those set forth in defendants' opening brief, the Alameda, Connecticut and Ohio complaints—other than Exchange Act claims based on the same statements this Court already has determined are actionable—should be dismissed with prejudice.

---

[51] The Ohio plaintiffs' scattered authorities are inapposite. In *Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 772, 774 (1984), the defendant publisher knowingly sold "some 10,000 to 15,000 copies" of its magazine in the forum state each month, and that "conduct . . . was purposefully directed at" the forum state, "inevitably affected persons in th[at] state" and could not "by any stretch of the imagination be characterized as random, isolated, or fortuitous." *FRC Int'l, Inc.* v. *Taifun Feuerloschgeratebau und Vertriebs GmbH*, 2002 WL 31086104, at *4 (N.D. Ohio Sept. 4, 2002), in which the defendant "entered into a contract with [an Ohio] plaintiff and consequently sent [to Ohio] many [allegedly fraudulent] communications relating to the contract," bears no resemblance to this action. Similarly, *Kauffman* is readily distinguishable because there the "effects of [defendant's] conduct went well beyond foreseeability," insofar as he "intended the effects of his conduct to be felt in Ohio" and "communicated with the very purpose of having th[ose] consequences felt by [plaintiff] in Ohio." 930 N.E.2d at 796. In fact, *Kauffman* recognizes that jurisdiction under the effects test "necessitates conduct 'calculated to cause injury' in a 'focal point' where the 'brunt' of the injury is experienced." *Id.* (citations omitted).

Dated: April 1, 2013

OF COUNSEL:                                          Respectfully submitted,

Daryl A. Libow (pro hac vice)                        */s/ Thomas W. Taylor*
Amanda F. Davidoff                                   Thomas W. Taylor
Elizabeth A. Rose                                    Texas State Bar No. 19723875
SULLIVAN & CROMWELL LLP                              S.D. Tex. Bar No. 3906
1701 Pennsylvania Avenue, N.W.                       ANDREWS KURTH LLP
Washington, D.C.  20006                              600 Travis, Suite 4200
Telephone:  (202) 956-7500                           Houston, Texas  77002
libowd@sullcrom.com                                  Telephone:  (713) 220-4200
davidoffa@sullcrom.com                               Facsimile:  (713) 220-4285
rosee@sullcrom.com                                   ttaylor@andrewskurth.com

Richard C. Pepperman, II (pro hac vice)              *Attorney-in-Charge for Defendants*
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
peppermanr@sullcrom.com
deleeuwm@sullcrom.com
pellerm@sullcrom.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing Reply

Memorandum has been served by electronic CM/ECF filing, on this 1st day of April, 2013.

*/s/ Thomas W. Taylor*
Thomas W. Taylor