# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| ALAMEDA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF PROVIDENCE, and STATE-BOSTON RETIREMENT SYSTEM, <br><br> Plaintiffs, <br><br> v. <br><br> BP PLC, BP AMERICA, INC., BP EXPLORATION & PRODUCTION, INC., ANTHONY B. HAYWARD, DOUGLAS SUTTLES, ANDREW G. INGLIS, H. LAMAR MCKAY, ROBERT W. DUDLEY, ROBERT MALONE, and DAVID RAINEY, <br><br> Defendants. | Case No.: 12-CV-01256 (cons.) <br><br> Jury Trial Demanded |
| *In re BP plc Securities Litigation* | MDL 2185 <br> Case No. 4:10-md-02185 |

## [PROPOSED] SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION .......................................................... 9

II.     JURISDICTION AND VENUE ................................................... 14

III.    THE PARTIES............................................................................ 15

     A.    Plaintiffs ......................................................................... 15

     B.    Defendants ...................................................................... 16

          1.    Corporate Defendants ......................................... 16

          2.    Individual Defendants ......................................... 18

IV.    ADDITIONAL BP PERSONNEL OF SIGNIFICANCE................. 23

V.     CONFIDENTIAL WITNESSES ................................................. 26

VI.    BP PURPORTEDLY TOOK EXTENSIVE MEASURES TO RECTIFY ITS OPERATIONAL HISTORY RIFE WITH SAFETY VIOLATIONS ............................ 27

     A.    BP's Relevant Operations ................................................ 27

     B.    BP Is No Stranger to Catastrophic Industrial Incidents ......................................... 28

          1.    BP's Flawed Process Safety Controls Cause Grangemouth Incidents .................................. 28

          2.    Unsafe Deepwater Drilling Operations................. 29

          3.    BP's Thunder Horse PDQ Operated With Pipeline Cracks That Could Have Been Catastrophic .................................. 31

          4.    Safety Lapses Cause an Explosion at BP's Texas Refinery ..................... 31

          5.    Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations in Prudhoe Bay ....................... 33

          6.    BP Purports to Adopt the Baker Panel Recommendations...................... 36

          7.    BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems............................ 39

          8.    SEEAC Closely Monitored BP's Safety Performance Including OMS Implementation................... 41

          9.    BP Launches OMS to Purportedly Implement the Baker Panel's Recommendations, but Exempts OMS's Application from Rigs that BP Did Not Fully-Own ...................... 44

          10.   Defendant Hayward Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky and That a Deepwater Blowout Was the Highest Risk Facing BP in the Gulf of Mexico ....................... 48

11.    Contrary To Defendants' Assertions, the Gulf of Mexico Had Not Completed The Transition to OMS At The Time Of The Deepwater Horizon Disaster ...................................................................... 49

VII.   DEFENDANTS' SCIENTER / INTENT TO DECEIVE REGARDING THEIR MISREPRESENTATIONS AND OMISSIONS ABOUT BP's PRE-SPILL SAFETY IMPROVEMENTS AND ITS POST-SPILL ASSESSMENTS ...................... 53

A.    Defendants' Scienter / Intent To Deceive Regarding Their Misrepresentations and Omissions About BP's Operational Safety And Its Deepwater Drilling Operations ................................................................. 53

1.    Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems ............................. 54

2.    Defendants Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly ................................................................. 56

3.    BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations ...................................................................................... 60

4.    BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk .................................... 62

5.    SEEAC Approved BP's Publications Regarding Safety ......................... 64

6.    Defendants Consciously Limited The Scope of Safety & Operations Audits So As Not To Apply To The Majority Of BP's Deepwater Drilling Fleet ............................................................. 67

B.    Defendants' Scienter / Intent To Deceive Is Further Established By Their Disregard of Safety and Operational Concerns .................................... 68

1.    Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased From Transocean ................................................... 69

2.    Concerns about the Integrity of Safety Processes in Alaska ..................... 71

3.    Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations ................................................................................ 73

4.    Aftermath of BP's 2007 Criminal Plea ................................................ 74

C.    Defendants' Scienter / Intent To Deceive Is Further Established By BP's Retaliation Against Individuals Who Raised Concerns About Its Operational Safety and Integrity ................................................... 76

1.    Whistleblower Retaliation in the Gulf of Mexico .................................... 76

2.    Whistleblower Retaliation in Alaska ..................................................... 79

D.    Defendants' Scienter / Intent To Deceive In Making Post-Spill Misrepresentations And Omissions To Congress, Law Enforcement,

Emergency Responders, and Investors, Including Plaintiffs, About The Oil Flow Rate Into The Gulf Of Mexico From The Blown Macondo Well ............... 82

    1.    Defendants' Publicly Stated Estimates Of Oil Spilling Into The Gulf Were Contradicted By Contemporaneous Internal BP Documents, Data, Estimates, and Calculations ......................................... 82

    2.    Defendants Misrepresented the Scope of the Leak in a Brazen Attempt to Whittle Down the Amount BP Would Owe in Fines ............ 86

    3.    BP Agreed To Pay The Third-Highest Civil Fine In The SEC's History - $525 Million – To Settle The SEC's Well-Pled Allegations That It And Its Executives Hid From Investors, Including Plaintiffs, Critical Information About the Spill ...................... 87

    4.    BP Pled Guilty to Felony Manslaughter, Environmental Crimes and Felony Obstruction of Congress And Agreed to Pay The Largest Criminal Fine in U.S. History – $4 Billion – To Resolve A DOJ Investigation That Revealed Defendants' Concealment Of Critical Spill Information From Congress And The Public .................... 88

    5.    The U.S. EPA Barred BP From New Contracts With The U.S. Government .................................................................................................... 99

  E.    Additional Allegations Regarding Defendants' Scienter / Intent To Deceive ........ 99

VIII.    THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH ....................................................... 102

  A.    BP's Systematic Failures Caused the Explosion on and the Sinking of the *Deepwater Horizon Rig* ................................................................................... 102

    1.    BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan ...................................................................... 102

    2.    Casing and Cementing the Well ................................................. 107

    3.    BP Begins the Temporary Abandonment Process ................................. 113

    4.    Explosion on the Deepwater Horizon ...................................... 118

    5.    BP Continues to Attempt to Activate the BOP Following the Abandonment of the Deepwater Horizon ................................. 120

  B.    BP Was Wholly Unprepared to Contain the Oil Spill ......................................... 120

    1.    BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico ................................. 120

    2.    The Failed Use of Unprecedented Amounts of Dispersants .................. 125

    3.    The Failed Use of A Cofferdam ............................................. 127

    4.    The "Top Kill" and "Junk Shot" Efforts Fail ......................................... 129

| | 5. | The "Top Hat" Failed to Collect the "Vast Majority" of the Spewing Oil | 131 |
| | 6. | The Well Is Finally Capped | 132 |
| IX. | | DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL FACTS DURING THE RELEVANT PERIOD | 134 |
| | A. | The January 16, 2007 Press Release False and Misleading Statements [Dismissed on scienter grounds per Alameda Order] | 136 |
| | B. | The March 6, 2007 False and Misleading Statements | 137 |
| | C. | The False and Misleading Statements Made On Or Before April 7, 2007 | 141 |
| | D. | The May 9, 2007 False and Misleading Statements [Dismissed per Alameda Order] | 146 |
| | E. | May 16, 2007 False and Misleading Statements  [Dismissed per Alameda Order] | 148 |
| | F. | The July 24, 2007 False and Misleading Statements  [Dismissed per Alameda Order] | 149 |
| | G. | The September 25, 2007 False and Misleading Statements  [Dismissed per Alameda Order] | 150 |
| | H. | The October 25, 2007 False and Misleading Statements  [Dismissed per Alameda Order] | 150 |
| | I. | The November 8, 2007 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #11) and upheld for Plaintiffs with §10(b) claims per Alameda Order] | 152 |
| | J. | The False and Misleading Statements Made On Or Before November 23, 2007 | 152 |
| | K. | The February 22, 2008 False and Misleading Statements [Sustained per Alameda Order and portions sustained per NY/Ohio Amended Order (Misrepresentation #13)] | 159 |
| | L. | The February 27, 2008 False and Misleading Statements [Sustained per Alameda Order and NY/Ohio Order (Misrepresentation #14)] | 159 |
| | M. | The March 4, 2008 False and Misleading Statements [Sustained per Connecticut Order] | 163 |
| | N. | The April 17, 2008 False and Misleading Statements [Sustained per Alameda Order and NY/Ohio Order (Misrepresentation #16)] | 163 |
| | O. | The False and Misleading Statements Made On Or Before June 10, 2008 | 165 |
| | P. | The False and Misleading Statements Made On Or Before December 5, 2008 | 168 |

Q. The December 17, 2008 False and Misleading Statements [Sustained per Alameda Order and portions Sustained per NY/Ohio Order (Misrepresentation #18)] ..................................................................... 174

R. The February 24, 2009 False and Misleading Statements [Sustained per Alameda Order and as to falsity and scienter per SCAC Order (Misrepresentation I-2)] ..................................................................... 175

S. The March 4, 2009 False and Misleading Statements [Sustained per Alameda Order; portions sustained as to scienter per SCAC Order (Misrepresentations J-1 and J-2); conceded as to falsity by Defendants in SCAC Order (Misrepresentation J-2)] ................................................. 177

T. The March 10, 2009 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #26) and Ludlow Order as to Particularity/Falsity/Materiality (Misrepresentation # L1 6); Upheld for Plaintiffs with §10(b) claims per Alameda Order] ............................... 180

U. The April 16, 2009 False and Misleading Statements [Sustained per Alameda Order and as to scienter per SCAC Order (Misrepresentation L)]...... 185

V. The June 30, 2009 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #30) and Upheld for Plaintiffs with §10(b) claims per Alameda Order] ................................................... 185

W. The False and Misleading Statements Made On Or Before October 23, 2009..... 186

X. The November 19, 2009 False and Misleading Statements [Dismissed per Alameda Order] ..................................................................... 190

Y. The February 26, 2010 False and Misleading Statements [Sustained per Alameda Order; portions sustained as to particularity/falsity per Ludlow Order (Misrepresentation 18); as to scienter per SCAC Order (Misrepresentation N)] ..................................................................... 193

Z. The March 5, 2010 False and Misleading Statements [Sustained per Alameda Order; portions sustained per NY/Ohio Order (Misrepresentation #35); as to scienter per SCAC Order (Misrepresentation O)]............................ 196

AA. The March 22, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained as to particularity/falsity/materiality per Ludlow Order (Misrepresentation #8)] ................................................... 197

BB. The March 23, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained per NY/Ohio Order (Misrepresentation #38)].......... 200

CC. The April 15, 2010 False and Misleading Statements [Sustained per Alameda Order; portions sustained as to particularity/ falsity/materiality per Ludlow Order (Misrepresentations #5, #30 and #3 2), as to falsity and scienter per SCAC Order (Misrepresentation R-1), and as to Hayward statements in the 2009 Sustainability Review per Alameda Order. Dismissed as to the 2009 Sustainability Report per Alameda Order.] ............... 201

    1. The 2009 Sustainability Review ........................................... 201

2.      The 2009 Sustainability Report ............................................................. 206

DD.  Events of April 20-22, 2010:  Macondo Well Blowout and *Deepwater Horizon* Explosion and Sinking .......................................................... 211

     1.      April 20, 2010:  Macondo Well Blowout and *Deepwater Horizon* Rig Explosion...................................................................... 211

     2.      April 21, 2010:  Initial Press Releases About The *Deepwater Horizon* Explosion Failed To Disclose Any Oil Leak ............................ 212

     3.      April 22, 2010:  *Deepwater Horizon* Rig Sank........................................ 212

EE.   The April 24, 2010 False and Misleading Statements [Permitted To Be Filed By Plaintiffs In The Class Action By The Court's Leave Order].............. 212

FF.   Events of April 24-28, 2010:  Reports of Leaking Oil Prompt Defendants to Fraudulently Understate the Spill's Flow Rate .................................................... 213

GG.  The April 28 - 29, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained per NY/Ohio Order (Misrepresentations #42 and 43)] ....................................................................................................... 214

HH.  BP's False and Misleading Misstatements In SEC Filings Made on April 29 - 30, 2010 and on Its Corporate Website on April 30, 2010 [Sustained per Alameda Order] ....................................................................................................... 216

II.    Additional Reasons Why The Statements On April 24 - 30, 2010 Were False And Misleading And Were Made With Scienter ...................................... 216

JJ.    Events of May 3, 2010:  BP Accepts Full Responsibility For the Oil Spill ......... 219

KK.  BP's False and Misleading Statements in Its SEC Filing on May 4, 2010 [Sustained per Alameda Order] ....................................................................... 220

LL.   The May 5, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained per NY/Ohio Order (Misrepresentation #45)] ........................ 220

MM. The May 14, 2010 False and Misleading Statements [Sustained per Alameda Order] ................................................................................................... 221

NN.  The May 17, 2010 False and Misleading Statements [Sustained per Alameda Order] ................................................................................................... 223

OO.  The May 19, 2010 False and Misleading Statements [Sustained per Alameda Order] ................................................................................................... 224

PP.   The May 20, 2010 False and Misleading Statements [Dismissed per South Yorkshire Order] ....................................................................................... 225

QQ.  The May 21, 2010 False and Misleading Statements [Sustained per Alameda Order] ................................................................................................... 226

RR.   The May 22, 2010 False and Misleading Statements [Sustained per Alameda Order] ................................................................................................... 227

SS.   The May 24, 2010 False and Misleading Statements  [Dismissed per South
      Yorkshire Order] ................................................................................................ 229

TT.   Additional Reasons Why The Statements During April 30 – May 24, 2010
      Were False And Misleading And Were Made With Scienter ............................ 230

UU.   ████████████████████████████████████
      ████████████████████████████████████
      ████████████████████████████████████
      ......................................................................................................... 234

X.     DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSSES ............................... 241

XI.    NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND
       MISLEADING STATEMENTS ....................................................................... 261

XII.   PLAINTIFFS' DIRECT RELIANCE ON DEFENDANTS' FALSE AND
       MISLEADING STATEMENTS AND MATERIAL OMISSIONS .............................. 262

XIII.  ADDITIONAL RELIANCE ALLEGATIONS: (A) DEFENDANTS' INTENT
       TO INDUCE PLAINTIFFS' RELIANCE; (B) PRESUMPTIONS OF
       PLAINTIFFS' RELIANCE; AND (C) PLAINTIFFS' INDIRECT RELIANCE
       ON DEFENDANTS' MISSTATEMENTS AND OMISSIONS THROUGH
       THEIR DIRECT RELIANCE ON THE PRICE INTEGRITY OF BP
       SECURITIES ............................................................................................. 276

XIV.   PLAINTIFFS' CLAIMS ARE TIMELY ............................................................. 280

XV.    PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY
       TRIAL ....................................................................................................... 281

FIRST CAUSE OF ACTION ................................................................................. 281

SECOND CAUSE OF ACTION .............................................................................. 284

THIRD CAUSE OF ACTION ................................................................................. 285

FOURTH CAUSE OF ACTION .............................................................................. 287

PRAYER FOR RELIEF ........................................................................................ 288

DEMAND FOR JURY TRIAL ............................................................................... 289

Plaintiffs Alameda County Employees' Retirement Association ("Alameda"), Employees' Retirement System of the City of Providence ("Providence"), and State-Boston Retirement System ("Boston") (collectively, "Plaintiffs") make the following allegations upon personal knowledge as to their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief are based on their counsel's ongoing investigation. The investigation of counsel is predicated upon, *inter alia*: a review of public filings by BP plc ("BP"), and its subsidiaries and affiliates, with the United States Securities and Exchange Commission ("SEC"), including, among other things, reports filed on Forms 6-K and 20-F; press releases and public statements issued by BP and its subsidiaries and affiliates; media reports about the same entities; publicly available data relating to the prices and trading volumes of securities; reports issued by securities analysts who followed BP; factual allegations in pleadings and other documents filed in the criminal action and plea deal between the U.S. Department of Justice ("DOJ") and BP, in the enforcement action and settlement between the SEC and BP, and in other civil lawsuits;  testimony and documents produced in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL 2179 (E.D. La.) and *In re BP plc Securities Litigation*, MDL 2185 (S.D. Tex.); and the Court's orders denying in part Defendants' motions to dismiss the claims in *In re: BP p.l.c. Securities Litig.*, No. 4:10-md-02185 (S.D. Tex.) (the "Class Action"), *Alameda County Employees' Ret. Assoc., et al. v. BP p.l.c., et al.*, No. 4:12-cv-1256 (S.D. Tex.) (the "Alameda Action"), *Connecticut Ret. Plans and Trust Funds, et al. v. BP p.l.c., et al.*, 4:12-cv-1272 (S.D. Tex.) (the "Connecticut Action"), *HESTA Super Fund v. BP p.l.c., et al*., 4:13-cv-0129 (S.D. Tex.), *Stichting Pensioenfonds Metaal En Techniek, et al. v. BP p.l.c., et al.*, 4:13-cv-0069 (S.D. Tex.), *Nova Scotia Health Employees' Pension Plan v. BP p.l.c., et al.*, 4:13-cv-3397 (S.D. Tex.), *KBC Asset Mgmt., et al. v. BP p.l.c.,*

*et al.*, 4:13-cv-0517 (S.D. Tex.), *Deutsche Asset Mgmt. Investmentgesellschaft MBH v. BP p.l.c., et al.*, 4:13-cv-0887 (S.D. Tex.), *Avalon Holdings, Inc., et al. v. BP p.l.c., et al.*, 4:12-cv-3715 (S.D. Tex.) (the "Avalon Action"), and *South Yorkshire Pensions Auth., et al. v. BP p.l.c., et al.*, 4:12-cv-2362 (cons.) (S.D. Tex.) (the "South Yorkshire Action").   Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This action seeks recovery on behalf of three domestic pension funds that purchased BP ordinary shares on the London Stock Exchange ("LSE") during the period January November 29, 2006 through June 25, 2010 (the "Relevant Period").   In addition, Plaintiffs Alameda and Boston purchased BP American Depository Shares ("ADSs") on the New York Stock Exchange ("NYSE") during the Relevant Period.   One ADS is equal to six ordinary shares.

2.      Plaintiffs lost large sums of money as a result of false and misleading statements and omissions made by Defendants regarding: (i) the extent of BP's commitment to a "safety first" approach to oil drilling, which Defendants claimed to have implemented, at the behest of regulators and experts, in the wake of catastrophic prior safety lapses caused by a "profits first" corporate culture; (ii) implementation across BP's global operations of key purported safety reforms; (iii) the size of the oil spill that followed the April 20, 2010 explosion on one of BP's Gulf of Mexico (the "Gulf") oil rigs (the "April 20 Explosion") and BP's ability to contain the spill; and (iv) the extent of BP's likely responsibility for the catastrophe once it occurred, and the correlating impact on BP and its dividend.

3.      Notably, two of the three corporate Defendants, BP Exploration and Production, Inc. and BP America, Inc., are based in Texas.   All of the Individual Defendants either reside in Texas, were high-placed executives in BP's Texas-based subsidiaries, and/or regularly travelled

to Texas in the course of their business (including immediately following the Deepwater Horizon explosion and the start of the oil spill).   A significant number of the false and misleading statements at issue were issued in the U.S., often by Texas-based U.S. Defendants, and concerned events that transpired in the U.S., in particular the Gulf of Mexico and the Gulf Coast states including Texas.   The statements at issue all were made in Texas, were made by Texas residents, and/or concerned the deepwater drilling operations of BP's Houston-based subsidiaries in the Gulf of Mexico.

4.       On April 20, 2010, as the crew aboard BP's Deepwater Horizon oil rig drilled the exploratory Macondo well 3.5 miles under the waters of the Gulf, high-pressure gas from the well shot up through the pipe that led to the surface.   The gas was released onto the rig, ignited, and engulfed the rig in flames.   The fire killed 11 workers, critically injured seven others, and sank the rig.

5.       This tragic April 20 Explosion was the manifestation of a much deeper problem that lay at the bottom of the Gulf.   BP had cut so many safety corners constructing the Macondo well that it was now spewing 2.3 million gallons of oil, *every day*, into the Gulf.   In just five days, the well spilled more oil than was released during the entire Exxon Valdez disaster.   Worse yet, BP had no plan or ability to quickly stop the spill.   By the time the well was capped almost three months later, 206 million gallons had been released into the Gulf, blackening the southern U.S. shoreline and crippling the local tourism and fishing economy.   It was the worst environmental disaster in the history of marine oil exploration.

6.       This catastrophic spill, and its causes, were not a surprise to Defendants.   Long before the Relevant Period, BP's corporate culture consistently placed cutting costs above

protecting lives and the environment as evidenced by a rash of oil spills, accidents, and governmental warnings from the year 2000 to 2006.

7.      In the wake of these accidents and at the insistence of federal regulators, BP established an independent panel to review and improve its safety procedures. Former U.S. Secretary of State James Baker, III was selected to chair the panel (the "Baker Panel").  After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of a Presidential Commission that subsequently investigated the spill (the "Presidential Commission Report"), that "*BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting*. And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."  More specifically, the Baker Panel found that: "*from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value*."

8.      The Baker Panel singled out organizational problems as the root cause of BP's failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."  The Baker Panel identified 10 specific recommendations that BP could implement "*to help bring about, sustainable improvements in process safety performance.*"

9.      Defendants immediately professed their commitment to implementing the Baker Panel's recommendations.  Lord Edmund John Philip Browne, BP's then CEO, mirroring his

11

repeated prior mantra about BP's commitment to improving safety, responded to the Baker Panel's recommendations with the following statements, among others: "***BP gets it. And I get it too***." He continued: "***BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety***. ***BP's safety lapses have been chronic***."

10.     Lord Browne's acknowledgement, in the wake of the Baker Panel's report, of BP's troubled past – and his pledge to investors that BP would be a different company going forward – signaled a purported sea change in BP's operations. Throughout the Relevant Period, Defendants repeatedly returned to this pledge and the recommendations of the Baker Panel, assuring investors that BP had learned its lesson, that its operations were now safe and reliable, and that it was prepared to address an oil spill in the Gulf.  They went so far as to say that BP strived to be an industry leader in process safety and managing risk.

11.     Unfortunately, none of this was true.  For example, an internal BP strategy document dated December 2008, not known to Plaintiffs or other BP investors, specifically warned BP executives of serious process safety "gaps" in the Gulf:

> ***It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents***.

The document concluded that BP employees needed "major hazard awareness" training.

12.     Indeed, the Presidential Commission Report concluded that BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling.  The first conclusion of the Presidential Commission Report was simple yet powerful: "***[t]he explosive loss of the Macondo well could have been prevented***." As the commission explained, "***the blowout was not the product of a series of aberrational decisions made by rogue industry or***

12

***government officials that could not have been anticipated or expected to occur again. Rather, the root causes are systemic*** " to BP.

13.     Equally damning, the Presidential Commission Report found that, contrary to defendants' representations, defendants had not implemented the recommendations made by the Baker Panel:  BP's " ***approach to managing safety has been on individual worker occupational safety but not on process safety. These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety*** ."

14.     Throughout the Relevant Period, Defendants' misrepresentations deceived Plaintiffs as to BP's true risk profile in deep sea drilling causing it to purchase BP securities at prices artificially inflated by those misrepresentations.

15.     The April 20 Explosion and oil spill at the Macondo well partially revealed the falsity of Defendants' prior representations about these matters.  It also presented Defendants with a moment of truth.  On the one hand, they could immediately come clean about their prior misrepresentations, tell investors everything they knew about BP's actual commitment to safety, disclose all the information they had about the scope and seriousness of the disaster, and admit that BP had little to no plan or ability to contain the situation.  On the other hand, they could continue misrepresenting the facts in an effort to prop up BP's stock price, which was under enormous pressure as investors worried about the impact of the spill on BP's profitability. Defendants chose the latter course of conduct, doubling down on their campaign of deceit.

16.     Defendants minimized the magnitude of the oil spill, overstated BP's ability to control it, and understated the amount of money BP would have to pay to clean it up.   In a string of post-spill emails, for example, a BP official urged lower level employees to conceal BP's

internal flow-rate projections – which were sixty times or more higher than the 1,000 barrels/day projection Defendants had initially released to Plaintiffs and the public at large.  As Defendants knew, but concealed, containing the spill was like trying to toss a hat on a fire hose.

17.     As the truth slowly emerged, BP ADSs and ordinary shares plunged in value. From the date of the April 20 Explosion through June 25, 2010, these BP securities fell in value by roughly 50%.  This lawsuit seeks to hold Defendants accountable for the misrepresentations they made to Plaintiffs and the economic losses they caused Plaintiffs to suffer on their BP investments.

## II.     JURISDICTION AND VENUE

18.     Inasmuch as Plaintiffs Alameda and Boston raise federal securities law claims herein, this Court has subject matter jurisdiction due to (i) federal question jurisdiction over those federal claims pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; and (ii) supplemental jurisdiction over these Plaintiffs' English law claims.  This Court has subject matter jurisdiction over all Plaintiffs' English law claims based upon its ruling, in a related action, that the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), confers subject matter jurisdiction over claims such as those asserted by Plaintiffs.

19.     This Court has personal jurisdiction over each defendant named herein.  Each defendant is either a corporation that conducts business, and maintains operations in this District, or is an individual who resides in this District or has sufficient minimum contacts with this District, State, or the United States to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  For example, the Individual Defendants, defined below, oversaw in whole or in part BP's U.S. operations including those within this district; issued false and misleading statements from Texas, including during the

aftermath of the April 20 Explosion, when they worked from BP's "crisis center" and/or from the Unified Command created to address the spill and issued misleading statements regarding the magnitude and BP's responsibility for the oil spill.

20.     This Court has personal jurisdiction over Defendants BP, BP America and BP E&P, defined below.

(a)     BP has its principal office in the U.S., and is authorized to do business in Texas. BP regularly transacts business in Texas and derives substantial revenue within Texas from its business, such as BP's brands of Castrol and BP's gas stations.  BP's registered agent is CT Corporation, 350 North Saint Paul, Dallas, Texas 75201.

(b)     The headquarters of BP America and BP E&P, both defined below, are located in Texas.  BP America's registered agent is located at 501 Westlake Park Boulevard, Houston, Texas 77079.

21.     Venue is proper in this Court because a significant part of the alleged wrongdoing occurred in this Judicial District, where BP has a presence.

22.     In addition to all the foregoing, the Court has already exercised jurisdiction over Defendants in prior-filed actions raising substantially similar allegations as noted above, including the Alameda Action, the Connecticut Action, the Avalon Action, and the South Yorkshire Action, among others.

## III.   THE PARTIES

### A.     Plaintiffs

23.     Plaintiffs are institutional investors who purchased BP securities during the Relevant Period, as follows:

(a)     Plaintiff Alameda County Employees' Retirement Association, a U.S. public pension fund, is located in Oakland, California.  Alameda is responsible for managing billions of

15

dollars of workers' pension funds. Alameda, acting through its investment managers, engaged in at least 100 transactions in BP common stock and/or ADSs during the Relevant Period, including over 70 purchases during at least the following months: November 2007; January, May, July, August, October, November, and December 2008; February, March, April, May, June, July, October, and November 2009; and February, March, April, and May 2010. Due to the misconduct alleged herein, Alameda County suffered monetary damages in excess of $75,000.

(b)     Plaintiff Employees' Retirement System of the City of Providence, a U.S. public pension fund, is located in Providence, Rhode Island. Providence is responsible for managing billions of dollars of workers' pension funds. Providence, acting through its investment manager, purchased BP common stock in October 2009. Due to the misconduct alleged herein, Providence suffered in monetary damages in excess of $75,000.

(c)     Plaintiff State-Boston Retirement System, a U.S. public pension fund, is located in Boston, Massachusetts. State-Boston is responsible for managing billions of dollars of workers' pension funds. State-Boston, acting through its investment managers, engaged in over 60 transactions in BP common stock and/or ADSs during the Relevant Period, including over 40 purchases made at least during the following months: January, February, May, June, August, September, October, and November 2007; January, February, April, May, July, August, October, and November 2008; January, February, March, April, June, August, September, and November 2009; and February, April, and May 2010. Due to the misconduct alleged herein, State-Boston suffered monetary damages in excess of $75,000.

**B.     Defendants**

**1.     Corporate Defendants**

24.     Defendant BP plc ("BP" or the "Company") is a U.K. corporation with long-running and extensive contacts in the United States. As BP's corporate website boasts:

BP's roots in the United States go deep, starting in 1866 with the founding of the Atlantic Petroleum Storage Company in Pennsylvania oilfields.  Since then, our heritage has come to embody some of the most famous names in American energy: Amoco, ARCO, and Standard Oil.

BP's portfolio of US business functions is extremely broad, encompassing virtually all aspects of the company's global business: onshore and offshore exploration and production of oil and gas, refining, marketing, retailing, alternative energy and more.

25.     Indeed, BP's corporate website makes clear that "The US is vital to BP."  BP's extensive U.S. contacts include: (a) BP is the largest oil and gas producer in the U.S. and both the largest leaseholder and largest producer in the deepwater U.S. Gulf of Mexico; (b) BP has invested $52 billion in U.S. energy development since 2007, more than BP invested in any other country and $20 billion more than any competitor invested here; (c) BP employs 23,000 people in the U.S., representing nearly 30% of its global workforce and more than it employs in any other country; (d) BP's current CEO, Defendant Dudley, is an American; (e) BP produces over 770,000 barrels of oil equivalent every day in the U.S., representing more than 20% of BP's global daily production; (f) BP operates 13 fields on Alaska's North Slope, which together equate to roughly two-thirds of Alaskan oil production; (g) BP's North America Gas business is the sixth-largest natural gas producer in the U.S., operating in seven of the U.S.'s leading gas basins; (h) BP operates five modern refineries in the U.S., processing up to 1.5 million barrels of crude oil daily; (i) BP markets over 17 billion gallons of gasoline annually in the U.S. coast-to-coast through more than 11,000 BP-branded service stations (BP and ARCO); (j) BP owns and operates CASTROL, which it touts as being "one of the world's most recognized lubricant brands"; (k) BP Pipelines North America is the U.S.'s second-largest liquids pipeline company, transporting over 1.6 million barrels daily of oil and refined products, natural gas liquids, carbon dioxide, and chemicals; (l) BP operates three chemical plants in the U.S., including one at Texas City; (m) owns and operates significant energy infrastructure throughout the U.S., including

thousands of oil and gas wells, wind farms and refineries in Texas; and (n) BP has spent more than $4 billion in the U.S. on alternative energy projects.

26.     BP also has a massive impact on U.S. investment markets.  Nearly 40% of BP shareholders are based in the U.S.  BP is subject to the informational requirements of the Exchange Act, and in accordance therewith, files annual reports, periodic financial statements, and other information with the SEC.

27.     During the Relevant Period, in particular following the Macondo well oil spill, BP's top executives and senior engineers, including the Individual Defendants, worked and made statements from the Gulf states in the U.S., including Texas.  Throughout the Relevant Period, BP controlled, directly or indirectly, Defendants BP Exploration & Production, Inc. and BP America, Inc.

28.     Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America produces oil and natural gas products in the U.S.  Throughout the Relevant Period, BP America controlled Defendant BP E&P and that entity's issuance of material information to the public.

29.     Defendant BP Exploration & Production, Inc. ("BP E&P" or "BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.

30.     Defendants BP, BP America and BP E&P are collectively referred to hereinafter as "BP."

### 2.     Individual Defendants

31.     Defendant Anthony B. Hayward ("Hayward") served as BP's Chief Executive Officer ("CEO") from May 2007 until October 2010, and served as an executive director of BP from 2003 to November 2010.  From 2002 to 2007, Hayward served as the CEO of BP E&P's

business segment, which oversaw exploration and drilling in the Gulf, among other places. Defendant Hayward was a member of BP's executive management, and was responsible for the day-to-day running of BP.  Starting in 2006, Hayward headed the Group Operations Risk Committee ("GORC"), an executive committee that reviewed BP's safety protocols, including BP's Operating Management System ("OMS"), and responded to safety incidents in BP's operations.  Hayward also was the executive liaison to the Safety and Ethics & Environment Assurance Committee ("SEEAC"), which is BP's Board of Directors' committee responsible for ensuring that BP's safety protocols are implemented and followed, including the implementation of the Baker Panel's recommendations.  GORC prepared regular safety reports for SEEAC, including quarterly reports called the Health Safety Environment & Operations Integrity Report, otherwise known as the "Orange Book."  During the Relevant Period, Hayward signed certain BP Annual Reports, and made many of the other false and/or misleading statements as alleged herein.  Defendant Hayward's conduct as alleged herein is attributable to Defendant BP throughout the Relevant Period and to BP E&P from the outset of the Relevant Period through May 2007.  Defendant Hayward directly or indirectly controlled BP, BP E&P, and BP America throughout the Relevant Period.

32.    Defendant Douglas Suttles ("Suttles") served as Chief Operating Officer for BP E&P from January 2009 through the end of the Relevant Period.  In January 2007, he was named President of BP Exploration (Alaska) Inc. (a position he left when he became BP E&P's COO) and joined BP's Board of Directors.  During the Relevant Period, Suttles made false and/or misleading statements as alleged herein.  Defendant Suttles's conduct as alleged herein is attributable to Defendants BP and BP E&P throughout the Relevant Period.  Defendant Suttles directly or indirectly controlled BP E&P from at least January 2009 through the end of the

Relevant Period.  Suttles left his position as COO of BP Exploration and as a member of BP's

Board of Directors in or about January 2011, suspicious timing that highlights his scienter.

33.     Defendant Andrew G. Inglis ("Inglis") served as the CEO of BP E&P and as an

executive director of BP from February 2007 until October 2010.  Beginning in July 2004, Inglis

was Executive Vice President and Deputy Chief Executive Officer of BP E&P.  Inglis was a

member of BP's executive management.  As CEO of BP E&P, Inglis attended SEEAC meetings

to report on topics specific to BP E&P.  Inglis also served as GORC member, provided special

reports on BP E&P to the Chairman of GORC (defendant Hayward), and received quarterly

Orange Book reports that monitored the progress of OMS implementation across BP.  Inglis

considered himself at the apex of responsibility during the Relevant Period (with the possible

exception of defendant Hayward) for BP E&P's activities worldwide.

> Q.     Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?
>
> A.     As the CEO of the exploration and production company, I am responsible for the safe and reliable operations across all of the E&P operations globally.
>
> * * *
>
> Q.     And that, of course, would include Gulf of Mexico, correct?
>
> A.     Again, as I said, I was responsible for the—safety and reliability of—of our operations globally.  So that would include the Gulf of Mexico operations.
>
> * * *
>
> Q.     All right.  And in terms of safety for drilling and exploration in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?
>
> A.     In terms of the—the responsibility for their safe and reliable operations, yes.

Inglis Dep. at 75:24-76:5; 79:18-24; 80:13-22.  Defendant Inglis's conduct as alleged herein is attributable to Defendants BP and BP E&P throughout the Relevant Period.  Defendant Inglis directly or indirectly controlled BP E&P throughout the Relevant Period.

34.     Defendant H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009.  McKay began his career in 1980 at Amoco Production Company.  Since 1998, he has worked for BP in various capacities, including as the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for worldwide Exploration and Production.  In May 2007, McKay became the Senior Group Vice President of BP and Executive Vice President of BP America, in which capacity he led BP's negotiations on the settlements for both the Texas City refinery disaster and Alaska pipeline oil spills.  McKay is a member of BP's executive management.  He holds a degree in Petroleum Engineering and is based in Houston, Texas.  Defendant McKay's conduct as alleged herein is attributable to BP and BP America throughout the Relevant Period.  Defendant McKay directly or indirectly controlled BP America and BP E&P since at least January 2009.

35.     Defendant Robert W. (Bob) Dudley ("Dudley") became Group Chief Executive of BP p.l.c. on October 1, 2010 and has served as an Executive Director on BP's Board of Directors since April 6, 2009.  Between June 23, 2010 and September 30, 2010, Dudley served as the President and CEO of BP's Gulf Coast Restoration Organization in the U.S.  From April 6, 2009 until June 22, 2010, Dudley was an Executive Vice President and a member of the executive management team with responsibility for the group's activities in the Americas and Asia.  Prior to that, Dudley served a variety of top roles at BP, including from 2003-2008 at President and CEO of TNK-BP, the joint venture between BP and Russian partners.  During the

facts at issue surrounding the Deepwater Horizon explosion and the Macondo well oil spill, Dudley was BP's Managing Director and one of the top BP officials coordinating BP's spill response.  Defendant Dudley's conduct as alleged herein is attributable to Defendant BP throughout the Relevant Period.  Defendant Hayward directly or indirectly controlled BP, BP E&P, and BP America since at least April 6, 2009.

36.     Robert "Bob" Malone ("Malone") served as Chairman and President of BP America from July 2006 until February 2009, and as an Executive Vice President of BP until March 2009.  Malone served on BP's executive management team, which is responsible for the day-to-day running of BP.  Malone holds a degree in Petroleum Engineering and has worked for BP for 34 years.  Malone's conduct as alleged herein is attributable to BP throughout the Relevant Period and to BP America from the start of the Relevant Period through February 2009. Malone directly or indirectly controlled BP America and BP E&P from the start of the Relevant Period through February 2009.

37.     David Rainey ("Rainey") was BP America's Vice President of Exploration for the Gulf of Mexico.  Rainey was the person within BP who had "ultimate accountability" for implementing OMS in the Gulf of Mexico and he participated in the Gulf of Mexico gap assessment in 2009 that identified significant risks to BP in the Gulf of Mexico.  Rainey was also a member of BP's executive management.  In the days after the Deepwater Horizon disaster, Rainey served on behalf of BP as Deputy Incident Commander at Unified Command, headquartered in Robert, Louisiana, in the Eastern District of Louisiana.  Unified Command consisted of representatives from the U.S. government as well as BP and Transocean Ltd., the designated "responsible parties" for purposes of responding to the spill.  Led by the United States Coast Guard, Unified Command coordinated the oil spill response.  Rainey was BP's second

highest-ranking representative at Unified Command. Rainey's conduct as alleged herein is attributable to BP and BP America throughout the Relevant Period. Rainey directly or indirectly controlled BP America and BP E&P during the Relevant Period. Rainey left BP by May or June 2011.

38.     Defendants Hayward, Suttles, Inglis, McKay, Dudley, Malone, and Rainey are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with BP, possessed the power and authority to control the contents of BP's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e. the market. Each Individual Defendant was provided with copies of BP's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations were then materially false or misleading when made. Each Individual Defendant herein made materially false or misleading statements, or omitted to disclose material facts, to investors in the U.S. and disseminated such material misstatements through the use and means of interstate commerce within the U.S. and caused U.S. investors to purchase BP securities at artificially inflated prices.

39.     The Defendants are collectively referred to as "Defendants."

## IV.     ADDITIONAL BP PERSONNEL OF SIGNIFICANCE

40.     Lord Edmund John Philip Browne, Baron Browne of Madingley ("Lord Browne" or "Browne") served as BP's CEO from 1995 until April 2007, during which time he made repeated false and misleading statements about BP's commitment to improving the safety of its

operations, which are attributable to BP. Lord Browne joined BP as an apprentice in 1966 and held various positions, including Managing Director and CEO of BP E&P. Lord Browne was a member of BP's executive management. During the Relevant Period, Lord Browne also served as an executive member of BP's Board of Directors and as the Head of the BP Group Chief Executive's Committee.

41. William Castell ("Castell") joined BP's Board of Directors in 2006 as the chairman of SEEAC. At each SEEAC meeting, Castell and other SEEAC members were provided a report from GORC, usually presented in person by defendant Hayward, and each quarter SEEAC received the Orange Book. Additionally, SEEAC was provided with regular reports on the implementation of the Baker Panel's recommendations and reports on the development and implementation of OMS. During the Relevant Period, Castell met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.

42. Peter Sutherland ("Sutherland") served as the Chairman of BP's Board of Directors during the Relevant Period. During the Relevant Period, Sutherland met or otherwise spoke with directly with investors in communications in which he and others made false and misleading statements and omissions, which are attributable to BP.

43. Carl-Henric Svanberg ("Svanberg") served as a non-executive member of BP's Board of Directors and its Chairman (succeeding Sutherland) during the Relevant Period. During the Relevant Period, Svanberg met or otherwise spoke with directly with investors in communications in which he and others made false and misleading statements and omissions, which are attributable to BP.

24

44.     Sir Ian Prosser ("Prosser") served as BP's Deputy Chairman during the Relevant Period.  During the Relevant Period, Prosser met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.  Prosser retired as Deputy Chairman and senior independent Director on BP's Board in April 2010.

45.     Dr. DeAnne Julius ("Julius") served on BP's Board of Directors during the Relevant Period.  During the Relevant Period, Julius met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.

46.     Byron Grote ("Grote") served as BP's CFO during the Relevant Period and was an executive member of BP's Board of Directors.  During the Relevant Period, Grote met or otherwise spoke with directly with investors in communications in which he and others made false and misleading statements and omissions, which are attributable to BP.

47.     John Manzoni ("Manzoni") served as BP's Chief Executive, Refining and Marketing, as an executive member of BP's Board of Directors, and as a member of the BP Group Chief Executive's Committee during the Relevant Period, having assumed those roles in 2002-2003.  During the Relevant Period, Manzoni met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.  Manzoni left BP in August 2007.

48.     Fergus MacLeod ("MacLeod") served as BP's Head of Investor Relations during the Relevant Period.  During the Relevant Period, MacLeod met or otherwise spoke directly with investors in communications in which he and others made false and misleading statements and omissions, which are attributable to BP.

49.     David Jackson ("Jackson") served as BP's Company Secretary during the Relevant Period.  During the Relevant Period, Jackson signed certain of BP's allegedly false and misleading SEC filings and met or otherwise spoke directly with investors in communications in which he and others made false and misleading statements and omissions, which are attributable to BP.

50.     Iain Conn ("Conn") served as an executive member of BP's Board of Directors during the Relevant Period.  During the Relevant Period, Conn met or otherwise spoke with directly with investors in communications in which false and misleading statements and omissions were made, which are attributable to BP.

## V.     CONFIDENTIAL WITNESSES

51.     As alleged in the Second Consolidated Amended Class Action Complaint for All Purchasers of BP ADS Securities (the "Class Complaint") in No. 4:10-md-02185 (S.D. Tex.), Confidential Witness # 1 ("CW1") is a confidential witness on process safety and risk assessment and management.  Through 2005, CW1 consulted directly with the BP Board of Directors and executive management.  Specifically, CW1 acted as a safety systems and risk assessment consultant for, among other things, deepwater platforms and offshore drilling, including but not limited to the Gulf of Mexico.  Subsequent to the consultation, through the present, CW1 has been apprised of information related to BP's process safety and risk assessment and management in the Gulf of Mexico operations.

52.     As alleged in the Class Complaint, Confidential Witness # 2 ("CW2") is a former BP senior manager and an expert in the offshore oil and gas drilling and completions.  CW2 possessed information related directly to BP's Gulf of Mexico deepwater exploration, including but not limited to process safety implementation.  Prior to separating from BP in 2009, CW2 reported directly to senior BP executives and indirectly to defendant Inglis.

53.     As alleged in the Class Complaint, Confidential Witness #3 ("CW3") is an oil industry operational safety expert and former consultant to the BP Board of Directors.  CW3 presented information and analyses directly to non-party Lord Browne and Defendant Hayward on issues, including but not limited to implementation of process safety and risk management practices.

## VI.     BP PURPORTEDLY TOOK EXTENSIVE MEASURES TO RECTIFY ITS OPERATIONAL HISTORY RIFE WITH SAFETY VIOLATIONS

### A.     BP's Relevant Operations

54.     BP is a global oil and gas company and is the third-largest energy company in the world. BP is active in every area of the oil and gas industry, including drilling exploration and production, refining, distribution and marketing, petrochemicals, power generation and trading. With operations in over 80 countries, BP produces around 3.8 million barrels of oil equivalent per day. Its largest division is BP America, which is the biggest producer of oil and gas in the U.S.

55.     BP's exploration and production segment, BP E&P, includes oil and natural gas exploration, field development and production, and marketing and trading of natural gas. It has exploration and production activities in Angola, Azerbaijan, Canada, Egypt, Libya, the Russian Federation, Trinidad and Tobago, Norway, the United Kingdom, and the U.S. (including the Gulf of Mexico), as well as in the Asia Pacific, Latin America, North Africa, and the Middle East.

56.     Throughout the Relevant Period, BP touted its Exploration and Production business and, more specifically, its operations in the deepwater Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area. BP described the Gulf of Mexico

as "an important source of domestic energy, and offshore deepwater developments" and told investors that oil from that region accounted for one-sixth of all oil produced in the U.S.

57.     Specifically, in the 2008 Annual Report filed on Form 20-F on March 4, 2009, BP highlighted the safety and success of its operations in the Gulf of Mexico, emphasizing the fact that it was one of the largest deepwater operators in the world. At the same time, BP failed to disclose that it had not implemented safety measures for its Gulf of Mexico operations, and BP also failed to disclose that it had disregarded safety warnings about its operations and that it lacked robust risk management processes that left BP dangerously exposed to a catastrophic accident.

### B.     BP Is No Stranger to Catastrophic Industrial Incidents

58.     BP is no stranger to catastrophic industrial incidents, including incidents related to its off shore drilling operations.

### 1.     BP's Flawed Process Safety Controls Cause Grangemouth Incidents

59.     Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents. These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline. The UK Health and Safety Executive "HSE" investigated the incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety management systems on-site over a period of time." BP carried out an internal investigation, which concurred in many of the UK HSE's findings. BP later pled guilty to criminal charges stemming from the incidents and paid over £1 million in fines.

### 2.      Unsafe Deepwater Drilling Operations

60.      In 2002, the *Ocean King,* a drilling rig under BP's operational control in the Gulf of Mexico, experienced two separate blowout incidents within a three-month span, raising questions about BP's process safety and well design procedures and practices.

61.      The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout while drilling a well in the Gulf of Mexico's Grand Isle block near Louisiana. The crew's efforts to contain the well failed, and they soon evacuated the rig because of the high level of airborne gas. The flow of gas and other material exploded, causing a fire on the rig and $2 million in damage.

62.      During its investigation of BP's safety practices, the U.S. Department of the Interior's Minerals Management Services ("MMS") discovered that BP had inexplicably installed a non-compliant blowout diverter system, which contributed to the explosion and fire, rather than the one specifically designed and approved for the rig. MMS also found that the fire's effects were intensified because BP personnel had stored pressurized containers of flammable gas too close to the diverter output. Worse still, the investigation revealed that BP engineers, because of a nearby well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor surface, the precise depth which the rig had reached when the well blew out. The incident was both caused by and revealed a host of systemic safety issues involving BP's failures to build and execute wells as designed, ensure the proper design of the drill rig, and keep accurate up-to-date designs of their equipment.

63.      Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle block, a second incident occurred, similar to the first. After cementing the steel casing in another newly drilled well hole, mud and gas began to flow onto the rig, indicating a failed cementing job. After an unsuccessful effort to contain the

well, the crew evacuated. The MMS issued a harsh critique of the second incident, noting the flawed attempt to bring the well under control, and serious deficiencies in BP's safety protocols and knowledge of equipment.

64.     The two incidents in 2002 resulted in MMS issuing a special "Safety Alert" to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job. The Safety Alert specifically mentioned MMS's findings about BP during the *Ocean King* incident, cautioning others in the industry about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

65.     In May 2003, BP suffered a near blowout not far from the Macondo well. In that incident, the Transocean *Discoverer Enterprise,* on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor. The breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded. Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked: the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico from the damaged riser. A subsequent inspection, however, showed that pieces of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its immediate effectiveness, was subsequently vulnerable to damage or incapacitation by a falling riser pipe – an outcome which in fact occurred during the *Deepwater Horizon* incident.

66.     In August 2004, BP experienced a blowout in the Nile delta, off the coast of Egypt, when the *GSF Adriatic IV,* a gas drilling rig leased from Global Santa Fe (which, in 2007, merged with Transocean) exploded while completing a well for a joint consortium, which included BP. The fire raged for over a week before the well was brought under control.  Analysts

later said that Egypt's natural gas production was reduced by 10-15 percent because of the incident. As with the *Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

### 3. BP's Thunder Horse PDQ Operated With Pipeline Cracks That Could Have Been Catastrophic

67.     In July 2005, BP's massive and newly-deployed production and drilling rig in the Gulf of Mexico, *Thunder Horse PDQ* ("Thunder Horse")*,* was evacuated for a passing hurricane and almost capsized after a key internal valve, which had been installed backwards, allowed ballast water to accumulate in one section of the rig, causing a dangerous tilt. When the rig was later put in dry-dock for repairs, cracks were discovered in the underwater pipelines beneath the rig. A senior engineering consultant who worked on the Thunder Horse project later told *The New York Times* that the pipeline cracks: "could have been catastrophic." He continued by noting that: "You would have lost a lot of oil a mile down before you would have even known. It could have been a helluva spill – much like the *Deepwater Horizon."* The Thunder Horse repairs took three years to complete.

### 4. Safety Lapses Cause an Explosion at BP's Texas Refinery

68.     On March 23, 2005, an explosion occurred at BP's Texas City refinery. Fifteen people were killed and approximately 170 were injured. The U.S. Environmental Protection Agency's ("EPA") criminal investigative division launched a criminal investigation, as did the U.S. Occupational Safety and Health Administration ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TCEQ").

69.     The next day, Lord Browne flew to Texas City and held a press conference at which he acknowledged the gravity of the incident, saying, "Yesterday was a dark day in BP's history.  It is the worst tragedy I have known during my 38 years with the company."  While

asserting that BP believed that the Texas City explosion was unrelated to previous incidents, he pledged to "leave nothing undone in our effort to determine the cause of the tragedy" and to carry out any reforms necessary.

70.     In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers who are "indifferent to their obligations under the OSHA Act." EPA civil inspectors entered into a settlement with BP, laying out a timeline and plan to bring the refinery's operations into compliance with EPA regulations. TCEQ reached a similar agreement with BP in mid-2006.

71.     On April 15, 2005, Lord Browne referred to Texas City as "the saddest and most moving day of my entire career at BP."  Later, in May 2005, he told the Houston Chronicle, "BP takes responsibility for what happens at its sites.  We want BP to be a safe place to work.  So as well as mourning for those we have lost, we are determined to learn from this tragedy and improve our safety record."

72.     In mid-2005, the CSB recommended that BP appoint an independent commission to investigate BP's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment. Lord Browne issued a statement saying that BP would comply with the recommendation.  He added, "The Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again.  Today's recommendation from the CSB is a welcome development, and we take it seriously."

73.     In response to the CSB's recommendation, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by former Secretary of State James Baker. Lord Browne said in a prepared statement, "The panel will have

BP's full support and cooperation.  We are determined to do everything possible to prevent a tragedy like this from ever happening again by ensuring that safety practices at our operations are effective and comprehensive."  The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.

74.     While the Baker Panel's work was underway, on October 24, 2006, Lord Browne stated, "The fire and explosion at Texas City have forever heightened our awareness of safety."

75.     In March 2007, CSB completed its investigation of the Texas City incident and issued its report on March 22, 2007. The report flagged weaknesses in BP's safety culture. It criticized BP's management for its lack of "focus on controlling major hazard risk," finding that managers provided "ineffective corporate leadership and oversight." CSB's report also identified BP's failures to heed warning signs and internal concerns raised by its own staff, writing that BP's managers "provided ineffective leadership and oversight" and "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures." The CSB found a direct correlation between the blast and BP's cuts in safety and staffing budgets, concluding: BP "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes." Finally, the CSB report criticized BP for failing to learn from its earlier, similar mistakes.

### 5.     Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations in Prudhoe Bay

76.     In early 2006, an oil spill of 210,000 to 260,000 gallons occurred on BP's Prudhoe Bay pipelines on Alaska's North Slope, facing the Arctic Sea. The pipeline had been leaking for weeks and was first discovered on March 2, 2006. Joint federal and state investigations, encompassing both criminal and civil matters, began in March 2006. The investigations ultimately addressed not only the March 2006 leak, but also addressed weaknesses

in other parts of the pipeline, and a subsequent leak that occurred on another part of the pipeline in August 2006.

77.     On July 25, 2006, Lord Browne told analysts and investors that Texas City and the oil spill in Alaska had caused "great shock within BP."  He took personal responsibility, stating, "These are things I want to apologize for.  These caused a lot of stress and distress to people, and to some families irreparable damage."  He stated, "First and foremost, we are committed to safety, integrity and the environment.  We're redoubling our efforts in this sphere, notably in North America."  He added that BP did not want to wait for the outcome of governmental investigations before acting, and that it would devote another $1 billion, in addition to $6 billion already committed over four years, to upgrade safety at BP's U.S. refineries and to replace infield pipelines in Alaska.  As regards Texas City and the Alaskan pipeline spill, he said, "We have to get the priorities right, and Job 1 is to get these things that have happened, get them fixed and get them sorted out.  We don't just sort them out on the surface, we get them fixed deeply."  He also underscored the importance of BP's having safe operations in the U.S., stating, "BP has some 40 percent of its assets and its staff in the United States… We are the largest indigenous producer of oil and gas combined.  It is of vital importance to BP and to Americans who depend significantly on us for secure energy supplies that our U.S. businesses operate to the highest standards of safety and integrity."

78.     An EPA criminal investigation concluded that widespread corrosion in the pipelines had led to the March and August leaks (and other points of corrosion uncovered in the investigation) and that BP could have prevented the leaks by maintaining and inspecting its pipelines. It further concluded that the duration of the spill revealed BP's criminal neglect of the pipeline.

79.    In 2007, BP pled guilty to a criminal charge in connection with the March 2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself. BP was sentenced to three years of probation and fined 22 million dollars.

80.    The 2006 spill was BP's second criminal plea in the U.S. in a decade: in the late 1990s BP had been indicted because its engineers were injecting dangerous materials into a well casing to dispose of the materials. In response, BP had pled guilty in 2000, had been put on five years of probation, and had entered into a compliance agreement with the EPA's debarment division.

81.    In March 2007, BP received warnings about the deficiencies in its safety-related corporate governance from the consulting firm Booz Allen Hamilton ("Booz Allen"). In the wake of the 2006 spill on its Prudhoe Bay pipeline, BP retained Booz Allen to "identify potential organizational, process, and governance issues" that related or contributed to the incident. The Booz Allen report found that BP's executive management and Board of Directors had created a culture focused on cost-cutting and ensuring that budget targets were met, while ignoring safety issues and critical maintenance. Among other findings, Booz Allen found major shortcomings in BP's internal communications culture noting, in particular, that "critical risk data" and concerns about major risks were not properly communicated within BP. More specifically, the report noted that "[r]isk-related vertical and horizontal communications do not elevate critical risk data to senior leadership." Booz Allen effectively put Defendants on notice that they could not rely on BP's internal reporting mechanisms to receive "critical risk data" and thus understand the risk of catastrophic operating failure.

82.    In May 2007, the CSB chairman, Carolyn Merritt, testified before Congress about similarities between the Booz Allen report on Alaska and the CSB's report on Texas City, noting

that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover. BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

### 6.    BP Purports to Adopt the Baker Panel Recommendations

83.    In 2005, at the CSB's urging, BP established its own independent panel to review and improve its safety procedures, chaired by former U.S. Secretary of State James Baker, III (the "Baker Panel").   After completing its investigation, the Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of the Presidential Commission, that "***BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting***. And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks." More specifically, the Baker Panel found that: "***from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value***." Indeed, even then-BP CEO Lord John Browne admitted that BP had failed to adequately address process safety issues prior to the Texas City disaster and that it was those failures that led to the explosion. For example, Lord Browne stated, in part, that:

> We had emphasized that individuals had to be safe as they went about their daily work – "personal safety." That led to dramatic improvements. ***But we had not emphasized that processes and equipment had to be safe under all circumstances and operated in a safe way at all times – "process safety."***

84.    The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating

discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."

85.    On January 16, 2007, the Baker Panel released its Report which contained 10 recommendations "*to help bring about, sustainable improvements in process safety performance*."

RECOMMENDATION #1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement,

maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

86.     Following the release of the Baker Panel recommendations, BP consistently stated

that it would implement the mandates across all lines of its business. In a January 16, 2007 press

conference responding to the findings of the Baker Report, Lord Browne announced:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. *I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations*.

* * *

The list of what we have done since the accident *shows how seriously we take process safety*.

87.     Yet the truth, as described herein, is not only that BP did not "get it," but that Defendants knew of or recklessly disregarded their continued failure to implement the process safety programs and procedures either as promised or necessary to avoid the recurrence of similarly preventable deep sea drilling incidents. The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "it's professed commitment to safety" belied BP's public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

### 7.   BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems

88.     As part of BP's professed commitment to process safety, BP told investors that OMS was designed to address the Baker Panel's recommendation to establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks. In connection with this public mandate, BP set up a committee called GORC – Group Operations Risk Committee – tasked with oversight and implementation of OMS, among other responsibilities. GORC met monthly and included sectional CEOs, with Defendant Hayward as Committee Chair. GORC's role was to educate Defendant Hayward, the CEOs, and to insure that operational risks were identified and properly managed. A document prepared for the March 1, 2007 GORC meeting states "GORC is the overall steward of the OMS implementation project."

89.     Defendants Hayward and Inglis both testified that they were knowledgeable about the scope and implementation of OMS through their participation in GORC. Defendant Inglis testified:

> A.     The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance. It was there to act as a vehicle for continuing to improve our performance. That

> was through OMS. So part of it was to actually look at how OMS was being implemented. It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. at 279:21-280:4.

90.     Similarly, as the CEO of BP and Chairman of GORC, Hayward was responsible for overseeing OMS development and implementation, which gave him detailed knowledge in these areas:

> Q.     And you are very familiar with process safety because of your position as Chair of the Group Operating Risk Committee, aren't you?
>
> A.     I am.
>
> * * *
>
> Q.     And one of the responsibilities you had . . . as Chair of [GORC] . . . tell me whether I read this correctly, quote, "Oversight of development and implementation of BP's Operating Management System . . ."
>
> A.     That's correct.

Hayward Dep. at 149:10-13; 163:14-21.

91.     Defendants Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the "Orange Book." As described by Defendant Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS:

> Q.     What was the purpose of the Orange Book?
>
> A.     The Orange Book actually started in the upstream [synonymous with "Exploration & Production"]. It was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring information around safety and operational integrity. So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS. So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda.

40

Inglis Dep. at 286:24-287:15.

92.     Inglis testified that he monitored the implementation of OMS through the Orange Book: "There was then a very rigorous process for [OMS'] implementation, as I've described to you. I monitored the implementation of that through the – the Orange Book and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]." Inglis Dep. at 379:11-16.

93.     Defendant Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS:

Q.      And what other areas would not have had OMS fully implemented until the end of 2010, other than the Gulf of Mexico?

A.      I can't remember the list, but, you know, we have a list that's in many of these reports, that – that document – if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition.

Hayward Dep. at 791:7-11.

### 8.     SEEAC Closely Monitored BP's Safety Performance Including OMS Implementation

94.     BP's Safety, Ethics and Environment Assurance Committee ("SEEAC") was a board-level committee. SEEAC was created to ensure that company publications concerning environmental, safety, and ethical matters were accurate. It purportedly carried out that purpose by obtaining reports from Defendant Hayward, a Special Liaison to SEEAC, who regularly reported to SEEAC concerning issues within the purview of GORC, including the status of OMS implementation. SEEAC also independently monitored progress in BP's process safety efforts. Defendant Inglis also reported to SEEAC, from time to time, concerning matters relating to his Exploration and Production unit. SEEAC met regularly (more than quarterly) – eight times in 2008, seven times in 2009, and nine times in 2010 – and was continuously updated with respect

to BP's implementation of OMS. Indeed, Hayward attended each of these meetings up until the time of the blowout.

95.     William Castell, the chairman of SEEAC, testified that "the duties and obligations [of SEEAC] are set out in [BP's] Annual Report." BP's 2008 Annual Report, published on March 4, 2009, defined SEEAC responsibilities as including: "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [*sic]* recommendations to the Board about their adoption and publication." It defined "the main tasks and requirements for SEEAC" to include "monitoring and obtaining assurance that the management or mitigation of material non-financial risks [was] appropriately addressed by the group chief executive." Castell testified that non-financial risks include safety-related risks.

96.     The 2008 Annual Report also discussed the types of information received by SEEAC: "[SEEAC] receives information on agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young. Like other board committees, SEEAC can access independent advice and counsel if it requires, on an unrestricted basis."

97.     Moreover, Castell testified that SEEAC members received the Orange Book on a quarterly basis, and that it contained detailed data concerning BP's safety performance:

Q.     Now, the Reports you get, that's the Orange Book; is that right?

A.     We receive an Orange Book on a quarterly basis, sir.

Q.     Yes. And tell us what that is. What is the Orange Book?

A.     The Orange Book is a compilation of Operations and Risk data which is – which is received by the Group Operations Risk Committee, which is the mechanisms of formal reporting to the GORC Committee as to the level of safety achieved, the lead and lag factors, the major incidents reported. These are all consolidated. So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance.

* * *

Q.     Is it metrics?

A.     It's metrics, and it's – well, it goes beyond metrics, sir. There are Reports that highlight where there have been major incidents. There are verbal Reports from Upstream and Downstream, and there are Reports on Audit, so not always metrics. There are also, you know, comments on audits, audit closeouts, et cetera.

* * *

Q.     I'm trying to understand at what level the seriousness of an incident would come to your Committee, the SEEAC Committee. How – how bad does it have to be before your Committee finds out about it?

* * *

A.     I think you've seen from the data, sir, that we have the data that comes to us. When you say, "How bad does it have to be," the – the data in the Orange Book goes down to lost days of work. So if they lost days at work, we can see it.

Castell Dep. at 377:23-378:12, 378:15-22, 380:22-381:1, 381:4-8.

98.     According to an April 2008 report of BP's independent expert concerning board-level monitoring of safety at BP, SEEAC had: extensively liaised with Defendants Hayward and Inglis (through GORC); received regular reports regarding the Safety & Operations ("S&O") audit function; and, received detailed process safety and OMS implementation information through quarterly dissemination of the Orange Book. The report also stated that SEEAC – which was formerly referred to as the "EEAC" – was re-designated in Autumn 2006 as SEEAC (Safety, Ethics and Environment Assurance Committee) to emphasize its monitoring role in safety matters. The report went on to note: "Executive management's attendance at meetings of this Committee is now led by the Chief Executive [Tony Hayward], sending a further strong signal to management and staff of the Board's focus on, and the Chief Executive's commitment to, safety." It stated further that "SEEAC has received regular reports on the implementation of the

Six Point Plan and the development and implementation of OMS. These are now monitored in the Orange Book."

> ### 9. BP Launches OMS to Purportedly Implement the Baker Panel's Recommendations, but Exempts OMS's Application from Rigs that BP Did Not Fully-Own

99.     In 2007, BP introduced OMS at 12 representative pilot sites and by early 2008 BP purportedly sought to implement OMS company-wide. OMS was supposedly the cornerstone of BP's efforts at improving its process safety protocols and preventing major accidents in the wake of the Texas City disaster. According to Ellis Armstrong, CFO of BP Exploration and Fed. R. Civ. P. 30(b)(6) witness in the MDL 2179 action, BP's executive management made the determination to extend the Baker Panel process safety recommendations across the entire panoply of the BP Group, including Exploration and Production in the Gulf of Mexico, rather than limiting implementation to its refineries. Armstrong Dep. at 57:1-13. Defendant Hayward repeatedly and publicly referred to OMS as the means by which BP would improve its process safety performance.

100.     BP's 2006 Sustainability Report, made publicly available on May 9, 2007, represented that "OMS is a comprehensive system that covers *all aspects* of our operations . . . ." The Report further represented that "[t]he new OMS will apply to *all operations"* and BP stated in its 2007 Annual Review that "OMS is the foundation for a safe, effective, and high-performing BP."

101.     On September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference and misleadingly stated: "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS). This will provide a blueprint for safety and *all aspects of operations* throughout BP."

102.     On May 20, 2008, BP released its 2007 Sustainability Report. In the "Group chief executive's introduction" to that report, Defendant Hayward noted that BP was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so." Describing BP's efforts in that regard, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations. My executive team continues to monitor closely our safety performance." In that regard, the 2007 Sustainability Report further noted that the Hayward-led GORC met 14 times in 2007.

103.     On February 24, 2009, BP released its 2008 Annual Review. In the section titled, the "Group Chief Executive's Review," Defendant Hayward noted that "[t]he BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how *every BP project, site, operation, and facility is managed."* Similarly, on March 4, 2009, BP released its 2008 Annual Report filed on Form 20-F, which was signed by Defendant Hayward. According to the 2008 20-F, OMS was a "*framework for operations across BP* that is integral to improving safety and operating performance in ___every site.___"

104.     Contrary to Defendants' representations, however, and as admitted by BP, OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP. This included six out of seven wells in the Gulf of Mexico during early 2010, among them the Transocean-owned *Deepwater Horizon. See* MTD Hr'g Tr. (Dkt. No. 304), No. 4:10-md-02185 (S.D. Tex.) at 66:6-68:20.

105.     Indeed, BP never intended for OMS to apply to the entirety of BP's operations and OMS was specifically not applicable to drilling rigs that BP did not fully-own. Massive portions of BP's riskiest and potentially most profitable exploration and production projects were

largely exempt from OMS because the well sites were physically drilled by contracted drilling rigs. Indeed, BP used contracted rigs to drill the majority of wells in the deepwater Gulf of Mexico. Armstrong Dep. at 247:18-248:4. This practice and the intent to exclude contracted drilling rigs from OMS coverage meant that OMS did not apply to the vast majority of BP's deepwater drilling operations in the Gulf of Mexico, including the Transocean-owned *Deepwater Horizon.*

106.    The deposition testimony of several key BP personnel in the MDL 2179 action confirms this reality. John Mogford ("Mogford"), BP's former Global Head of Safety & Operations and a GORC member testified that "OMS was designed for BP owned and operated institutions, so the focus was on BP production facilities where BP had people . . . according to the guidance for where it was to be applied, on – OMS was not designed to be implemented on contractor sites or vessels." Mogford Dep. at 150:13-19. According to Mogford, this key limitation of the OMS was known to GORC, including Defendants Hayward and Inglis, because the "OMS document, it was approved, and the scope was approved . . . at the GORC." *Id.* at 461:18-19. Mogford testified that GORC held "a discussion that the scope was that [OMS] applied to BP owned and operated and controlled sites." *Id.* at 461:23-25.

107.    Likewise, in his deposition in MDL 2179, Defendant Hayward testified that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon:*

Q.    And, again, the effective well control system, is that something that is both part [Transocean]'s and part BP's?

A.    Yes, ***very largely Transocean, because it is a Transocean Drilling Team that implement the well control procedures. There's no one from BP involved in implementing well control procedures.*** So what we have to do is determine that the well control procedures that Transocean has and that are documented as their well control procedures are appropriate, and, of course, that they're . . . followed.

46

> Q.      Okay. But if there are well control procedures and process procedures in place in the gulf of Mexico, BP procedures, those are applicable as well as the [Transocean] procedures?
>
> A.      Well, I don't want to be pedantic, ***but BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are.*** So what we want to verify is that those procedures are in place, and they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement and follow them to control the well.

Hayward Dep. at 668:7-669:5.

108.      John Baxter, Group Head of Engineering for BP and member of GORC, testified that OMS did not apply to the *Deepwater Horizon,* and that as a result numerous safety and risk management procedures instituted in direct response to the Baker Panel recommendations were not applicable to the majority of BP's drilling fleet in the Gulf of Mexico, including the *Deepwater Horizon.* Baxter Dep. at 175:14-15. For example, BP did not apply its Integrity Management, Major Accident Risk ("MAR") analysis, Safety & Operations Audits, or Control of Work to the majority of its drilling rig fleet, including the *Deepwater Horizon,* because OMS was limited to rigs that were fully owned by BP. *Id.* at 175:11-12; 186:24-187:8; 191:20-192:23; 2 10:3-10. This was confirmed by Pat O'Bryan, Vice President of Drilling & Completions, who testified that "[t]he only drilling rig that we had in our fleet [in the Gulf of Mexico] that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse." O'Bryan Dep. at 413:6-9.

109.      Several BP employees familiar with BP's drilling and completions in the Gulf of Mexico revealed that upstream operations – *i.e.* drilling rigs, including the *Deepwater Horizon* – did not receive information on OMS. For instance, John Guide, Wells Team Leader for the *Deepwater Horizon,* testified that he had no formalized training on OMS until January 2011. Guide Dep. at 433:5-8. Ronnie Sepulvado, Well Site Leader on the *Deepwater Horizon* since

2003, stated that he didn't know what the Gulf of Mexico local OMS was, that he had only "heard" of process safety, and he was completely unfamiliar with 13 policies that were ostensibly part of the Gulf of Mexico Local OMS. Sepulvado Dep. at 357:16-20, 391:6-394:10. Additionally, Cheryl Grounds, Chief Engineer of Process and Process Safety, stated that "[m]y understanding is it was frequently stated in the company is [*sic*] that drilling managed their own work. And we had a lot of work to do in process safety elsewhere, so that was prioritized. So I focused on producing assets and major capital projects[.]" Grounds Dep. at 88:18-24. These statements confirm that the scope of OMS was never intended to apply to some of BP's most critical projects involving drilling rigs that were not fully-owned by BP.

### 10. Defendant Hayward Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky and That a Deepwater Blowout Was the Highest Risk Facing BP in the Gulf of Mexico

110.    Defendant Hayward stated that BP's cornerstone process safety program (OMS) in the Gulf of Mexico, would apply "across all of BP's operations," that BP had "completed the transition to OMS in" the Gulf of Mexico and that OMS "turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed." These and other similar statements were, at a minimum, severely reckless, considering his knowledge that a deepwater blowout was the highest risk facing BP in the Gulf of Mexico. Not only did Defendant Hayward know that his misrepresentations concerning OMS implementation were false, but he also knew that those misrepresentations concerned the highest risk that BP faced in the Gulf of Mexico, and one of the highest risks facing the company. As Hayward testified in his deposition in the MDL 2179 Action:

> Q.    Well, what you did know, though, was that DEEP WATER blowout was the highest risk across the entire corporation and that it was the highest risk for your Exploration and Production Unit, wasn't it?

A. It was certainly one of the highest risks for the corporation. It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit.

Hayward Dep. at 196:10-18.

### 11. Contrary To Defendants' Assertions, the Gulf of Mexico Had Not Completed The Transition to OMS At The Time Of The Deepwater Horizon Disaster

111. BP's 2008 and 2009 Annual Reports on Form 20-F included Defendants' representations that OMS was in place at BP's exploration and production projects in the Gulf of Mexico. BP stated unequivocally that, "[e]ight sites completed the transition to OMS in 2008," including "the Gulf of Mexico." In reality, however, as BP conceded at oral argument, this statement was false when made. MTD Hr'g Tr. (Dkt. 304), No. 4:10-md-02185 (S.D. Tex.) at 58: 15-2 1 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that that is a statement of specific fact . . . that the plaintiffs have alleged and that I will admit to the Court is not accurate").

112. During the Relevant Period, BP and Defendants presented specific information about OMS, including the number of sites in which the program was supposedly implemented, specific sites where it was supposedly already implemented, and statistical percentages demonstrating that BP was supposedly on track with implementation. BP presented this hard data on OMS implementation – and the benefits that OMS had allegedly already begun to achieve – alongside BP's expectations for continued success in its Gulf of Mexico operations. However, the transition to OMS in the Gulf of Mexico was not complete in 2008 and was not even complete at the time of the *Deepwater Horizon* disaster.

113. As Defendant Hayward testified at his deposition in the MDL 2179 action, he knew that OMS was not fully implemented in the Gulf of Mexico as of April 2010:

> Q.    Go back to an old familiar subject, the OMS. Did you know in April of 2010, that the OMS had not been fully implemented in the Gulf of Mexico?
>
> A.    I – yeah. I believe I was aware that it had not been fully implemented. It was in the process of being implemented as it was in other parts of BP.
>
> Q.    But specifically with respect to the Gulf of Mexico, that's your answer?
>
> A.    Yes.
>
> Q.    Okay. When did you come to learn that?
>
> A.    I would have been aware of it prior to the – you know, in the course of doing my – my job.
>
> Q.    Okay.
>
> A.    Because we had a – as I've explained a number of times through this deposition, the Group Operations Risk Committee was looking at the progress of implementation.
>
> Q.    So you were getting reports as to where it was implemented, where it was not yet implemented?
>
> A.    And where it – where it was entrained, so to speak.

Hayward Dep. at 662:25-663:20.

114.    Hayward further testified that BP did not even begin to implement OMS in the Gulf of Mexico until the Fall of 2009 and that he did not expect implementation to be complete until the end of 2010:

> Q.    [Y]ou said that you were on target to implement OMS in the Gulf of Mexico in 2009?
>
> A.    I – my recollection is that we began the process of cutover to OMS in the Fall of 2009.
>
> * * *
>
> Q.    And your recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?
>
> A.    That's correct.

Hayward Dep. at 789:11-14, 789:17-20.

115.    BP's failure to complete implementation of OMS in the Gulf of Mexico had enormous repercussions. Hayward testified that the *Deepwater Horizon* tragedy potentially could have been avoided if OMS had been fully implemented in the Gulf and/or applicable to the *Deepwater Horizon*.

> Q.    If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?
>
> * * *
>
> A.    There is possible potential –
>
> * * *
>
> A.    Undoubtedly.

Hayward Dep. at 793:25-794:8.

116.    Likewise, SEEAC Chairman Castell fully understood that implementation of OMS had not been completed in the Gulf of Mexico by 2008. Castell testified, "I believe OMS started its integration in the Gulf in 2009. I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems [as of April 20, 2010]."

Castell Dep. at 71:11-14.

117.    Moreover, in February of 2009, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008.

118.    Indeed, according to CW2, BP's OMS lagged far behind its peers (*e.g.* Chevron and Exxon) in 2009, and by 2010, the program was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico.

119.    According to CW1, there was a company failure to implement an OMS protocol that would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon.*

120.    In the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico. According to CW2, the global reorganization was attributable to decisions made by Defendants Inglis and Suttles. A consequence of the restructuring was the termination or forced transfer for those chiefly responsible for BP's Gulf of Mexico Operations, including but not limited to safety processes and the implementation of BP's OMS in the Gulf of Mexico.  Indeed, the people charged with implementing OMS in the Gulf of Mexico were transferred or terminated in Q4 2009 and Q1 2010.

121.    Further as described below, the individuals brought in to implement BP's OMS and manage BP's Gulf of Mexico Operations lacked the knowledge, experience and expertise of those they were replacing. In fact, in September 2009 a non-public BP rig audit of the *Deepwater Horizon* found that safety goals were not commonly known or properly communicated to employees and not all relevant rig personnel were knowledgeable about drilling and well operations practices.

122.    According to CW2, the restructuring of BP's Gulf of Mexico operations was undertaken despite concerns raised by CW2 and other senior BP employees to top-level management with direct reporting responsibilities to BP's board of directors. These concerns related to BP's ability to operate safely in the Gulf.

123.    Ian Little was the Gulf of Mexico wells manager for BP. Little was replaced by David Sims who, according to CW2, lacked Little's knowledge and expertise. Despite this, Sims

was required to make decisions regarding not only management of the well, but also the response to the *Deepwater Horizon's* explosion.

124.    Prior to becoming Vice President of Drilling and Completions, London in December 2009, Harry Thierens served from 2006-2009 as the well director for the Gulf of Mexico. He managed the engineering and operations group in the Gulf of Mexico. Thierens was replaced by David Rich, who according to CW2 lacked the expertise of Thierens.

125.    Kevin Lacy was the vice president of Drilling and Completions for BP until December 15, 2009 when he left BP. Lacy, who worked in exploration and production for thirty years, was replaced by Patrick O'Bryan.

126.    According to CW1 and CW2, O'Bryan lacked Lacy's experience and expertise. According to CW2, by 2009 and 2010, BP still had not implemented a robust operations management system to ensure offshore processes could be managed effectively for both exploration and risk. Given the difficulties of Gulf of Mexico exploration, this invited disaster.

## VII.    DEFENDANTS' SCIENTER / INTENT TO DECEIVE REGARDING THEIR MISREPRESENTATIONS AND OMISSIONS ABOUT BP's PRE-SPILL SAFETY IMPROVEMENTS AND ITS POST-SPILL ASSESSMENTS

### A.    Defendants' Scienter / Intent To Deceive Regarding Their Misrepresentations and Omissions About BP's Operational Safety And Its Deepwater Drilling Operations

127.    Throughout the Relevant Period, Defendants were aware, or recklessly disregarded, that their statements to investors regarding BP's commitment to safety were not true and that their statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deep sea operations.  When they spoke, Defendants knew or recklessly disregarded that BP's process safety procedures did not adequately address the known risks of deepwater drilling – risks that materialized at the Macondo well when the *Deepwater Horizon* rig exploded and sank.

128.    The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;
- Failing to wait for the foam stability test results and/or redesigning slurry; Failing to run a cement evaluation log;
- Failing to use the correct spacer to avoid disposal issues;
- Failing to recognize the dangers inherent in displacing the mud from the riser before the surface cement plug had been set;
- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet before the mud line;
- Failing to install additional physical barriers during the temporary abandonment procedure;
- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and
- Failing to monitor the mud pits and conducting other simultaneous operations during mud displacement.

129.    The Presidential Commission then concluded that: "*The evidence now available does not show that the BP team members (or other companies' personnel) responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives.*

### 1.    Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems

130.    As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

131.    BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico since 1973, some of which involved "well

loss" and "rig and platform destruction by fire." Indeed, an October 22, 2003 MMS alert noted that "*[a]nnual flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico.*"

132.   Lord Browne knew of these developments and the others alleged herein which arose during his tenure as CEO and concerned BP's extensive, dangerous record of repeated safety violations and incidents, which cost the company billions of dollars from fines, lawsuits, and lost productivity costs and, in the case of the Texas City refinery explosion, cost the lives of 15 workers in addition to the roughly 200 more who were injured.

133.   BP had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the Relevant Period. Additionally, BP experienced, but did not disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.

134.   More specifically, on or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater drilling operations in Azerbaijan. Shortly thereafter, another rig in the field, called *B-i 7,* suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion. *B-i 7* was evacuated and its well was sealed, either by annular rams or because the well simply "bridged" (collapsed on itself or otherwise stopped flowing on its own). As a result, BP shut down most of the entire field's operations, cutting daily production by over 600,000 barrels per day ("barrels per day" or "bopd"). In later communications, BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

135.   BP made no announcement or disclosure of this incident at the time it occurred. In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008 and notably omitted references to the blowout on *B-i 7*, the fact that gas alarms went off on the field's central production platform, and the possibility that cementing jobs on other wells were faulty as well. As noted by *The Wall Street Journal* on December 17, 2010: "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partner." Moreover, according to the same article, several of BP's partners "were upset with BP for allegedly withholding information from them about the incident."

> **2.    Defendants Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly**

136.   As early as 2000, and on a continuous basis throughout the Relevant Period, Defendants were aware of or recklessly disregarded the substantial and known risks associated with relying on a single blind shear ram in a BOP to prevent an uncontrolled oil or gas release. Indeed, Defendants were well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time.

137.   A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing that seals around the "annulus," which runs down further into the earth toward the "pay sands" in which oil and gas are found.

138.   More specifically, Defendants knew, or recklessly disregarded, that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or:

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through drill pipe in the well and then seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

139.   As set forth below, as early as 2000, and on a continuous basis throughout the Relevant Period, Defendants knew, or were reckless in not knowing, that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic pressures affect hydraulic systems which control the BOP rams.

140.   In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but *two* separate blind shear rams, because of the significant risk that one might fail. The SINTEF report, while not publicly released, was shared with BP and other industry operators.

141.   In both December 2002 and September 2004, MMS provided to BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams. In particular, the reports mentioned:

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure on BOPs' hydraulic systems.

57

142.    The studies noted above, although not known to the general public and Plaintiffs, were shared with and made available to industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences that occurred during the Relevant Period, including, but not limited to, conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans, February 2-4, 2010 and in Amsterdam in 2009. Senior BP drilling managers routinely attended SPE and IADC conferences, including those noted above.

143.    In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon.* The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design – despite extensive back-up systems, or so-called "redundancies," in the BOP's layout – there was a particular component in the unit's hydraulic system, a single "shuttle valve," which had no backup. In response, EQE noted the potential for a "single point failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

144.    Significantly, throughout the Relevant Period, BP actually utilized the services of West Engineering, the company that carried out the research for MMS on BOP reliability, to carry out specific studies for BP on risk issues relating to BOP testing. In both 2008 and early 2010, BP specifically requested, as a member of the joint industry group focused on deepwater drilling issues, that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.

145.    A July 2009 report also put BP on notice that BOPs were unreliable. BP's partner, Transocean, commissioned the report, which analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska. The report, written by the consultant group Det Norske Veritas, which was subsequently contracted by the U.S. government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45 percent.

146.    Defendant Hayward acknowledged in his deposition that he was aware that problems had been identified with BOPs and that those problems were generally known throughout the industry. Hayward Dep. at 774:9-780:20. Nevertheless, the existence of this report and its findings were not disclosed to the investing public or Plaintiffs until June 20, 2010.

147.    BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram. In addition, BP contracted with Transocean in 2004 to replace one of the variable bore rams on the Deepwater *Horizon*'s BOP with a test ram in order to speed up subsea testing procedures. Yet, the installation of this test ram lowered the unit's reliability even further. Indeed, in an agreement between BP and Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile." The existence of this agreement was not made public until June 20, 2010.

148.    Thus, despite all the knowledge and information about difficulties with cementing and BOPs, Defendants either knew, or recklessly disregarded, that BP failed to establish uniform process safety features for rig operators to follow during off shore drilling to address cementing issues and BOPs.

### 3.   BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations

149.   Defendants knew of the significant risks in its deepwater drilling operations during the Relevant Period that were pervasive across BP's deepwater operations. Yet, Defendants knew, or recklessly disregarded, that BP's process safety protocols failed to properly and sufficiently address these known risks.

150.   Unknown to the investing public and Plaintiffs, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing BP for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities. Many of the communications related to offshore deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion, Unity, Bruce, Hutton, Magnus, Clair,* and *Miller* vessels. Some of these rigs and the ships that serviced them were decades old, and the safety issues, in many cases, concerned a failure to properly maintain and inspect equipment.

151.   According to UK HSE records, the *Schiehallion,* an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced a 2005 engine room fire and a 2006 "mooring chain failure," resulting in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental violations during the Relevant Period.

152.   In correspondence in 2006, UK HSE strongly urged BP to dry-dock the *Schiehallion* for repairs. BP refused, arguing that they would instead prioritize efforts to improve the ship's condition through a focus on maintenance. UK HSE, in a letter to BP on February 2, 2007, strongly criticized BP's decision, noting several areas of maintenance backlog and numerous cases in which past UK HSE notices were not addressed, and listing various

continuing operations which were not in compliance with "relevant statutory provisions" ("RSPs"):

> Finally, it is HSE's view that ***the overall magnitude of the various categories of maintenance backlog [on the Schiehallion] is such that BP does not have sufficient control of the situation. . . .*** [T]he situation means that there are concerns for BP's continued ability to comply with the fundamental duties under Sections 2 and 3 of the HASWA [Health and Safety at Work Act]. At the meeting of 29th January, we discussed with BP the issues associated with drydocking, shutting down production and prioritizing integrity management (i.e., the latter being BP's current approach) as a means of addressing the overall maintenance backlog. ***We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSO Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs*** (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure).

153.   The February 2, 2007 UK HSE letter continued, laying out concerns that were prescient of the *Deepwater Horizon* incident:

> [UK HSE maintains] the view that ***major accidents result when a series of failings with several critical risk control systems materialize concurrently.... The number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising.***

154.   The February 2, 2007 UK HSE letter concluded with criticism of BP's larger problem with its lax safety culture and inability to avoid a major incident that echoed the MMS's findings about BP in 2002: "BP's decisions on the *Schiehallion* have not in any way been informed by a systematic assessment [by independent safety inspectors] of the adequacy of the management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

155.   According to a 2009 UK HSE letter, BP again suffered a "significant Hydrocarbon Release" (*i.e.,* an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008.

The UK HSE said the release was attributable to a "failure to comply" with BP's own process safety procedures.

156.    Several other UK HSE letters were sent to BP between 2007 and 2010 as well. These letters outlined safety and maintenance problems on other rigs that could create a serious risk of hydrocarbon release:

- A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticizing BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices. The inspector wrote: "This lack of progress is unsatisfactory. It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents" (*i.e.,* spills); and

- Additional letters to BP Exploration Operating Company Ltd. on March 25, 2008, March 5, 2009, and July 7, 2009 relating to the *Bruce, Magnus, Unity,* and *ETAP* platforms criticize BP for failing to conduct maintenance programs compatible with the intended lifespan of its rigs – suggesting, in other words, that BP was running its own equipment into ruin.

    **4.**    **BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk**

157.





158.    The Safety & Operations segment ("S&O") was a key component of OMS that BP utilized to achieve monitoring of process safety performance. Before and during the Relevant Period, BP utilized the S&O function for a variety of reporting mechanisms, progress updates and metrics which allowed for the Executive and Board to monitor process safety performance.

███████████████████████████████████████████████████

████████████████████████████████

159.    The Orange Book was a reporting format conceived of by Defendants Inglis and Hayward, to relay key safety information to GORC. Ellis Armstrong, CFO of BP Exploration and Production, was involved in the process of creating the Orange Book. Armstrong Dep. at 85:21-22. Armstrong testified that the purpose of the Orange Book was to cull safety metrics across BP and regional business units, including E&P in the Gulf of Mexico that "had the same level of standing in the firm as financial information." This information was reported on a quarterly basis to GORC and SEEAC in connection with the committees' safety monitoring roles. Armstrong Dep. at 86:4-11.

160.    █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

### 5.    SEEAC Approved BP's Publications Regarding Safety

161.    As noted above, SEEAC responsibilities included: "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication." Minutes of SEEAC meetings confirm that SEEAC reviewed and approved various documents regarding safety before those documents were published to shareholders.

162.    For example, on January 9, 2008, SEEAC held a meeting, attended by Defendants Hayward and Inglis, among other participants. At the meeting, SEEAC discussed "the approach

being taken to the 2007 Sustainability Report[.]" The minutes state that "[a] full draft of the report would be presented to the March Committee meeting." Finally, "Dr. Hayward discussed the possible inclusion of a summary of the Independent Expert's Report in the Sustainability Report[.]"

163.    SEEAC met again on March 13, 2008. Defendant Hayward was present. The meeting minutes state:

> Dr. Bickerton [Director of Communications, BP corporate reporting team] described the structure of this year's Sustainability Report and that its publication would be principally web-based with only an 8 page summary available in printed form. He noted that the draft contained new disclosures on retail dismissals and on major integrity incidents and HIPOs [high potential situations]. The latter responded to a recommendation of the Baker Panel. He noted that certain environmental performance data would be included when finalized, and that a section had been provided for a summary of Mr. Wilson's first annual report.
>
> Committee members provided Dr. Bickerton with specific comments of [sic] the draft for inclusion in the final version which would be brought to the SEEAC in May.

164.    Likewise, on January 7, 2009, Defendant Hayward attended a SEEAC meeting where he and SEEAC "discussed the proposed structure and content of the Sustainability Report, and its relevance to the company's commitment to people, safety and performance." SEEAC also "considered how the company's report of sustainable and environmental issues could be presented as a business case fundamental to the company's success," discussed the content of the "Annual Report and Form 20-F," and provided "detailed comments . . . to the [BP] Secretary and . . . Corporate Reporting team." The minutes note that "a full draft of the Sustainability Report would be presented to the March meeting."

165.    At SEEAC's March 12, 2009 meeting, attended by Defendant Hayward, "Dr. Bickerton introduced the draft Sustainability Review" and "[t]he Committee discussed the Review's narrative[.]" "[I]t was agreed that some additional text would be included on the

company's community support activities and that the introductory section on strategy would be reworked."

166.    Also, BP's "Sustainability Reporting 2009 Safety" ("Sustainability Report") was published on April 15, 2010. Meeting minutes of SEEAC demonstrate that the committee specifically reviewed the Sustainability Report prior to its publication. On February 24, 2010, a meeting of SEEAC was convened, and was attended by Defendant Hayward and others. At that meeting, the participants discussed OMS implementation, gaps in OMS implementation, process safety audits, external (investor) perceptions of BP's reporting of sustainability (safety) issues, and the proposed content of the Sustainability Report. The minutes state, in part:

> Mr. Wilson [an independent expert embedded on BP's Board as recommended by the Baker Panel] also highlighted areas requiring continued attention. He referred to embedding OMS and closing remaining gaps, to establishing more formal documentation on roles and responsibilities and to improving incident investigations and subsequent learning. He also discussed closure dates on actions arising from process safety audits, and action item tracking and reporting more generally.

* * *

> Dr. Bickerton reviewed the approach taken to the BP Sustainability Report for 2009 and outlined its proposed content. He discussed external perceptions of the company's reporting of sustainability issues, and reviewed the topics that are material in the public's perception. He noted that the document in printed form would increase from 24 pages in 2009 to 32 pages in 2010 in a five chapter format.

167.    Just weeks before the publication of the Sustainability Report, SEEAC met again, and the top item on its agenda was commendation of the final draft form of the report. That meeting, on March 24, 2010, was attended by Defendants Hayward and Inglis, among others. At the meeting, Defendant Inglis presented to the members of SEEAC concerning implementation of OMS across all operating sites, Defendant Hayward stated that the Sustainability Review – a companion document to the Sustainability Reporting – encapsulated statements of BP's policies

66

(in addition to being a report on BP's activities), and the committee commended the final draft of the Sustainability Report. The minutes state, in part:

> Dr. Bickerton introduced the 2009 BP Sustainability Report noting that it was in the final stages of drafting in preparation for publication on 15th April. He discussed the additional material that had been added on Canadian oil sands and noted that it was consistent with the recent presentation to investors by Dr. Hayward.

* * *

> Dr. Hayward noted that the Sustainability Review had evolved to become a means of encapsulating statements of BP's policies, in addition to being a report on the company's activities.

The Committee commended the report.

### 6. Defendants Consciously Limited The Scope of Safety & Operations Audits So As Not To Apply To The Majority Of BP's Deepwater Drilling Fleet

168. Contrary to BP's representations that OMS was a systematic management framework that provided superior monitoring of safety, Defendants Hayward and Inglis made the decision to exclude some of the most lucrative – and the riskiest – of all BP operations from S&O audits.

169. These S&O audits were especially critical because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set by OMS.

170. The July 31, 2009 GORC "Pre-Read" that was distributed to GORC (including Defendants Hayward and Inglis) prior to the monthly GORC meeting included a proposed prioritization scheme for S&O audits that was to be "reviewed and endorsed by GORC." This established which businesses received S&O audits. The Gulf of Mexico Developments, Gulf of Mexico Exploration and Deep Gas, and Gulf of Mexico Joint Ventures were excluded from the S&O Audit Programme and would not have received an S&O Audit. Defendants Hayward and

Inglis made a conscious decision to exclude these risky BP operations, which were responsible for drilling the vast majority of BP's deepwater wells in the Gulf of Mexico, from the scope of the S&O audit function. Had such operations not been purposefully excluded, GORC and SEEAC (which received all S&O audits) would have received detailed information concerning the myriad process safety failures on the *Deepwater Horizon* (such as those identified throughout the Presidential Commission's Report).

171. █████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ The decision to exclude Gulf of Mexico from BP's S&O Audits belied BP's repeated public statements regarding a systematic framework for improved process safety.

**B.    Defendants' Scienter / Intent To Deceive Is Further Established By Their Disregard of Safety and Operational Concerns**

172. █████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████

173. █████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

174.    On February 20, 2008, Barbara Yilmaz, Technology Vice President for Drilling & Completions, sent an e-mail to Defendant Inglis stating, in part, "[s]afety performance in [Drilling & Completions] continues to deteriorate and we have had a very poor month in January with no improvement in February." Yilmaz cautioned that she did not "expect the external environment to get better in the near future."

           **1.**       **Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased From Transocean**

175.    During the Relevant Period, Defendants knew of, or recklessly disregarded, significant process safety problems with rigs operated or owned by third parties. These individuals knew of especially acute problems for Transocean-operated rigs.

176.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████

177.    On July 21, 2007, BP experienced a high-potential incident in the Gulf of Mexico. The incident involved Transocean rig operators dragging the BOP along the sea floor which almost severed underground pipelines. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

178.   ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

179.   In GORC meeting minutes from February 15, 2008, Defendants Hayward and Inglis discussed two new safety incidents involving Transocean-owned rigs. As a result of these incidents, a joint safety improvement plan was to have been implemented to address rig-safety culture and joint standardization.

180.   Defendant Inglis himself expressed concerns that OMS standards were not being applied to contractor operated drilling rigs. In an email to the Upstream Senior Leadership Team dated July 13, 2009, Defendant Inglis stated:

> One of the emerging findings from our analysis of incidents is that conformance with Control of Work (CoW) practices, on many of our contractor operated drilling rigs, falls short of BP expectations. I have asked Barbara [Yilmaz] to clarify the expectations we have of our contractors in the matter of CoW and the bridging requirements between contractor practice and BP's CoW Standard.

181.    Control of Work is a component of OMS, and BP's OMS Framework defines Control of Work:  "BP entities employ a formal Control of Work process to provide a work environment that will allow tasks to be completed safely and without unplanned loss of containment causing environmental damage."

182.    Additionally, a "Pre-read" document for the July 31, 2009 GORC meeting complained of a "lack of contractor competency."

## 2.    Concerns about the Integrity of Safety Processes in Alaska

183.    On April 11-12, 2009, Marc Kovac ("Kovac"), a BP mechanic, welder and union representative, sent two emails to BP's Ombudsman's office — which was headed by the Honorable Stanley Sporkin (a retired federal judge) — copying numerous BP Exploration Alaska BPXA offices raising serious concerns about the integrity of pipelines in Alaska, overstretched staff and contractors, and general problems with inspections of oil wells in the western part of BP's Prudhoe Bay facilities. The first email noted that "it's getting back to a very dangerous situation, too much overtime and too much responsibility and area to cover for each man. Anything can happen when [well] pads are not monitored. Anything can happen when workers work over 12 hours a day, every day. Things are not getting better." In a second email dated April 12, 2009, Kovac listed a host of specific examples of overstretched staff, concluding that the situation "sets us up for another major mishap. Who will they blame this time? This situation is not acceptable."

184.    Then, in June and August 2009, BP employees and representative members of the United Steelworkers met with BP management in Alaska about various safety and pipeline integrity issues and complaints about BP's culture making it difficult for employees to raise safety issues. Minutes released from the United Steelworkers revealed that union representatives raised detailed concerns to BP management about understaffing and excessive overtime (being

required to work 16-18 hour shifts) and noted that these issues caused an "increased . . . risk for accidents."

185.    This concern was underscored in October 2009 by Phil Dziubinski ("Dziubinski"), BPXA senior officer for HSSE. Dziubinski noted that a shift greater than 16 hours impeded workers' ability to make sound decisions, describing the impaired decision-making ability as akin to "intoxication." He noted these conditions were persistent in BP's operations before and throughout the Relevant Period. Further, he believed that the failure to abate such work conditions would require BP to affirmatively acknowledge to HSE Committees, the Board, the Ombudsman and Congress that this situation put "production ahead of safety." In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

186.    In the June and August 2009 meetings, union representatives also raised concerns about delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors. (Faulty gas leak detection devices were among the problems that led to the ignition of flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon.) "We have several lines ready to leak,"* the representatives are noted as stating. The minutes show union representatives urging BP not to simply "patch" pipelines: "These lines should be replaced."

187.    These were precisely the types of safety issues BP informed Plaintiffs and other institutional investors it would address after the Baker Report was released and the types of safety issues that BP represented were – purportedly – already being addressed and remedied throughout the Relevant Period.

### 3.      Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations

188.     In late 2009, another private employee "concern" was sent to the BP Ombudsman from an anonymous employee of BP-operated Aleyska, the BP-led consortium that operates the Trans-Alaska Pipeline in Alaska. The email was signed "Afraid-a-spill." The email raised a litany of complaints about Alyeska's operations, including serious safety and pipeline integrity concerns.

189.     Unidentified executives, the email stated, "told employees not to speak up or go against" the Alyeska CEO, Kevin Hostetler ("Hostetler"). The email stated that as a result of Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point where: "*People are afraid to speak up on safety or integrity issues for fear of retaliation.*" According to a subsequent investigation into the allegations by BP-retained lawyers with the law firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior leadership in early 2010, and Judge Sporkin, the Ombudsman, discussed it with BP leadership, which led to the firm being hired to carry out a further investigation. The results of the investigation still are not public.

190.     Concerns about the risks of spills in BP's Alaska operations, and the inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced internally or to the BP Ombudsman. BP also received enforcement letters sent to BP companies by the U.S. Department of Transportation's "Pipeline and Hazardous Materials Safety Administration" ("PHMSA"). PHMSA letters communicate regulatory violations, enforcement actions, orders to comply, and warnings relating to pipelines. In 2008 through 2010, BP related companies operating in the United States received 40 separate enforcement letters from PHMSA, a far higher number than those sent in the same period to peer companies Exxon Mobil, Conoco Philips, Chevron, or Shell. (During the same period, Shell received only six PHMSA letters.)

One PHMSA letter was sent to BP on April 20, 2010, the very day the *Deepwater Horizon* blast occurred. In that letter, PHMSA communicated that it had found serious shortcomings with BP's pipeline inspection and anti-corrosion systems in Alaska, increasing the likelihood of a major spill.

191.    These were precisely the types of safety issues BP informed Plaintiffs and other institutional investors it would address after release of the Baker Report and the types of safety issues that BP represented were – purportedly – already being addressed and remedied throughout the Relevant Period.

### 4.    Aftermath of BP's 2007 Criminal Plea

192.    During the Relevant Period, Defendants Hayward and Inglis knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately instituted throughout BP, especially in terms of improving its process safety practices. In particular, as set forth below, between 2008 and 2010, the Environmental Protection Agency warned BP's General Counsel, among other senior BP executives, that EPA investigators found BP to be operating unsafely.

193.    As described above, BP pled guilty to a violation of the U.S. Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting that its "criminal negligence" had caused the corrosion and thus the spill. BP was sentenced to three years of probation, and fined $22 million. In late 2008, BP attempted to obtain an early release from probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes ("Barnes"), that BP had made "significant progress" in relevant areas of maintenance and inspection. Unbeknownst to investors, however, Barnes, found continuing safety issues and incidents with BP operations and denied BP's request. In September 2010, due to continuing complaints that

she received about safety and pipeline integrity issues in 2008 through 2010, Barnes requested that the court revoke BP's probation and that additional fines and penalties be levied against BP.

194.    Also unknown to investors during the Relevant Period, BP was potentially facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD"), in connection with past and ongoing misconduct in Alaska, Texas, and other states. The SDD has the authority to prevent BP from being a party to any U.S. government or state contract or grant funded with federal funds, which would materially affect BP's revenues.

195.    Beginning in early 2008 and through early 2010, Jeanne Pascal ("Pascal"), the EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA debarment oversight activities on the BP Group in the greater United States, communicated repeatedly by telephone and email with senior BP officials, including senior BP executive and Defendant Doug Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's counsel at Vinson & Elkins, Carol Dinkins, among other persons. The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, McKay. In her communications, Pascal noted that her office was in receipt of information from BP employees and from EPA inspectors in Alaska and Texas demonstrating that BP was *in a state of continuing non-compliance* with numerous applicable laws and civil settlement agreements; that BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues. Thus, on several occasions during the Relevant Period, Pascal stated that, because of BP's continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its subsidiaries of the right to bid for U.S. government contracts and to bid for U.S. government oil and gas concessions.

196.    BP was also informed of significant problems with its process safety with respect to refineries. For example, in May 2010, it was revealed that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period – BP's main competitors' combined citations were 22. Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.

197.    These were precisely the types of safety issues BP informed Plaintiffs and other institutional investors it was addressing after release of the Baker Report.

C.    **Defendants' Scienter / Intent To Deceive Is Further Established By BP's Retaliation Against Individuals Who Raised Concerns About Its Operational Safety and Integrity**

1.    **Whistleblower Retaliation in the Gulf of Mexico**

198.    Throughout the Relevant Period, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations. These whistleblowers provide further support of Defendants' knowledge or reckless disregard of the falsity and misleading nature of their Relevant Period statements.

199.    In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about BP's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis.* One particular

concern was that designs for critical units on the rig were not updated to reflect changes made during repairs, maintenance, or other modifications.

200.    On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of properly-reviewed and approved designs could result in "**catastrophic operating errors"** and that "**currently there are hundreds if not thousands of Subsea documents that have never been finalized,"** a situation which Duff referred to as "**fundamentally wrong."**

201.    Abbott continued to raise the above concerns from November 2008 through January 2009 when he was fired in retaliation for his whistle-blowing. Shortly after his termination, Abbott raised his concerns with BP's Ombudsman. On June 17, 2010, Abbott was invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management. During his testimony, Abbott stated, in part, that:

> *From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies*. Of course, everyone and every company will make mistakes occasionally. *I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills. BP's own investigation of itself,* by former Secretary of State James Baker, *reported that BP has a culture which simply does not follow safety regulations. From what I saw, that culture has not changed*.

202.    Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was a declaration by a safety engineer in Houston, Texas, Mike Sawyer, who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

203.    The Sawyer affidavit affirmed that a "large portion of [the *Atlantis'*] subsea safety critical drawings, documents, specifications, and certificates were not in final, 'as-built' status," and warned: "**The lack of 'as-built' design documents is a violation of Federal requirements**

*under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905."* The Sawyer affidavit specifically warned that:

- Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, Atlantis production should be shut in until resolution of its design short comings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved. . . . *It is inconceivable that BP could justify the risk of commissioning Atlantis production without completed design documentation reflecting the latest approved design version . . . .*

- The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces substantial risk of large scale *damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers,* primarily because analyses and inspections based on *unverified design documents can not accurately assess risk or suitability for service. . . .*

- "The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the *safety* of platform workers. *The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time.*

204.    In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had been substantiated. More specifically, Abbott received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), on April 13, 2010, stating: "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . *The concerns that you expressed about the status of the drawings upgrade project were... of concern to others who raised the concern before you worked there, while you were there, and after you left."*

205.    In addition, the Presidential Commission Report found that a contributory factor to the *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to

78

BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis.*

206.    On the issue of retaliation, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation. The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – i.e., approximately one month prior to the *Deepwater Horizon* explosion. According to the Presidential Commission, the survey found that: "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

### 2.      Whistleblower Retaliation in Alaska

207.    The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008 and who had begun to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program. According to 2009 communications between the BP Ombudsman's office and Lynch, in 2007 Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown." According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

208.    The matters concerning Anderson and pipeline inspections were serious enough for the BP Ombudsman's office to raise them with BP and BP North America officials, including

Rick Cape, BP's Vice President for Compliance and Ethics, *specifically recommending to him that Anderson's concerns be reported to the BP Board of Directors and to Lynch.* In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Defendant Malone. Garde wrote to Lynch about it in September 2009, and Anderson himself met with Lynch on August 3, 2009. BP did not adequately address the continuing concerns that had been raised. An internal email dated July 15, 2010, from Christine Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting" [*i.e.,* into mid 2010] and "it is clear that, over time, root causes have not been identified and/or addressed . . . ."

209.   A 2008 BP Ombudsman "Workforce Briefing" containing an assessment of Acuren's "Work Environment" reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns. A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [*i.e.,* during the period BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes." The section noted: "[p]roduction is viewed by very many workers as the primary focus," (*i.e.,* as opposed to safety). The presentation also noted that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ." In fact, one in three employees believed "recent resignations" were due to HIRD, and 38 percent of employees – and 80 percent of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns: "nothing seems to happen to reported items."

210.    The Ombudsman also noted that about one in ten Acuren employees said in the last 18 months that they had been asked to perform a job that was not in compliance with regulations or safety practices. (The number was even higher for workers who monitor BP natural gas pipelines: almost half of Acuren's workers indicated that they had been asked to perform "non-compliant work".)

211.    The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it" [*i.e.,* the job that was stopped].

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates. While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

212. Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees. For instance, according to an article published by ProPublica on June 7, 2010, on December 9, 2009 a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections." This individual's name is Stuart Sneed ("Sneed"). Sneed worked on BP's Alaska pipeline and stated that: "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you. They'll destroy your life. . . . No one up there [in Alaska] is going to say anything if there is something they see is unsafe. They are not going to say a word."

**D. Defendants' Scienter / Intent To Deceive In Making Post-Spill Misrepresentations And Omissions To Congress, Law Enforcement, Emergency Responders, and Investors, Including Plaintiffs, About The Oil Flow Rate Into The Gulf Of Mexico From The Blown Macondo Well**

**1. Defendants' Publicly Stated Estimates Of Oil Spilling Into The Gulf Were Contradicted By Contemporaneous Internal BP Documents, Data, Estimates, and Calculations**

213. Throughout the Relevant Period, BP, Rainey, Suttles, Hayward, McKay, and Dudley were aware or recklessly disregarded that their statements regarding estimates of the amount of oil spilling into the Gulf following the *Deepwater Horizon* explosion were not true and that their statements omitted material information concerning the true magnitude of the Macondo well oil spill.

214. By way of example, at a time when the publicly reported oil flow rate from the blown well was only 1,000 barrels per day, an internal BP document dated April 26, 2010 revealed that BP had actually estimated that 5,000 barrels per day were leaking into the Gulf (the following was linked to a May 27, 2010 article published in *The New York Times* entitled "Ruptured BP Well Tops Valdez as Worst U.S. Spill"):

**2)   Estimated Present Volume Release Rate**

*The following assumptions are used to make a release rate calculation. If any of them are changed, the answer could be significantly different.*

The oil is leaking, in a vertical plume from a hole approximately 40 cm. in diameter.

The velocity of the material in the plume is estimated by visual observation to be between 7 cm/sec and 30 cm/sec.

The plume itself contains gas bubbles, oil droplets, and entrained seawater.

Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this <u>source</u> would be <u>roughly 5000 bbl/day</u>, (approximately 200,000 gal/day) Other sources would contribute additional oil. This answer will be refined as additional information becomes available.

(emphasis in downloaded version).   As was later discovered, however, and as described in greater detail below, even the larger 5,000 barrels per day figure was knowingly and grossly insufficient.

215.   Another internal BP document (dated April 27, 2010), also linked to the *New York Times* article in the preceding paragraph, that was provided to BP's senior management revealed that BP's low estimate of the oil spill was 1,063 barrels per day, BP's best estimate was 5,758 barrels per day and BP's high estimate was 14,266 barrels per day:



BP-HZN-CEC020065

Using "Standard Guide for Visually Estimating Oil Spill Thickness on Water, ASTM F 2534 - 06."

ATTACHMENTS I

**Oil on Water Estimate - Low**

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.5 | 50 | 37500 | 893 |
| Dull oil | 250 | 0.2 | 666 | 33300 | 793 |
| Dark oil | 9 | 0.15 | 3330 | 4495.5 | 107 |
| Total oil on water | | | | 75296 | 1793 |
| x 2 to compensate for evap and disp | | | | | 3586 |
| recovered | | | | | 200 |
| chemically dispersed | | | | | 1000 |
| **Total emitted** | | | | | 4786 |
| **Barrels emitted per day** | | | | | 1063 |

**Oil on Water Estimate - Best Guess**

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.66 | 333 | 329570 | 7849 |
| Dull oil | 250 | 0.35 | 1332 | 116550 | 2775 |
| Dark oil | 9 | 0.25 | 6660 | 14985 | 357 |
| Total oil on water | | | | 461206 | 10981 |
| x 2 to compensate for evap and disp | | | | | 21962 |
| recovered | | | | | 450 |
| chemically dispersed | | | | | 3500 |
| **Total emitted** | | | | | 25912 |
| **Barrels emitted per day** | | | | | 5758 |

**Oil on Water Estimate - High**

| | sq mi | Cover Factor | gal/sq mi | gals | bbls |
|---|---|---|---|---|---|
| Sheen | 1500 | 0.75 | 666 | 749250 | 17839 |
| Dull oil | 250 | 0.5 | 3330 | 416250 | 9911 |
| Dark oil | 9 | 0.35 | 13320 | 41958 | 999 |
| Total oil on water | | | | 1E+06 | 28749 |
| x 2 to compensate for evap and disp | | | | | 57498 |
| recovered | | | | | 700 |
| chemically dispersed | | | | | 6000 |
| **Total emitted** | | | | | 64198 |
| **Barrels emitted per day** | | | | | 14266 |

216.    As Chief Operating Officer for BP Exploration and BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, Suttles knew BP's estimated spill rate from the Macondo well, or was reckless in not knowing.  Indeed, as described below, he knew of at least six, and likely more, internal pieces of data, estimates, and calculations indicating that oil spill flow rate was vastly larger than the figure being publicly reported.  Nonetheless, on April 28, 2010, as reported by the *Huffington Post*, Suttles reiterated earlier estimates that ***1,000 barrels*** of oil from the Macondo well were spilling into the Gulf of Mexico each day.  Then, on April 29, 2010, Suttles stated in interviews on *CBS's* "The Early Show" and other media outlets that "I think that somewhere between 1,000 and 5,000 barrels a day is probably the best estimate we have today" of the Macondo well spill rate.

217.    Thereafter, BP, Suttles, Hayward, McKay, and Dudley made false and misleading misrepresentations and omissions, with scienter, throughout the rest of April and May 2010.  As described below, in each such instance, they understated the then-stated oil flow rate, in the face of known facts to the contrary, including internal data, estimates, and calculations.  These allegations are set forth in far greater detail in Sections IX. II. and IX. TT. below, and provide additional, extensive evidence as to the scienter of BP, Suttles, Hayward, McKay, and Dudley.

218.    In one particularly glaring example, as reported by the *Times-Picayune* on May 19, 2010, "[a]n engineering professor who has been monitoring the *Deepwater Horizon* disaster said . . . that **'there is scientifically <u>no chance</u>' that BP's estimate of a discharge of about 5,000 barrels of oil per day into the Gulf of Mexico is anything close to the actual number**.  Steve Wereley, associate professor of mechanical engineering at Purdue University, told the House Energy and Environment Subcommittee that his own review indicates that a 1.2-inch hole is producing about 25,000 barrels of oil a day by itself, and overall the daily spill could amount to **something '<u>short of 70,000</u> barrels** to as high as 115,000 barrels.'"

219.    BP immediately went on the attack, ensuring that Professor Wereley's message was strongly refuted by the one entity who the Congress, law enforcement, Gulf residents and business, and the investing public entrusted with knowing and conveying an accurate flow rate - - BP itself.  In response to Wereley's estimates, "BP America Chief Executive Lamar McKay, denied that his company is trying to obscure the size of the leak.  'This leak is not measurable through technology we know,' he said.  He also told the House Transportation and Infrastructure Committee that **anyone working on the spill would have a hard time believing the size is anything close to the 70,000 barrels per day projected last week by Wereley**."

220.    As noted herein, roughly 60,000 barrels of oil per day leaked into the Gulf from the blown Macondo well.  Coupled with the internal BP data, estimates, and calculations received by the Defendants (as described  below) and Wereley's estimates (and the information upon which Wereley based his work, to which BP had access), Defendants knew, or at a minimum were reckless in not knowing, that their statements minimizing the spill rate were materially misleading.  Here, the Defendants ignored, *inter alia*, contemporaneous reports provided to them, from among other sources BP's own senior engineers, utterly undermining the veracity of their public statements as to the oil flow rate of the Macondo well spill.

221.    The facts alleged herein have been previously found to support an inference of scienter as to Hayward and Suttles.  *See BP I*, 843 F. Supp. 2d at 782-84, 786-88.  In addition, the facts alleged herein were the basis upon which BP pled guilty to, *inter alia*, felony obstruction of Congress and agreed to pay the highest criminal penalty ever in U.S. history - $4 billion.  They were the basis upon which Rainey has been criminally indicted.  They were also the basis upon which BP admitted its liability and settled the SEC's civil securities fraud case for the third highest penalty in the SEC's history - $525 million.    Simply put, the facts alleged herein overwhelmingly indicate that BP and the Individual Defendants, with scienter, perpetrated a massive fraud on the investing public, including the Plaintiffs.

### 2.    Defendants Misrepresented the Scope of the Leak in a Brazen Attempt to Whittle Down the Amount BP Would Owe in Fines

222.    Civil fines under the U.S. Clean Water Act are based on the number of barrels spilled.  According to the *Wall Street* Journal, the final government estimate of the amount of oil spilled was between 53,000 and 62,000 barrels of oil per day, or 4.9 million barrels spilled overall, which translates to $5.4 billion to $21 billion in fines, depending on whether investigators find that BP was grossly negligent. Faced with that crude reality, Defendants were

motivated to lie about the amount of oil gushing into the Gulf in order to skirt the amount of civil fines and penalties it owed under the Clean Water Act.

### 3. BP Agreed To Pay The Third-Highest Civil Fine In The SEC's History - $525 Million – To Settle The SEC's Well-Pled Allegations That It And Its Executives Hid From Investors, Including Plaintiffs, Critical Information About the Spill

223. The facts alleged in Sections IX. II. and IX. TT. below, among others, gave rise to the SEC's securities fraud complaint against BP filed on November 15, 2012. On that same day, BP filed a Consent in the SEC action in which it agreed to entry of a Final Judgment and admitted that the allegations in the SEC's complaint were true. In doing so, BP agreed to pay a $525 million penalty to settle with the SEC, thereby incurring the third-largest civil fine *ever* imposed by the SEC and a permanent injunction barring BP from violating the federal securities laws. As described in far greater detail in Sections IX. II. and IX. TT., with Rainey's assistance, Defendants BP, Suttles, Hayward, McKay, and Dudley all engaged in a massive fraud by knowingly fabricating and repeatedly asserting to the public an artificially low oil spill flow rate figure in April and May 2010, at times directly refuting scientists who dared challenge its veracity. They did so despite internal knowledge of at least *sixteen* different sources of data, estimates, and calculations – many of them created by BP's own senior engineers – indicating that the spill was greater by many orders of magnitude. Each of those sixteen was undisputedly known to BP and at least one (and likely all) of the Individual Defendants.

224. At the announcement of the settlement, SEC officials were unambiguously harsh in their criticism of BP's conduct in misleading investors. For instance:

(a) Robert Khuzami, Director of the SEC's Division of Enforcement said in an SEC press release:

> The oil spill was catastrophic for the environment, but by hiding its severity BP also harmed another constituency – its own shareholders and the investing public

who are entitled to transparency, accuracy, and completeness of company information, particularly in times of crisis.  Good corporate citizenship and responsible crisis management means that a company can't hide critical information simply because it fears the backlash.

(b)      Daniel M. Hawke, Director of the SEC's Philadelphia Regional Office and Chief of the Enforcement Division's Market Abuse Unit said in the same press release, "Without accurate critical flow rate data known only to BP, the company denied its shareholders and investors the opportunity to fairly assess BP's potential liabilities and true financial condition."

(c)      At a news conference, Mr. Khuzami further reprimanded BP's executives, the Defendants in the instant action, for standing behind an oil flow estimate of 5,000 barrels per day "despite an ever-growing body of evidence that this estimate was unreasonably low," until "eventually, outside groups realized that the flow rate estimate was 10 times what BP had fraudulently communicated to investors."  He summarized the SEC's case against BP:

> [T]he eyes of the world were on BP in the spring and summer of 2010.  The company had an opportunity to provide fulsome, accurate disclosure about the facts needed by the public to make informed investment decisions.  And, instead, BP chose to mislead the public.
>
> That is not what we expect from public companies and their management.  In fact, it is exactly in times of crisis that the need for accurate information is most acute.

**4.      BP Pled Guilty to Felony Manslaughter, Environmental Crimes and Felony Obstruction of Congress And Agreed to Pay The Largest Criminal Fine in U.S. History – $4 Billion – To Resolve A DOJ Investigation That Revealed Defendants' Concealment Of Critical Spill Information From Congress And The Public**

225.      On April 23, 2012, federal prosecutors filed criminal charges against BP engineer Kurt Mix for obstruction of justice in connection with a criminal investigation of the *Deepwater Horizon* disaster.  In a press release issued the next day, the DOJ reported that "Mix worked on internal BP efforts to estimate the amount of oil leaking from the well and was involved in

various efforts to stop the leak.  Those efforts included, among others, Top Kill . . . . ."  The

DOJ's April 24, 2012 press release also states the following:

> Mix allegedly deleted on his iPhone a text string containing more than 200 text messages with a BP supervisor.  The deleted texts, some of which were recovered forensically, included sensitive internal BP information collected in real-time as the Top Kill operation was occurring, which indicated that Top Kill was failing . . . . Mix deleted a text he had sent on the evening of May 26, 2010, at the end of the first day of Top Kill.  In the text, Mix stated, among other things, "Too much flowrate – over 15,000."  Before Top Kill commenced, Mix and other engineers had concluded internally that Top Kill was unlikely to succeed if the flow rate was greater than 15,000 barrels of oil per day (BOPD).  At the time, BP's public estimate of the flow rate was 5,000 BOPD – three times lower than the minimum flow rate indicated in Mix's text.

226.    The Wall Street Journal reported on May 28, 2012 that during DOJ's

investigation into whether BP's representatives lied to Congress about the oil flow rate of the

Macondo well spill, federal investigators examined an email by a BP engineer warning not to

share data "outside the circle of trust."  In particular, the prosecutors uncovered a May 27, 2010

email written by a senior BP engineer, Rupen Doshi, in the midst of the first effort to stop the

leak, known as the "top kill," warning that "NO ONE is to get the data files from the Top Kill

method that is being pumped from yesterday or today except for Paul Tooms' group."  Mr. Doshi

was referring to Paul Tooms, then head of upstream engineering at BP.  "The purpose of the note

was meant to put a limit on the people outside the circle of trust getting the data," Mr. Tooms

wrote in an email later that day.

227.    On November 15, 2012, DOJ announced that BP E&P agreed to plead guilty to 11

counts of felony manslaughter, felony obstruction of Congress, and criminal violations of the

Clean Water and Migratory Bird Treaty Acts.  In its plea, BP agreed to pay a record **$4 billion** in

criminal fines and penalties for its conduct regarding the *Deepwater Horizon* disaster and the

ensuing coverup – the single largest criminal fine *ever* in U.S. history.  In addition to the record

monetary penalty, BP agreed to extensive monitoring and reforms.  Among other things, BP

must retain a process safety and risk management monitor and an independent auditor, who will oversee BP's process safety, risk management and drilling equipment maintenance with respect to deepwater drilling in the Gulf of Mexico.  BP also must retain an ethics monitor to improve BP's code of conduct to ensure BP's future candor with the U.S. government.  These unprecedented sanctions underscore the severity of BP's deception at issue in this case.

228.    In the wake of BP's guilty plea, Assistant Attorney General Lanny A. Breuer of the Justice Department's Criminal Division put it bluntly:  "***The explosion of the rig was a disaster that resulted from BP's culture of privileging profit over prudence***."  He added:

> As the oil spill continued, BP made a tragic situation worse: it began misleading Congress and the American people about how much oil was pouring out of the Macondo well.  As BP now admits, in responding to Congress, the company lied and withheld documents, in order to make it seem as though less damage was being done to the environment than was actually occurring.  Acknowledging those lies, BP has agreed to plead guilty to felony obstruction of Congress.

229.    Among other things, DOJ's 14-count information details that BP, through Rainey, obstructed an inquiry by the U.S. Congress into the amount of oil being discharged in the Gulf while the spill was ongoing – the very facts at issue here.  As part of the plea agreement, BP admitted that, through Rainey, it withheld documents and provided false and misleading information in response to the U.S. House of Representatives' request for flow-rate information. BP admitted that, *inter alia*, Rainey manipulated internal estimates to understate the amount of oil flowing from the Macondo well and withheld data that contradicted BP's publicly stated estimate of 5,000 barrels of oil per day.  BP also admitted that, while Rainey was preparing his manipulated estimates, BP's internal engineering response teams were using sophisticated methods that generated significantly higher estimates.  All of this information was withheld not only from Congress, but also Plaintiffs and other BP investors.

230.    Pertinent here, DOJ's criminal information, with respect to which BP admitted its

guilt, charged the following (as quoted from the information):

**Early Flow-Rate Estimates**

i.   The amount of oil leaking from the Macondo well was directly relevant to various efforts to stop the leak and also relevant to potential civil and criminal litigation, including the calculation of penalties.

ii.  On or about April 24, 2010, very soon after it was determined that the Macondo well was leaking oil and natural gas, Unified Command, with BP's input, issued a preliminary public estimate that the well was flowing at a rate of approximately 1,000 barrels of oil per day ("BOPD").

iii. On or about April 26, 2010, a scientist at the National Oceanic and Atmospheric Administration ("NOAA") prepared a written flow-rate estimate of approximately 5,000 BOPD.   The NOAA scientist's estimate, which was based in part on a very preliminary assessment of oil that had started to float to the surface of the Gulf, cautioned that the methodologies used were "highly unreliable" and that the estimate was accurate "to only an order of magnitude," such that the actual flow amount could exceed 5,000 BOPD by ten times.  As a result of this NOAA estimate, on or about April 28, 2010, Unified Command raised its public estimate to 5,000 BOPD.

**Rainey's "Estimates"**

iv.  After learning of NOAA's preliminary and heavily-qualified 5,000 BOPD estimate, Rainey, an executive who had no prior experience in spill estimation, surfed the Internet for information about how to conduct oil-spill-volume estimates based on observations of oil floating on the surface of a water body, known as "mass balance" estimates.  Rainey's internet search led him to a website where he found a Wikipedia entry that described some generally accepted mass balance methodologies, including the American Society for Testing and Materials ("ASTM") method and the European "Bonn" method.

v.   Between on or about April 26, 2010 and on or about April 30, 2010, despite having no experience performing mass balance estimates and despite knowing that BP had employees who were trained in generating such estimates, defendant BP, through Rainey, performed and caused to be performed daily estimates purportedly using the ASTM and Bonn methods,

vi. Defendant BP's Bonn estimates, prepared by Rainey, resulted in "best guess" estimates significantly higher than 5,000 BOPD and "high end" estimates of up to 92,000 BOPD. Defendant BP, through Rainey, withheld these Bonn estimates from individuals working on flow rate within Unified Command and, later, also withheld them from Congress.

vii. Defendant BP's "ASTM" estimates, prepared by Rainey, did not conform to ASTM standards but instead were manipulated to consistently arrive at or near a "best guess" of between 5,000 and 6,000 BOPD. In effect, defendant BP, through Rainey, conducted the estimates in a manner designed to reverse engineer results consistent with NOAA's preliminary 5,000 BOPD estimate. Defendant BP, through Rainey, labeled the estimates as "ASTM" estimates even though the estimates did not conform to the ASTM method.

viii. As described below, defendant BP, through Rainey and other BP executives, consistently maintained that 5,000 BOPD was the "best guess" estimate, without disclosing internal BP information suggesting the flow rate was considerably higher.

**Defendant BP's Actual Estimates**

ix. In its engineering response to the Macondo oil spill, defendant BP did not rely internally on Rainey's contrived and inaccurate flow-rate numbers. Instead, defendant BP and its affiliated companies had numerous expert teams assessing the flow rate using sophisticated methodologies that focused on the conditions at the seafloor where the oil and natural gas were gushing out. These teams were generating flow-rate estimates much higher than Rainey's purported "best guess" of between 5,000 and 6,000 BOPD.

x. For example, on or about April 22, 2010, BP subsurface engineers, including Kurt Mix, separately charged, estimated "various release scenarios" with potential flow rates ranging from 64,000 to 146,000 BOPD (the "Subsurface Team Estimates").

xi. Also, on or about May 11, 2010, a team of BP engineers working under the direction of an engineering supervisor ("Engineer 1") prepared a series of possible flow rates that ranged from 14,000 BOPD to 82,000 BOPD depending on potential flow paths and other known and unknown variables (the "Engineer 1 Slide Deck").

**Defendant BP's Public Estimates Questioned**

xii. On or about May 13, 2010, a university professor with expertise in fluid mechanics measurement publicly estimated that the Macondo

well was leaking oil at a rate of approximately 70,000 BOPD, based on a review of video footage of the leak that BP had recently released.

xiii. On or about May 14, 2010, defendant BP and its affiliated companies publicly rejected the university professor's work and continued defending 5,000 BOPD as the "best" estimate, even though 70,000 BOPD was within the range of Rainey's Bonn estimates and other internal BP engineering estimates, including the work of Engineer 1 described above.

xiv. On or about May 14, 2010, Engineer 1 sent an email to two executives at BP, including BP's then-Chief Executive Officer for Exploration and Production, expressing concern over BP's continued public embrace of the 5,000 BOPD number. The email stated:

I just read an article on CNN (May 14, 2010 1:00 p.m.) stating that a researcher at [a university] believes that the Macondo well is leaking up to 70,000bopd and that BP stands by a 5,000bopd figure. With the data and knowledge we currently have available, we cannot definitively state the oil rate from this well. **We should be very cautious standing behind a 5,000bopd figure as our modeling shows that this well could be making anything up to ~ 100,000 bopd** depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

xv. Engineer 1's email caused concern within BP because it contradicted BP's public position regarding flow rate.

**The Rainey Memo**

xvi. On or about May 17, 2010, defendant BP, through Rainey, prepared a memorandum purporting to summarize the efforts that had been undertaken within Unified Command to estimate flow rate (the "Rainey Memo"). The Rainey Memo, which sought to justify BP's 5,000 BOPD estimate, was false and misleading in numerous respects, including:

a. Defendant BP, through Rainey, omitted Rainey's Bonn estimates, which were significantly higher than 5,000 BOPD.

93

b.  Defendant BP, through Rainey, falsely labeled the estimates in the memorandum as "ASTM" calculations.

c.  Defendant BP, through Rainey, omitted that the estimates included in the memorandum were premised on data and other inputs defendant BP, through Rainey, knew were inaccurate.

d.  Defendant BP, through Rainey, omitted other documents relating to flow-rate estimates that contradicted defendant BP's 5,000 BOPD estimate, including, among others, the work performed by Engineer 1, the Subsurface Team Estimates, and a critique by another BP engineer ("Engineer 2") of the university professor's work that used different assumptions than those used by the professor and concluded that 15,000 BOPD was an appropriate assessment of the flow rate based on the same video footage of the spill.

e.  Defendant BP, through Rainey, falsely stated that Rainey's estimates ranging from 5,000 to 6,000 BOPD "played an important part in Unified Command's decision [on April 28, 2010] to raise the estimate of flow rate from 1,000-5,000 barrels per day."  In fact, as defendant BP, through Rainey, well knew, defendant BP had not yet provided these purported "ASTM" estimates to Unified Command by the time that Unified Command raised its estimated flow rate to up to 5,000 BOPD.

**The Flow Rate Technical Group**

xvii.  On or about May 19, 2010, as a result of the growing concern that BP was understating the amount of oil spilling from the Macondo well, Unified Command announced the creation of the Flow Rate Technical Group ("FRTG"), made up of independent and government experts, to determine the flow rate.  Later, following independent analysis, the FRTG announced on or about August 2, 2010, its conclusion that the flow rate after the blowout had initially been approximately 62,000 BOPD—over twelve times BP's public estimate of 5,000 BOPD—and had been approximately 53,000 BOPD at the time the well was shut in on or about July 15, 2010.  The FRTG concluded that a total of approximately 4.9 million barrels of oil had been released during the course of the spill.

**The Congressional Inquiry and Investigation**

xviii.  The House Subcommittee on Energy and Environment (the "Subcommittee") was a subcommittee of the Committee on Energy and Commerce of the House of Representatives of the United States Congress.  The Subcommittee had oversight authority over matters including the regulation of energy, drinking water and soil and water

contamination.  The Subcommittee's oversight authority included the authority to analyze the effectiveness of existing laws and to evaluate the need to propose new or additional legislation.  The Subcommittee was a "Committee" for purposes of Title 18, United States Code, Section 1505.

xix. Following the Deepwater Horizon blowout, the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well.  Congress's inquiry and investigation included, among other things, requests for information from BP.

xx. On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant BP, through Rainey, falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate.  Defendant BP, through Rainey, further stated to Congress that, while defendant BP had calculated a hypothetical "worst case" scenario of 60,000 BOPD, the worst case scenario was not possible, in part because it assumed removal of the blowout preventer from the wellhead, which remained in place at that time.  During the May 4 briefing, defendant BP, through Rainey, did not disclose any information that contradicted defendant BP's purported "best guess" of 5,000 BOPD, including the Bonn estimates and other BP internal information of which defendant BP, through Rainey, was aware indicating that the actual flow—not a hypothetical worst case scenario assuming the non-existent condition of the blowout preventer being removed—was much higher than 5,000 BOPD.

xxi. On or about May 14, 2010, the then-Chairman of the Subcommittee ("the Subcommittee Chairman") sent a letter to BP accusing BP of understating the amount of oil leaking from the well.  The letter noted that BP had recently "reaffirmed the 5,000 barrels per day estimate" despite recent news reports that the "actual amount of oil being released into the Gulf of Mexico could be upwards of 70,000 barrels per day."  The letter further stated that Congress was concerned that an "underestimation of the flow may be impeding the ability to solve the leak and handle management of the disaster."  The Subcommittee requested answers to fifteen questions relating to flow rate and requested that BP "update [its] response or provide additional documents at such time as such information becomes available."  Among other things, the Subcommittee requested:

a. "What is the BP method and scientific basis for the estimate of 5,000 barrels per day?  Was this estimate based solely on surface monitoring of the size of the spill?

95

b. "All documents created since the incident that bear on, or relate to, in any way, estimates of the amount of oil being released"; and

c. "BP's current estimate of the amount of oil flowing from the well, including the basis and methodology for that estimate, along with any uncertainty or error ranges for the estimate."

xxii. On or about May 21, 2010, defendant BP, through Rainey, began working on a response to the May 14 Congressional request. Rainey was the primary source of flow-rate information for defendant BP's eventual written response to Congress on or about May 24, 2010 (the "BP Response") that continued to embrace 5,000 BOPD as the "best guess" estimate. During the preparation of the BP Response, defendant BP, through Rainey, continued to receive information that contradicted a "best guess" of 5,000 BOPD, including that the amount of oil actually being collected via a riser insertion tube tool (the "RITT") confirmed that the flow rate was in excess of 5,000 BOPD and an email that "everyone" within the FRTG at that time agreed that "5,000 barrels/day was too low." Aware of this and other information contradicting the 5,000 BOPD estimate, defendant BP, through Rainey, withheld such information from other BP employees and from BP in-house and outside lawyers working on the BP Response. Defendant BP, through Rainey, also prepared false and misleading responses to the Congressional request, and provided false and misleading information to others working on the BP Response.

xxiii. On or about May 24, 2010, defendant BP, through Rainey, caused to be submitted to the Subcommittee the BP Response, which appended the false and misleading Rainey Memo and its attachments, which were selected by defendant BP, through Rainey. As a result of defendant BP's actions, through Rainey, in withholding information and also providing false and misleading information, the BP Response made false and misleading statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation. For example:

a. The BP Response omitted all of Rainey's Bonn estimates, which contained estimates of oil spill up to 92,000 BOPD

b. The BP Response omitted key parts of Engineer 1's work, including flow-rate estimates up to 82,000 BOPD.

c. The BP Response omitted Engineer 1's email expressing concern about BP's public defense of the 5,000 BOPD estimate.

d.  The BP Response falsely labeled Rainey's estimates as having been calculated using the "ASTM" method, when, in fact, the estimates did not conform to that method.

e.  The BP Response omitted that Rainey's purported "ASTM" estimates were premised on data and other inputs Rainey knew were inaccurate.

f.  The BP Response omitted that Rainey had manipulated his purported "ASTM" estimates to arrive near 5,000 BOPD.

g.  The BP Response omitted Engineer 2's conclusion that a proper assessment of the video footage relied upon by the university professor resulted in an estimate of 15,000 BOPD—three times higher than the 5,000 BOPD estimate contained in the BP Response that Rainey asserted was the best estimate.

h.  The BP Response omitted the Subsurface Team Estimates ranging from 64,000 to 146,000 BOPD.

i.  The BP Response falsely stated that Rainey's purported "ASTM" estimates played an important part in Unified Command's decision to raise its early estimate from 1,000 to 5,000.

j.  The BP Response omitted data Rainey received on or about May 22, 2010, that the amount of oil actually being collected via the RITT confirmed that the flow rate was in excess of 5,000 BOPD.

k.  The BP Response omitted a May 23, 2010 email from the head of the FRTG to Rainey and others stating, among other things, that "everyone is at least comfortable with saying that the 5,000 barrels/day was too low."

231.   BP E&P (referred to in the Guilty Plea Agreement as "BP") plead guilty to making the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

i.   BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

ii.   BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using

97

the Bonn Agreement analysis, that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

iii.  BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.  At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

iv.  BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

v.  BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

vi.  On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."  At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

232.  A separate indictment was also unsealed on November 15, 2012, charging Rainey with obstructing a Congressional investigation and making false and misleading statements to law enforcement officials.  Simply put, he is charged with lying about the very facts at issue in this case to authorities attempting to manage the worst ecological disaster in U.S. history as it was unfolding.

233.    When the DOJ criminal pleas, SEC securities fraud settlement, and resulting fines and penalties were announced on November 15, 2012, Defendant Dudley issued a statement stating, in part, "We apologize for our role in the accident, and as today's resolution with the U.S. government further reflects, *we have accepted responsibility for our actions*."  Plaintiffs, via this lawsuit, seek to hold BP to its word, by accepting responsibility for its lies and deceptions and those of its executives which caused Plaintiffs to suffer the losses alleged herein.

### 5.    The U.S. EPA Barred BP From New Contracts With The U.S. Government

234.    On November 28, 2012, in the wake of BP's guilty pleas, BP was barred from doing new business with the U.S. government.  The effects on BP were profound.  In a statement on its website, EPA stated, "EPA is taking this action due to BP's lack of business integrity as demonstrated by the company's conduct with regard to the Deepwater Horizon blowout, explosion, oil spill and response."  The U.S. Interior Department confirmed that the ruling temporarily barred BP from winning any new federal oil leases, including the roughly 20 million new acres of federal waters in the Gulf of Mexico that the Interior Department had opened for auction the same day.  BP was barred from bidding on any of those parcels.  The ban was expected to impact BP's extensive business with the U.S. military as well, including an estimated $1.35 billion in Defense Department fuel contracts.

235.    Following this announcement, analysts stated that a lengthy government contract ban could seriously impact BP's bottom line, particularly given BP's previously stated intent to ramp up U.S. production.

### E.    Additional Allegations Regarding Defendants' Scienter / Intent To Deceive

236.    In addition to the foregoing, certain of the Individual Defendants' actual knowledge of the falsity of the alleged misstatements is established by their signing of

certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, as described herein, which certified that the SEC filings to which they were appended "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained [therein] fairly presents, in all material respects, the financial condition and results of operations of the company."  In order to so certify, the certifying Defendants were obligated to familiarize themselves with the contents of the SEC filings and the underlying operations of BP described therein.

237.    The Individual Defendants who made, signed, or otherwise were quoted in the other statements to investors described herein, who thereby presented themselves as knowledgeable about the subject matter thereof, were under a similar obligation to familiarize themselves with the subject matter of those statements to ensure that they conveyed truthful, non-misleading information.

238.    Moreover, the subject matter of the misrepresentations and omissions alleged herein were firmly within the core operations of BP, such that knowledge is in any event imputable to the Individual Defendants due, among other reasons, to their high-ranking positions within BP, their high level of involvement in the day-to-day operations of BP, and their oversight and control of BP, BP America and BP E&P.

239.    Defendants had a duty to disclose the whole truth to Plaintiffs and investors:

(a)    By choosing to speak on the topics and subjects outlined herein, in the allegedly false and misleading statements described herein, Defendants had a duty to familiarize themselves with the subject matter thereof and a correlating duty to speak accurately and completely about it;

(b)      By choosing to disclose information about these topics and subjects, Defendants were under a duty to disclose the whole truth;

(c)      In any instance where Defendants made partial disclosures that conveyed false impressions, they had a duty to disclose the whole truth;

(d)      To the extent that new information later arose that made any of Defendants' earlier alleged misstatements misleading or untrue, Defendants were obligated to disclose the whole truth and to correct their prior misstatements.

240.      Defendants breached the foregoing duties.  As outlined herein, they voluntarily disclosed and discussed information concerning BP that, even when viewed in the best light imaginable to them, disclosed only partial, deceptive information and misleading half-truths (and in a more realistic light, was utterly false).

241.      The Individual Defendants' scienter and intent to deceive is further evidenced by their highly unusual mass resignations, departures, and employment changes during or shortly after the Relevant Period, including, *inter alia*:

(a)      Hayward was removed as BP's CEO in October 2010 and as a BP executive director in November 2010;

(b)      Suttles left his position as COO of BP Exploration and as a member of BP's Board of Directors in or about January 2011;

(c)      Inglis left his position as CEO of BP E&P and as an executive director of BP in October 2010;

(d)      Rainey left BP in May or June 2011;

(e)      Malone's tenure as Chairman and President of BP America ended in February 2009 and his role as Executive Vice President of BP ended in March 2009;

(f)      Manzoni, BP's Chief Executive, Refining and Marketing, who served as an executive member of BP's Board of Directors and as a member of the BP Group Chief Executive's Committee, entering the Relevant Period, left BP in August 2007;

(g)      Prosser retired as Deputy Chairman and senior independent Director on BP's Board in April 2010; and

(h)      Browne left BP in April 2007.

242.      To the extent that, as regards any particular alleged misstatement or omission set forth herein, knowledge or recklessness cannot be tied to any of the Individual Defendants, then such misstatement or omission was nevertheless attributable to Defendants BP, BP America, and BP E&P, and actionable as deceit under English common law, on a theory of corporate scienter.

## VIII.   THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH

### A.   BP's Systematic Failures Caused the Explosion on and the Sinking of the *Deepwater Horizon Rig*

#### 1.   BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan

243.      The tragedy of the Macondo well explosion was avertable, but BP's overarching culture of indefensible risk-taking prevailed. At every turn, BP's conduct evidenced a systematic departure from recognized industry safety practices. Thus, the Presidential Commission found that "*the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]*"

244.      In March 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico that encompasses the Macondo well. Although the Mississippi Canyon area has many productive oil fields, BP knew little about the specific geology of Block 252 and, in

fact, the Macondo was BP's first well on the new lease. BP planned to drill the well to 20,200 feet in order to learn the geology of the area and to determine whether the oil and gas reservoir would warrant installing production equipment. The Macondo well was located 47.6 miles off the coast of Louisiana. It was believed that the well could hold as much as fifty (50) million barrels (or 2.1 billion gallons) of producible oil.

245.    Throughout the Relevant Period, MMS required BP to prepare and file oil spill response plans demonstrating BP's specific strategy and ability to respond to an oil spill if one occurred while drilling in the Gulf of Mexico. MMS regulations required that an oil spill response plan include, *inter alia:* (i) an emergency response action plan; (ii) disclosure of the equipment available to combat an oil spill; (iii) any oil spill response contractual agreements with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding oil spill response training and drills. *See* 30 C.F.R. § 254.21.

246.    The first of these requirements, the "emergency response action plan," is the "core" of the overall operational response plan and required BP to disclose, among other things: (i) information regarding BP's oil spill response team; (ii) the types and characteristics of oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed in the event of an oil spill. *See* 30 C.F.R. § 254.23.

247.    BP publicly filed its oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" – with the MMS on December 1, 2000 and last revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM"). A regional oil spill response plan is designed to cover multiple facilities or leases of a lessee that have: (i) similar modeled spill trajectories and worst case discharge scenarios, (ii) the potential to affect the same

ecological or socioeconomic resources, and (iii) are located in close enough proximity to be served by the same response equipment and personnel. BP's Regional OSRP for the GOM covers a massive area, including all of the United States' interests in the Gulf of Mexico. This area encompasses the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida. BP has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico. BP's Regional OSRP for the GOM applied to all of these wells.

248.    According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day.*** More specifically, BP's Regional OSRP for the GOM stated: (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day. BP's Regional OSRP for the GOM explicitly states that BP and its subcontractors ***could recover approximately 491,721 barrels of oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico. Moreover, BP claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*"

249.    On March 10, 2009, the MMS deemed BP's initial exploration plan for Mississippi Canyon Block 252 ("BP's EP") "submitted." BP's EP included the area encompassing the Macondo well.[1] In connection with the EP, BP sought a permit from the MMS

---

[1] BP's Regional OSRP for the GOM and EP are collectively referred to herein as "BP's Oil Spill Response Plan."

to drill to a total depth of 19,650 feet at the Macondo Well. Following the sinking of the *Deepwater Horizon,* a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit.

250.    According to BP's EP, the worst case scenario of an oil spill occurring in Mississippi Canyon Block 252 would be the release of approximately *162,000 barrels of oil per day.*

251.    In BP's EP, BP claimed it would have no difficulty responding to a worst case scenario while drilling the Macondo well:

> **Since BP ... has the capability to respond to the appropriate worst-case scenario included in its regional OSRP ..., and since the worst-case scenario determined for our [EP] does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP ... has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our [EP].**
>
> *                 *                 *
>
> **[D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.**

252.    Because the worst case scenario discharge figures in BP's EP – which BP calculated – fell below the threshold established in BP's Regional OSRP for the GOM, BP was not required to submit a site-specific drilling plan for the Macondo well itself.

253.    In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the Macondo well. However, operations were halted at approximately 4,000 feet below the sea floor due to damage caused to the rig by Hurricane Ida.

254.    The replacement rig, the *Deepwater Horizon,* arrived at the Macondo well on January 31, 2010. Although the rig was in place on that date, several steps needed to occur prior to beginning any drilling operation, including connecting the rig's BOP to the wellhead. BP

completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly thereafter.

255.    Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling pipe through the riser and BOP in order to reach the wellbore in the ocean floor. As drilling progressed, so-called "drilling mud" was pumped down through the drilling pipe and emerged through holes in the drill bit.

256.    Drilling mud is not mud in the traditional sense; it is a blend of synthetic fluids, polymers and weighting agents costing approximately $100.00 per barrel. Drilling mud accounts for as much as 10% of the total cost in drilling a deepwater well. Drilling mud is a critical part of the drilling process. For example, as it is circulated down the drilling pipe and back up the wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to as "cuttings"), cools the drill bit and maintains stable pressure within the well, which is critical to the mechanical stability and integrity of the wellbore.

257.    When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet (or about 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean floor – controlling pressure is a paramount concern. The inward or "pore" pressure (*i.e.,* the pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be balanced with the outward or "fracture" pressure (*i.e.,* the pressure exerted by the drilling fluids in the wellbore on the surrounding rock formation). Following proper safety procedures is critical because uncontrolled well pressure can cause an explosion.

258.    On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well was too high and fractured the surrounding formation; drilling mud began flowing into the cracks in the formation. In an attempt to plug the fractures and stop the outflow of drilling fluid,

BP circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the wellbore. The lost circulation pill succeeded in staunching the outflow of drilling mud, but the episode underscored the sensitivity of the Macondo well. As noted by the Presidential Commission: "*BP's on-shore engineering team realized the situation had become delicate.* They had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per gallon (ppg) in order to balance the pressure exerted by the hydrocarbons in the pay zone." Thus, BP's engineers were on notice that they must be even more vigilant in monitoring and controlling the competing pressures within the wellbore.

### 2.       Casing and Cementing the Well

259.    Once the initial drilling of the well was complete, BP then needed to insert casing to seal off the walls of the wellbore to provide structural integrity. BP considered two casing methods: a long-string casing and a liner/tie-back casing. The long-string casing involves hanging a single continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well over thirteen thousand feet below. The liner/tie-back method entails hanging shorter segments of casing to one another in order to form a stronger and less flexible piece of metal. A critical distinction between the two methods is that the long-string casing method provides two barriers to flow up the annular space (once cementing is complete) whereas the liner/tie-back casing provides four barriers to annular flow. This means that the liner/tie-back method provides twice the safety precautions as compared with the long-string casing method. In addition, BP knew that obtaining a reliable primary cement job with the long-string casing would be much more difficult.

260.    In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas modeled the likely success of the cementing process using the two casing methods and determined that **the long- string method would fail in effectively cementing the Macondo well.**

261.    In light of this determination, the engineering team elected to proceed with the liner/tie-back method, but, according to the Presidential Commission, others at BP opposed the decision. In the end, despite the conclusion that the long-string method could not be cemented reliably, BP's view prevailed and the crew proceeded with the long-string casing method.

262.    The next step in the drilling process was to thread the long-string casing through the center of the wellbore down to the bottom of the well. Centering the casing is of vital importance to obtaining a secure cement job. As the cement mixture flows out of the casing, it ascends through the annular space surrounding the casing. If the space around the casing is uneven (*i.e.,* there is more space on one side than on the other), the cement begins to fill in the annular space in an uneven manner, leaving channels of drilling mud in the cement. These channels are pathways through which highly pressurized hydrocarbons can flow.

263.    To ensure that the long-string casing will be centered, guides called "centralizers" are placed around the casing at regular intervals. For the Macondo well, BP decided that it would use only six centralizers because that was the amount currently available on the rig. It does not appear that BP's reasoning was based on any scientific or engineering calculations. However, before BP could actually place the centralizers in the well, it needed Halliburton – who BP contracted for this cementing job – to verify that six centralizers would be sufficient.

264.    On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers. Gagliano's calculations demonstrated a high likelihood of channeling resulting in a cement failure if BP used only six centralizers. Computer simulations showed that twenty-one centralizers were necessary – i.e., almost four times as many as BP intended to use.

265.     After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz ("Walz") agreed with Gagliano's conclusions. On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the ... modeling to be consistent with our previous decisions to go with the long string." Walz proceeded to make arrangements to obtain the additional centralizers.

266.     However, BP Well Team Leader John Guide ("Guide"), who was also based in BP's Houston office, opposed using the additional centralizers because the installation would delay the team by approximately ten hours and would therefore cost BP money. Although BP ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined that the centralizers were the wrong type. Despite the serious threat of channeling identified in the modeling data, however, Guide's view prevailed and only six centralizers were used to center the more than thirteen thousand foot long-string casing in the wellbore.

267.     BP's culture of unreasonable, indefensible risk taking is echoed in an email by Brett Cocales (a drilling operations engineer in BP's Houston office), dated April 16, 2010, in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it. ***But, who cares, it's done, end of story, will probably be fine*** and we'll get a good cement job.

268.     On April 17, 2010, after learning that BP would proceed with only six centralizers, Gagliano re-ran the computer simulations and modeling using seven centralizers and the conclusion was the same: the well would have "***a SEVERE gas flow problem.***" BP, however, continued to ignore its own expert's opinion.

269.     On April 18, 2010, BP began lowering the long-string casing into the wellbore. To enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the

long-string casing is lowered, two trap doors within the long-string casing, referred to as the "float collar," are propped open with a tube called an "auto fill tube."

270.   On April 19, 2010, after the long-string casing reached the bottom of the wellbore, BP needed to dislodge the auto fill tube, converting the float collar from a two-way valve to a one-way valve. Successfully converting the float collar insures that the pumped cement will only flow downward through the casing, a critical step in the cementing process.

271.   Two events should have indicated to BP that the conversion of the float collar was not proceeding properly. First, the tube should be dislodged once the flow through the tube reaches six barrels of mud per minute (6 bpm), equivalent to six hundred pounds of pressure per square inch (600 psi). Yet, as the crew pumped drilling mud down the casing, pressure began to climb beyond the 600 psi threshold which should have converted the float collar, but still the crew was unable to establish flow. The pressure continued to rise, peaking at 3,142 psi (more than five times more pressure than should have been needed to convert the float collar) before suddenly dropping precipitously. It appears that BP assumed that this meant the float collars had converted. This is a scientifically indefensible position, however, because, as noted by the Presidential Commission: "[t]he auto fill tube was designed to convert in response to *flow-induced* pressure. Without the required rate of flow, an increase in *static* pressure, no matter how great, will not dislodge the tube."

272.   Second, after the tube is dislodged and the float collar is converted to a one way passage, the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and up the annular space to the rig again should have been 570 psi. Yet, as BP began the process of converting the float collars, the results differed considerably. After the spike and sudden drop in pressure, the circulation pressure was only 340 psi.

273.    BP personnel on the rig erroneously ignored the mounting evidence that something was amiss, and proceeded to the next step in the well abandonment plan — mud circulation.

274.    Correct mud circulation requires a complete circulation of drilling mud in the wellbore, referred to as "bottoms up" circulation. The process, which requires about 12 hours, allows workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate any debris or other foreign matter that could contaminate the cement. Given the heightened challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was critical. In addition, "bottoms up" circulation would allow the BP crew to test the mud at the bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement job at the bottom of the well.

275.    In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of drilling mud. Instead, as noted by the Presidential Commission, BP circulated only 350 barrels of mud – eight times less than the amount required to properly complete the "bottoms up" circulation of the well.

276.    In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little experience in the Gulf of Mexico. In February 2010, Gagliano conducted tests regarding the stability of the nitrogen foam cement. The tests showed that the mixture was unstable and therefore represented an additional risk of well failure. According to the Presidential Commission Report, these test results were communicated to BP personnel in Houston on March 8, 2010, however, the warnings were ignored and BP pumped nitrogen foam cement into the Macondo well.

277.    BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone. For the Macondo well, BP injected just enough cement to extend the annular cement barrier half the distance, or only 500 feet above the uppermost hydrocarbon zone. According to the Presidential Commission Report, this deviation reduced the safety margin for this procedure by 50% and meant that a total of sixty barrels of cement would be used to cement the well, which BP's own engineers recognized left absolutely no margin for error. Also according to the Presidential Commission Report, BP was also keenly aware that it was pumping the cement at an unsafe rate (four barrels per minute rather than six barrels per minute), further impeding the efficiency with which cement would be displaced from the annular space, and reducing its safety margin even further.

278.    At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job. A team of outside technicians was on hand to conduct the battery of tests needed including, but not limited to, the "cement log," which was designed to evaluate and test the sufficiency of the cement job. The cement log is an acoustical test used to identify areas (if any) where the cement failed to channel up through the annular space in a uniform fashion. If cement channeling is uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where they can ascend (and expand) rapidly.

279.    The acoustical test was especially critical given BP's prior erroneous decisions regarding the construction of the Macondo well, which included, *inter alia:* (i) using the difficult-to-cement long-string casing method; (ii) foregoing the "bottoms up" mud circulation; (iii) failing to use twenty one centralizers as BP's expert recommended; (iv) ignoring scientifically accepted data pertaining to the float collar conversion; (v) electing to use nitrogen foam cement deemed unstable in prior testing; (vi) pumping the cement at reckless rates; and

(vii) halving the safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing "pay zone." BP decided to forego the acoustical test and sent the team of technicians home by helicopter at 11:15 a.m. that morning. Forgoing the acoustical test saved BP approximately ten hours and $100,000. This decision was contrary to industry practice and the recommended safe practices of the American Petroleum Institute.

### 3.    BP Begins the Temporary Abandonment Process

280.    The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig. Once drilling operations are complete, the well is placed in "temporary abandonment" until the arrival of the production rig, which will connect to the well and begin pumping oil and gas from the site. Placing the well into temporary abandonment means that that the drilling rig will be removing its own BOP and riser from the wellhead. There are several key features in the temporary abandonment process to insure that the well is secure before the BOP and riser are removed. For one, a cement plug, which acts like a cap, is placed in the well. Typically this cap is placed at or near the mudline. The area in the well *beneath* the cap is filled in with heavy drilling mud, which applies additional downward pressure on the hydrocarbon bearing zone. If the cement plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud in the well underneath the cement plug. Finally, the crew will install a "lockdown sleeve" at the wellhead. Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure — *i.e.,* that no hydrocarbons are leaking into the well. According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day abandonment procedure began. Indeed, the temporary abandonment plan had undergone numerous changes leading up to April 20, 2010, but, according to the Presidential Commission:

"It does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

281.    Prior to abandonment, the well must be tested to insure that there are no leaks. In part, this involves conducting a "negative-pressure test" to assess whether hydrocarbons are flowing into the well. To conduct this test, BP needed to simulate the pressure conditions that would exist in the well once it was placed into temporary abandonment. As part of the negative pressure test, the crew removed 3,300 feet of mud from the wellbore.

282.    To remove the drilling mud from the wellbore (and later the riser), BP pumped "spacer" through the drilling pipe followed by seawater. Spacer is a synthetic blend that acts as a barrier between the drilling mud and seawater. Although the use of spacer is a common and accepted practice, BP's spacer concoction was mixed on board the rig from leftover chemicals that would enable BP to save money and skirt environmental regulations. As explained by the Presidential Commission:

> While drilling crews routinely use water-based spacer fluids to separate oil-based drilling mud from seawater, *the spacer BP chose to use during the negative pressure test was unusual.* BP had directed . . . mud engineers on the rig to *create a spacer out of two different lost-circulation materials left over on the rig - the heavy, viscous drilling fluids used to patch fractures in the formation* . . . .
>
> *BP wanted to use these materials as spacer in order to avoid having to dispose of them onshore as hazardous waste pursuant to the Resource and Conservation Recovery Act*, exploiting an exception that allows companies to dump water-based "drilling fluids" overboard if they have been circulated down through a well. *At BP's direction, the [mud engineers] combined the materials to create an unusually large volume of spacer that had never previously been used by anyone on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

283.    Testimony before the Presidential Commission indicates that this concocted, untested spacer may have clogged the BOP's kill line, interfering with the results of later testing designed to assess the integrity of the well.

284. After removing drilling mud from the wellbore, BP began a negative-pressure test to determine whether the well was sealed such that gas or liquid could not permeate into the well. This negative pressure test is the ***only*** test that assesses the integrity of the cement job at the bottom of the well. BP had no established procedure or protocol for conducting a negative pressure test.

285. To conduct the negative-pressure test, the crew "bled off" pressure from the drilling pipe until it was 0 psi. The pipe was then sealed and monitored. For a successful negative pressure test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time. The BP crew went through this process ***three*** times – bleeding down the pressure and then sealing the pipe – and all ***three*** times the pressure within the drill pipe jumped, reaching 1400 psi on the third attempt. Thus, the pressure test failed three times, in identical fashion.

286. The negative-pressure test performed exactly as intended. It gave the clear, unequivocal warning that the integrity of the well was compromised. As noted by the Presidential Commission: "[B]ased on available information, *the 1400 psi reading on the drill pipe could only have been caused by a leak* into the well." In May 2010, BP admitted in Congressional testimony that these pressure test results clearly signaled a "very large abnormality" in the well. Yet, notwithstanding the unequivocal results of the negative pressure test and without communicating the results to safety experts in Houston, BP ignored the warnings and instead applied the same test to the "kill line," one of the pipes used to circulate fluids into and out of the well.

287. After conducting the negative-pressure test a *fourth* time (this time on the kill line), BP achieved what it considered to be a successful test result, and continued with the temporary abandonment process. During this last test, the crew was able to maintain 0 psi on the

kill line, but the pressure on the drill pipe continued at 1400 psi. The Presidential Commission Report found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that was not fully tested, and that may have clogged the kill line," leading to the so-called successful test result.

288.    As part of the negative-pressure testing of the well, the crew had already removed 3,300 feet of drilling mud below the sea floor from the well and replaced it with seawater. This decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet. The cement plug is a three hundred foot cap, which is placed in the well as an additional safety measure to secure the well while it is in temporary abandonment. Placing the cement plug 3,300 feet below the ocean floor is not in accordance with accepted industry practice for performing this function. Indeed, placing the cement plug three *thousand* feet below the mud line was inconsistent with MMS regulations and required special dispensation.

289.    The associated risks were amplified by BP's decision: (i) to leave 3,300 feet of the well below the ocean floor filled with only seawater, rather than heavy drilling mud and (ii) to postpone placement of the cement plug in the well. As a result, once BP opened the annular preventers on the BOP to facilitate the removal of mud from the riser, the only remaining barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling mud remaining in the bottom section of the well and, beneath that, the cement job at the very bottom of the well.

290.    At this stage, there was nothing to prevent leaked hydrocarbons (if present in the wellbore) from traveling up the riser to the rig. An influx of hydrocarbons is called a "kick" and is exceedingly dangerous due to the highly pressurized conditions. One gallon of gas at the bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the

ocean's surface. As the gas expands, it accelerates the kick. It is therefore imperative that the well be monitored closely for any evidence of a mounting kick.

291. At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser. As operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor the rate of return. The returned mud should have been placed in a subset of the rig's mud pits, referred to as the "active mud pits," to facilitate monitoring. Instead, the returned mud was being dispersed over a number of pits and mud from other operations was being routed to the active mud pits. As a result, there was no way to know whether more mud was returning to the rig than was being pumped into the well, a fact that would have been evidence that a kick was in progress.

292. At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the impending crisis. Pressure in the well should have remained constant or decreased because the pumping pressure remained constant. However, the pressure in the drilling pipe slowly began to *increase,* signaling an influx of hydrocarbons into the well.

293. The crew did not respond to the pressure reading until approximately 9:30 p.m., when driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe. Despite the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure reading or to seal the well. In addition, no employee in BP's Houston office was monitoring the pressure in the Macondo well. As Fred Bartlit ("Bartlit"), a Presidential Commission investigator, made clear during a Commission presentation on November 9, 2010, drill pressure data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the *Deepwater Horizon* blowout: "There was nobody in that B.P. Macondo well office that night," Bartlit said. "Everybody had gone home."

294.     Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

### 4.     Explosion on the Deepwater Horizon

295.     The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons from flooding the rig itself. However, the annular preventer failed to stop the flow of oil, most likely because the device had been ruptured four weeks earlier when the drilling pipe was moved through the annular preventer while the preventer was in the closed position, sending a plume of drilling fluid filled with chunks of rubber to the surface.

296.     Well data indicates that at 9:38 p.m., the first hydrocarbons passed through the BOP.

297.     At 9:46 p.m. the crew attempted to activate the variable bore ram, which (like the annular preventer) should have sealed off the area around the drilling pipe. This effort also failed to stop the flow of hydrocarbons.

298.     At 9:49 p.m., the hydrocarbon-filled drilling mud that was continuing to spew onto the deck of the rig ignited, causing the first explosion aboard the *Deepwater Horizon.* One eyewitness referred to "a cascade of liquid" pouring out twenty stories above the main deck of the rig. Another described hearing an explosion that sounded like a "blown tire, times 100." Barrels filled with explosive materials were catching fire and launching into the sky like missiles.

299.     After the explosion, workers on the bridge did not immediately act to deploy the Emergency Disconnect System ("EDS"). Andrea Fleytas ("Fleytas"), a Dynamic Positioning Operator for the *Deepwater Horizon* who was in the bridge at the time of the explosion, told *The New York Times* that it did not occur to her to use the EDS and, in fact, she had never been

taught how to use it. With respect to the EDS system, Fleytas stated, "I don't know of any procedures."

300.    Sometime after the explosion, BP's Subsea Supervisor Christopher Pleasant made his way to the bridge and attempted to activate the EDS, which should have activated the BOP's blind shear ram. The blind sheer ram – the last line of defense – is designed to seal a wellbore by cutting through the drilling pipe and pinching it closed, as the rams close off the well. However, the blind shear ram failed to respond.

301.    Despite the failure of the EDS, the BOP's "deadman switch" (an automatic response mechanism) should have triggered the blind sheer ram. The deadman switch also failed to activate the blind shear ram. Later inspections revealed that the device had a myriad of problems due to lack of inspection and poor maintenance, including low battery charges in the critical components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind shear ram.

302.    At this point, the only option left to the crew to activate the BOP would have been an acoustical control signal that would trigger deployment of the blind sheer ram via an encoded pulse of sound transmitted by an underwater transducer. However, BP decided not to install the acoustic switch. While an acoustic switch is not required in the United States, it is mandated in many places throughout the world. In those foreign locations, BP uses rigs that do include such a safety device.

303.    Witnesses on a supply ship stood horrified as they watched the fire growing on the rig and crew members leaping from the main deck and jumping 100 feet into the sea. With no way to bring the explosion under control, crew members abandoned ship, struggling to fight their way to safety. The *Deepwater Horizon* burned for thirty-six hours before finally tipping and

sinking. The impact to human lives was stark – 11 crew members were killed and 17 more were injured.

### 5. BP Continues to Attempt to Activate the BOP Following the Abandonment of the Deepwater Horizon

304. Beginning at 1:15 a.m. on April 21, 2010, BP and other personnel began attempts to activate the BOP with remotely operated vehicles ("ROVs"). Over the ensuing days, BP attempted to activate the blind shear ram on several occasions. All efforts failed.

305. First, the ROVs applied hydraulic pressure to a panel controlling the blind shear ram, a method of activating the ram, referred to as "hot stab." It would take BP ten days to learn that the method would necessarily fail because the targeted panel was actually attached to a useless test ram.

306. The ROVs also cut electrical wires in an attempt to simulate the deadman switch and attempted to activate the ram by triggering the autoshear (an automated disconnect that is triggered if the rig drifts too far from the well, threatening to break the riser). Still the ram did not deploy.

307. At 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* sank, wrenching and further damaging the riser.

308. On May 5, 2010, after learning that the attempts to activate the blind shear ram through the "hot stab" method were actually targeting a useless test ram, BP ceased its attempts to activate the BOP.

### B. BP Was Wholly Unprepared to Contain the Oil Spill

### 1. BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico

309. In the wake of the *Deepwater Horizon* catastrophe, it has become evident that BP's OSRP was materially false and misleading when filed. Indeed, the Presidential Commission

has described BP's OSRP as outright "***embarrassing.***" Indeed, Defendant Suttles admitted on May 10, 2010 that BP failed to have an oil spill response plan with "***proven equipment and technology***" in place that could contain the oil spill. Similarly, in a November 9, 2010 interview with the BBC, Hayward ultimately confirmed that BP had failed to draw up sufficient emergency response plans, admitting that "***we were making it up day to day.***"

310.   For example, since BP claimed that it was prepared to recover approximately 500,000 barrels of spilled oil per day, and the worst case scenario for the Macondo well was the release of only 162,000 barrels of oil per day, BP should have had no problems containing the oil spill. However, as noted by the Presidential Commission: "*Despite [BP's claims that it 'could recover nearly 500,000 barrels of oil per day'], the oil-spill removal organizations were quickly outmatched.*"

311.   Furthermore, while BP's Regional OSRP for the Gulf of Mexico claimed that an oil spill occurring under the three different scenarios – i.e., less than ten miles from the shoreline, more than ten miles from the shoreline, and from a mobile drilling rig that is drilling an exploratory well – could cause differences in the amount of oil spilled, BP consistently stated that the "shoreline impact" under each scenario would be identical. This led the Presidential Commission to find that BP's Regional OSRP for the Gulf of Mexico "*evidenced [a] serious [lack] of attention to detail.*"

312.   The Presidential Commission also noted several other errors in BP's OSRP. For instance, the Presidential Commission found that BP's Regional OSRP for the Gulf of Mexico was false when issued because "half of the 'Resource Identification' appendix (five pages) ... was copied from material on [The National Oceanic and Atmospheric Administration ("NOAA")] websites, without any discernible effort to determine the applicability of that

information to the Gulf of Mexico. *As a result, the BP Oil Response Plan described biological resources nonexistent in the Gulf— including sea lions, sea otters, and walruses."*

313.    Likewise, BP's Regional OSRP for the Gulf of Mexico named Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as a wildlife expert. Lutz was a pioneer in whole-organism integrative physiology, but the Presidential Commission found that he "*had died several years before BP submitted its plan."* Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years prior to chair the marine biology department at a different university.

314.    Similarly, BP's Regional OSRP for the Gulf of Mexico included incorrect contact information for the Marine Spill Response Corporation ("MSRC"). According to the Presidential Commission, the MSRC was "BP's main oil-spill removal organization in the Gulf," but, inexplicably, "*a link in [BP's Regional OSRPJ that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site."* Likewise, the names and phone numbers of several Texas A&M University marine specialists were wrong and the listing of certain mammal stranding network offices in Louisiana and Florida were outdated and, in certain cases, had been closed.

315.    On June 8, 2010, journalist Tim Dickinson from *Rolling Stone* magazine published an article decrying BP's OSRP. The article's powerful message was clear: "*The effect of leaving BP in charge of capping the well,* says a scientist involved in the government side of the [clean up] effort, *has been 'like a drunk driver getting into a car wreck and then helping the police with the accident investigation"* or, in other words, allowing a fox to guard the hen house and hoping that it does not get hungry. The article also stated, in part, that:

> 'This response plan is not worth the paper it is written on,' said Rick Steiner, a retired professor of marine science at the University of Alaska, who helped lead

the scientific response to the Valdez disaster. 'Incredibly, this voluminous document never once discusses how to stop a deepwater blowout.'

316.     Likewise, these gross deficiencies, errors and misrepresentations, among others, caused the Associated Press to publish an article on June 10, 2010 entitled "BP Spill Response Plans Severely Flawed" which detailed the "*glaring errors and omissions in BP's oil spill response plans.*" The article states, in relevant part, as follows:

> *BP PL C's 582-page regional spill plan for the Gulf, and its 52-page, [EP] J vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one,* according to an Associated Press analysis.

> * * *

> In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.

> * * *

> *The plans contain wildly false assumptions about oil spills. BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.*

> * * *

> In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video. It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

> * * *

> There are other examples of how BP's plans have fallen short:

> *Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore a claim that in retrospect seems absurd.*

> "The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

*BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles,* according to Hans Graber, director of the University of Miami's satellite sensing facility. *Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.*

*The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion. Heavy globs soon followed. Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.*

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida. More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

*The response plans anticipate nothing on this scale. There weren't supposed to be any coastline problems because the site was far offshore.*

"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

* * *

*Perhaps the starkest example of BP's planning failures. The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.*

*Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.*

*While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.*

124

## 2. The Failed Use of Unprecedented Amounts of Dispersants

317. As set forth below, BP's extensive and potentially problematic use of dispersants further demonstrated its lack of preparedness to respond to the spill.

318. On April 22, 2010, BP began spraying massive amounts of dispersants — namely "Corexit" — on the oil that had reached the surface of the Gulf of Mexico. Dispersants such as Corexit are not intended to remove oil from the water; rather, energy from wind and waves naturally disperses oil and dispersants may accelerate the process by allowing the oil to mix with water more easily, dispersing the oil vertically and horizontally in the water column.

319. However, dispersants pose several serious health and environmental threats. For example, dispersants — including Corexit — decrease the amount of oil on the surface of the water, but *increase* the amount of oil in the water column. Corexit therefore enables the oil to spread over a wider area, significantly increasing the exposure of marine life to toxic chemicals and oil. In addition, chemically dispersed oil can be toxic not just in the short term, but also over the long term. Accordingly, the decision to engage in wide-spread use of dispersants must be carefully considered, particularly given the fact that studies have found that dispersants may not increase biodegradation rates and *might even inhibit biodegradation.*

320. Furthermore, Corexit is a chemical dispersant that contains 2-butoxy ethanol. According to the New Jersey Department of Health, 2-butoxy ethanol "may be a carcinogen in humans. There may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level." BP's OSRP for the Gulf of Mexico makes no mention of this serious side effect.

321. Between April 22, 2010 through April 26, 2010, BP and its subcontractors applied 14,654 gallons of Corexit to the surface of the Gulf of Mexico. Then, from April 27, 2010 to May 3, 2010, BP and its subcontractors applied another 141,358 gallons of Corexit to the surface

of the Gulf of Mexico. The following week, they applied an additional 168,988 gallons of Corexit to the surface of the Gulf of Mexico. The Presidential Commission found that BP's extreme use of Corexit was "*novel*" and had never been used in these "*unprecedented volumes.*" The Presidential Commission stated that while oil spill "responders had often deployed dispersants to respond to spills" it had "***never***" been done "in such volumes; during the Exxon Valdez spill, responders sprayed about *5,500 gallons [of dispersants], and that use was controversial.*"

322.    As the volume of dispersants sprayed on the surface grew dramatically, BP then raised the idea of applying dispersants directly at the well. Once again, however, the Presidential Commission found that oil spill responders "*had never before applied dispersants in the deep sea*" and "*responders were concerned about the absence of information of the effects of dispersants in the deepwater environment. No federal agency had studied subsea dispersant use and private studies had been extremely limited.*"

323.    Because no federal agency had ever allowed the subsea release of dispersants in a deepwater environment, on May 10, 2010, the U.S. Coast Guard and EPA prohibited its use "until initial testing demonstrates the effectiveness of subsurface dispersant application." Then, during a May 24, 2010 press conference, EPA Administrator Lisa Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that BP "can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more." Based on the unknown and highly risky side effects of dispersants, on May 26, 2010, the U.S. Coast Guard and EPA issued a joint letter and directive stating, in part, as follows:

> Reduction in Use of Dispersants. BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum

amount possible. *BP shall establish an overall goal of reducing dispersant application by 75%* from the maximum daily amount used as follows:

    a.   Surface Application. *BP shall eliminate the surface application of dispersants.* In rare cases when there may have to be an exemption, BP must make a request in writing to the [Federal On Scene Coordinator ("FOSC")] providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application. The FOSC must approve the request and volume of dispersant prior to initiating surface application.

    b.   Subsurface Application. *BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day.* Application of dispersant in amounts greater than specified in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the FOSC.

324.  "*Despite this directive,*" the Presidential Commission noted that "*surface use of dispersants continued.*"  While BP did seek exemptions from the directive, "*EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants.*"  On July 14, 2010, EPA ultimately prohibited the use of dispersants altogether.

### 3.    The Failed Use of A Cofferdam

325.  Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP began to theorize other ways that it might be able to contain and/or recover the spewing oil. BP's new idea – which was noticeably absent from BP's OSRP – was to place a large containment dome (or "cofferdam") over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise.* BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment. Thus, BP was forced to quickly attempt to modify one of its existing cofferdams

for these new and unintended purposes. The modification of the preexisting cofferdam was complete on or about May 4, 2010. BP began its attempt to place the 98-ton dome to the sea floor late in the evening on May 6, 2010.

326.    It was essentially guaranteed that the *ad hoc* modifications that were hurriedly made to the cofferdam would be unsuccessful. In his book on the *Deepwater Horizon* incident published in late 2010, *Disaster on the Horizon,* former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "*silliest contraption*" that BP built in the aftermath of the incident, and that the steps to construct and lower it down to the leaking BOP "never made much sense . . . they were more for show – to look like they were doing something while they were trying to come up with a real plan." Cavnar stated in an interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in the device and clog it, and describes in his book the results of its deployment as "almost instantaneous failure."

327.    Likewise, the Presidential Commission noted:

> BP's Suttles publicly cautioned that previous successful uses had been in much shallower water. BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice. *Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High." Others in the oil and gas industry were not so optimistic. many experts believed the cofferdam effort was very likely to fail because of the hydrates.*

328.    Not surprisingly, the effort did fail. Hydrates accumulated during the installation of the dome, yet BP only had a plan to deal with hydrates once the cofferdam was in place. Thus, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before they could even place the dome over the leak, immediately clogging the opening through

which oil was to be funneled. This error in planning almost led to another catastrophe. As noted by the Presidential Commission:

> Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it. BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface. Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor. *In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job.*"

329.    In the days after the failure of the cofferdam, BP temporarily utilized a device known as a "riser insertion tube" to collect some of the oil. However, BP abandoned the effort after only a few days because of the relatively minor amount of oil the device actually managed to collect.

### 4.    The "Top Kill" and "Junk Shot" Efforts Fail

330.    Following the failure of BP's cofferdam experiment, BP tried to stop the flowing oil by embarking on so-called "top kill" and "junk shot" efforts. Both methods are industry techniques that have been historically applied to stop the flow of oil from a blown-out well.

331.    BP, like the rest of the oil industry, was well aware of the Ixtoc I Oil Spill in 1979 in which a rig exploded, caught fire, sank, killed workers and released millions of gallons of oil into the Gulf of Mexico. In the Ixtoc spill, the same two techniques were attempted and it took approximately 290 days to bring that well under control. BP's Oil Spill Response Plan made no mention of having to rely on either of these methods let alone provide any qualification as to how effective each method might be in a similar circumstance. Further, the Presidential Commission noted that neither technique "*had never been used in deepwater.*" In the end, both efforts failed to control the proliferation of oil from the Macondo well.

332.   A top kill – also known as a momentum or dynamic kill – involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir. A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines. That material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas. By slowing or stopping the flow of oil, a successful junk shot makes it easier to execute a top kill.

333.   BP's top kill and junk shot plan began on the afternoon of May 26, 2010. In this regard, the Presidential Commission concluded, in relevant part, as follows:

> As with the cofferdam, BP struggled with public communications surrounding the top kill. ***At the time, both industry and government officials were highly uncertain about the operation's probability of success.*** *One MMS employee estimated that probability as less than 50 percent,* ***while a BP contractor said that he only gave the top kill a "tiny" chance to succeed But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent***."

334.   During three separate attempts over the next three days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP. After the third unsuccessful attempt, BP acknowledged that the plan was a failure. BP's explanation of the failed attempts focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet. That casing was fabricated with three sets of weak points, or "rupture disks." During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well. If the pressure buildup was too high, it could cause the collapse of one of the two casings. The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed. According to BP, pressures created by the initial blowout could have caused the rupture of disks to collapse inward, compromising the well's integrity.

335.     The Presidential Commission, however, disagreed with BP's explanation and found, in part, that the "[c]ollapse of the rupture disks *was only one of BP's possible explanations for the unsuccessful top kill. But the company presented it to the government as the most likely scenario.*" Indeed, the U.S. Government noted that it "*did not fully accept BP's analysis of what happened*" and, in contrast, believed that "*the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per day estimate.* Because BP did not pump mud into the well at a rate high enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser."

### 5.     The "Top Hat" Failed to Collect the "Vast Majority" of the Spewing Oil

336.     In the aftermath of the failed top kill and junk shot plan, BP began shifting its main focus to collecting the oil rather than killing the well itself. On May 29, 2010, BP announced that it would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device – or "top hat," which would then be connected via a new riser to the *Discoverer Enterprise* vessel. As before, BP's Oil Spill Response Plan failed to mention the top hat technique as a potential remedy in the event of an oil spill. BP began installing the top hat on June 1, 2010 and had it in place by 11:30 p.m. on June 3, 2010. By June 8, 2010 – forty-nine days after the explosion occurred – the *Discoverer Enterprise* was collecting about 15,000 barrels of oil per day – or approximately 25% of the oil being released.

337.     BP also developed a system to bring oil and gas to the surface through the choke line on the BOP. More specifically, BP outfitted a vessel called the *Q4000* with collection equipment, including an oil and gas burner imported from France. This vessel and resource was also never mentioned in BP's Oil Spill Response Plan.

338.    While BP was able to slowly start collecting some of the oil, BP was, in the words of the Presidential Commission, once again "overly optimistic about the percentage of the oil it could remove or collect." Indeed, the Presidential Commission found, in part, as follows:

> On June 1, Suttles said that he expected the top hat, when connected to the Discoverer Enterprise, to be able to collect the "vast majority" of the oil. Within days, it became apparent that the top hat and Discoverer Enterprise were inadequate. On June 6, Hayward told the BBC that, with the Q4000 in place, "we would very much hope to be containing the vast majority of the oil." But when the Q4000 came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

339.    In the wake of the failure to contain most of the oil using the top hat, the U.S. Coast Guard continued questioning BP's response to the spill. As noted, in part, by the Presidential Commission:

> BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.[2]

> One senior Coast Guard official challenged BP's definition of availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so. Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the Q4000.

### 6.    The Well Is Finally Capped

340.    Following the limited success of the top hat procedure, BP began presenting its final well-control plans to government experts. According to the Presidential Commission Report:

> The [U.S. government] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk. *The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities. **According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best."*** [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the

---

[2] Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and direction, despite external factors such as wind, waves, and current.

containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk. *BP, however, was not in the best position to tout that expertise: its well had just blown out.*

341.    By late June, BP was working towards deploying a "capping stack," yet another *post hoc* measure nowhere reflected in BP's OSRP for the Gulf of Mexico. The capping stack was essentially a smaller version of a BOP, designed to sit atop the BOP and stop the flow of oil and gas.

342.    On July 9, 2010, Coast Guard Admiral Thad Allen ("Admiral Allen") authorized BP to install the capping stack, but not to close it. Sealing the capping stack would increase the pressure in the well. There was a concern that if one or more of the rupture disks had in fact ruptured, the increased pressure could force hydrocarbons into the surrounding formation, leading to uncontrolled eruptions from the ocean floor at other locations.

343.    The installation of the capping stack was completed on July 12, 2010. The next day, experts conducted a "well integrity test" to determine if the well had been compromised and to see whether oil could flow into the rock formation. According to the Presidential Commission: "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the [U.S. government's] Well Integrity Team."

344.    On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and began the well integrity test. For the first time in 87 days – and after approximately five million barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped spewing oil. Unfortunately, however, by that time, the vast environmental damage had already occurred and, as noted by *The New York Times* on August 6, 2010, "BP's containment efforts had captured only approximately 16 percent of the spill."

345.    Meanwhile, on July 19, 2010, BP publicly raised the possibility of actually killing the well through a procedure called a "static kill." Like the top kill, the static kill involved

pumping heavy drilling mud into the well in an effort to push oil and gas back into the reservoir. However, because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than the top kill. The U.S. government approved the static kill procedure on August 2, 2010. By 11:00 p.m. on August 3, 2010, the static kill appeared to have worked. On August 8, 2010, Admiral Allen reported that the cement had been pressure-tested and was holding.

346.    In mid-September 2010, the first relief well — which BP had begun to drill in early May — finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir.  Thus, on September 19, 2010 — 152 days after the blowout — the U.S. government finally announced that "*the Macondo well is effectively dead.*"  In total, 206 million gallons of crude oil spilled into the Gulf of Mexico, thousands of square miles of fishing grounds were closed through 2010 and billions of dollars of tourist revenue in the area were lost.

## IX.  DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATE-MENTS AND OMITTED MATERIAL FACTS DURING THE RELEVANT PERIOD[3]

347.    Before the start of the Relevant Period, BP experienced a series of high-profile safety lapses that resulted in the loss of life, damage to the environment, harm to BP's reputation, and  significant  costs  to  BP  in  the  form  of  criminal  pleas  and  fines,  civil  settlements,  and

---

[3] Misrepresentations identified as having been sustained in whole or in part per "Alameda Order" or "Connecticut Order" refer to those that survived Defendants' motion to dismiss the amended pleadings in the Alameda Action or the Connecticut Action.  Statements identified as having been dismissed per the Alameda Order or the South Yorkshire Order refer to those wholly dismissed in the Alameda Action or the South Yorkshire Action.  Statements identified as having been sustained in whole or part per "NY/Ohio Order" refer to those that survived Defendants' motion to dismiss the Consolidated Amended Class Action Complaint (Doc. 324) in No. 4:10-md-02185 (S.D. Tex.).  Misrepresentations identified as having been sustained in whole or in part per "Ludlow Order" refer to those that were so ruled upon in the Court's Order dated February 13, 2012 (Doc. 323) in No. 4:10-md-02185. Misrepresentations identified as having been sustained in whole or in part per "SCAC Order" refer to those that were so ruled upon in the Court's Order dated February 6, 2013 (Doc. 536) in *In re BP Securities Litigation*, MDL 2185, No. 4:10-md-02185.  Misrepresentations identified as having been permitted by the Court via the "Leave Order" are those permitted by the Court to be filed on class plaintiffs' motion for leave to amend via the Court's Order dated May 20, 2014 (Doc. 857) in *In re BP Securities Litigation*, MDL 2185, No. 4:10-md-02815.

remediation expenses. In particular, the 2005 Texas City refinery explosion and the 2006 Alaska oil spills were extremely damaging to BP and left investors concerned about the ability of BP to operate safely and without catastrophic failures.

348.    Responding to these concerns, beginning on May 9, 2007, BP sought to assure its investors that BP was a company committed to ensuring safe operations through the implementation of the Baker Panel recommendations and, in particular, its process safety system, OMS. BP reaffirmed this commitment to safety for three years, and at nearly every opportunity during the Relevant Period. In fact, in May 2009, Defendant Hayward lamented that he had "got so bored with saying 'safety, people, and performance' but [he had] determined that [he was] not going to say anything else." This public commitment to right BP's past wrongs was touted as a sea change in BP's operations.

349.    Throughout the Relevant Period, BP consistently touted its operations in the deepwater Gulf of Mexico, a region that had become one of the most important areas of production for BP and which BP hailed as a "profit centre" and a "high margin" production area. In fact, however, BP's deepwater drilling operations created undisclosed risks of a catastrophic system failure that ultimately was realized when the *Deepwater Horizon* exploded and oil began to spew from the Macondo well. Moreover, the explosion revealed that BP never committed to developing effective safety protocols and systems through OMS on rigs that BP did not fully-own, had not completed OMS in the Gulf of Mexico as it had claimed, and did not have procedures in place that would guide its employees through best practices to avoid an otherwise preventable spill or to contain a spill, should one occur.

350.    Whenever any of the following false and misleading statements is attributed to any one or more of the Individual Defendants, it is attributable also to Defendant BP, as well as

to BP subsidiaries Defendants BP America and/or BP E&P (whichever employed the Individual Defendant speaking).

A.   **The January 16, 2007 Press Release False and Misleading Statements [Dismissed on scienter grounds per Alameda Order]**

351.   In BP's January 16, 2007 press release announcing the release of the Baker Report, BP stated, in part: "BP *already has taken* a number of actions which align with the recommendations of the BP US Refineries Independent Safety Review Panel and will, after a more thorough review, develop plans for additional action at its U.S. refineries and for applying lessons learned elsewhere."  This statement was made in Texas.

352.   On that day, BP filed the January 16, 2007 press release with the SEC on Form 6-K.  This statement was made in Washington, D.C.

353.   The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear rams.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.  Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes."

**B.      The March 6, 2007 False and Misleading Statements**

354.    On March 6, 2007, 2008, BP released its 2006 Annual Review, which BP made available to the investing public on its official website that day and which BP transmitted via email to institutional investors like the Plaintiffs.   The 2006 Annual Review made numerous materially false and misleading statements and omissions, including the following:

(a)      The BP Annual Review 2006 included a "Chairman's Letter," signed by Peter Sutherland, which made the following false and misleading statements:

•      "[I]n the vast majority of our activities, we continue to be justly proud of our safety record… However, it is quite clear to your board that the group's record in some areas has not met the standards to which we aspire.   ***Above all, we must ensure that, <u>at all locations</u>, those who work for us do so safely***."

•      Regarding the Baker Panel recommendations, it stated:

***[The Baker Panel] made a number of recommendations***, ***all of which we have considered and will implement***.   One recommendation was that the board, for at least five years, should engage an outside expert, independent of the executive, to report to it on the progress of the implementation of the panel's recommendation. Your ***board will keep you fully advised on the implementation of those recommendations, to which we, and the group's executives and employees, are fully committed***.

(b)      The BP Annual Review 2006 also included a "Group chief executive's review," signed by Lord Browne, which made the following false and misleading statements in a section captioned "Our response to the Baker report":

•      "***BP will implement the Baker panel's recommendations*** and we are now consulting with the panel on how best to do that.   Many of the recommendations are consistent with our own internal reviews and our aim now is to develop a timely and intelligent plan of action in order to transform BP into an industry leader in process safety management."

• "Our response to the Baker report comes alongside **what we were <u>already doing</u> to embed consistently high standards of safety and operational integrity <u>throughout BP</u>.** This includes an **ambitious four-year programme of investment in safety and operational integrity <u>right across the group</u>** and the **creation of an advisory board of external experts to assist and advise BP America Inc. in <u>monitoring the operations of U.S. businesses</u>, with particular focus on** compliance**, safety,** and regulatory affairs.

• Lord Browne stated, "We are also implementing lessons from the two oil spills and the cases of corrosion that occurred at Prudhoe Bay in 2006," before listing a multitude of purported steps being taken by BP to prevent future pipeline corrosion incidents.

• He also emphasized that BP was using heightened safety standards to conduct its subsea drilling operations in the Gulf of Mexico.  Specifically, he stated, "We took similar precautionary action to replace subsea components for the Thunder Horse platform in the Gulf of Mexico.  The components had passed industry tests and met regulatory requirements **but a metallurgical failure was revealed when our own engineers tested compliance with BP's own, more stringent standards**."

(c)     The BP Annual Review 2006 also included a graphical analysis of BP's progress in preventing oil spills.  It included a chart tracking the declining number of oil spills greater than one barrel from 2004 (578 spills) to 2005 (541 spills) to 2006 (417 spills).  Significantly, that analysis included **<u>an explanatory note expressly linking the Baker Panel recommendations to the prevention of oil spills</u>**, which stated: "**In response to the Baker Panel recommendations, we will be developing additional metrics for monitoring process safety in 2007.**"

(d)     Attempting to convince shareholders that BP was improving safety, through the implementation of the Baker Panel recommendations, the BP Annual Review 2006 also stated:

138

When the safety of people and of BP operations is at stake, actions matter far more than words. ***We continued to make significant investment and took numerous actions to improve*** the three dimensions of safety – personal safety, ***process safety***, and the environment – ***and the monitoring of <u>all</u> our operations in 2006***.

* * *

***<u>We have committed to implement the 10 recommendations</u> from [the Baker] report as part of our continuing effort to strengthen and <u>standardize process safety management</u>. We will also share the lessons*** both <u>***across BP***</u> and with the industry as a whole.

* * *

***<u>Worldwide, we have conducted further accident risk assessments of all our major operations and have begun implementation of a revised integrity management standard that will apply to every significant asset.</u>***

355.   The foregoing statements and omissions, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Browne and BP misled investors about BP's implementation of the Baker Panel's recommendations by falsely representing BP's steps already taken to implement the policies, procedures, and recommendations detailed in the Baker Report and its then-ongoing efforts to implement the rest. Browne and BP knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear rams.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the

139

recommendations of the Baker Panel.  Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes."

356.    Moreover, each of the above-quoted statements were materially false or misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons additional , among others:

(a)    Browne's immediate successor as CEO, Defendant Hayward, who was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS, testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(b)    Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(c)    An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(d)      Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(e)      Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(f)      According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

(g)      Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

**C.      The False and Misleading Statements Made On Or Before April 7, 2007**

357.   Throughout the Relevant Period, BP published *The BP Magazine: The International Magazine of the BP Group* (hereinafter "The BP Magazine"), a quarterly

publication bearing the BP logo and a BP copyright, listing BP personnel as editorial staff, and bearing a BP corporate address in the U.K. and a URL for the BP website (www.bp.com/bpmagazine), on which each quarterly issue was prominently posted, and remained posted throughout the Relevant Period, in addition to its hard copy distribution to readership including institutional investors such as the Plaintiffs.  None of these actions were possible without the direct involvement, oversight, and approval by the highest levels of BP, including the Individual Defendants, particularly where the content of any particular BP Magazine discussed prior safety incidents, purported safety reforms, the Baker Panel and its safety recommendations, OMS, the Operations Academy and the Operating Essentials program, and S&O audits, and other core operations of BP.  All issues of the BP Magazine are therefore corporate statements attributable to BP, and any misstatements made therein can be imputed to BP on the basis of corporate scienter, whether or not any Individual Defendant was quoted and irrespective of which author(s) or editor(s) contributed to their publication.  Notably, statements made in the BP Magazine issues during the course of the Relevant Period, as described herein, were cumulative and, particularly when read together, illustrate Defendants' fraud regarding implementation of the Baker Panel recommendations, OMS, the Operations Academy and the Operating Essentials training program, and the S&O audits.  *See* Sections IX. C., J., O., P., and W. herein.

358.    For instance, the BP Magazine's "Issue 1 2007" was publicly posted on BP's corporate website by no later than April 7, 2007 and was published and distributed to readership sometime prior.  It contained an article focused on BP America, with a detailed interview of its President, Defendant Malone, both recounting the series of safety incidents, including the Texas City refinery explosion and discussing the path forward.  Malone cited as one of three main

reasons for optimism regarding BP America "the help of external experts like the Baker Panel." The article discussed the Baker Panel, the Baker Report, and its safety recommendations, stating, *inter alia*, "The [Baker] panel's recommendations included actions to manage process safety as an integrated and comprehensive system, and to engage a third party to report progress against recommendations annually to the Board."

359.   The article also contained false and misleading statements by Defendant Malone, attributable to BP, as follows:

(a)    Describing the Baker Report as a "gift," Defendant Malone stated:

It comes from some of the leading experts in the U.S., who did the best job they could to help us learn how to go forward. We asked them for a critical report and that's what we got. In that report there are tremendous learnings for us. As group chief executive John Browne said, "we get it. **We will implement those recommendations**."

(b)    Defendant Malone falsely stated BP's efforts to implement the Baker Panel recommendations, and to do so across its operations, stating, among other things:

It's two years since the Texas City incident, and **many of the actions recommended by the Baker Panel and expected in the CSB** [U.S. Chemical Safety and Hazard Investigation Board] **report have either been taken or are currently under way**.  The Texas City refinery has undergone a tremendous transformation since March 2005.  And **those improvements have been shared** within our refinery network **as part of an effort to implement the Baker Report's findings**.

**People have asked me what it will look like when** the Texas City refinery **and BP's other facilities have adopted a comprehensive process safety overhaul, as recommended by the Baker Panel**.  These are operational and cultural changes that aren't readily visible.  **They will emerge in our improved** personal safety and **process safety performance at individual sites**…in our actions and our record.

(c)    In the same breath, as part of his discussion of a purported $2 billion in Gulf of Mexico investments and the ramp up of the Atlantis and Thunder Horse platforms, Defendant Malone misrepresented concrete steps purportedly being taken to increase safety at offshore facilities in the Gulf of Mexico, stating in relevant part:

143

*This year, we'll complete a large fibre optic system in the Gulf to connect all of our deepwater fields to shore with a high-fidelity data network. This network will significantly improve safety* and operations efficiency.

360.   The foregoing statements and omissions, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Defendant Malone misled investors about BP's implementation of the Baker Panel's recommendations by falsely representing BP's steps already taken to implement the policies, procedures, and recommendations detailed in the Baker Report and its then-ongoing efforts to implement the rest. Defendant Malone and the other Defendants knew that the Baker Panel recommendations were not being implemented on Gulf of Mexico oil rigs that BP did not fully own.  Defendant Malone knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear rams.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel. Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes."

361.   Moreover, each were materially false or misleading when made, and were known by Defendants, GORC members and SEEAC members to be false at that time, or were made with reckless disregard for the truth, for the following reasons additional , among others:

(a)      Defendant Hayward was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS;

(b)      Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(c)      Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(d)      An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(e)      Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in

the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(f)     Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(g)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

(h)     Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

D.     **The May 9, 2007 False and Misleading Statements [Dismissed per Alameda Order]**

362.    On May 9, 2007, BP issued its 2006 Sustainability Report, which BP made available to the investing public on its official website.  The 2006 Sustainability Report stated in part:

> During 2006, we undertook specific investments and targeted programmes in response to the Texas City incident as well as building more comprehensive systems for managing process safety across the group. . . . During 2006, we built on the learning from more recent incidents and industry best practice to develop a new operating management system (OMS) to achieve further improvements and reductions in risk. Our goals remain unchanged: no accidents, no harm to people

and no damage to the environment. **The OMS is a comprehensive system that covers all aspects of our operations,** including three dimensions of safety — personal safety, process safety and the environment.

However, we recognize that we have more to do to achieve excellence in process safety, which includes preventing accidental releases of hazardous materials from industrial processes that can have catastrophic effects, such as fires, which may result in fatalities, injuries or environmental damage. This was one of the main findings of the BP US Refineries Independent Safety Review Panel under former US Secretary of State James A Baker, III, which reported in January 2007. The panel made 10 recommendations, all of which BP will implement, in areas ranging from leadership to performance indicators[.]

***

**The new OMS will apply to all operations** by the end of 2010 and includes safety, integrity, environmental management and health. . . . **Each site will have its own local OMS,** based on a consistent group-wide framework. . . . The aim of the OMS is to have consistent standards of design, construction, operating procedures and maintenance that help to ensure the reliability and integrity of our plants.

***

In 2006, this approach was approved as a group practice, part of the new OMS, defining the environmental impact management processes and requirements to which BP will operate. We intend that all new projects in BP will use the practice [of assessing "environmental requirements for new projects"] by the end of 2007. The practice was developed primarily for major projects where the potential for environmental impact is often the greatest. However, it also applies to smaller projects that may have the potential for similar levels of impact in environmentally sensitive areas. (Footnote omitted)

363.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by Defendants, including Defendant Hayward as chairman of GORC and special liaison to SEEAC, to be false at that time, or were made with reckless disregard for the truth, for the following reason, among others: BP misled investors with regard to BP's OMS program applying to "all aspects of our operations," "all operations," and "all new projects in BP" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

147

E.     **May 16, 2007 False and Misleading Statements  [Dismissed per Alameda Order]**

364.    On May 16, 2007, Defendant Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations in Washington, D.C.  During his testimony, Malone falsely claimed that: "**[t]oday, I want to assure you that we get it**.  We have learned the lessons of the past."  Malone also submitted certain written statements to the Committee.  In those written statements, Malone falsely stated, in part, as follows:

> BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance. That is and has long been our philosophy . . . .

* * *

> *I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.*

* * *

> *BP does not tolerate retaliation against workers who raise safety concerns*.

365.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Malone portrayed BP's operations as safe when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.

(b)      Malone misrepresented BP's risk profile and the risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations thereby rendering his statements materially false and misleading; and

(c)      Malone falsely represented that BP did not retaliate against workers who raised safety concerns when, in fact, BP knew that numerous, substantiated complaints of retaliation had been submitted to BP through numerous avenues, including BP's Office of the Ombudsman headed by Judge Sporkin.

**F.      The July 24, 2007 False and Misleading Statements  [Dismissed per Alameda Order]**

366.    On July 24, 2007, BP held a conference call with analysts and investors, during which Defendant Hayward stated:

> First, safety. We are ensuring that we have consistent, safe, reliable operations across BP. We are implementing the Baker Panel recommendations. We are also in the early days of establishing a new way of operating in BP — ***with the progressive rollout of a common group-wide Operating Management System***.

367.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others: Defendant Hayward misled investors with regard to BP's OMS program as providing a "common" or "group-wide" solution when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

**G.    The September 25, 2007 False and Misleading Statements  [Dismissed per Alameda Order]**

368.    On September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference, during which he misrepresented the scope of BP's OMS:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is our new standardized *Operating Management System (OMS). This will provide a blueprint for safety and all aspects of operations throughout BP,* making sure operations are undertaken to a consistently high standard worldwide.

369.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Inglis to be false at that time, or was made with reckless disregard for the truth, because Defendant Inglis stated that OMS would apply to "all aspects of operations" and failed to disclose that BP's OMS would apply only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

**H.    The October 25, 2007 False and Misleading Statements  [Dismissed per Alameda Order]**

370.    On October 25, 2007, BP issued a press release announcing the resolution of various law enforcement investigations, including those relating to the Texas City refinery explosion and the Prudhoe Bay oil spill.  The press release was issued in Texas.  The press release quoted Defendant Malone stating, in part, that: "[i]n the months and years since these violations occurred, *we have made real progress in the areas of process safety performance and risk management*."  The press release also claimed that: "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."

371.     On that day, BP filed the October 25, 2007 press release with the SEC on Form 6-K.  This statement was made in Washington, D.C.

372.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Malone misrepresented that "real progress" was made in the areas of "process safety performance and risk management" and that BP was "standariz[ing] process safety and risk management at all BP-operated facilities" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk and, as the Presidential Commission Report found, BP lacked "consistent and reliable risk-management processes";

(b)     Malone misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering his statements materially false and misleading; and

(c)     Defendants misrepresented BP's efforts to "improve its safety culture and to standardize safety and risk management programs" since BP did not, in fact, standardize its process safety programs with regard to deepwater drilling and Malone failed to disclose that BP implemented safety budget cuts and staff reductions which impacted BP's ability to safely drill in the Gulf of Mexico rendering his statements materially misleading.

I.     **The November 8, 2007 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #11) and upheld for Plaintiffs with §10(b) claims per Alameda Order]**

373.    On November 8, 2007, Defendant Hayward spoke at the Houston Forum about BP's implementation of the Baker Panel recommendations. During his presentation in Texas, Defendant Hayward stated, in part, as follows:

> *We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel*. BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.

374.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others: Defendant Hayward misled investors about BP's implementation of the Baker Panel's recommendations because he falsely represented BP's intention to implement the policies, procedures, and recommendations detailed in the Baker Report.

J.     **The False and Misleading Statements Made On Or Before November 23, 2007**

375.    The BP Magazine, Issue 4 2007, was publicly and prominently posted onto BP's corporate website by no later than November 23, 2007, and was published and distributed to readership sometime prior.  It contained an article entitled "A standard of excellence," which detailed BP's design and implementation – across *all* of its global operations – of OMS, the "Operations Academy" (which was also discussed by Defendant Hayward in the 2008 Strategy Presentation on February 27, 2008 as discussed *infra*), and its related "Operating Essentials" training.

376.    It contained extensive false and misleading statements and omissions regarding these topics, as follows:

(a)    The article introduction misstated the Operations Academy's scope as reaching all of BP's worldwide operations:

> Under the leadership of its chief executive officer Tony Hayward, BP has begun to revitalize how the company is structured and operated. *Safety*, people and performance *remain at the heart of BP's priorities, with safe, reliable operations the company's primary focus*. *A key component of this rejuvenation is Operations Academy, a programme created in conjunction with the Massachusetts Institute of Technology* – and closely aligned to BP's existing Projects Academy – *to help BP's operational managers <u>around the world</u> keep this focus*.

(b)    The article also falsely escribed BP's purported efforts to implement OMS across *all* its operations:

> *Through the progressive implementation of BP's Operating Management System (OMS), the company is building a framework for a <u>common mode</u> of safe* and reliable *operations*. *OMS* is a way of working that *will help prioritise, ensure consistency and*, over time, *bring heightened levels of effectiveness to <u>all</u> operating systems in BP*.

(c)    In its very next sentence, the article linked the Operations Academy inextricably to OMS and again falsely indicated that it would impact BP's operations *worldwide*:

> In parallel, the newly-created Operations Academy has been developed to ensure BP leaders have the skills to lead and sustain change in identifying and managing risk, both equally vital to achieving operational excellence.

> One of its elements is the 'executive programme', which focuses on the role of senior managers in leading operational change. Hayward himself was one of the 22 participants in the initial executive programme held in October 2007. The group spent two days talking about how to create a culture of continuous performance improvement in BP and came away with specific ideas and concepts about what it will take to sustain changes as operations move forward.

> The main component of the academy is an intensive course that immerses a select group – called cadres – of managers in an academic and behavior-changing learning environment. *Participants are senior operations and safety leaders of sites or large units in BP's locations worldwide*. Key to the programme is its arrangement of three, two-week sessions over a 12-month period, *which allows*

*the cadres to begin the process of applying and sharing their new lessons in daily work*.

(d)     Touting that the Massachusetts Institute of Technology (MIT) was engaged to develop and conduct the operations courses of the Operations Academy in conjunction with senior BP operations personnel, the article repeatedly and falsely emphasized its full-operations scope, stating, *inter alia*:

> "*The Operations Academy is for the senior operations and safety leaders throughout BP*," says Steve Marshall, vice president of operations development. "With MIT's input, we began to understand how to focus the operations workforce on committing to make BP a world-class company." …
>
> New cadres are scheduled to enter the programme at MIT, beginning with the second group in December 2007.  Marshall's team of term directors – Susan Kolbush, Ian Livett and Ronan O'Neill – *with their experience from various BP operational segments*, work closely with MIT in the design of the Operations Academy programmes.

(e)     The article continued, falsely representing that the Operations Academy was designed, like OMS, to create a uniform approach across *all* of BP's global operations:

> Coursework is structured as a balance between teaching leadership and management tools for sustaining change, and interactive participation between pupils and instructors.  The cadre members are given considerable teaching materials with MIT instructors present and follow with open discussions about what the topics mean and why they would be effective in making BP a world-class organization.
>
> It is not the first time BP and MIT have worked together.  In 2003, they collaborated to create the Projects Academy, which set out to teach project managers – a highly-talented and technical group – how to improve BP's return on capital projects.
>
> Its continuing success provided the foundation for the Operations Academy and *both now share key components*: *creating a culture for all of BP's management people*, *a common way of understanding* and *a single way of doing business*.

(f)     The article again linked the Operations Academy to OMS and emphasized that they would impact *all* of BP's operations *throughout* the company:

> ***The thread that runs through the Operations Academy***, however, ***is OMS***. Continuous improvement – a major part of it and a focus of the academy – is an essential feature, which addresses leadership actions.  These include risk assessment and prioritisation, planning and controls, implementation and operation, measurement, evaluation and corrective action, and management review and improvement.

> Says Marshall: "***As OMS is implemented throughout BP***, ***its elements will be at the core of the company's operations***.  The academy brings together all of the strands crucial in leading the company towards becoming a world-class operator: continuous improvement, change leadership and strength of the operations community."

(g)  The article described the Operations Academy training as encompassing the full range of BP's operations, including its Anadarko assets and wells, and implementation of OMS thereon:

> The first cadre of 38 managers, ***spanning the breadth of BP's operations***, completed its initial course at MIT's campus in Cambridge, Massachusetts in July 2007.  The participants went in as managers of various operations and assets, but came out as leaders and believers in ***BP's new underlying culture*** of continuous improvement.

> Dan Lawson is a member of that first cadre.  Based in Amarillo, Texas, Lawson's role as operations centre manager for the Anadarko assets entails a great many responsibilities: director of line management of safety and operations for more than 500 people (employees and contractors) and 1,800 well sites; … and leader in embedding a safety culture among employees in the effective delivery of daily production. …

> "In the academy, under the guidance of world-class instructors from MIT, our cadre covered a lot of good material on OMS and leading change," notes Lawson.

(h)  Citing another high-ranking BP executive, the article falsely stated that OMS and the Operations Academy teachings were being implemented in BP's exploration and production operations and in its health, safety, security and environment protocols:

> In her position as director of organisational capability, [Janet Weiss] bears the responsibility of deployment and development of staff in BP's exploration and production operations and health, safety, security and the environment. …

> [During the Operations Academy cadre,] "we found that, ***across the segments***, ***we in operations leadership have a lot in common as we move BP's OMS forward***."

(i)     The article again emphasized OMS being implemented throughout BP, aided by the Operations Academy:

> **_Weaving OMS throughout BP_ is part of what the Operations Academy is helping to teach managers**.  It requires people to choose to change behaviour, specifically in discipline and open dialogue.

(j)     The article also described the Operating Essentials program as part of OMS's broad implementation across BP's operations:

> Capability development for frontline supervisors is another important part of OMS implementation.  Although separate from the Operations Academy, and using internal expertise, the Operating Essentials (OE) courses are intensive training programmes, which share a similar infrastructure.
>
> Participants in OE are managers in maintenance, operations and safety, who are responsible for frontline operators and staff.

377.    All the foregoing statements and omissions, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded that: (i) BP was exempting rigs that it did not fully own from the implementation of the Baker Panel recommendations and OMS; (ii) the instruction, lessons, and teachings of the Operations Academy and the Operating Essentials were likewise not being applied to such rigs; and (iii) such exemptions applied to offshore rigs in the Gulf of Mexico, and would include the Deepwater Horizon.

378.    Moreover, Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear

rams.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.  Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes.

379.    In addition, these statements and omissions were all materially false or misleading when made, and were known by Defendants BP and Hayward, as well as GORC members and SEEAC members, to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward signed the certification statement for the foregoing statement and was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS;

(b)    Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even implemented in the Gulf of Mexico as of April 2010.  Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(c)    Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(d)    An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the

Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(e)     Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(f)     Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(g)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

(h)     Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of

its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

### K.   The February 22, 2008 False and Misleading Statements [Sustained per Alameda Order and portions sustained per NY/Ohio Amended Order (Misrepresentation #13)]

380.   On February 22, 2008, BP released its 2007 Annual Review, which BP made available to the investing public on its official website and which BP transmitted via email to institutional investors like the Plaintiffs.  The 2007 Annual Review contained the "Group chief executive's review."  In his Executive Review, Defendant Hayward stated that, under his leadership, safety was BP's top priority. For example, Defendant Hayward stated, in part, as follows: "[w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations. ***I set out three priorities: safety, people and performance***."

381.   The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others: Defendant Hayward misled investors with regard to BP's efforts to "restore the integrity and the efficiency of BP's operations," which supposedly was to be achieved by implementing the Baker Panel's recommendations. Defendants' repeated statements falsely represented BP's intention to implement the policies, procedures, and recommendations detailed in the Baker Report.

### L.   The February 27, 2008 False and Misleading Statements [Sustained per Alameda Order and NY/Ohio Order (Misrepresentation #14)]

382.   On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts, in which Defendants Hayward, Inglis, and Dudley

participated.  Defendants distributed presentation slides and a transcript of the remarks made by the BP presenters that day.  Defendants made extensive false and misleading representations during this Strategy Presentation, follows:

(a)     Defendant Hayward made an extensive presentation regarding BP's purported efforts to improve safety following the issuance of the Baker Panel report.  The Strategy Presentation slides provided publicly indicate that Hayward made "Closing the Competitive Gap" remarks about (i) "Safe and Reliable Operations," which included a slide about a steady decline 1999-2007 in oil spills greater than one barrel and (ii) "People: building capacity," which included slide references to "Major Projects Common Process," "Operations Academy," and "Operating Management System."   The text of his remarks, also distributed to investors, included the following misstatements:

Let me begin with safety.

2007 saw further improvement in our overall safety performance. Over the last eight years our safety performance measured by Recordable Injury Frequency Rate – the standard measure of safety in our industry has improved three-fold. As you can see on this chart our performance is amongst the best in our industry.

Notwithstanding this track record our intense focus on process safety continues. *We are making good progress in addressing the recommendations of the Baker Panel* and have begun to implement a new Operating Management System across all of BP's operations*. Integrity related incidents have fallen significantly over the last three years and oil spills of more than one barrel continue a strong downward trend*.

Safe and reliable operations remain our number one priority.

A key focus in restoring the performance of BP is to ensure that we have much greater consistency in our operations and a much more rigorous application of BP standards across our global operations.

In 2003 we established a Projects Academy at the Massachusetts Institute of Technology and at the same time developed a Major Projects Common Process to be applied uniformly and consistently across all of our upstream projects. Over the last five years this programme and approach have made an enormous impact

160

on how our projects are executed. The Academy which is proprietary to BP has now trained almost 200 of our senior project managers and is recognised throughout the industry. More importantly we are seeing significant benefits in helping projects meet budget and schedule. Andy will talk in more detail about how this is working in places like Azerbaijan, Trinidad, Angola and Egypt.

***Based on the success of the Projects Academy we established an Operations Academy at MIT early last year. It has already met with significant success and is beginning to redefine operations leadership in BP – to date almost 80 of our senior operations managers have started a six week course spread over 18 months. In parallel we have begun to implement a new more rigorous Operating Management system across all of BP's operations. This is designed to ensure that across the world BP's operations look, feel and perform the same.*** Over the course of the next three to five years we are determined to transform our core operations to be amongst the very best in the industry.

Part of this programme has been an extensive recruitment effort – over the last two years we have recruited nearly 2000 additional engineers, including senior operations managers to strengthen our team and bring an external perspective to BP. We have also increased our graduate recruitment which is now running at more than 750 graduates a year, up from less than 300 three years ago.

The final element we have changed significantly this year is a much stronger link between performance and reward. There is now a much greater focus on individual performance coupled with greater differentiation on how people are paid.

(b)     The February 27, 2008 Strategy Presentation also included slides for Defendant Inglis's "Exploration and Production" remarks, including slides indicating that "Safe and Reliable Operations" was among the short list of "Priorities" in operations in every domestic and foreign locale discussed, including the Gulf of Mexico.  The text of Inglis's remarks included these misstatements: "Our top priority continues to be the safety and reliability of our operations. In 2007, we saw both an improvement in personal safety and increased reliability." and  "[I]n the Gulf of Mexico, our priorities are clear – grow revenues near term through the safe start-up and ramp-up of Atlantis and Thunder Horse."

(c)     The February 27, 2008 Strategy Presentation also includes slides for Iain Conn, Chief Executive, Refining and Marketing's "Closing the Competitive Gap" remarks about

"Safety and Operations" and "Fundamental Shift in Behaviors."   The text of his remarks included the following misstatements:

> I have set three goals for Refining and Marketing:
>
> - The delivery of safe and reliable operations; …
>
> On the first of these, we have been focusing a huge amount of our efforts on improving safety performance through reduction of risk, the significant investments underway in integrity management, and the implementation of our Operating Management System.  Safety remains our top priority in everything we do, and in 2007 we delivered continuous improvement across a wide range of safety and environmental measures.  In our U.S. refining system, I believe we are making progress in addressing the recommendations of the Baker Panel, particularly around process safety.

He also made the additional misstatement: "I have five priorities to improve performance of R&M.  It starts with a focus on safety and progressive delivery of our Operating Management System."

383.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendants Hayward, Inglis, and Dudley (who participated in the Strategy Presentation, made remarks on other topics, and observed Hayward's and Inglis's remarks) to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report; and

(b)    Defendants misrepresented that BP was implementing OMS "across all of BP's operations" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's

operations where BP leased rigs from others, as it did with Transocean's Deepwater Horizon in the Gulf of Mexico.

**M.    The March 4, 2008 False and Misleading Statements [Sustained per Connecticut Order]**

384.    On March 4, 2008, BP filed its Annual Report on Form 20-F, which was signed by David Jackson and was certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Hayward and by Grote.  In it, BP stated, *inter alia*:

> ***Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery***.  We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 (see www.bp.com/bakerpanelreport).  ***We have made material progress throughout the group across all of the panel's 10 recommendations***.

This statement was made in Washington, D.C.

385.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant Hayward to be false at that time, or were made with reckless disregard for the truth, because they falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report.

**N.    The April 17, 2008 False and Misleading Statements [Sustained per Alameda Order and NY/Ohio Order (Misrepresentation #16)]**

386.    On April 17, 2008, Defendant Hayward and BP Chairman Peter Sutherland delivered speeches at BP's 2008 Annual General Meeting. BP posted transcripts of the speeches on its publicly-accessible website. In his speech, Defendant Hayward again asserted that safety was of the utmost importance at BP and distinguished BP from other oil companies based on its deepwater operations. In particular, Defendant Hayward stated, in part, as follows:

When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance. Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.

Safety is our number one priority and in 2007 our overall safety record continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

***Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*** This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard.

387.    On April 17, 2008, BP filed with the SEC on Form 6-K an "Address to Shareholders at The Annual General Meeting of BP plc on April 17, 2008," which contained the misleading statements set forth above.  This statement was made in Washington, D.C.

388.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report; and

(b)    Defendant Hayward misrepresented that BP was implementing OMS "across all of BP's operations" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's Deepwater Horizon in the Gulf of Mexico.

### O.     The False and Misleading Statements Made On Or Before June 10, 2008

389.     The BP Magazine's "Issue 1 2008" was publicly posted on BP's corporate website by no later than June 10, 2008 and was published and distributed to readership sometime prior.  It contained an article profiling Defendant Hayward, in which he discussed the Baker Panel recommendations and BP's purported reforms.  Both the article and Defendant Hayward, who it quoted, and made the following false and misleading statements:

> *The Baker Panel*, the commission of inquiry led by former U.S. Secretary of State James Baker, which reported back last year, [Hayward said] "was quite rightly scathing, but it *has provided us with a road map for a three- to five-year journey to transform our operations globally*."

> What Hayward is talking about on a wider front – and, after almost a year in the chief executive's seat, beginning to implement – *is a radical overhaul of BP's entire modus operandi*.

390.     The foregoing statements and omissions, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants Hayward and BP knew or recklessly disregarded that BP was exempting rigs that it did not fully own from the implementation of the Baker Panel recommendations, OMS, and the Operations Academy teachings.  Moreover, Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear rams.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the

recommendations of the Baker Panel.  Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes.

391.    In addition, these misrepresentations were each materially false or misleading when made, and were known by Defendants BP and Hayward, as well as GORC members and SEEAC members, to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward signed the certification statement for the foregoing statement and was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS;

(b)    Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(c)    Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(d)    An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby

misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(e)      Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(f)      Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(g)      According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

(h)      Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

**P.      The False and Misleading Statements Made On Or Before December 5, 2008**

392.   The BP Magazine's "Issue 4 2008" was publicly posted on BP's corporate website by no later than December 5, 2008 and was published and distributed to readership sometime prior.  It contained an entire article, entitled "Process Safety – Operating Essentials," devoted to BP's purported process safety efforts, specifically the purported widespread rollout of the Operating Essentials program – including on drilling platforms – and its key role in BP's purported global implementation of OMS within 2009.

393.   Among other things, the article made the following false and misleading statements:

(a)      The article falsely touted the Operating Essentials program's rollout across all operations, including drilling platforms, as a key component of BP's full implementation of OMS within 2009:

> Operations are at BP's core.  ***The group's Operating Essentials (OE) programme is now in full-blown rollout, giving more than 4,000 BP front line leaders*** – ***those overseeing the company's day-to-day operations, <u>such as on platforms</u>***, in refineries and chemical plants – ***valuable training to help BP achieve safer, more reliable and efficient operations***.  In short, to ensure that everyone managing BP's global operations is doing the basics really well.

> Consistent Standards.  ***OE is an integral part of BP's <u>group-wide effort</u>*** to improve and streamline organisational capability, ***and is designed to equip operational managers with the skills essential to meeting consistent standards within the framework of BP's Operating Management System (OMS), to be implemented in 2009***.

> "Our goal is to move BP to become a leader in process safety, as well as personal safety," says Mark Bly, head of safety and operations.  "To create truly safe, reliable and efficient operations, you have to have ***common mindsets***, ***consistent ways of managing operational risk***, and a ***set of professional skills*** in place.  ***OMS is designed to lead the first part of that, and OE is an important part of equipping people with the skills they need to really make the OMS system come to life***."

168

(b)     The article also falsely and misleadingly quantified the progress purportedly being made in OE's enrollment levels and site-specific implementation:

> **By the end of 2008, 1,000 people will have started OE, with 2,000 on the programme by the end of 2009**. …

> **[A]lthough OE is a group-wide progamme**, it is not a case of one size fitting ll. To bring maximum benefit, **OE is very much a site-by-site programme**. It takes two to three years to go through and, crucially, gives people the time, space and the tools to apply what they've learnt and really embed change back at their respective sites.

> "By bringing a site team together across its various levels, people have an opportunity to voice and deal with live, site-specific issues," says Urbain Bruyere, OE project director. "This adds a practical dimension and means we can both align people and build a site's operating capability."

> **OE's starting point and cornerstone is a thorough 'needs' analysis, carried out with a site's leadership and workforce which provide the OE team with a clear picture of their specific issues. These findings have then been used to help the leadership select the most appropriate of OE's nine modules**. Covering both process and personal safety issues, these include areas such as safety culture, effective performance conversations, control of work, coaching and planning and prioritising.

(c)     The article also touted OE's effectiveness at improving process safety through cooperation between BP and contractor personnel:

> [BP offsite operations superintendent Chris Bennison] says the [OE] modules opened minds that 'safety' wasn't just about personal safety. "It helped us to develop a clear realisation that the things we do and say every day influence what people pay attention to and really brought home to front line leaders that they had a direct part to play in both personal and process safety incident prevention. … It prompted some excellent conversations we'd never had before about process safety among BP and contractor front line leaders and senior leaders on site."

(d)     In addition, the article touted the use of OE to improve safety on specific offshore drilling platforms amongst BP's worldwide operations:

> For drilling workers on the Chirag I platform [in Azerbaijan], that open channel offered by OE may soon effect an important change. The usual method of manually moving waste oil below deck had not necessarily caused accidents or near misses, but workers saw a better, and safer, way.

"Safety here is about ensuring that absolutely everything is done safely, with everyone going home in the same state in which they arrived," said Chirag health, safety & environment advisor Emin Askerov.  "Through the OE conversations, a driller shared a concern about the way we were manually handing waste oil before it was transported down to the closed drain."

"This is the way we have been doing it for 11 years, but this person suggested putting in a pipeline instead, to reduce the risk to people on the platform, and we have put in an application for that.  OE facilitated the conversation and mechanism for change."

394.    The BP Magazine's "Issue 4 2008" also contained a false and misleading Safety and Operations article entitled "Starman in Audit," discussing the role of former astronaut Jim Wetherbee as an auditor on BP's safety and operations (S&O) audit team.  The article contained the following false and misleading statements and omissions:

(a)    The article falsely and misleadingly described the S&O audit process as extending to BP's offshore platforms, without stating that its Gulf of Mexico platforms had been excluded:

S&O audit is made up of world-class men and women with safety expertise and experience form industries where risk is an everyday reality that needs to be controlled, managed and made a high priority.  ***Teams within the audit group travel to BP's*** refineries, ***offshore platforms*** and other onshore operations ***around the world*** ***to work closely with employees on key elements of safety compliance, risk analysis and leadership behaviour***.

The internal programme is designed to continue improving BP's safety performance and compliance, making facilities as safe as possible for people, the environment, and production.

The falsity of these misstatements and omissions is particularly glaring given that, alongside a photo of Wetherbee, it included a captioned picture of BP's Na Kika platform in the Gulf of Mexico, clearly conveying the ***false message*** that the S&O audit processes it discussed in detail were being applied to ***BP's Gulf of Mexico rigs***.

(b)    The article then detailed the extensive, ***on-site*** work done by S&O audit teams, without making clear that BP's Gulf of Mexico rigs were excluded, stating, *inter alia*:

BP has produced a booklet outlining leadership behaviours for managers and supervisors, highlighting the need to value expertise, energise people, act decisively and deliver results.  Measuring a person's performance and compliance against this framework, however, is challenging and subjective.  "S&O audit does research, visits sites, examines documents and conducts interviews, so that we can put together a product to help the business unit leaders increase operational safety and performance at the facility.  It's valuable to have objective data that can be measured and analysed," says Wetherbee.  … [W]hen assessing leadership performance[,] … "I look for a consistent message about safety in operations during interviews with the workers.  That reflects how well the leader is doing.  The interviews can also serve as indicators of where deficiencies may exist.  Then, we have an idea of where to look for objective evidence that needs to be addressed."

395.    All the foregoing statements and omissions, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded that: (i) BP was exempting rigs that it did not fully own from the implementation of the Baker Panel recommendations and OMS; (ii) the instruction, lessons, and teachings of the Operations Academy and the Operating Essentials were likewise not being applied to such rigs; (iii) such exemptions applied to offshore rigs in the Gulf of Mexico, and would include the Deepwater Horizon; and (iv) Defendants had decided to exclude Gulf of Mexico rigs from S&O audits, a decision which removed the Deepwater Horizon from the S&O audit process.

396.    Moreover, Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear

rams.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.  Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes.

397.    In addition, the foregoing misrepresentations were each materially false or misleading when made, and were known by Defendants BP and Hayward, as well as GORC members and SEEAC members, to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward signed the certification statement for the foregoing statement and was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS;

(b)    Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(c)    Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(d)    An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the

Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(e)     Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(f)     Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(g)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

(h)     Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of

its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico;

and (4) BP lacked adequate internal safety and risk management controls.

### Q. The December 17, 2008 False and Misleading Statements [Sustained per Alameda Order and portions Sustained per NY/Ohio Order (Misrepresentation #18)]

398.   On December 17, 2008, Defendant Hayward gave a speech at the HRH Prince Of

Wales's 3rd Annual Accounting for Sustainability Forum. BP posted a transcript of the speech

on its publicly-accessible website. Hayward claimed that BP was continuing to improve its

process safety practices. More specifically, Defendant Hayward stated, in part, as follows:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.
>
> These lapses exposed shortcomings - but they also gave us a huge opportunity to learn and improve the way we operate. ***We opened ourselves up to scrutiny - and we listened more to our front-line operations people - who, of course, really know what is going on on the ground~ And we have continuously reported progress against a response plan and against an independent external report.***
>
> One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP - and we operate in 100 countries - so that is no mean feat.

399.   The foregoing misrepresentations, of consistent progress in safety processes, a

potent OMS, and thus, safe, reliable and responsible deep sea drilling operations, which caused

BP securities to trade at artificially inflated prices, were each materially false or misleading when

made or included material omissions, and were known by Defendant Hayward to be false at that

time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)   An internal BP strategy document issued in December 2008 warned BP

executives of "major" process-safety concerns in the Gulf of Mexico that permitted the

accumulation of risks prior to and in response to incidents and therefore, increased the likelihood

and severity of "process-safety related incidents."; and

(b)    Defendant Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report.

### R.    The February 24, 2009 False and Misleading Statements [Sustained per Alameda Order and as to falsity and scienter per SCAC Order (Misrepresentation I-2)]

400.    On February 24, 2009, BP issued its 2008 Annual Review, which BP made available to the investing public on its official website and which BP transmitted via email to institutional investors like the Plaintiffs.    It repeatedly assured investors of its supposed continuing commitment to safety.   For example, the 2008 Annual Review falsely stated, in part, as follows:

> Safety, both personal and process, remains our highest priority. 2008 was one of our best ever years for personal safety, with our performance expected to remain among the best in the industry. During the year we began migrating to *the new BP OMS, which has an increased focus on process safety and continuous improvement.* The majority of our operations in North America Gas, *the Gulf of Mexico,* Colombia and the Endicott field in Alaska *all completed the migration to the OMS in 2008.*

401.    The 2008 Annual Review also contained the "Group chief executive's review," in which Defendant Hayward asserted that safety was BP's "number one priority" and discussed the "safe and reliable" Gulf of Mexico operations. More specifically, Hayward stated, in part, that:

> Q.  At the start of the year what priorities did you set out for BP?
>
> Safety, people and performance, and these remain our priorities. Our number one priority was to do everything possible to achieve safe, compliant and reliable operations. Good policies and processes are essential but, ultimately, safety is about how people think and act. That's critical at the front line but it is also true for the entire group. Safety must inform every decision and every action. *The BP operating management system (OMS) turns the principle of safe and reliable*

*operations into reality by governing how every BP project, site, operation and facility is managed.*

\*\*\*

Q.  How did Exploration and Production perform?

It was an excellent year, with major projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream. That, together with safe and reliable performance from our existing operations, contributed to underlying production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricanes Ike and Gustav and other operational issues.

402.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)      BP misled investors by stating that the Gulf of Mexico operations had completed the transition to OMS when, in fact, *inter alia,* Defendant Hayward and other BP personnel testified in MDL 2179 that OMS had not been implemented in the Gulf of Mexico as of April 2010, and BP conceded the falsity of the representation at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(b)      Hayward misrepresented that OMS governed "how every BP project, site, operation and facility is managed" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico; and

(c)      An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby

misleading investors that operations in the Gulf of Mexico were operating within uniform Company-wide process safety procedures.

**S.    The March 4, 2009 False and Misleading Statements [Sustained per Alameda Order; portions sustained as to scienter per SCAC Order (Misrepresentations J-1 and J-2); conceded as to falsity by Defendants in SCAC Order (Misrepresentation J-2)]**

403.    On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by David Jackson and was SOX certified by Hayward and Grote. This statement was made in Washington, D.C.   In the report, BP misrepresented the scope and implementation of its OMS, BP's marquee process safety initiative, and made numerous false statements about its supposed safe practices and the quality of its deepwater Gulf of Mexico operations. Specifically, BP misrepresented that eight sites, including the Gulf of Mexico, had "completed the transition to OMS in 2008."

404.    For example, the Form 20-F stated, in part, as follows:

We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.*

When fully implemented, OMS will be the *single framework* within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . . The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis. BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability. A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

All operated businesses plan to transition to OMS by the end of 2010. *Eight sites completed the transition to OMS in 2008;* two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico,* Colombia and the Endicott field in Alaska. . . . For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators. A core aspect of OMS implementation is that each site produces its

own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks. As part of its transition to OMS, a site issues its local OMS handbook, and this summarizes its approach to risk management. Each site also develops a plan to close gaps that is reviewed annually. The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

Experience so far has supported our expectation that having one integrated and coherent system brings benefits of simplification and clarity, and that the process of change is supporting our renewed commitment to safe operations.

* * *

- Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. . . .

405.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)   Defendant Hayward signed the certification statement for the foregoing statement and was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS.   Additionally, Defendant Hayward attended the January 7, 2009, SEEAC meeting where "it was agreed that [SEEAC] Committee members' detailed comments [regarding the 2008 Annual Report and Form 20-F content] should be provided to the Secretary and conveyed to the Corporate Reporting team.";

(b)   Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to

178

OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(c)     Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(d)     An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(e)     Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(f)     Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all

179

operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(g)   According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

(h)   Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

**T.   The March 10, 2009 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #26) and Ludlow Order as to Particularity/Falsity/Materiality (Misrepresentation # L1 6); Upheld for Plaintiffs with §10(b) claims per Alameda Order]**

406.   On March 10, 2009, BP's EP, which discusses BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS in Louisiana.  The document was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009.  The document falsely stated, in part, that:

> *I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge,* or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

* * *

An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. *If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sub lethal* and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

* * *

*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

407. In addition, the EP stated that:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.* Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources.*

408. The EP also contained identical statements to the statement in the immediately preceding paragraph, except that they pertained to wetlands, coastal wildlife, refuges, and wilderness areas.

409. Section 7.1 of the EP also falsely estimated a worst-case discharge scenario of 162,000 barrels of oil per day, an amount it falsely asserted that MMS could handle.

410. Additionally, before BP could begin operations at the Macondo site, federal regulations required BP to submit its EP demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to

human or marine health, or the coastal environment. 30 C.F.R. §§250.201, 250.202. BP did not have such a plan or a means of conducting their proposed activities.

411.    Further, federal regulations required that the EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information." 30 C.F.R. §§250.2 12, 250.219, 250.227.

412.    Among the information required to accompany the EP was a "blowout scenario," described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons. Include the estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well. 30 C.F.R. §250.213(g).

413.    The oil and hazardous spills information accompanying the EP was also required to include an oil spill response plan providing the calculated volume of BP's worst-case discharge scenario (*See* 30 C.F.R. §254.26(a)), and a comparison of the appropriate worst-case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst-case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst-case discharge scenario that could result from [its] proposed exploration activities. *See* 30 C.F.R. §§254.26(b), (c), (d), and (e); 30 C.F.R. §250.2 19.

414.    Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. §250.280.

415.    The misrepresentations above, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by

Defendant BP to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     As explained by a group of eight U.S. Senators in a May 17, 2010 letter to U.S. Attorney General Eric H. Holder, Jr., there was no "proven equipment and technology" to respond to the spill. The Senators wrote that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis." Indeed, BP acknowledged on May 10, 2010 that: "*[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before"*;

(b)     BP falsely represented that the EP was based on an analysis of the Mississippi Canyon Block 252 site when, in fact, the EP was boilerplate language copied from one or more exploration plans that MMS had previously approved for other distinct drilling sites;

(c)     BP misrepresented that BP was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared;

(d)     In connection with the EP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo Well. Following the sinking of the *Deepwater Horizon,* a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit;

(e)     BP misrepresented that an oil spill would not adversely impact beaches, wetlands, and other environmentally sensitive areas;

(f)     Concealed from the investing public was BP's failure to have sufficient internal safety and risk management processes to satisfy the above referenced regulation. In fact, Defendant Suttles acknowledged on May 10, 2010, that BP did not actually have a response plan

with "proven equipment and technology" in place that could contain the *Deepwater Horizon* Spill. Later, Defendant Hayward admitted that "BP's contingency plans were inadequate," and that BP had been *"making it up day to day."* Defendant Hayward further admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because *"[w]hat 's undoubtedly true is that we did not have the tools you'd want in your tool kit"* to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion;

(g)     On May 12, 2010, H. Lamar McKay, Chairman, President and Chief Operating Officer of Defendant BP America, Inc., admitted in testimony to the House Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, that BP did not have the capability and technology to respond to the *Deepwater Horizon* oil spill:

> Mr. McKay:  We are using the best technology at scale. This is the largest effort that has ever been put together. So we believe we are using the best technology and if we have any other ideas.
>
> Mrs. Capps:  But you never had any until it happened.
>
> Mr. McKay:  Well, we have been drilling with the Coast Guard for years.
>
> Mrs. Capps:  Did you develop technologies for dealing with this?
>
> Mr. McKay:  Not individual technologies for this, no.
>
> Mrs. Capps:  I rest my case

(h)     The Presidential Commission concluded, "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk factors on the prospects of a successful cement job"; and

(i)     Finally, in his deposition testimony, Defendant Inglis confirmed that BP never invested a dollar in developing methods to contain an oil spill.  Inglis Dep. at 162:9- 162:21.

U.   **The April 16, 2009 False and Misleading Statements [Sustained per Alameda Order and as to scienter per SCAC Order (Misrepresentation L)]**

416.   On April 16, 2009, BP issued its 2008 Sustainability Review, which BP made available to the investing public on its official website.   The 2008 Sustainability Review contained a "Group Chief executive's review" containing remarks by Defendant Hayward. Defendant Hayward stated, in part: "You can see a similar balanced approach in our new operating ***management system (OMS), which is to be implemented at each BP site.*** It covers everything from compliance and risk management through to governance and measuring results."

417.   The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others: Defendant Hayward misrepresented that BP was implementing OMS "at each BP site" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

V.   **The June 30, 2009 False and Misleading Statements [Sustained per NY/Ohio Order (Misrepresentation #30) and Upheld for Plaintiffs with §10(b) claims per Alameda Order]**

418.   On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" or "BP's Regional OSRP for the GOM".   This document was issued in Texas.   According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day.*** More specifically, BP's Regional OSRP for the GOM stated: (i) an oil spill occurring less than ten

miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day. BP's Regional OSRP for the GOM explicitly states that BP and its subcontractors *could recover approximately 491,721 barrels of oil per day* (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  BP further claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*"

419.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills" and that nearly 500,000 barrels of oil per day could be recovered were each materially false or misleading when made, and were known by Defendant BP to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)    BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and was wholly inadequate to respond to a deepwater oil spill; and

(b)    Defendant Hayward confirmed that BP had failed to draw up sufficient emergency response plans, admitting that during the spill "*we were making it up day to day*". In addition, Defendant Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.

## W.    The False and Misleading Statements Made On Or Before October 23, 2009

420.    The BP Magazine, Issue 3 2009, was publicly and prominently posted onto BP's corporate website by no later than October 23, 2009, and was published and distributed to

readership sometime prior.  It contained an "US Special" article, captioned "BP America in focus" and entitled "Spanning the Land of Opportunity," which, focusing on refining operations, described purported safety improvements being made in BP's U.S. and global operations.

421.    The article contained the following false and misleading statements and omissions regarding the implementation of OMS.  It quoted a BP employee as describing the path to enhanced safety in this manner: "The way organisations continuously improve is through systems and processes by which everyone does the same things the same way, every time.  Come up with the right recipe, write it down, agree to follow it, and use it to teach new people, and over time, the organization can get better and better."  After doing so, it misrepresented the scope of OMS's implementation by BP, as follows:  "***The 'recipe' in this case is BP's rigorous and consistent approach to operations through the application of OMS, <u>which is currently in the process of being implemented across BP worldwide</u>***."

422.    The foregoing, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Defendants Hayward and BP knew or recklessly disregarded that BP was exempting rigs that it did not fully own from the implementation of the Baker Panel recommendations, OMS, and the Operations Academy teachings.  Moreover, Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing BP's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear rams.  Moreover, the fact that the

Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.  Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes.

423.    In addition, this misrepresentation was materially false or misleading when made, and was known by Defendants BP and Hayward, as well as GORC members and SEEAC members, to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward signed the certification statement for the foregoing statement and was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS;

(b)    Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010.  Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(c)    Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(d)    An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the

Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(e)     Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(f)     Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(g)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements; and

(h)     Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of

its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

### X.   The November 19, 2009 False and Misleading Statements [Dismissed per Alameda Order]

424.   On November 19, 2009, Defendant Rainey testified in front of and submitted written statements to the United States Senate Committee on Energy and Natural Resources in Washington, D.C.  Rainey's testimony included the following false and misleading statements:

*Releases from oil and gas operations are rare, and the application of technology has enabled a dramatic reduction of releases from our industry over the last 30 years.*  To be clear, any release from our operations is unacceptable, and we will continue to invest in research and technology to drive us to our ultimate goal of zero discharge.

Contrary to popular perception, ours is a high-tech industry. To demonstrate this point, I would like to highlight three technologies which enable the safe and reliable production of offshore oil and gas. These are seismic imaging, drilling, and production systems.

* * *

In summary, I would like to return to the Gulf of Mexico, where technology has been a key driver of our success.  In September, we announced a Tiber discovery, where we set a new drilling depth record for the industry at 35,055 feet. There are many challenges to overcome to bring Tiber to production, but they are exciting challenges and we look forward to addressing them.  As we do so, *we will be ever mindful and respectful of the communities and the environments in which we operate.*

425.   Rainey elaborated further on these remarks in his prepared statement, which included the following false and misleading statements:

Examples of the technologies which have helped to reduce accidental releases include:

• *Down hole flow control valves that shut down the well automatically if damage to the surface equipment is detected*;

• *Blowout preventer technology which includes redundant systems and controls*;

• *New and improved well control techniques which maintain constant control of the fluids in the wellbore*;

**• *Sensors which continually monitor the subsurface and seabed conditions for sudden changes in well pressures***; and

**• *BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston***.

While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. ***All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents***.

Offshore Technologies Enabling Environmental Stewardship

Three key technologies which enable the safe and reliable production of offshore oil and gas resources:

• Seismic imaging;
• Offshore drilling; and
• Offshore production systems.

Seismic imaging allows us to predict the presence of hydrocarbon reservoirs below the sea bed. Drilling allows us to test for the presence of hydrocarbons in the reservoirs. When hydrocarbons are present, the well bore connects the reservoir to the surface, where ***production systems enable us to produce the hydrocarbons, and deliver them safely to the refinery***.

Our industry has a remarkable track record of moving forward the limits of each of these technologies. In BP, we have been at the forefront of both the development of the technologies, and their application.

\*\*\*

Advances in drilling technologies and production systems have been significant. They include extended reach drilling, drilling in deeper waters, and to greater depths. ***These advances enable more production while reducing environmental impacts*** and allowing for efficient use of existing facilities and infrastructure.

426.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Rainey falsely represented that "releases from oil and gas operations are rare" when in fact, BP had experienced numerous releases in recent years that were undisclosed to investors;

(b)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents";

(c)     Rainey misrepresented BP's true risk profile associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, as well as BP's audit of the *Deepwater Horizon* which found equipment failures serious enough to lead to personal injury and environmental damage, rendering his statements materially false and misleading;

(d)     Rainey misrepresented that while BOP's had the technology to include redundant systems and controls, BP had purposefully removed such redundant systems in its drilling operations in the Gulf of Mexico rendering his statements materially false and misleading;

(e)     Rainey falsely represented that BP was able to conduct its operations safely when, in fact, BP did not have adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure. Due to the lack of adequate protocol, the nature of BP's operations differed vastly from the representations made to the public.  For example, as noted, the BOPs used in BP's operations did *not* have adequate safety redundancies, such as a second blind shear ram or an acoustical control switch; in the event of a blowout, the well would *not* automatically shut-in.  Furthermore, well pressures were *not* being monitored "*both at the facility and in our offices in Houston*" in real time.  To the contrary, as Presidential Commission

investigator made clear during a presentation on November 9, 2010, although drill pressure data was "available" in BP's office in Houston, BP did not in fact monitor it, including on April 20, 2010, the night of the Deepwater Horizon blowout:  "There was nobody in that B.P. Macondo well office that night . . . . Everybody had gone home";

(f)    Rainey misrepresented BP's commitment to the environment and ability to respond to an oil spill as it did not have an adequate contingency plan for dealing with incidents such as a well blowout and subsequent deepwater oil leak thereby misrepresenting BP's risk profile, rendering his statements materially false and misleading; and

(g)    Rainey falsely represented that BP was committed to "Environmental Stewardship" and reducing environmental impacts when, in fact, BP was completely unprepared to prevent a deep water well blowout and stop the worst oil leak in history.

**Y.    The February 26, 2010 False and Misleading Statements [Sustained per Alameda Order; portions sustained as to particularity/falsity per Ludlow Order (Misrepresentation 18); as to scienter per SCAC Order (Misrepresentation N)]**

427.    On February 26, 2010, BP issued its 2009 Annual Review, which BP made available to the investing public on its official website and which BP transmitted via email to institutional investors like the Plaintiffs.  In the Annual Review, BP made misrepresentations concerning the scope of OMS. In a section entitled "Sustaining momentum and growth," BP acknowledged that its safety protocols are material to investors by including a separate section on safety entitled "Safety, reliability, compliance and continuous improvement." That section states:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system ***(OMS), which provides a common framework for all BP operations,*** designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, ***OMS enables each site to focus on the most important***

*risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.*

428. The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, that BP's OMS "provides a common framework for *all* BP operations" and "enables *each site* to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework" were each materially false or misleading when made, and/or omitted to disclose material facts necessary to make the statements not misleading, for the following reasons, among others:

(a) Because the 2009 Annual Review was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was required to review the 2009 Annual Review and make recommendations to the board concerning its adoption and publication. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

(b) Defendant Hayward has testified that he knew OMS was not fully implemented in the Gulf of Mexico in 2008 or at the time of the *Deepwater Horizon* disaster. Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the

Gulf of Mexico as of April 2010. Moreover, BP conceded the falsity of such statements on November 4, 2011 (Transcript Doc. No. 304 at 58:15-21);

(c)        As of the date of this statement, OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-owned PDQ on *Thunder Horse*.  Moreover, Defendants Hayward and Inglis knew, or were reckless in not knowing, that contracted drilling rigs without OMS accounted for the majority of deepwater wells drilled in the Gulf of Mexico – which were the chief economic driver for BP Exploration and Production – during the Relevant Period;

(d)        Defendants Hayward and Inglis (and other GORC members) made the decision not to apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon*; *see also* Armstrong Dep. at 207:20-208:18;

(e)        According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).*  Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements;

(f)        Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan) lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry Thierens, and Kevin Lacy) as such BP's OMS implementation in the Gulf of Mexico was disorganized and incomplete; and

(g)        A 2009 rig audit of the *Deepwater Horizon* revealed that not all relevant personnel on the rig were knowledgeable about drilling and well operation practices and rig crew

195

members were not knowledgeable about well operation practices, including containing a blowout.

### Z.     The March 5, 2010 False and Misleading Statements [Sustained per Alameda Order; portions sustained per NY/Ohio Order (Misrepresentation #35); as to scienter per SCAC Order (Misrepresentation O)]

429.    On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by David Jackson and was SOX certified by Hayward and Grote.  This report was filed in Washington, D.C.  In the report, BP continued to tout its position as the largest producer of oil in deepwater Gulf of Mexico operations while delivering safety in its operations. In addition, the Form 20-F falsely stated, in part, that:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the ***BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.***
>
> ***
>
> This performance follows several years of intense focus on training and procedures across BP. ***BP's operating management system (OMS), which provides a single operating framework for all BP operations,*** is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in the continuing implementation of OMS.
>
> ***
>
> Our OMS covers all areas from process safety, to personal health, to environmental performance.
>
> ***
>
> ***Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including:*** the establishment of a safety & operations (S&O) function with the highest calibre of staff; ***development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites;*** the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety

and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority.

430.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Hayward falsely claimed that BP had undertaken a series of "key developments" since the Texas City refinery disaster and misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intent to and actual progress in improving its process safety since the Texas City disaster; and

(b)    Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico.

### AA.    The March 22, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained as to particularity/falsity/materiality per Ludlow Order (Misrepresentation #8)]

431.    On March 22, 2010, Defendant Inglis delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana, in which he discussed the nearby deepwater Gulf of Mexico operations. BP posted a transcript of the speech on its publicly-accessible website. During the presentation, Inglis falsely stated, in part, as follows:

We are currently planning to make final investment decisions for 24 new major projects in the next two years. Each project has been high-graded though our project selection and progression process. They are concentrated in the Gulf of

197

Mexico, the North Sea, Azerbaijan and Angola – high margin production areas that improve the portfolio and enable profitable growth.

***

***Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.*** And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

432.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendant Inglis to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Inglis was a member of GORC, and as such, was charged with oversight and implementation of OMS with respect to exploration and production activities in the deepwater Gulf of Mexico. Moreover, Defendant Inglis received the quarterly Orange Book that contained detailed reports concerning the scope of OMS and revealed that the status of its implementation across BP's various business units, including Exploration and Production in the Gulf of Mexico, was incomplete;

(b)    Defendant Inglis made these statements about the importance of deepwater drilling in the Gulf of Mexico as part of BP's asset portfolio during the Howard Weil Energy Conference, which bills itself as "one of the premier investor conferences in the energy industry." *See* http://howardweil.com/energy-conference.aspx. However, as of the date of Inglis' statement, OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-owned PDQ on *Thunder Horse*. Moreover, as Chief Executive of Exploration and Production, Inglis knew, or was reckless in not knowing, that over half of the deepwater wells drilled in the Gulf of Mexico – which were the chief economic driver for BP Exploration and

198

Production – were drilled by contracted rigs that did not apply OMS, including the *Deepwater Horizon*; *see also* Armstrong Dep. at 247:7-248:21;

(c)      Defendant Inglis (and other GORC members) made the decision to not apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon*; *see also* Armstrong Dep. at 207:20-208:18;

(d)      Defendant Inglis testified that "[o]ne of the purposes of OMS would be to prevent loss of primary containment." Inglis Dep. at 242:23-243:9. Moreover, on July 13, 2009, Defendant Inglis sent an email to the Upstream Senior Leadership Team that expressed concern over contractor operated rigs – *e.g.* the *Deepwater Horizon* – not conforming to BP's Control of Work practices. The Control of Work standard was defined in BP's OMS framework as a "process to provide a work environment that will allow tasks to be completed safely and without unplanned loss of containment causing environmental damage;

(e)      BP had only begun to implement its OMS in a pilot stage in the Gulf of Mexico when BP, in part due to a re-organization led by Inglis, terminated and/or displaced the key employees responsible for the implementation of OMS. According to CW2 it was not true that BP was in the final stages of rolling out OMS in the Gulf of Mexico in 2010 and employees in key positions, including Wells Team Leaders and Well Site Leaders, in Gulf of Mexico operations had no knowledge of OMS requirements;

(f)      Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan) lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry Thierens, and Kevin Lacy), and BP's OMS implementation in the Gulf of Mexico was disorganized and incomplete;

(g)     According to CW1, there was a company failure to implement an appropriate OMS protocol which would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*; and

(h)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).*

### BB.     The March 23, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained per NY/Ohio Order (Misrepresentation #38)]

433.    On March 23, 2010, Defendant Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C. in which he discussed BP's changes to its safety program following the Texas City, Texas refinery explosion. BP posted a transcript of the speech on its publicly-accessible website. During the presentation, Hayward falsely stated, in part, that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.
>
> ***That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority***.

434.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others: Defendant Hayward misrepresented that BP had changed its approach to safety "in a profound and fundamental way" in response to the Texas City disaster, when, in fact, Defendants' repeated statements falsely represented BP's intention to and actual

progress in implementing the policies, procedures, and recommendations detailed in the Baker

Report that were to achieve process safety reforms following the Texas City disaster.

**CC.    The April 15, 2010 False and Misleading Statements [Sustained per Alameda Order; portions sustained as to particularity/ falsity/materiality per Ludlow Order (Misrepresentations #5, #30 and #3 2), as to falsity and scienter per SCAC Order (Misrepresentation R-1), and as to Hayward statements in the 2009 Sustainability Review per Alameda Order.  Dismissed as to the 2009 Sustainability Report per Alameda Order.]**

**1.    The 2009 Sustainability Review**

435.    On April 15, 2010, BP issued its 2009 Sustainability Review, which BP made

available to the investing public on its official website.  The 2009 Sustainability Review

contained a Q&A session with Defendant Hayward in a section entitled "Group Chief

Executive's Review." There, Defendant Hayward reemphasized the misrepresentation contained

in BP's 2008 Annual Report (which he signed), that eight sites (including the Gulf of Mexico)

completed the transition to OMS in 2008:

- Group Chief Executive's Review

*Question:*  What progress has BP made on safety during 2009?

*Answer:* Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS). The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement. I see it as the foundation for a safe, responsible and high-performing BP. ***Having been initially introduced at eight sites in 2008,*** the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. ***This means implementation is 80% complete.***

436.    The foregoing misrepresentations, which caused BP securities to trade at

artificially inflated prices, were each materially false or misleading when made, and were known

by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for

the truth, for the following reasons, among others:

(a)     Defendant Hayward, as Chairman of GORC, was ultimately responsible for and charged with oversight and implementation of OMS;

(b)     Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico had not "beg[u]n the process of cutover to OMS" until fall 2009, and that OMS had not been implemented in the Gulf of Mexico as of April 2010. Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the Gulf of Mexico as of April 2010;

(c)     Hayward made this statement, which reemphasized and confirmed the earlier statement made in the 2008 20-F that eight sites, including the Gulf of Mexico, had completed the transition to OMS despite knowledge that the Gulf of Mexico had not completed the transition to OMS in 2008;

(d)     Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico. Moreover, Hayward was aware or reckless in disregarding, that OMS was never meant to apply, and in fact, never did apply, to contracted third-party rigs, which accounted for the majority of BP's deepwater wells drilled in the Gulf of Mexico during the Relevant Period;

(e)     Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008;

(f)     As members of GORC, Defendants Hayward and Inglis received documents that put them on notice that the Gulf of Mexico had not completed the transition to OMS;

(g)     An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures;

(h)     Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster;

(i)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).* Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements;

(j)     According to CW1 there was a company failure to implement an appropriate Operations Management Safety protocol which would have ensured that the individual decision

makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*; and

(k)      Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

437.   Additionally, the 2009 Sustainability Review, published April 15, 2010, which emphasized BP's systematic approach to safe and environmentally responsible operations, stated further, in part:

> BP's operating management system (**OMS) provides a single framework for all BP operations to follow,** covering all areas from process safety, to personal health, to environmental performance.
>
> Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken. Its principles and processes are designed to simplify the organization, improve productivity, **enable consistent execution** and focus BP on performance.

438.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)      Because the 2009 Sustainability Review was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was required to review the 2009 Sustainability Review and make recommendations to the board concerning its adoption and publication; *see also* 2008 Form 20-F at 69;

(b)     SEEAC, including Defendant Hayward, specifically discussed and reviewed the content of the "2009 Sustainability Review" and the companion document titled "2009 Sustainability Reporting," which were published simultaneously, before they were released to the public. For instance, on February 24, 2010, a meeting of SEEAC was convened and attended by Defendant Hayward and other. At that meeting, the participants discussed OMS implementation, gaps in OMS implementation, process safety audits, external (investor) perceptions of BP's reporting of sustainability (safety) issues, and the proposed content of the Sustainability Reporting. The minutes state, in part:

> Mr. Wilson [the BP independent expert] also highlighted areas requiring continued attention. He referred to embedding OMS and closing remaining gaps, to establishing more formal documentation on roles and responsibilities and to improving incident investigations and subsequent learning. He also discussed closure dates on actions arising from process safety audits, and action item tracking and reporting more generally.

> ***

> Dr. Bickerton [Director of Communications, BP corporate reporting team] reviewed the approach taken to the BP Sustainability Report for 2009 and outlined its proposed content. He discussed external perceptions of the company's reporting of sustainability issues, and **reviewed the topics that are material in the public's perception.** He noted that the document in printed form would increase from 24 pages in 2009 to 32 pages in 2010 in a five chapter format.

(c)     Additionally, on March 24, 2010, a SEEAC meeting was attended by Defendants Hayward and Inglis, among others. At the meeting, Defendant Inglis presented a report to the members of SEEAC concerning implementation of OMS and Defendant Hayward stated that "the Sustainability Review had evolved to become a means of encapsulating statements of BP's policies, in addition to being a report on the company's activities." Similarly, SEEAC discussed the 2009 Sustainability Report which was "in the final stages of drafting in preparation for publication on 15th April," and had been recently updated to be "consistent with the recent presentation to investors by Dr. Hayward";

(d)     Defendants BP and Hayward misled investors by stating that the Gulf of Mexico operations had completed the transition to OMS when, in fact, *inter alia,* Defendant Hayward and other BP personnel testified in MDL 2179 that OMS had not been implemented in the Gulf of Mexico as of April 2010, and BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss the Class Complaint on November 4, 2011;

(e)     Hayward misled investors with regard to BP's OMS program, because BP did not intend for OMS to apply to BP's operations that were not fully-owned by BP, as was the case with Transocean's *Deepwater Horizon* in the Gulf of Mexico;

(f)     An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform Companywide process safety procedures; and

(g)     Defendant Hayward further misled investors regarding BP's OMS program given that he received a GORC "Internal Pre-Read" on July 31, 2009 stating that the vast majority of BP's drilling operations in the Gulf of Mexico were not covered by BP's safety operations, specifically including the Macondo Well. Defendant Hayward knew that Gulf of Mexico joint ventures (such as the Macondo well) were "not in scope" of the BP Safety & Operations audit program.

### 2.     The 2009 Sustainability Report

439.     On April 15, 2010, BP issued its 2009 Sustainability Report, which was evaluated and recommended for publication by SEEAC prior to its publication. The Sustainability Report contained misrepresentations related to BP's capability to respond to oil spills:

- **Oil Spills**

BP recognizes the risk posed to the environment from spills and takes a range of measures to prevent any loss of hydrocarbons.

*Our approach*

Our strategy to address spills has three components:

Prevention: we seek to assure the integrity of vessels and pipelines used to transport oil and other hydrocarbons.

***Preparation: we seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate contingency planning and emergency response.***

Performance: we record incidents, learn lessons and aim to reduce the number of losses from primary containment.

440.    Moreover, BP's 2009 Sustainability Report stressed BP's capability to operate safely, primarily through its implementation of OMS and commitment to improving process safety:

- **A Systematic Approach**

BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of "no accidents, no harm to people and no damage to the environment."

Our commitment to safe, reliable and responsible operations starts with the group chief executive Tony Hayward and his leadership team: a commitment that filters down through the organization and is regularly communicated to all staff.

Safety performance is a regular focus of the group chief executive's formal communications such as BP's quarterly results and in less formal communications such as his regular townhalls with BP staff. BP's leadership has continued to reinforce the importance of safety when undertaking regular site visits to BP facilities around the world and from all parts of the business.

"I am extremely proud of BP's 2009 safety performance – it reflects a sustained effort across all our operations over many years." – Tony Hayward, Group Chief Executive

*Promoting Safe Operations*

We are carrying forward our efforts on process safety, which is an integral part of our operating management system (OMS) and ingrained within our capability programmes. As participants in a second round of operations leadership sessions at MIT this year, the group chief executive and his executive team were instrumental in establishing the concept of continuous improvement to help drive systematic safety and reliability in our operations. Continuous improvement is a means of empowering our operations managers and supervisors, who are closest to our operational problems, to develop the necessary solutions.

***

- **Striving for Safe Operations**

***BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at every BP operation***

Taking a systematic approach is integral to improving safety and operating performance in BP operated sites. Our operating management system covers all areas from process safety, to personal health, to environmental performance.

***

*Unifying Way of Operating*

We have successfully introduced OMS at every refinery worldwide in advance of the internal expectations. Hugh Parsons, Vice President with responsibility for management processes in refining states that "the OMS framework has given us a common path, applicable across different sites and assets worldwide. It has provided a unifying way of operating. This is true not only for refining but across the whole of BP, where we have a much clearer definition of what 'good operations' looks and feels like, regardless of the business context."

***

- **Process Safety**

BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this.

Process safety involves applying good design principles, engineering and operating and maintenance practices to manage our operations safely.

*Process Safety Reporting*

To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, such as oil spills, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as inspections and tests of safety-critical equipment.

208

441.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP to be false at that the time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)   Because the 2009 Sustainability Report was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was required to review the 2009 Sustainability Report and make recommendations to the board concerning its adoption and publication; *see also* 2008 Form 20-F at 69;

(b)   SEEAC, including Defendant Hayward, specifically discussed and reviewed the content of the "2009 Sustainability Review" and the companion document titled "2009 Sustainability Reporting," which were published simultaneously, before they were released to the public. For instance, on February 24, 2010, a meeting of SEEAC was convened and attended by Defendant Hayward and others.   At that meeting, the participants discussed OMS implementation, gaps in OMS implementation, process safety audits, external (investor) perceptions of BP's reporting of sustainability (safety) issues, and the proposed content of the Sustainability Reporting. The minutes state, in part:

> Mr. Wilson [the BP independent expert] also highlighted areas requiring continued attention. He referred to embedding OMS and closing remaining gaps, to establishing more formal documentation on roles and responsibilities and to improving incident investigations and subsequent learning. He also discussed closure dates on actions arising from process safety audits, and action item tracking and reporting more generally.
>
> ***
>
> Dr. Bickerton [Director of Communications, BP corporate reporting team] reviewed the approach taken to the BP Sustainability Report for 2009 and outlined its proposed content. He discussed external perceptions of the company's reporting of sustainability issues and reviewed the topics that are material in the public's perception. He noted that the document in printed form would increase from 24 pages in 2009 to 32 pages in 2010 in a five chapter format.

(c)     Additionally, on March 24, 2010, a SEEAC meeting was attended by Defendants Hayward and Inglis, among others.  At the meeting, Defendant Inglis presented a report to the members of SEEAC concerning implementation of OMS across BP and Defendant Hayward stated that "the Sustainability Review has evolved to become a means of encapsulating statements of BP's policies, in addition to being a report on the company's activities". Similarly, SEEAC discussed the 2009 Sustainability Report which was "in the final stages of drafting in preparation for publication on 15th April," and had been recently updated to be "consistent with the recent presentation to investors by Dr. Hayward";

(d)     Defendants were also aware that BP safety and operations audits consistently uncovered facts that were contrary to public representations of improved process safety and operations. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

(e)     The 2009 rig audit of the *Deepwater Horizon* confirmed that not all relevant personnel on the rig were knowledgeable about drilling and well operation practices including containing a blowout, and safety goals were not commonly known or properly communicated;

(f)     The Presidential Commission concluded, "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk factors on the prospects of a successful cement job";

(g)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon).*   Moreover,

employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements;

(h)     BP's Gulf of Mexico operations had failed to implement BP's OMS in any robust manner and the individuals responsible for its implementation had been terminated or moved outside of Gulf of Mexico operations;

(i)     BP's highest officers had knowledge that its Gulf of Mexico operations had caused oil spills in 2008 and two of its rigs (the *Deepwater Horizon* and the *Atlantis)* had reported operational safety problems, which would have been reported to GORC and, as such, put Defendants on notice of the inadequacy of their safety processes in the Gulf of Mexico;

(j)     BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan, understated its exposure from drilling operations in the Gulf of Mexico, and lacked adequate internal and safety controls; and

(k)     According to BP's own internal reporting, decisions regarding the Macondo well "appear to have been made by the BP Macondo well team in an ad hoc fashion . . . This appears to have been a key causal factor to the blowout."

## DD.     Events of April 20-22, 2010:  Macondo Well Blowout and *Deepwater Horizon* Explosion and Sinking

### 1.     April 20, 2010:  Macondo Well Blowout and *Deepwater Horizon* Rig Explosion

442.     On the evening of April 20, 2010, after the markets closed, the Macondo well suffered a significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater Horizon* killing 11 crew members and injuring many others. After attempts to stop the blowout failed, the surviving crew members abandoned ship, as the rig became engulfed in flames. Oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico.

### 2. April 21, 2010:  Initial Press Releases About The *Deepwater Horizon* Explosion Failed To Disclose Any Oil Leak

443.   On April 21, 2010, BP issued two press releases about the *Deepwater Horizon* explosion. In the first press release, BP confirmed a statement by Transocean reporting a fire aboard the rig. In the second press release, BP offered its full support to Transocean and said it "stood ready to assist" in responding to the tragedy. However, neither press release acknowledged that oil was currently leaking from the Macondo well into the Gulf of Mexico.

### 3. April 22, 2010:  *Deepwater Horizon* Rig Sank

444.   At approximately 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* rig sank, further damaging the riser that had connected the rig to the wellhead on the ocean floor.

### EE. The April 24, 2010 False and Misleading Statements [Permitted To Be Filed By Plaintiffs In The Class Action By The Court's Leave Order]

445.   On April 24, 2010, during a joint press conference with the U.S. Coast Guard, **Defendant Suttles stated** that BP had detected ongoing releases of oil from the Macondo well at a rate of approximately ***1,000 barrels per day***.  **Defendant Suttles also did not correct** the U.S. Coast Guard leader, Rear Admiral Landry, when she said that the U.S. government also estimated the flow rate at ***1,000 barrels per day***.  Rear Admiral Landry had asked Defendant Suttles prior to the press conference whether he could support the 1,000 barrel per day flow rate estimate and had been so reassured.  *See* MDL 2185 Doc. No. 777-2 at ¶370; Doc. 857 at 28.

446.   Defendant Suttles's scienter for the foregoing misstatements and omissions, and the falsity thereof, derive from, *inter alia*, the following:

(a)   BP engineers and at least one BP-hired consultant were modeling the "worst case" discharge from the well in the April 21-22, 2010 time period, with models that returned numbers from 64,000 to 138,000 barrels per day (*see* MDL 2185 Doc. No. 777-2 at ¶¶372-375; Doc. No. 857 at 28);

212

(b)     On April 23, 2010, BP's Ryan Malone sent an email, on which Defendant Suttles was copied, that estimated the flow rate at 31 gallons per minute, or 1,063 barrels per day.  On April 24, 2010, before Defendant Suttles made the above-referenced misstatements and omissions at issue, Mr. Malone sent another email – against copying Defendant Suttles – stating "[d]isregard the [1,063 barrels per day] estimate for flowrate" because "[i]t is wrong" (*see* MDL Doc. No. 777-2 at ¶376; Doc. No. 857 at 28);

(c)     Defendant Suttles later testified that he never "engage[d] with [BP's] flow assurance people" – *i.e.*, the engineers and consultant mentioned – before he made the April 24, 2010 statement (*see* MDL 2185 Doc. No. 777-2 at ¶377; Doc. No. 857 at 28).

### FF.     Events of April 24-28, 2010:  Reports of Leaking Oil Prompt Defendants to Fraudulently Understate the Spill's Flow Rate

447.     On Saturday, April 24, 2010, while the unsuccessful attempts to activate the BOP continued, ROVs discovered additional leaks in the broken riser. Although officials had initially estimated that it would take the ROVs 24 to 36 hours to deploy the BOP, by Monday, April 26, 2010, oil continued to spew into the Gulf of Mexico. This news caused BP ADSs to fall $1.97 per ADS, closing at $57.91 per ADS or more than 3% on April 27, 2010.  BP's ordinary shares suffered a similar decline.

448.     Beginning on April 26, 2010, Rainey, who had been assigned to the Unified Command, undertook the task to create a BP flow rate estimate, despite lacking prior experience calculating oil spill flow rates.  Initially consulting the online encyclopedia "Wikipedia," Rainey created or caused to be created several spreadsheets purporting to show a "best guess" of flow rate at 5,000 to 6,000 barrels per day.  Ultimately, Rainey developed his own methodology for estimating flow rates, which did not comport with industry standards, and applied it in a manner rife with mathematical and procedural inaccuracies.  None of the infirmities and inaccuracies in

Rainey's work was contemporaneously known by Plaintiffs or investors at large.  Each time, Rainey's "analysis" yielded BP's desired result, which was a "best guess" of flow rate close to 5,000 barrels per day.  Unbeknownst to Plaintiffs and other investors, Rainey's flawed spreadsheets also showed a high flow rate of approximately 14,000 barrels per day.

449.   On April 28, 2010, NOAA's representative on the Unified Command expressed a concern that the flow rate was higher than the 1,000 barrels per day that previously had been publicly reported by the Unified Command.  Upon hearing this concern, a senior member of the Unified Command approached Defendant Suttles and asked for BP's flow rate estimate so that the Unified Command could update the publicly disclosed flow rate number.  Suttles responded that BP's internal flow rate was between 1,000 barrels per day and 5,000 barrels per day, with 2,500 barrels per day being the most likely number.  No document exists to support this statement by Suttles.

**GG.    The April 28 - 29, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained per NY/Ohio Order (Misrepresentations #42 and 43)]**

450.   On April 28, 2010, after the markets closed, in reliance upon Suttles' representation, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that NOAA had increased its estimate of the oil flow rate from 1,000 to only 5,000 barrels per day.

451.    During the joint press conference in Louisiana, Defendant Suttles again reiterated that BP's best estimate was that *1,000 barrels of oil per day were flowing from the Macondo well.* In addition, Suttles stated, in part, as follows:

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak. This leak is just beyond the top of the blowout preventer in the pipe work called the riser. Given the location, *we do not believe this changes the amount currently estimated to be released*.

452.    The following day, April 29, 2010, Department of Homeland Security Janet Napolitano announced that "*today I will be designating that this is a spill of national significance.*"

453.    On the same day, April 29, 2010, Defendant Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well while he was in Louisiana.  For example:

(a)    During an interview with CBS's "The Early Show," Suttles stated, in part: "I think that somewhere **between one and five thousand barrels a day is probably the best estimate** we have today."[4]

(b)    Similarly, during an interview on ABC's "Good Morning America," Suttles, stated, in part: "I think ***between one and 5,000 barrels a day is a reasonable estimate***."

(c)    Likewise, on NBC's "Today Show," Suttles stated, in part:  "I actually don't think there's a difference between NOAA's view and our view.  I would say ***the range is 1,000 to 5,000 barrels a day***."

454.    On the news that spill estimates had increased to 5,000 barrels per day and Secretary Napolitano's designation of the spill as one of "national significance," BP ADSs fell from $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS or more than 8%.  BP's ordinary shares suffered a similar decline.

455.    Although the price of BP securities fell in response to this news, the price of BP's securities were still artificially inflated due to the false and misleading statements made by Defendant Suttles on April 28 and 29, 2010, as well as those made by BP, Suttles, McKay, Hayward, and Dudley in the days and weeks ahead (as alleged below).

---

[4] All emphasis in quoted text herein is added unless otherwise specifically noted.

**HH.    BP's False and Misleading Misstatements In SEC Filings Made on April 29 - 30, 2010 and on Its Corporate Website on April 30, 2010 [Sustained per Alameda Order]**

456.    On April 29, 2010, BP filed a Form 6-K with the SEC addressing the Deepwater Horizon explosion and sinking and containing quotes by Defendant Hayward.  In it, BP stated in part: "Efforts continue to stem the flow of oil from the well, ***currently estimated at up to 5,000 barrels a day***."  This statement was made in Washington, D.C.

457.    On April 30, 2010, BP filed a Form 6-K with the SEC addressing its response effort, which contained quotes from Defendant Hayward.  In it, BP stated in part: "Efforts to stem the flow of oil from the well, ***currently estimated at up to 5,000 barrels a day***, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the flow out preventer (BOP) on the sea bed."   This statement was made in Washington, D.C.

458.    On April 30, 2010, BP published on its corporate website the same 5,000 barrels per day oil flow estimate as articulated in its Form 6-K filed with the SEC that day.

**II.    Additional Reasons Why The Statements On April 24 - 30, 2010 Were False And Misleading And Were Made With Scienter**

459.    Each of the misrepresentations in Sections IX. EE., GG., and HH. above were materially false or misleading when made, and were known by Defendant Suttles (Sections IX. EE. and GG.) and BP (Sections IX. EE., GG., and HH.) to be false at that time, or were made with reckless disregard for the truth, because they falsely represented that the amount spilling from the Macondo well was between 1,000 and 5,000 barrels of oil per day.  Indeed, as discussed herein, BP agreed on November 15, 2012 to the pay the third-largest penalty in the SEC's history, $525 million, to settle securities fraud charges arising, in part, from the misrepresentations described in Sections IX. EE., GG., and HH. above.

460.    In contrast to Suttles's and BP's misrepresentations on April 24-30, 2012 (as set forth in Sections IX. EE., GG., and HH. above) that the oil flow rate was between 1,000 and 5,000 barrels per day, they failed to disclose that BP's then-existing, internal "best estimate" of the amount of oil flowing from the well, unbeknownst to the investment markets, was in actuality *many multiples* greater.

461.    When the statements set forth in Sections IX. EE., GG., and HH., which caused BP common stock and ADSs to trade at artificially high prices, were made, BP and Suttles knew them to be false or were severely reckless in not knowing them to be false.  BP admitted in its November 15, 2012 Consent with the SEC that by April 28, 2010, BP had possessed at least four internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 barrels per day.  They were:

(a)     BP engineers and at least one BP-hired consultant were modeling the "worst case" discharge from the well in the April 21-22, 2010 time period, with models that returned numbers from 64,000 to 138,000 barrels per day (*see* MDL 2185 Doc. No. 777-2 at ¶¶372-375; Doc. No. 857 at 28);

(b)     By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates *between 64,000 barrels per day and 146,000 barrels per day*.

(c)     On April 23, 2010, BP's Ryan Malone sent an email, on which Defendant Suttles was copied, that estimated the flow rate at 31 gallons per minute, or 1,063 barrels per day.  On April 24, 2010, before Defendant Suttles made the above-referenced misstatements and omissions at issue, Mr. Malone sent another email – against copying Defendant Suttles – stating

"[d]isregard the [1,063 barrels per day] estimate for flowrate" because "[i]t is wrong" (*see* MDL Doc. No. 777-2 at ¶376; Doc. No. 857 at 28);

(d)     Defendant Suttles later testified that he never "engage[d] with [BP's] flow assurance people" – *i.e.*, the engineers and consultant mentioned – before he made the April 24, 2010 statement (*see* MDL 2185 Doc. No. 777-2 at ¶377; Doc. No. 857 at 28)

(e)     On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of 100,000 barrels per day.

(f)     By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 barrels per day.

(g)     On April 27, 2010, a BP engineer estimated the oil flow rate to be approximately 5,000 to 22,000 barrels per day on the basis of temperature readings along the riser pipe, among other factors.

(h)     By April 28, 2010, Rainey's own spreadsheets showed a flow rate ranging up to over 14,000 barrels per day.

462.     In addition, by April 28, 2010, BP had learned that there was oil leaking also from the "kink," the place where the riser pipe had bent before it came to rest on the ocean floor.  This fact represented a totally separate leak point, the flow from which would necessarily add to the total being calculated and reported.

463.     Given that BP possessed data, estimates, and calculations significantly higher than 5,000 barrels per day, for BP and Suttles to publicly disclose that the flow rate had been estimated by BP as ranging "up to 5,000" barrels per day was knowingly and materially false and misleading.   Moreover, failing to disclose even the existence of data, estimates, and calculations

showing a higher flow rate also constituted a material omission of information regarding the oil flow rate.

464.    Further, Rainey's deposition testimony in MDL 2179 indicated that one internal estimate of the amount of oil flowing from the well was as high as 92,000 barrels per day. These figures were provided to BP's senior management in two internal BP documents dated April 26, 2010 and April 27, 2010 – i.e., **before** Suttles made his public misrepresentations. In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles's misrepresentations and stated, in part, as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. *Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.*
>
> ***
>
> BP has also turned over another document dated April 26 [2010] which includes a 5,000 barrel per day figure as well. *So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels* that were spilling into the Gulf every day.

**JJ.    Events of May 3, 2010:  BP Accepts Full Responsibility For the Oil Spill**

465.    On May 3, 2010, after initially blaming Transocean and others for the Macondo well blowout and spill, BP admitted that it was fully responsible for the disaster in the Gulf of Mexico. More specifically, Defendant Hayward told NPR's Steve Inskeep that: "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . . We will absolutely be paying for the cleanup operation. There is no doubt about that. It's our responsibility – we accept it fully." On this news, BP's ADSs fell from $52.15 per ADS on Friday, April 30, 2010 to close

at $50.19 per ADS on Monday, May 3, 2010, a decline of $1.96 per ADS or almost 4%.  BP's ordinary shares suffered a similar decline.

### KK.  BP's False and Misleading Statements in Its SEC Filing on May 4, 2010 [Sustained per Alameda Order]

466.   On May 4, 2010, BP filed a Form 6-K with the SEC, which contained quotes from Defendant Hayward and in which BP stated in part: "[C]urrent estimates by the U.S. National Oceanic and Atmospheric Administration (NOAA) suggest *some 5,000 barrels (210,000 U.S. gallons) of oil per day* are escaping from the well."  This statement was made in Washington, D.C.

467.   The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by BP to be false at that time, or was made with reckless disregard for the truth.  BP omitted from this Form 6-K the material fact that, by that date, its own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.  For the same reasons, BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.  Likewise, for the same reasons, it was misleading to use NOAA's 5,000 barrels per day as the "best estimate" as the basis of any public disclosure when BP itself had its own, higher range of flow rate estimates.

### LL.  The May 5, 2010 False and Misleading Statements [Sustained per Alameda Order; sustained per NY/Ohio Order (Misrepresentation #45)]

468.   On May 5, 2010, Defendant Hayward conducted an interview with journalists from the Houston Chronicle, at BP's offices in Houston, Texas. In reference to the oil flow rate

at the Macondo well, Hayward stated, "*A guesstimate is a guesstimate. And the guesstimate remains 5,000 barrels a day.*"

469.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth. Hayward omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.   For the same reasons, Hayward also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.

### MM.  The May 14, 2010 False and Misleading Statements [Sustained per Alameda Order]

470.    On May 14, 2010, Defendant Suttles appeared on ABC's "Good Morning America," during which interview he stated in part:  "[O]urselves and the people from NOAA and others believe that *something around 5,000, that's actually barrels a day, is the best estimate*."  This statement was made in Louisiana.

471.    Also on May 14, 2010, Defendant Suttles appeared on NBC's "Today Show," where he was asked whether BP had "underplayed" the size of the leak and "[I]s it possible that you are actually leaking more than 5,000 barrels a day?  Yes or no."  In response, Suttles replied in part:  "I don't think it is wildly different than that number…it could be a bit above or below." This statement was made in Louisiana.

472.    Additionally on May 14, 2010, on CNN.com, BP publicly reasserted the 5,000 barrels per day number and directly rejected a Purdue University professor's estimate that the flow rate was up to 70,000 barrels per day.  Specifically, Defendant Dudley, who at the time was BP's Managing Director and one of its top officials coordinating BP's oil spill response, called the 70,000 barrel-per-day figure "not accurate at all" and said it "isn't anywhere I think within the realm of possibility."   As discussed below, Dudley essentially disavowed this statement altogether as having been false just two weeks later, on May 30, 2010.  On or about July 27, 2010, BP announced that Dudley would become BP's new CEO, succeeding Hayward, which he did on October 1, 2010.

473.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by BP and Suttles to be false at that time, or were made with reckless disregard for the truth.  Suttles omitted his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.  For the same reasons, BP and Suttles also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico. Likewise, for the same reasons, it was misleading to use NOAA's 5,000 barrels per day as the "best estimate" as the basis of any public disclosure when BP itself had its own, higher range of flow rate estimates.

474.    Indeed, as BP admitted in its November 15, 2012 Consent with the SEC, a BP senior engineer performed work that resulted in an estimated range of flow rates between 14,000

and 96,000 barrels per day, which he shared internally with BP executives during the second week of May 2010.  That same engineer read on CNN.com that BP had publicly reasserted the 5,000 barrels per day flow rate while refuting the Purdue University professor's figure of 70,000 barrels per day, and after doing so, wrote an email to a senior executive within BP's Exploration and Production business segment and a junior executive tasked to support him, stating:

> I just read an article on CNN (May 14, 2010 1:00 pm) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd figure.  With the data and knowledge we currently have available we cannot definitively state the oil rate from this well.  ***We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd*** depending on a number of unknown variables…   We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information.

This email failed to spur any discussion within BP as to whether it should update or correct its prior disclosures about the 5,000 barrels per day figure.

### NN.   The May 17, 2010 False and Misleading Statements [Sustained per Alameda Order]

475.    On May 17, 2010, at a Unified Command press briefing in Louisiana, Defendant Suttles was asked if BP was "certain how much is actually leaking and that it is about that 5,000 barrel figure we used to hear before?"  In response, he stated in part: "***[T]hat's our best estimate today***.  Clearly people are constantly asking that question."

476.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Suttles to be false at that time, or was made with reckless disregard for the truth. Suttles omitted his statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.  For the same reasons, Suttles also failed to disclose

that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.

### OO.   The May 19, 2010 False and Misleading Statements [Sustained per Alameda Order]

477.   On May 19, 2010, Defendant McKay appeared before the Committee On Transportation And Infrastructure in Washington, D.C. and said the following in response to a question about whether "5,000 barrels per day [was] the most accurate" figure for the amount of oil leaking into the Gulf:

> [McKay] **That is our best estimate**.  Obviously, it's continually being looked at. As you may know, we've gotten this riser insertion tube to work, and we're getting increased volumes at the surface where we can actually measure.  And then, I believe there is a new small task force that has been put together under direction of Unified Command to get all the experts together in a room and try to understand, with the latest available data, is there a more accurate estimate?  But we do recognize there is a range of uncertainty around the current estimate.

478.   The following exchange ensued later during this same hearing:

> [Rep. LAURA A. RICHARDSON]: . . . Why is there a disagreement between the total amount of oil that is leaking?  BP has said 5,000, other reports are saying otherwise.  Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?

> Mr. McKay.  I think there are a range of estimates and it is impossible to measure. That is the reality.   What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface. And those two added together is the estimated volume.  It has been clear from day one there is a large uncertainty range around that.

> Mr. Richardson.  Is it possible it could possibly be the larger number that has been reported?

> **Mr. McKay**.  It is theoretically possible.  **I don't think anyone believes it is quite that high that has been working on this.  I believe the uncertainty range is around that 5,000 number, and it could be higher.  But if the number you**

**are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.**

479.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the truth.  McKay omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.  For the same reasons, McKay also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.  In reality, BP's own internal estimates were significantly closer to the 70,000 barrels per day McKay dismissed as someone working on the spill response would not believe.

### PP.   The May 20, 2010 False and Misleading Statements [Dismissed per South Yorkshire Order]

480.   On May 20, 2010, BP filed a Form 6-K with the SEC entitled "Update On Gulf Of Mexico Oil Spill Response."  In it, BP provided an update on containment measures aimed at reducing the amount of leaking oil that escaped into the Gulf.  BP stated, "The volume of oil and gas being collected by the riser insertion tube tool (RITT) containment system at the end of the leaking riser is estimated to be about 3,000 barrels a day (b/d) of oil and some 14 million standard cubic feet a day of gas.  The oil is being stored and gas is being flared on the drillship Discoverer Enterprise, on the surface 5,000 feet above."   This statement was made in Washington, D.C.

481.    The foregoing statement, which gave the impression that BP was capturing sixty percent (60%) of the oil leaking from the blown well given its publicly stated 5,000 barrel per

day flow rate, caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant BP to be so at that time or was made with reckless disregard for the truth.  BP omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.  For the same reasons, BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico, and that, as a result, the amount of oil being captured by BP's RITT containment system was a negligible amount as compared to the oil flow actually leaking.

### QQ.  The May 21, 2010 False and Misleading Statements [Sustained per Alameda Order]

482.  On May 21, 2010, while in Louisiana, Defendant Suttles appeared once again on ABC's "Good Morning America," where he was asked point-blank as to whether he and BP were being truthful in their oil flow estimates.  Specifically, this exchange occurred:

> Q:  People have really had enough of this.  You know, initially, you were saying 5,000 barrels were leaking.  Now we can see for ourselves that it's far more than that.  Could be – approaching 100,000.  Did you deliberately underestimate the size of the spill and mislead the public?
>
> Suttles:  Robin, you know, from the beginning, we've, we, we've worked with the government on this estimate.  In fact, I should actually point out that the 5,000 barrels a day… That was not just BP's estimate.  That was the estimate of the Unified Command, including NOAA and the Coast Guard.  ***And that's the best estimate we have.***  We can't put a meter on this thing.  We can see what you can see.  We can see what's on the surface. …

483.  Also on May 21, 2010, Suttles appeared at a Unified Command press briefing in Louisiana, where in response to a question he stated in part:

> [W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times.  And we've said since quite early on

226

in this that ***our best estimate was around 5,000 barrels a day***…   So ***at the moment, that's our best estimate***.

484.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by Suttles to be false at that time, or were made with reckless disregard for the truth.   Suttles omitted from his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.   For the same reasons, Suttles also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico. Likewise, for the same reasons, it was utterly misleading to use NOAA's 5,000 barrels per day as the "best estimate" as the basis of any public disclosure, or to reference the Unified Command, NOAA, and the Coast Guard as evidence of the validity of such a statement, when BP itself had its own, higher range of flow rate estimates.

## RR.   The May 22, 2010 False and Misleading Statements [Sustained per Alameda Order]

485.   On May 22, 2010, Defendant Suttles was interviewed on NPR's "Weekend Edition" while he was in Louisiana.   During the course of the interview, Suttles made repeated misrepresentations about the oil flow rate from the Macondo well, including among others:

Q:  And how much oil is billowing into the Gulf right now?

Suttles:   Well, Scott, I precisely don't know.   We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others.   We can monitor what comes out of that pipe, but that's visual.   It's very difficult to measure that.   There's no meter.   But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at the difference.   ***And***

*those are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do*…

Q:  Now…there's independent scientists who've made their own estimates at NPR's request, and they've come up with a substantially higher figure than 5,000.  They say as much as 70,000 barrels a day.

Suttles:  *I've heard those [70,000 barrels a day] estimates and seen them and I don't believe it's possible that it's anywhere near that number*… since I can't meter it, I can't actually say it couldn't be.  But *all of our techniques say that that's highly unlikely.*  And I think some of the reasons these estimates may not be able to accurately calculate is there's a large volume of gas coming out of the end of that pipe with the oil.  And in addition to that, we, particularly over the last few days, when we've had good weather, we've actually seen the size of the spill and the amount of the oil on the surface go down.  *So those are the things that lead me to believe that those estimates are way too high*.

Q:  What I'm trying to understand is if, and I will split the difference, but let's say that it's 30,000 barrels a day that are spilling – if you try to top kill…do you risk using a technique that could make the spill even worse?

Suttles:  No, I don't believe that's the case, Scott, and *we don't think the rate's anywhere near that high*.

486.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by Suttles to be false at that time, or were made with reckless disregard for the truth.  Suttles omitted from his statements the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.  For the same reasons, Suttles also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of Mexico.  Likewise, for the same reasons, it was misleading to reference NOAA and the Coast Guard's role in estimating the oil flow rate as evidence of the validity of Suttles's statements reaffirming the

5,000 barrels per day figure and refuting the 30,000 and 70,000 barrels per day figures, when BP itself had its own, higher range of flow rate estimates.

### SS.    The May 24, 2010 False and Misleading Statements  [Dismissed per South Yorkshire Order]

487.    On May 24, 2010, BP filed a Form 6-K with the SEC entitled "Update On Gulf Of Mexico Oil Spill Response."  This statement was made in Washington, D.C.  In it, BP provided an update on containment measures aimed at reducing the amount of leaking oil that escaped into the Gulf.  BP stated:

> In the period from May 17th to May 23rd, the daily oil rate collected by the RITT has ranged from 1,360 barrels of oil per day (b/d) to 3,000 b/d, and the daily gas rate has ranged from 4 million cubic feet per day (MMCFD) to 17 MMCFD.  In the same period, the average daily rate of oil and gas collected by the RITT containment system at the end of the leaking riser has been 2,010 barrels of oil per day (BOPD) and 10 MMCFD of gas.  The oil is being store and gas is being flared on the drillship Discoverer Enterprise, on the surface 5,000 feet above.

488.    The foregoing statements, which gave the impression that BP was capturing between twenty-seven and two-tenths percent (27.2%) and sixty percent (60%) of the oil leaking from the blown well given its publicly stated 5,000 barrel per day flow rate, caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant BP to be so at that time or was made with reckless disregard for the truth. BP omitted from this statement the material fact that, by that date, BP's own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 barrels per day figure, as set forth in Sections IX. II. and IX. TT. herein.  For the same reasons, BP also failed to disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 barrels per day was the best estimate of the amount of oil flowing into the Gulf of

Mexico, and that, as a result, the amount of oil being captured by BP's RITT containment system was a negligible amount as compared to the oil flow actually leaking.

> **TT.    Additional Reasons Why The Statements During April 30 – May 24, 2010 Were False And Misleading And Were Made With Scienter**

489.    Each of the misrepresentations in Sections IX. EE., GG. - HH., and JJ. - SS. above were materially false or misleading when made, and were known by the speaking Defendant(s) and those Defendant(s) to whom each such statement was attributable to be false at that time, or were made with reckless disregard for the truth, because they falsely represented that the amount spilling from the Macondo well was approximately 5,000 barrels of oil per day and/or rejected the idea that the flow rate could be higher.  Indeed, as discussed herein, BP agreed on November 15, 2012 to the pay the third-largest penalty in the SEC's history, $525 million, to settle securities fraud charges arising, in part, from the misrepresentations described in Sections IX. EE., GG. - HH., and JJ. - SS. above.

490.    In contrast to the misrepresentations in Sections IX. EE., GG. - HH., and JJ. - SS. above, Defendants failed to disclose that BP's then-existing, internal "best estimate" of the amount of oil flowing from the well, unbeknownst to the investment markets, was in actuality *many multiples* greater.  When the statements set forth in Sections IX. EE., GG. - HH., and JJ. - SS., which caused BP common stock and ADSs to trade at artificially high prices, were made, the speaking Defendant(s) and those Defendant(s) to whom each such statement was attributable knew them to be false or were severely reckless in not knowing them to be false.  In addition to the *five* pieces of data, estimates, or calculations that BP possessed by April 28, 2010 showing flow rates significantly higher than 5,000 barrels per day (as discussed in Section IX. II. above), BP admitted in its November 15, 2012 Consent with the SEC that between April 30, 2010 and May 24, 2010, BP generated or was aware of *eleven* additional pieces of data, estimates, and

calculations - - of which Suttles received at least six, Rainey received at least four, and Hayward knew of all eleven - - showing a range of flow rates *significantly higher than 5,000 barrels per day*.  They were:

(a)     On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates *from 5,000 barrels per day to 40,000 barrels per day*.

(b)     In early May 2010, a video analysis by a BP engineer resulted in an estimate of *20,000 barrels per day*, attributable to just the riser pipe.

(c)     On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates *from 37,000 to 87,000 barrels per day*.

(d)     On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be "ruled out" that the flow rate was "in the order of *40,000 bopd*."

(e)     On or about May 10 and May 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates *from 14,000 bopd to 96,000 bopd*.  This senior engineer shared his work internally with senior BP executives during the second week of May 2010.  As described above, on May 15, 2010, he expressed concerns in an email to a senior and a junior executive in BP's Exploration and Production business regarding BP's public statements reaffirming the 5,000 barrels per day figure and refuting a professor's calculated estimate of 70,000 barrels per day.  In the email, this engineer stated that the flow rate could be anything up to 100,000 barrels per day.

(f)     From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 barrels per day.  The critique identified what the BP engineer stated were potential errors made by that professor that,

when corrected for, yielded a revised estimate of 15,000 barrels per day, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made.

(g)     On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer yielded a flow rate calculation of 86,600 barrels per day, based on the then-estimated pressure.

(h)     From May 19 to May 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool ("RITT") showed average collection rates of approximately 5,000 barrels per day for a 12-hour period, capturing only a portion of the oil leaking from the riser, therefore indicating that the total amount of oil leaking was in excess of 5,000 barrels per day.

(i)     On May 22, 2010, an external surface expression analysis showed a range of estimated flow rate from 6,154 to 11,609 barrels per day.

(j)     On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 barrels per day.

(k)     On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil flowing out from the well, therefore indicating again that the total amount of oil leaking was in excess of 5,000 barrels per day.

491.    On May 27, 2010 the Flow Rate Technical Group ("FRTG"), a group of scientists and engineers from federal agencies and universities charged with creating an estimate of the oil

flow rate from the Macondo well, issued its first public report and statement, setting forth a flow rate estimate range of 11,000 barrels per day to 25,000 barrels per day.

492.     The same day, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

> *I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest.* I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming. So my attitude is *we have to verify whatever it is they say about the damage.*
>
> This is an area, by the way, where I do think our efforts fell short. And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front. But I do believe that *when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day,* that was based on satellite imagery and satellite data that would give a rough calculation. *At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like.*

493.     It is not surprising that BP, Suttles, Hayward, McKay and Dudley continuously misrepresented the known amounts of oil that were being released from the well. As noted in a *Rolling Stone* article dated June 8, 2010: "***For BP, the motive [to downplay the amount of oil seeping into the Gulf] is financial***. *Under the Clean Water Act, the company could owe fines of as much as $4,300 for every barrel [of oil] spilled, in addition to royalties for the oil it is squandering.*"

494.     Additionally, information regarding the oil flow rate was material to BP's investors, because the amount of oil spilled would inform any consideration of the costs of offshore and onshore oil spill response, claims for natural resource damage under the Oil Pollution Act of 1990 [33 U.S.C. §2701 *et seq.*], penalties for strict liability under the Clean Water Act [33 U.S.C. §1251 *et seq.*], as well as other potential liabilities arising from claims, lawsuits, and enforcement actions related to the explosion and sinking of the Deepwater Horizon rig and the resultant oil spill.

495.     Moreover, governmental investigations following the oil spill primarily blamed BP for the initial explosion and the ensuing oil spill, thereby exposing it to potentially massive liabilities.  For example, the Interior Department Report (dated September 14, 2011) stated:

> The loss of life at the Macondo site on April 20, 2010, and the subsequent pollution of the Gulf of Mexico through the summer of 2010 were the result of *poor risk management*, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the *Deepwater Horizon*.
>
> BP, as the designated operator under BOEMRE regulations, was *ultimately responsible* for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment

496.     Indeed, the cost of the spill to BP has been astronomical.  To date, BP has set aside over $55 billion (and counting) to pay spill-related expenses, including the $18.7 billion settlement reached with five Gulf states in early June 2015.

**UU.**     ████████████████████████████████████████████████████████████████████████████

497.     ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

498.     ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

499.     ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

(a) ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

(b)   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████   ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

(c)   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(d)

(e) ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

(f) ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

(g) ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

500. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████

501. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

502. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

503.   ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████

## X.    DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSSES

504.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs to suffer economic losses related to their purchases of BP securities during the Relevant Period.

505.    Throughout the Relevant Period, the market prices of BP securities (including those purchased by Plaintiffs) were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  For example, prior to the *Deepwater Horizon* explosion, securities analysts touted BP's renewed dedication to safety and BP's operations in the Gulf of Mexico as one of the main focuses for BP's future results:

(a)    A February 28, 2008 analyst report from JP Morgan stated that "Safety and operations: although BP has already made significant progress in this area through the implementation of the Baker panel recommendation and their 'sixpoint plan,' safety and operations remain one of BP's main priorities."

(b)      An October 9, 2009 analyst report from Bank of America stated that "[w]e believe that the focus of results will center around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . .

(c)      A February 1, 2010 analyst report from Dolmen Stockbrokers stated "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

(d)      A March 3, 2010 analyst report from Bank of America stated that "the development of recent deepwater discoveries in the GoM (e.g., Tiber field) along with further growth from TNKBP is [sic] set to be the key drivers."

(e)      A March 3, 2010 analyst report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

(f)      A March 12, 2010 analyst report from Bank of America stated that "whilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM—particularly in the Lower Tertiary area—is second to none and are clearly taking a positive view here."

506.      As set forth below, the price of BP securities significantly declined when the truth about Defendants' misrepresentations and the information alleged herein to have been concealed from the market began to be disclosed, and/or the effects thereof began to be materialized, causing a correction in the price of BP securities, resulting in the Plaintiffs suffering losses.  As a result of its transactions in BP's securities during the Relevant Period, Plaintiffs suffered damages under the federal securities laws and English common law.

507.      The relevant truth about BP's operations slowly emerged following the April 20, 2010 explosion on the *Deepwater Horizon* and BP's failed efforts to control the resulting oil spill.  Immediately prior to the explosion, BP's ADSs traded on the NYSE at approximately

$60.48 per ADS and its common stock traded at approximately 655.4 pence per share on the LSE.  Following the explosion, the price of BP ADSs began a nearly continuous decline as the artificial inflation created by the Defendants' misrepresentations and material omissions was removed from the price of the securities.

508.    In addition, Defendants' fraudulent inducement of Plaintiffs' purchases and non-sales of BP securities during the Relevant Period, through Defendants' false and misleading statements as alleged herein, proximately caused Plaintiffs to suffer consequential losses, following the April 20, 2010 explosion and the start of the oil spill, as a result of the price declines in BP's securities as delineated below.

509.    On April 26, 2010, government officials announced that attempts to stop the spill had failed and that oil was flowing into the Gulf of Mexico.  This news caused the price of BP securities to plummet.  Specifically, BP's ADSs declined $1.97 per ADS, from $59.88 per ADS on Friday, April 23, 2010 to close at $57.91 per ADS on Monday, April 26, 2010, while BP's ordinary shares fell from 639.7 pence per share on April 23, 2010 to close at 626.8 pence per share on April 26, 2010, a decline of 12.9 pence per share.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and

Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

510.     After the market closed on April 28, 2010, NOAA held a press conference during which it increased its estimate of the amount of oil spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day – five-times greater than that previously estimated by BP.  On April 29, 2010, Homeland Security Secretary Janet Napolitano declared the spill a crisis of "national significance."  This news caused the price of BP securities to fall again.  Specifically, BP ADSs fell from a closing price of $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS (or more than 8%), while BP's common stock fell from 625.0 pence per share on April 28, 2010 to 584.2 pence per share on April 29, 2010, a decline of 40.8 pence per share.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

511.     On April 30, 2010, when it was reported that the oil slick caused by the disaster reached Louisiana's coastline, BP ADSs closed at $52.15 per ADS, a decline of over $8.00 per

ADS since April 20, 2010.  Over the same time span, BP's common stock declined over 79.9 pence per share, to close at 575.5 pence per share on April 30, 2010.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

512.    In the days and weeks that followed, additional news and information emerged on a seemingly continuous basis, further partially revealing BP's wanton disregard for conducting its Gulf drilling operations in a safe manner, BP's lack of any legitimate oil spill response plan, and BP's having misrepresented its purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.  These revelations, along with additional revelations as to the significantly larger scope of the oil spill, caused BP's securities to plummet further.

513.    On May 3, 2010, BP claimed responsibility for the cleanup efforts related to the spill, with Hayward calling it "our responsibility."  BP's ADSs fell from $52.15 to $50.19 (a decline of 3.8%).  BP's common stock was not traded on the LSE on May 3, 2010, due to a

holiday, but closed at 575.5 pence per share on April 30, 2010 and opened at 546 pence per share on May 4, 2010 (representing a 5.1% decline).  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

514.    On May 8, 2010, BP disclosed that its attempts to contain the spill through the deployment of a large dome-like structure over the blown well, which had begun on May 6, 2010, had failed.  At this time, tar began to wash up on the Alabama coast.  On May 10, 2010, BP released a statement updating the public on the Gulf oil spill response and revealed that oil spill costs to date had reached $350 million.  In reaction to this news on May 8-10, 2010, BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on Monday, May 10, 2010, a decline of $0.31 per ADS, while BP's ordinary shares feel from 553.9 pence per share on Friday, May 7, 2010 to close at 549.2 pence per share on Monday, May 10, 2010.  This decline was directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed

*supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

515.    On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress Gulf Well Failed Tests Before Blast."  The article stated, in relevant part:

> A Gulf of Mexico oil well failed a pressure test hours before a drilling rig exploded last month, an executive for well owner BP Plc told the U.S. House Energy Committee that's investigating the incident.
>
> Such pressure tests are aimed at ensuring the integrity of cement poured into the well to keep out natural gas, said Committee Chairman Henry Waxman, a California Democrat, citing a report to the panel from James Dupree, BP senior vice president for the Gulf.  The tests before the April 20 blast showed "discrepancies" in pressure levels, Waxman said.
>
> \*        \*        \*
>
> *"BP, one of the largest oil companies, assured Congress and the public that it could operate safely in deep water and that a major oil spill was next to impossible," Waxman said. "We now know those assurances were wrong."*
>
> \*        \*        \*
>
> **'Serious Questions'**
>
> "BP promised to make safety its number one priority," Stupak said.  "This hearing will raise serious questions about whether BP and its partners fulfilled this commitment.  The safety of its entire operations rested on the performance of a leaking and apparently defective blowout preventer."

516.    These revelations caused BP ADSs to close at $48.50 per ADS on May 12, 2010, a decline of $0.24 per ADS from the previous day's closing price and approximately $11.98 (or 19.8%) per ADS since April 20, 2010; they caused BP's common stock to close at 541.6 pence per share on May 12, 2010, down 3.9 pence from the previous day's closing price and 113.8 pence per share (or 17.4%) from April 20, 2010.  These declines were directly related to and

were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

517.   On May 13, 2010, *The Wall Street Journal* published an article entitled "Red Flags Were Ignored Aboard Doomed Rig."  This article stated, in relevant part:

> Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed *Deepwater Horizon* rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal*.

518.   On May 13, 2010, as a result of these continuing revelations about BP's operations, BP ADSs closed at $48.10 per ADS, $0.40 per share below the previous day's closing price, while BP's common stock closed at 547.6 pence per share, 6 pence per share below the previous day's closing price.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker

Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

519.    On May 14, 2010, *The Wall Street Journal* published an article entitled "BP Wasn't Prepared for Leak, CEO Says."  This article stated, in relevant part:

> BP has been particularly vulnerable to criticism because among the large oil companies it is by far the biggest player in deepwater oil exploration.  *Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with an underwater oil leak at this depth.*
>
> *Mr. Hayward, speaking to a small group of journalists Wednesday night in Houston, admitted the oil giant had not had the technology available to stop the leak.  He also said in hindsight it was "probably true" that BP should have done more to prepare for such an emergency of this kind.*
>
> "It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he said.

520.    On May 14, 2010, due to these revelations, BP's shares dropped $1.23 per ADS from the previous day's closing price to close at $46.87 per share, while BP's common stock fell 17.4 pence per share from its prior day's closing price to close at 530.20 pence per share.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

249

521.     On May 24, 2010, BP announced that the costs for addressing the Gulf oil spill had more than doubled, from $350 million to $760 million.  Additionally, BP announced that it was recovering less oil than it expected.  Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, BP's ADSs fell from $43.86 per ADS on Friday, May 21, 2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS, while BP's ordinary shares fell from 506.7 pence per share on May 21, 2010 to close at 493 pence per share on May 24, 2010.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan, and Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions.

522.     On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy drilling mud into the well to reduce outward pressure and flow from the well and thereby to permit it to be plugged.

523.     On May 27, 2010, the Flow Rate Technical Group, a group comprised of engineers and scientists from various federal agencies and universities that was tasked with creating its own estimate of the oil spill rate from *Deepwater Horizon*, issued a public report estimating the oil spill flow rate to be between 11,000 and 25,000 barrels per day.  In response to

this news, the price of BP ADSs fell $1.74 per ADS in after-hours trading, from a closing price of $45.38 on May 27, 2010, to open at $43.64 per ADS on May 28, 2010, while BP's common stock fell in after-market trading from a closing price of 520.8 pence per share on May 27, 2010 to open at 517.0 pence per share on May 28, 2010.  BP's securities fell throughout the day on May 28, 2010 as the market continued to digest this information, with BP's ADSs closing at $42.95 per ADS, for a total loss of $2.43 per ADS (or 5.35%) and BP's common stock closing at 494.8 pence per share, for a total loss of 26 pence per share (or 4.99%).  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

524.    On May 29, 2010 (a Saturday), BP revealed that its "top kill" efforts had failed. The failure of the "top kill" indicated that BP would be unable to stop the oil spill absent completion of a relief well and would have to rely on efforts to try to merely contain the spill while it completed work on two relief wells.  The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked observers, the media, and investors.  For instance:

(a)      As noted by ABC News on Saturday, May 29, 2010: "We begin tonight with breaking news from the Gulf.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed.  That live picture so many Americans have been keeping track of [*i.e.*, the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis."

(b)      Similarly, on that same day, the Agence France Presse reported, in part, that: "The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history. . ." Moreover, The Business Insider made clear that the failure of the top kill would lead to BP's securities being "slaughtered in London trading on Monday."

(c)      Also on May 29, 2010, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  This article stated, in relevant part:

> Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week.
>
> *        *        *
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

525.     On Sunday, May 30, 2010, Dudley conducted a series of interviews with U.S. media outlets in which he admitted that BP's original oil flow estimates – which he himself had personally reiterated just two weeks prior – were vastly understated.

526.     On June 1, 2010 (the first trading day since the failure of the "top kill" effort), United States Attorney General, Eric Holder, reported that the DOJ had opened formal criminal and civil probes of BP.

527.    On these May 29 – June 1, 2010 disclosures, BP's ADS fell from $42.95 per ADS on Friday, May 28, 2010, to close at $36.52 per ADS on Tuesday, June 1, 2010, a decline of $6.43 per ADS (or approximately 15%), while BP's common stock fell from 494.8 pence per share on May 28, 2010 to close at 430.0 pence per share on June 1, 2010, a decline of 64.8 pence per share (or approximately 12%). These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

528.    BP's closing price on June 1, 2010 represented a cumulative decline in the value of BP's ADSs of nearly $24.00 per ADS since April 20, 2010 (or approximately 40%) and a total decline in BP's common stock of more than 225 pence per share (or approximately 34%). These aggregate declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed

*supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

529.     Speaking to the Financial Times in Houston on June 2, 2010, Hayward admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because "***[w]hat is undoubtedly true is that we did not have the tools you would want in your tool-kit***" to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion.  This statement is a corporate admission, attributable to BP.

530.     On June 9, 2010, fears that BP would suspend dividends caused a further decline in BP Securities.  For instance, an Associated Press article published on the afternoon of June 9, 2010, entitled "Dividend worries weigh on BP shares" explained, "[c]utting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."  On this news, BP's ADS fell from $34.68 per ADS on June 8, 2010, to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS (or almost 16%), while BP's common stock fell from 408.9 pence per share on June 8, 2010 to close at 391.5 pence per share on June 9, 2010, a decline of 17.4 pence per share.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed

*supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

531.   On June 14, 2010, BP's Board of Directors officially met to discuss suspending BP's dividend payments in light of BP's agreement to set up a $20 billion claim fund for damages caused by the Deepwater Horizon catastrophe.   The press disclosed details of the meeting in negative reports that day, including, for example:

(a)   The New York Times reported, in part, as follows:

> To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually.  Senate Democrats are asking BP to set up a $20 billion cleanup fund.

> BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds.

> But in response to the federal government's requests, BP's board met Monday to consider its options.  A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called.

> A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.

(b)   According to another news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed U.S. demands that it suspend dividend payments until it pays for the cleanup of the Gulf of Mexico oil spill.

532.    On this news, BP's ADS fell from $33.97 per ADS on Friday, June 11, 2010, to close at $30.67 per ADS on Monday, June 14, 2010, a decline of $3.30 per ADS (or almost 10%), while BP's common stock fell from 391.9 pence per share on June 11, 2010 to close at 355.5 pence per share on June 14, 2010, a decline of 36.4 pence per share (or almost 9%). These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

533.    The next day, on June 15, 2010, the FRTG released its latest public report, revising its oil flow rate estimates upward again, to between 35,000 barrels per day and 60,000 barrels per day.[5] On this news, BP ordinary shares fell from 355.45 pence per share on June 14, 2010 to close at 342.00 pence per share on June 15, 2010. These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead

_____

[5] The FRTG maintained this estimate until August 2, 2010, when it issued its final report, estimating the oil flow rate at between 52,700 barrels per day and 62,200 barrels per day during the course of the leak, meaning a total of 4.9 million barrels of oil was spilled overall.

investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

534.   On June 21, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2 billion, an increase compared to prior estimates.  Also, on June 21, BBC interviewed a Deepwater Horizon worker, Tyrone Benton ("Benton"), ***who claimed to have spotted a leak in safety equipment weeks before the explosion***.  Benton claimed the leak in the blowout preventer was not fixed at the time, but instead the faulty device was shut down and a second one used.  Benton said: "We saw a leak on the pod, so by seeing the leak ***we informed the company men***. . . . They have a control room where they could turn off that pod and turn on the other one, so that they don't have to stop production."  He said to repair the control pod would have meant temporarily stopping drilling work on the rig at a time when it was costing BP $500,000 per day to operate the Deepwater Horizon.  Thus, ***BP clearly chose to prioritize cost savings over safety***.

535.   On this news, BP ADS fell $1.43 (or 4.5%) on June 21, 2010 to close at $30.33 and fell another 65 cents on June 22, 2010, while BP's common stock fell 7.95 pence per share to close at 349.5 pence per share on June 21, 2010 and another 15.3 pence per share (or 4%) on June 22, 2010.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public

statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

536.    On June 25, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2.35 billion.  There was also concern that tropical storm Alex may disrupt the clean-up response.

537.    On this news, BP ADS fell $1.72 (or 6%) from its June 24, 2010 closing price of $28.74 to close at $27.02 on June 25, 2010, while BP's common stock fell 20.65 pence per share (or 6.4%) from its June 24, 2010 closing price of 325.25 pence per share to close at 304.6 pence per share on June 25, 2010.  These declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants'

post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

538.    In total, the price of BP ADS fell $33.68 between April 20, 2010 and June 25, 2010, from $60.70 to $27.02, representing a cumulative decline of over 55%.   During the same time span, the price of BP's common stock fell from 655.4 pence per share to 304.6 pence per share, representing a cumulative decline of 53.5%.   These aggregate declines were directly related to and were proximately caused by the market absorbing information partially revealing risks Defendants had concealed throughout the Relevant Period as discussed *supra*, including, *inter alia*, that, contrary to Defendants' public statements, BP had been recklessly conducting its drilling operations in the Gulf, without a legitimate spill response plan; Defendants had mislead investors, through the misrepresentations and omissions discussed *supra*, about BP's purported reforms and process safety enhancements, such as, among other things, the purported implementation of the Baker Panel recommendations, OMS, the Operations Academy and Operating Essentials program, and the S&O audit across BP's global operations without exceptions or exclusions; and Defendants' post-spill statements had misrepresented the amount of oil believed to be spilling into the Gulf on a daily basis.

539.    Based on the foregoing, Plaintiffs are entitled to recover, under the U.S. federal securities laws, for their losses related to their BP ADS transactions and holdings during the Relevant Period.

540.    In addition, based on the foregoing, Defendants' fraudulent inducement of Plaintiffs' purchases of BP ADSs and BP common stock during the Relevant Period, through Defendants' false and misleading statements and omissions as alleged herein, caused Plaintiffs to suffer economic losses recognizable and recoverable under English law.   As described *supra*, the

price of BP ADSs and BP common stock purchased by or on behalf of Plaintiffs significantly declined below their original purchase price(s) on the partial corrective disclosure dates set forth above, during which time Plaintiffs held such shares. In addition, as a result of Defendants' ongoing and continuing misrepresentations up through May 24, 2010, including Defendants' post-spill misrepresentations, Plaintiffs continued to retain BP ADSs and common stock (including those purchased prior to the spill) and suffered further losses, having been induced to do so by such ongoing and continuing misrepresentations, until Defendants' fraud was fully revealed on June 25, 2010.

541. The price declines in BP ADSs and BP common stock, as described above, and Plaintiffs' resulting losses are a consequence of Defendants' inducement of Plaintiffs' purchases and/or continued holding of BP securities through the false and misleading statements alleged herein. Accordingly:

(a) In remedy of Defendants' deceit and FSMA violations, Plaintiffs are entitled to recover the difference between Plaintiffs' purchase price(s) and the value of their BP securities at the point at which it ceased to be reasonable to retain them and the fraud was fully revealed;

(b) In remedy of Defendants' negligent misstatements, Plaintiffs are entitled under common law to recover at least the difference between the price(s) Plaintiffs paid for their BP securities and the actual value of those securities on the date(s) of purchase. However, because Defendants' negligent misstatements were not fully withdrawn and therefore continued to operate throughout the Relevant Period, including the post-spill time period, Plaintiffs were induced to retain their BP securities as alleged herein, and thus are entitled to recover instead the difference between the price(s) Plaintiffs paid for their BP securities and the securities' value on the date the negligent misstatements at issue were fully withdrawn; and

(c)     Under English law, Plaintiffs are also entitled to recover consequential measures of damages and lost profits on foregone opportunities flowing from Defendants' wrongful conduct as alleged herein, necessary to put Plaintiffs as nearly as possible in the position Plaintiffs would have been if Defendants' such wrongful conduct had not occurred.

(d)     To the extent that Plaintiff's claims solely arise from inducement to continue holding previously-purchased BP securities, Plaintiff  is alternatively entitled to recover the difference between the price(s) of such securities on the date(s) on which it was induced to continue holding them by Defendants' deceit alleged herein and the price of such securities on the earlier of (i) the actual date(s) on which Plaintiff sold such securities on or after April 26, 2010 up to and including June 25, 2010; or (ii) the actual dates on which Plaintiff can establish it would have sold such securities but for the Defendants' ongoing deceit.

## XI.   NO SAFE HARBOR APPLIES TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

542.    To the extent that any safe harbor is provided for forward-looking statements under certain circumstances, such safe harbor does not apply to any of the false and misleading statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

543.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

544.    Alternatively, to the extent that any safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

## XII.   PLAINTIFFS' DIRECT RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

545. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████  ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

███████████

546. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

547. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

548. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████    ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

263

549.

550.

551.

552.

553.



554.

555.

556.

557.

558.

559. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

560. ████████████████████████████████████████████
██████   ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

561. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████    ████████████████
████████████████████████████████████████████
████

562. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

563. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████

564. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████

565.   ████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████   ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

                        ██████████

566.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

567.   ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████

270

568. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

569. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

570. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

571. ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



572.

573.

574.

575.

576.

577.

578.

579.

580. ████████████████████████████████████

581. ████████████████████████████████████

582. ████████████████████████████████████

583.

584.

585.

██████████████████████████████████████████████████████

██████████

586.   ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

**XIII.  ADDITIONAL RELIANCE ALLEGATIONS: (A) DEFENDANTS' INTENT TO INDUCE PLAINTIFFS' RELIANCE; (B) PRESUMPTIONS OF PLAINTIFFS' RELIANCE; AND (C) PLAINTIFFS' INDIRECT RELIANCE ON DEFENDANTS' MISSTATEMENTS AND OMISSIONS THROUGH THEIR DIRECT RELIANCE ON THE PRICE INTEGRITY OF BP SECURITIES**

587.    Defendants intended to induce Plaintiffs' reliance on the false and misleading statements and omissions alleged herein.

588.    BP and the Individual Defendants voluntarily disseminated the information in the false and misleading statements and omissions alleged herein to the market.

589.    Insofar as BP is a publicly-traded company, which by law is required to make certain filings and statements regarding its operations and financial performance, Defendants

knew, understood and had reason to expect that: (1) their misstatements and omissions would artificially inflate the price of BP securities; (2) their statements would be distributed to or available to Plaintiffs and the investing public; (3) investors like the Plaintiffs would rely on Defendants' statements and on the price of BP securities as reflecting accurate information known to BP and its principals; (4) Defendants' misstatements and omissions would induce Plaintiffs and/or their agents to purchase BP securities, as well as  to continue to hold such securities even after the April 20, 2010 *Deepwater Horizon* explosion and start of the resulting oil spill.

590.    The misrepresentations and omissions alleged herein were material, inflated the price of BP securities, and induced reasonable investors to misjudge the value of BP's securities.

591.    In purchasing BP's securities, Plaintiffs and/or their investment advisors also justifiably or reasonably relied on the reasonable assumption that the market price of BP's securities was not affected by material misrepresentations and omissions by Defendants, and that the price of BP securities reflected accurate and truthful information issued by Defendants.

592.    ████████████████████████████████████████████████████

████████████████████████████████████████████

593.    Without knowledge of the misrepresented or omitted facts alleged herein, Plaintiffs and/or their investment advisors purchased or otherwise acquired BP securities during the Relevant Period, during which time the price of BP's securities was artificially inflated by Defendants' misrepresentations and omissions.

594.    Defendants intended that the misrepresentations alleged herein be conveyed to Plaintiffs and their investment advisors because those misrepresentations were directed to existing BP shareholders, investors, and the market at large.  Thus, Defendants had every reason

to expect that their misrepresentations would materially inflate the price of BP securities, and thereby cause Plaintiffs and/or their investment advisors to purchase BP's securities at artificially inflated prices, in justifiable reliance on the misrepresentations.  Defendants knew that there was an especial likelihood that the misrepresentations would reach Plaintiffs and/or their investment advisors, and would influence their BP investment decisions.  The Defendants are responsible for Plaintiffs' damages, which resulted from Defendants' misconduct.

595.    Defendants were required to present BP's operations, including without limitation its actions (or lack thereof) to enhance BP's process safety, and BP's Gulf oil spill response, including without limitation the most accurate data on the oil flow rate, in a fair and accurate manner in, among other documents, filings with U.S. and U.K. regulators, press releases and Defendants' other public statements.  Defendants were required to file Forms 20-F, Forms 6-K and other reports with the SEC pursuant to the Exchange Act, 15 U.S.C. § 78 *et seq*., which mandates periodic filings of disclosure documents and is devised to protect the Plaintiffs as investors, and to publish similar annual, semi-annual and interim reports under the United Kingdom Listing Authority's Disclosure and Transparency Rules ("DTR"), which were enacted to protect investors such as Plaintiffs from misrepresentations by public companies like BP.  Thus, Defendants had reason to expect that Plaintiffs and the investing public would be influenced by and rely upon the statements in BP's public reports, as the class of persons intended by Congress to be protected by the Exchange Act, and the class of persons intended to be protected under the DTR and other European Directives, including the Transparency Obligations Directive.   As described herein, Defendants made such filings in the U.S. and the U.K., which are alleged to have contained material misstatements and omissions, made with scienter and/or intent to deceive.  As such, Defendants are presumed to have reason to expect

that the false and misleading statements contained therein would reach and influence the Plaintiffs, as they did, as the class of persons the above-referenced U.S. and U.K. laws are designed to protect.

596.   Plaintiffs are entitled to a presumption, under *Esso Petroleum Ltd v. Mardon* [1976] QB 801 and its English-law equivalents, that if the false statements and omissions of material fact alleged herein had not been made by Defendants as alleged herein, Plaintiffs would not have purchased the BP securities at issue.

597.   Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) and its English-law analogues, because the claims asserted herein against Defendants are also predicated upon omissions of material fact which there was a duty to disclose.

598.   Plaintiffs will also rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)     The omissions and misrepresentations were material;

(c)     BP's securities traded in efficient markets;

(d)     The misrepresentations alleged would induce a reasonable investor to misjudge the value of BP's securities; and

(e)     Plaintiffs, through their investment advisers, purchased BP securities during the Relevant Period without knowledge of the misrepresented or omitted facts.

599.   At all relevant times, the market for BP securities was efficient for the following reasons, among others: (1) BP's ADSs were listed and actively traded on the NYSE and BP's

ordinary shares were listed and actively traded on the LSE; (2) BP filed periodic public reports with the SEC; (3) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, posting of materials on its corporate website, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and (4) numerous investment analysts followed BP and issued investment research reports on BP that entered the public markets.

600.    In the parallel Class Action, Defendants conceded that the market for BP ADSs was efficient during the Relevant Period.

## XIV.   PLAINTIFFS' CLAIMS ARE TIMELY

601.    The claims asserted herein were initially filed within applicable limitations and repose periods and/or benefit from tolling.

602.    The statute of limitation applicable to Plaintiffs' common law claims under English law is six years, subject to a discovery rule.  Due to the facts alleged herein, due to Defendants' continuing fraud and fraudulent concealment, Defendants' fraud was not fully revealed until June 25, 2010.

603.    Filing of the initial class action complaint in the first action that would become the parallel Class Action served to toll the statute of limitations and/or the statute of repose for all individual claims of putative class members, including state law claims.  Until the filing of this instant action, Plaintiffs were absent class members of the putative class at issue in such complaint, and as such, they benefitted from its tolling effect.  Such tolling continued with respect to claims based on BP ordinary shares until February 13, 2012, when the Court dismissed all claims based on purchases of BP ordinary shares abroad.  Such tolling continues with respect

to claims based on BP ADSs, in light of this Court's prior decisions certifying, in part, the putative class in the parallel Class Action.

## XV.   PLAINTIFFS' CLAIMS, PRAYER FOR RELIEF, AND DEMAND FOR JURY TRIAL

604.   Defendants Hayward, Suttles, Inglis, McKay, Dudley, Malone, and Rainey are hereinafter sometimes referred to altogether as the "Individual Fraud/Deceit Defendants."

### FIRST CAUSE OF ACTION

### Common Law Deceit And Fraudulent Concealment

### (Against BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants)

605.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

606.   During the Relevant Period, Defendants BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants, individually and in concert with others, participated in the fraudulent scheme set forth herein and made (as attributed to them above), or caused BP to make, statements which, at the time and in light of the circumstances in which they were made, were materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiffs and the investing public.

607.   Defendants BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants made the foregoing false and/or misleading statements and/or failed to disclose or concealed information necessary to make such statements not misleading; which were material; with scienter and/or intent to deceive; and with the intent to induce Plaintiffs' reliance thereon and/or the foreseeability that Plaintiffs and other investors or prospective investors and/or their investment advisors would rely thereon; and upon which Plaintiffs and/or their investment advisors actually and/or justifiably relied to its detriment.

608.    Plaintiffs and/or their investment advisers acted in reasonable and justifiable reliance, both actually and presumptively, on these Defendants' false and misleading statements, the market price of BP securities and/or the integrity of the market, as alleged herein, without knowing the statements were false or misleading due to the content they contained and/or the content they omitted, when making investment decisions regarding BP securities.   These Defendants' false and misleading statements and omissions also induced Plaintiffs and/or their investment advisers to retain Plaintiffs' holdings in BP securities during the Relevant Period, including after the April 20, 2010 *Deepwater Horizon* explosion and ensuing oil spill when Defendants' post-spill misstatements and omissions perpetuated the deceit.  Had Plaintiffs and/or their investment advisors known the true facts as misrepresented and omitted by Defendants, as described above, they would not have purchased and/or retained BP's securities during the Relevant Period, or at least would not have done so at the prices that they paid or at which they did not sell, which were artificially inflated by Defendants' misconduct as alleged herein.

609.    Defendants BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants had a duty to disclose the truth, which they breached, because where a person or entity voluntarily discusses a topic, it has a duty to familiarize itself with that topic and to speak accurately and completely about it; where a person or entity voluntarily discloses information, it must disclose the whole truth; when a person or entity makes a representation and new information makes that earlier misrepresentation misleading or untrue, it must disclose the whole truth and correct its prior misrepresentation; and when a person or entity makes a partial disclosure and conveys a false impression, it must disclose the whole truth.  As described herein, these Defendants breached such duties through their misstatements and omissions.

610.     In addition, as the persons being quoted in, signing, or SOX certifying the SEC filings, filings with UK regulators, or other public statements, the Individual Fraud/Deceit Defendants were under an obligation, which they breached, to inform themselves of the subject matter contained therein and to ensure that the contents therein spoke truthfully and presented the whole truth.

611.     Defendants BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants knew or, but for their recklessness would have known, that their misstatements and omissions were false and/or misleading at the time they were made.

612.     Moreover, the subject matter of the misrepresentations and omissions alleged herein were firmly within the core operations of BP, such that knowledge is in any event imputable to Defendants.

613.     To the extent that, as regards any particular alleged misstatement or omission, knowledge or recklessness cannot be tied to any of the Individual Fraud/Deceit Defendants, then such misstatement or omission was nevertheless attributable to Defendants BP, BP America, and BP E&P, and actionable as deceit under English common law, on a theory of corporate scienter.

614.     As a result of these Defendants' false and misleading statements and omissions, Plaintiffs suffered substantial damages, the amount of which will be proved at trial.

615.     The misrepresentations and omissions, as set forth herein, constitute deceit under English common law.[6]

---

[6] The Court previously held in the Alameda Order that the FSMA *may* apply to alleged misrepresentations found in just two of the various documents and statements at issue (BP's 2008 and 2009 Annual Reports), but reserved a final ruling on such potential application until after discovery.  Plaintiff therefore expressly reserves all rights to further amend, if the Court later rules that the FSMA does indeed apply to these or any other alleged misrepresentations or omissions set forth herein and if the Court deems it necessary for an FSMA count to be affirmatively alleged.

## SECOND CAUSE OF ACTION

## Common Law Negligent Misstatement

### (Against All Defendants)

616.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except all allegations speaking only to any Defendants' subjective state of mind.

617.    Defendants expected, or it was reasonably foreseeable to them, that BP investors like the Plaintiffs and their investment managers would rely on Defendants' statements in determining whether to buy BP securities.  To the extent necessary for this claim, Defendants owed duties of care and candor to Plaintiffs and investors in BP and/or a professional or pecuniary duty to provide accurate information to Plaintiffs and their investment managers.

618.    Moreover, Plaintiffs were part of a limited group of persons, institutional investors which were pre-existing shareholders either before or at some point during the Relevant Period, who themselves or whose investment managers had direct, face-to-face meetings and teleconferences with Defendants and the identities of whom, either way, were known to BP, its Investor Relations personnel, and Defendants.  Thus, Plaintiffs were actually known to Defendants, or Defendants should have known of Plaintiffs, further evidencing Defendants' duties owed to Plaintiffs.

619.    Defendants breached their duties when they supplied false and materially misleading statements and omissions in the course of their business for the guidance of Plaintiffs and/or their investment managers to purchase and/or retain BP securities on Plaintiffs' behalf.

620.    When Defendants made the materially misleading misstatements and omissions alleged herein, they had no reasonable ground for believing them to be true.  Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

621. Defendants made untrue statements of material fact or failed to disclose material facts which rendered their affirmative statements materially misleading.

622. Plaintiffs and/or their investment advisers acted in justifiable reliance on the Defendants' false and misleading statements, the market price of BP securities and/or the integrity of the market, without knowing the statements were false or misleading, when making investment decisions regarding BP securities, including not only whether to purchase such securities but also at what price to do so. The Defendants' false and misleading statements and omissions also induced Plaintiffs and/or their investment advisers to retain Plaintiffs' holdings in BP securities during the Relevant Period.

623. Had Defendants not made the false and misleading misrepresentations and omissions alleged herein, Plaintiffs would not have purchased BP securities, at least not at the artificially inflated prices that it paid.

624. When Plaintiffs purchased BP securities, they did not know about the untrue and misleading nature of the statements and omissions alleged herein.

625. As a direct and proximate result of the negligent misrepresentations made by Defendants, Plaintiffs incurred damages, the amount of which will be proved at trial.

626. The misrepresentations and omissions, as set forth herein, constitute negligent misstatement under English common law.

### THIRD CAUSE OF ACTION

### Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

### (Brought by Plaintiffs Alameda and Boston with respect to their ADS transactions Against BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants)

627. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

628.    This cause of action is brought by Plaintiffs Alameda and Boston against Defendants BP, BP E&P, BP America, and the Individual Fraud/Deceit Defendants for fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

629.    Defendants BP, BP E&P, BP America, and the Individual Fraud/Deceit Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S. to carry carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiffs Alameda and Boston, as alleged herein; and (ii) cause Plaintiffs Alameda and Boston to purchase BP ADSs at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

630.    Defendants BP, BP E&P, BP America, and the Individual Fraud/Deceit Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S.: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the BP ADSs in an effort to artificially inflate and maintain the market prices for BP ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

631.    As a result of the conduct of Defendants BP, BP E&P, BP America, and the Individual Fraud/Deceit Defendants, Plaintiffs Alameda and Boston purchased BP ADSs at artificially inflated prices and were damaged thereby when the price of those ADSs declined as alleged herein.

## FOURTH CAUSE OF ACTION

### Section 20(a) of the Exchange Act

**(Brought by Plaintiffs Alameda and Boston with respect to their ADS transactions Against BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants)**

632.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

633.    This cause of action is brought by Plaintiffs Alameda and Boston against Defendants BP, BP America, BP E&P, and the Individual Fraud/Deceit Defendants for control person liability under Section 20(a) of the Exchange Act.

634.    These Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein. Specifically:

(a)    Defendants Hayward and Dudley directly or indirectly controlled Defendant BP as alleged above;

(b)    Defendants Hayward, Dudley, BP, McKay, Malone, and Rainey directly or indirectly controlled Defendant BP America as alleged above;

(c)    Defendants Hayward, Dudley, BP, Malone, McKay, Rainey, BP America, Suttles, and Inglis directly or indirectly controlled Defendant BP E&P as alleged above; and/or

(d)    BP, BP America and BP E&P directly controlled the Individual Defendants who worked for them during the Relevant Period.

635.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of BP's, BP America's and/or BP E&P's operations and/or intimate knowledge of the false financial and operations statements by BP disseminated to the investing public, including those filed by BP with the SEC, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of

BP, BP America, and BP E&P, including the content and dissemination of the various statements which Plaintiffs Alameda and Boston contend were false and misleading and/or omitted material information. These Defendants were provided with or had unlimited access to copies of the statements alleged by Plaintiffs Alameda and Boston to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

636.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of BP, BP America, and/or BP E&P and, therefore, is presumed to have had the power to control or influence the particular transactions, statements, and omissions giving rise to the securities violations as alleged herein, and to have exercised the same.

637.    As set forth above, BP, BP E&P, BP America, and the Individual Fraud Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Defendants named in this Cause of Action are liable pursuant to Section 20(a) of the Exchange Act.

638.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs Alameda and Boston suffered damages in connection with their purchases of the BP ADSs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment in their favor and pray for relief as follows:

A.    An award in favor of Plaintiffs against all Defendants, jointly and severally, for all damages, including compensatory and consequential damages as recognized and recoverable under applicable laws, sustained by Plaintiffs as a result of Defendants' wrongdoing, in an amount to be proved at trial;

B.    An award in favor of Plaintiffs against all Defendants, jointly and severally, for

all punitive damages Plaintiffs are entitled to as a result of Defendants' wrongdoing, in an amount to be proved at trial;

C.      An award in favor of Plaintiffs of the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees, if applicable, together with pre- and post-judgment interest; and

D.      An award in favor of Plaintiffs of any other relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated September 4, 2015                    Respectfully submitted,

                                           **ABRAHAM, WATKINS, NICHOLS,**
                                           **SORRELS & FRIEND**

                                           By: /s/  Sammy Ford IV_____
                                           Sammy Ford IV
                                           Federal Bar Number 950682
                                           Texas Bar Number: 24061331
                                           800 Commerce Street
                                           Houston, Texas 77002
                                           Telephone: (713) 222-7211
                                           Facsimile: (713) 225-0827

                                           **POMERANTZ LLP**

                                           /s/        Matthew L. Tuccillo___
                                           Marc I. Gross
                                           Jeremy A. Lieberman
                                           Matthew L. Tuccillo
                                           Jessica N. Dell
                                           600 Third Avenue, 20th Floor
                                           New York, NY  10016
                                           Telephone:  (212) 661-1100
                                           Facsimile: (212) 661-8665

                                           **POMERANTZ LLP**
                                           Patrick V. Dahlstrom
                                           10 South LaSalle Street, Suite 3505
                                           Chicago, Illinois 60603
                                           Telephone: 312-377-1181
                                           Facsimile:  312-377-1184

                                           ***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of September, 2015, I electronically filed the foregoing [Proposed] Second Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/   Sammy Ford IV